Lady and Gentlemen                          -2-                        March 29, 2006

3.  Requirement for a limited of soil and groundwater investigation to insure protection of
    existing uses of surface and groundwater in the immediate area.

In consideration of the issues at the Facility and the need for more frequent sampling and
reporting, our office is terminating Ukiah Auto Dismantlers participation in the Group
Monitoring Program of the General Industrial Storm Water Permit, immediately. Upon receipt
of this letter, the Facility will comply with the monitoring and reporting provisions of the
General Permit applicable to individual sites. This action does not impact your current
arrangement with your consultants with the exception of the monitoring and reporting provisions
of the General Permit. If you or your consultants have any questions how to make this transition
please contact the Regional Water Board staff responsible for oversight of the Facility. When
you submit the 2005-06 annual report in June 2006, a cover letter should be attached discussing
how the Facility has implemented this change. The following constituents will comprise the
monitoring program:

| Oil and Grease | Total Petroleum Hydrocarbons–Gas Range | |
|----------------|------|------|
| Copper         | Zinc | |
| Lead           | pH   | Total Suspended Solids |

Regional Water Board staff will be available to discuss interim and long term solutions with you
and your consultants as the need arises in order to arrive at a complete and technically sound
work product. If you have any question please contact John Short or Richard Azevedo of my
staff at jshort@waterboards.ca.gov, 707-576-2065 and razevedo@waterboards.ca.gov, 707 576-
22679, respectively.

Sincerely,

for Catherine Kulman
Executive Officer

032906_RGA_UADTrans4CAO

cc:  Leo Cosentini, State Water Resources Control Board, Water Quality Division
     Karen Maurer, Department of Fish and Game, P.O. Box 1165, Cloverdale, CA  95425
     David Koppel, Mendocino County Health Department, 501 Low Gap Road,  Room 1326,
        Ukiah, CA  95482
     Veronica Swan, Environmental Protection Agency, 75 Hawthorne Street (CED-3),
        San Francisco, CA  94105
     Andrew Sallach, Environmental Protection Agency, 75 Hawthorne Street (CED-3),
        San Francisco, CA  94105
     Michael Biggs, Pinoleville Pomo Nation, P.O. Box 454, Petaluma, CA  94953
     Pinoleville Indian Community, 357 N State Street, Ukiah, CA  95482
     NEST Environmental Services, 1040 Grant Road,  Suite 155-325,
        Mountain View, CA  94040

*California Environmental Protection Agency*

California Regional Water Quality Control Board
North Coast Region

CLEANUP AND ABATEMENT ORDER NO. R1-2006-0036
and
WATER CODE SECTION 13267(b) ORDER

FOR

WAYNE HUNT
ISABEL B. LEWRIGHT
dba
UKIAH AUTO DISMANTLERS
ID NO. 1 231017330
and
RICHARD MAYFIELD
dba
WARRIOR INDUSTRIES INC.
and
ROSS JUNIOR AND PAULA MAYFIELD

Mendocino County

The California Regional Water Quality Control Board, North Coast Region (hereinafter Regional Water Board) finds that:

1. The Ukiah Auto Dismantlers, APN 169-19-048 (hereinafter Facility) is an auto dismantler with retail parts sales and car crushing located at 520 Pinoleville Road approximately one mile west of Ukiah, California. The property is owned by Wayne Hunt and Isabel B. Lewright and operated by Mr. Hunt. An adjacent parcel immediately to the east of the Facility is owned by Richard Mayfield dba Warrior Industries Inc, and Ross Junior and Paula Mayfield, APN 169-19-047 (hereinafter Adjacent Property Owner). The Facility uses a portion of the adjacent property to store the car crusher and a portion of the cars. The Facility, the Facility owners and operators, and the owners of both properties are collectively referred to herein as "the Dischargers."

2. The Facility submitted a Notice of Intent for coverage under the Statewide General Permit for Discharges of Storm Water Associated With Industrial Activities (hereinafter General Permit) on June 18, 2002. The General Permit prohibits discharges of material other than storm water that are not authorized by the General Permit and discharge of pollutants that may cause a pollution or nuisance.

3. The scope of this Order with respect to the Adjacent Property and Adjacent Property Owner is limited to those historical, existing and future activities related to operations and usage of the Facility by the Dischargers.

4. A levee separates several parcels located within the 100-year floodplain, including the Facility and the Adjacent Property Owner's site, from Ackerman Creek. The majority of surface runoff from the Property flows northward via sheet flow until it reaches the levee separating the Facility from Ackerman Creek. Storm water is diverted along a ditch eastward and parallel to Ackerman Creek to a retention basin located on the Adjacent Property Owner's parcel. During recent storm events, the retention basin overflows onto lands owned by the Pinoleville Pomo Nation.

5. Based on interviews during the inspections, floodwaters reportedly overtopped, or flowed around, the levee during the flood events experienced in late December 2005 and early 2006. Ackerman Creek is a tributary to the Russian River. The Russian River provides habitat for steelhead trout, chinook salmon, and coho salmon, which are listed as threatened under the Endangered Species Act.

6. In January 2006, the Office of Emergency Services informed the Regional Water Board staff via electronic mail of a potential discharge of oily waste from the Facility. On January 19, 2006 and February 6, 2006 Regional Water Board staff conducted site inspections. The Department of Fish and Game inspected the Facility in late-January 2006 and accompanied Regional Water Board staff during the February 6, 2006 inspection.

7. Regional Water Board staff inspections (Attachment A to this Order) found: 1) Lack of impervious working surfaces and containment structures for auto dismantling 2) Car crushing activities off the impervious pad designated for such activities; 3) Lack of covered and contained parts storage; 4) Handling practices that would allow automotive fluids to contact soil and potentially become entrained in surface water runoff as well having the potential to enter groundwater; 5) Offsite discharge of storm water containing floating oil and numerous areas on the Facility and the Adjacent Property where spillage or floating oil was noted, and; 6) The Storm Water Pollution Prevention Plan was not onsite and not available during the initial inspection.

8. Results of the Department of Fish and Game's inspection noted several potential violations related to the lack of a hazardous materials business plan and contingency plans onsite, and lack of a current CUPA permit.

9. Beneficial uses of Ackerman Creek, a tributary to the Russian River, are:

   Existing:
   a. Municipal and domestic water supply (MUN)
   b. Agricultural supply (AGR)
   c. Industrial service supply (IND)
   d. Ground water recharge (GWR)
   e. Freshwater replenishment (FRESH)
   f. Navigation (NAV)
   g. Contact water recreation (REC-1)
   h. Non-contact (REC-2) water recreation
   i. Commercial and Sport fishing (COMM)
   j. Warm freshwater habitat (WARM)
   k. Cold freshwater habitat (COLD)
   l. Wildlife habitat (WILD)
   m. Preservation of rare, threatened or endangered species (RARE)
   n. Migration of aquatic organisms (MIGR)
   o. Spawning, reproduction, and/or early development (SPWN).

   Potential:
   p. Shellfish harvesting (SHELL)
   q. Aquaculture (AQUA).

10. The beneficial uses of the groundwater, as designated in the Basin Plan, include:

    Existing:
    a. Municipal and Domestic Supply (MUN)
    b. Agricultural Supply (AGR)
    c. Industrial Service Supply (IND)
    d. Native American Culture (CUL)

Potential:
e.  Industrial Process Supply (PRO)

11. The Dischargers named in this Order have caused or permitted or threatened to cause or
    permit, waste to be discharged where it is, or probably will be, discharged into waters of
    the State and create, or threaten to create, a condition of pollution or nuisance. The
    discharge and threatened discharge of contaminants may have unreasonably affected
    water quality in that the discharge or threatened discharge is deleterious to the above
    described beneficial uses of State waters, and may have impaired water quality to a
    degree which creates a threat to public health and public resources and therefore,
    constitutes a condition of pollution or nuisance. These conditions threaten to continue
    unless the discharge or threatened discharge is abated.

12. The California Water Code, and regulations and policies developed thereunder, require
    cleanup and abatement of discharges, and threatened discharges of waste to the extent
    feasible. Cleanup to background levels is the presumptive standard. Alternative cleanup
    levels greater than background concentrations shall be permitted only if the Dischargers
    demonstrate that: it is not feasible to attain background levels; the alternative cleanup
    levels are consistent with the maximum benefit to the people of the State; alternative
    cleanup levels will not unreasonably affect present and anticipated beneficial uses of such
    water; and they will not result in water quality less than prescribed in the Basin Plan and
    Policies adopted by the State and Regional Water Board. Any proposed alternative that
    will not achieve cleanup to background levels, must be supported with evidence that it is
    technologically or economically infeasible to achieve background levels, and that the
    pollutant will not pose a substantial present or potential hazard to human health or the
    environment for the duration of the exceedence of background levels (SWRCB Res. Nos.
    68-16 and 92-49, Title 23, California Code of Regulations Section 2550.4, subds. (c),
    and (d)).

13. Discharge prohibitions contained in the Basin Plan apply to this Site. State Water
    Resources Control Board Resolution 68-16 (Non-Degradation Policy) applies to this Site.
    State Water Resources Control Board Resolution 92-49 applies to this Site and sets out
    the "Policies and Procedures for Investigation and Cleanup and Abatement of Discharges
    under Section 13304 of the California Water Code."

14. The Water Quality Control Plan for the North Coast Region (Basin Plan), Chapter 3,
    contains specific standards and provisions for maintaining high quality waters of the state
    that provide for the beneficial uses listed above. In the Basin Plan, the section entitled
    OBJECTIVES FOR INLAND SURFACE WATERS, ENCLOSED BAYS AND
    ESTURARIES includes the following water quality objectives, which are violated or
    threatened to be violated:

    a.  Floating Material - *"Waters shall not contain floating material, including solids,
        liquids, foams, and scum, in concentrations that cause nuisance or adversely affect
        beneficial uses."*

    b.  Oil and Grease - *"Waters shall not contain oils, greases, waxes, or other materials in
        concentrations that result in a visible film or coating on the surface of the water or on
        objects in the water, that cause nuisance, or that otherwise adversely affect beneficial
        uses."*

  c. Toxicity - *"All waters shall be maintained free of toxic substances in concentrations that are toxic to, or that produce detrimental physiological responses in human, plant, animal or aquatic life."*

  d. Chemical Constituents - *"Waters designated for use as domestic or municipal supply (MUN) shall not contain concentrations of chemical constituents in excess of the limits specified in California Code of Regulations, Title 22, Chapter 15, Division 4, Article 4, Section 64435 (Tables 2 and 3), and Section 64444.5 (Table 5) and listed in Table 3-2 of the Plan".*

  e. Taste and Odor – *"Waters shall not contain taste or odor-producing substances in concentrations that impart undesirable tastes or odors to fish flesh or other edible products of aquatic origin, or that causes nuisance or adversely affect beneficial uses."*

15. Water Quality Order No. 97-03 DWQ (General Storm Water Permit) regulates storm water discharges and authorized non-storm water discharges from specific categories of industries. Applicable portions of the Permit that are being violated, or threatened to be violated, are:

  a. Discharge Prohibitions A.1 – *"Except as allowed in Special Conditions (D.1) of this General Permit, materials other than storm water (non-storm water discharges) that discharge directly or indirectly to waters of the United States are prohibited. Prohibited non-storm water discharges must be either eliminated or permitted by a separate NPDES permit."*

  b. Discharge Prohibitions A.2 - *"Storm Water discharges and authorized non-storm water discharges shall not cause or threaten to cause pollution, contamination, or nuisance."*

  c. Effluent Limitations B.3 - *"Facility operators covered by this General Permit must reduce or prevent pollutants associated with industrial activity in storm water discharges and authorized non-storm water discharges through implementation of $BAT^1$ for toxic and non-conventional pollutants and $BCT^2$ for conventional pollutants. Development and implementation of an $SWPPP^3$ that complies with the requirements in Section A of the General Permit and that includes $BMP's^4$ that achieve BAT/BCT constitutes compliance with this requirement."*

  d. Receiving Water Limitations C.1 - *" Storm water discharges and authorized non-storm water discharges to any surface water of ground water shall not adversely impact human health or the environment."*

  e. Storm Water Pollution Prevention Plan Requirements Section A.2 - *"... The SWPPP shall be revised whenever appropriate and shall be readily available for review by facility employees or Regional Water Board inspectors."*

16. The following sections of the Porter-Cologne Water Quality Control Act authorize the Regional Water Board Executive Officer to make the following requirements for persons

---

[1] Best Available Technology Economically Achievable

[2] Best Conventional Pollutant Control Technology

[3] Storm Water Pollution Prevention Plan defined in Section A of the General Permit

[4] Best Management Practices

suspected of violating the applicable Waste Discharge Requirements and Basin Plan prohibitions:

a. Section 13267(a) - *"A regional board, in establishing or reviewing any water quality control plan or waste discharge requirements, or in connection with any action relating to any plan or requirement or authorized by this division, may investigate the quality of any waters of the state within its region."*

b. Section 13267(b) - *"In conducting an investigation specified in subdivision (a), the regional board may require that any person who has discharged, discharges, or proposes to discharge waste within its region...that could affect the quality of waters within its region shall furnish, under penalty of perjury, technical or monitoring program reports which the regional board requires."*

c. Section 13267(c) - *"In conducting an investigation pursuant to subdivision (a), the regional board may inspect the facilities of any person to ascertain whether the purposes of this division are being met and waste discharge requirements are being complied with. The inspection shall be made with the consent of the owner or possessor of the facilities or, if the consent is withheld, with a warrant duly issued pursuant to the procedure set forth in Title 13 (commencing with Section 1822.50) of Part 3 of the Code of Civil Procedure. However, in the event of an emergency affecting the public health or safety, an inspection may be performed without consent or the issuance of a warrant."*

d. Section 13304(a) - *"Any person who has discharged or discharges waste into the waters of this state in violation of any waste discharge requirement or other order or prohibition issued by a regional board or the state board, or who has caused or permitted, causes or permits, or threatens to cause or permit any waste to be discharged or deposited where it is, or probably will be, discharged into waters of the state and creates, or threatens to create, a condition of pollution or nuisance, shall upon order of the regional board, clean up the waste or abate the effects of the waste, or, in the case of threatened pollution or nuisance, take other necessary remedial action, including, but not limited to, overseeing cleanup and abatement efforts."*

17. All of the technical reports required by this Order are necessary to ensure that the prior harm and future threat to water quality created by the discharges described above are properly abated and controlled. The financial burdens of preparing these reports bear a reasonable relationship to the needs for the reports and the benefits to be obtained from the reports.

18. Reasonable costs incurred by Regional Water Board staff in overseeing cleanup or abatement activities are reimbursable under Section 13304(c)(1) of the California Water Code.

19. This Order in no way limits the authority of this Regional Board to institute additional enforcement actions or to require additional investigation and cleanup at the facility consistent with California Water Code. This Order may be revised by the Executive Officer as additional information becomes available.

20. This enforcement action is being taken for the protection of the environment and, therefore, is exempt from the provisions of the California Environmental Quality Act (Public Resources Code. Section 21000 et seq.) in accordance with Section 15321, Chapter 3, Title 14, California Code of Regulations.

21. Failure to comply with the terms of this Order may result in enforcement under the California Water Code. Any person failing to provide technical reports containing information required by this Order by the required date(s) or falsifying any information in the technical reports is, pursuant to Water Code Section 13268, guilty of a misdemeanor and may be subject to administrative civil liabilities of up to one thousand dollars ($1,000.00) for each day in which the violation occurs. Any person failing to clean up or abate threatened or actual discharges as required by this Order is, pursuant to Water Code Section 13350(e), subject to administrative civil liabilities no less than five hundred dollars per day ($500.00) for each day of violation and up to five thousand dollars ($5,000.00) per day for each day of violation; or ten dollars ($10) per gallon of waste discharged.

22. Any person affected by this action of the Regional Water Board may petition the State Water Resources Control Board (State Water Board) to review the action in accordance with California Water Code Section 13320 and Title 23, California Code of Regulations, Section 2050. The petition must be received by the State Water Board within 30 days of the date of this Order. Copies of the law and regulations applicable to filing petitions will be provided upon request.

In addition to filing a petition with the State Board, any person affected by this Order may request the full Regional Water Board to reconsider this Order. To be timely, any such request must be made within 30 days of the date of this Order. Note that even if reconsideration by the Regional Water Board is sought, filing a petition with the State Water Board within the 30-day period is necessary to preserve the petitioner's legal rights. If a request to reconsider this Order is made to the Regional Water Board or a petition filed with the State Water Board, all terms of the Order remain in effect and must be complied with while the request for reconsideration and/or petition is considered.

**THEREFORE, IT IS HEREBY ORDERED** that, pursuant to California Water Code Sections 13267(b) and 13304, the Dischargers shall cleanup and abate the discharge and threatened discharge of the pollutants described above and shall comply with the following provisions:

A. Short-Term Abatement:

All work performed shall be conducted in accordance with all local ordinances. All necessary permits shall be obtained.

1. Take actions to immediately abate the discharge of storm water containing oily waste, petroleum, and auto-related pollutants forthwith. This shall include, but not limited to:

    a. Installation of a temporary, lined oil/water separator, or equivalent, an oil collection area and use of adsorbent booms and pads to remove floating product, as needed.

    b. Interim measures to prevent, to the extent possible, the discharge of pollutants in storm water, such as installation of an onsite storm water runoff containment area, or surface water run-on diversion.

    c. Cleanup of all floating oil and grease and petroleum products.

    d. Containment and disposal of all solid and liquid debris or waste, for example absorbent pads used to remove floating product, leaking cars or other material, that

> obviously contribute to floating products or discharge of automotive-related pollutants.

> e. Temporary containment for the car crusher and implementation of interim operating practices to prevent discharges to soil from the car crushing activities.

> f. Cleanup of all solid waste, oily materials, and soils discharged offsite during the recent flood events to the extent practicable.

2. By May 13, 2006 submit a report to the Executive Officer documenting all activities undertaken to date. Written descriptions, a site map showing locations, field marking of locations and photo-documentation shall be included in the report.

## B. Long Term Abatement

All soil and water investigations and any storm water conveyance and treatment systems shall be conducted in accordance with all local ordinances and under the direction of a California Registered Geologist or Registered Civil Engineer experienced in the investigation and cleanup of petroleum hydrocarbons and pollutants related to auto dismantlers.

1. By June 1, 2006, the Dischargers shall submit a proposal to the Executive Officer detailing long-term Facility improvements, both capital and operational, designed to prevent the discharge of automotive fluids and automotive-related pollutants to soil, surface water and groundwater. This proposal shall include, but not be limited to:

   a. Improvements to the automotive processing area such as installation of impermeable working surfaces and roof structures to prevent rainfall from contacting the area, to the extent practicable, in order to prevent discharge of automotive fluids to soil and groundwater.

   b. Containment structures surrounding the automotive processing area to collect and direct all rainfall runoff and spills within the processing area.

   c. Improvement to the car crushing process to eliminate discharge of automotive–related pollutants.

   d. Treatment or disposal processes to eliminate, or treat storm, water runoff from the automotive processing and car crushing areas.

   e. A time schedule to install and implement improvements.

   f. Generalized site map of the Facility and improvements.

   g. Detailed design drawing of improvements, as needed.

   h. Improvements to parts storage and handling to include roofing, impermeable bases, and /or a process to clean parts to eliminate automotive-related pollutants from contacting storm water.

   i. Improved practices to reduce and/or eliminate the discharge of automotive fluids from cars in the storage area.

j. Design of surface water drainages and treatment processes to ensure storm water pollutant removal before discharge from the Facility and the adjacent property.

k. Written operations plan and employee training plan to ensure proper operations at the Facility.

C. Soil and Ground Water Investigation

By June 1, 2006, the Dischargers shall prepare and submit a workplan proposing a limited soil and groundwater investigation focusing on assessing the groundwater quality under, and emanating from, the Facility and Adjacent Property and assessing the extent of soil contamination that would impair either surface water or groundwater. The workplan should include, but no be limited to:

a. Map of the Facility, surrounding properties, and Ackerman Creek.

b. Location of all known wells within ½ mile of the Facility.

c. Location of onsite septic or domestic waste disposal systems.

d. Identify location of major activities, current and historical.

e. Proposed soil and groundwater sampling locations, sample techniques, and suite of analytes.

f. Determining the direction of groundwater flow.

g. A time schedule to implement the workplan and submit a final report of results. The time schedule shall be approved by the Executive Officer and activities shall be conducted in accordance with the approved schedule.

If, for any reason, the Discharger is unable to perform any activity or to submit any document in compliance with the schedule set forth herein or in compliance with any work schedule submitted pursuant to this Order and concurred with by the Executive Officer, the Discharger may request, in writing, a specified time extension. The extension request must be received by the Regional Water Board at least five days in advance of the due date, and shall include justification for the delay, including a description of good faith efforts performed to achieve compliance with the due date. The extension request shall also include a proposed time schedule with new performance dates for the due date in question and all dependent dates. An extension may be granted for good cause, in which case this Order will be revised accordingly. A failure to deny a requested extension of time in writing shall not be deemed approval.

Ordered by _____
                        Catherine Kuhlman
                        Executive Officer

March 30, 2006



# California Regional Water Quality Control Board
## North Coast Region
### John Corbett, Acting Chairman



Alan C. Lloyd, Ph.D.
*Agency Secretary*

5550 Skylane Boulevard, Suite A, Santa Rosa, California 95403
Phone: 1 (877) 721-9203 (toll free) • Office: (707) 576-2220 • FAX: (707) 523-0135

Arnold
Schwarzenegger
*Governor*

TO:        John Short

FROM:    Richard Azevedo
            Associate Engineer

DATE:     February 7, 2006

SUBJECT:   UKIAH AUTO DISMANTLERS - INSPECTION AND RECOMMENDATIONS

On 1/19/06 I inspected the Ukiah Auto Dismantlers facility (Facility) with:

Andrew Sallach, Environmental Protection Agency-Region IX
Veronica Swan, Environmental Protection Agency-Region IX

The inspection was a result of an Office of Emergency Services' notification regarding the potential release of petroleum products and other material onto property adjoining the Facility. The adjoining property belongs to the Pinoliville Tribe. The inspection was jointly conducted with an EPA inspector and the EPA tribal program coordinator. Prior to the inspection we met with Mr. Biggs, the Tribe's attorney, to discuss our site visit. We were given permission at that time to access tribal land, if the need arose. An exit interview was also conducted.

The Facility is enrolled under the State's General Industrial Storm Water Program. In addition to inspecting the site for releases, we evaluated the Facility for compliance with its Storm Water Pollution Plan (SW3P) and the General Industrial Storm Water Permit.

Wayne Hunt, the owner/operator of the Facility, reportedly owns the parcel in question. Rick Mayfield reportedly owns an adjoining parcel directly to the east. Property east of the Mayfield parcel is tribal land. The Facility is "Fee Land" and bounded by tribal land on the west and south and Ackerman Creek to the North. Access is from Orr Springs Road to Pinoliville Road. A location map is attached.

### January 19, 2006 Inspection

The inspection was unannounced. Mr. Hunt was not onsite when we arrived. An employee, Joe ?, accompanied us during the first 1/3 of the inspection until Mr. Hunt arrived. We followed the process for receiving, processing and storing autos and parts. We examined the crusher pad and

*California Environmental Protection Agency*

Recycled Paper

Ukiah Auto Dismantler                    -2-

toured the vehicle storage area, which made up most of the yard. We walked the levee along Ackerman Creek eastward until it reached tribal land. We did not review any paperwork, re, business plans, etc. A log showing the general location of each photo is attached.

The Facility is graded such that a majority of the runoff sheet flows to, and along, the levee and then runs eastward off the Facility and onto Mr. Mayfield's property. Runoff from both properties flows along the levee onto tribal lands. Based on information provided during the inspection, Ackerman Creek overtopped it banks and flowed through the facility several feet deep during the worst part of the storm. The creek receded quickly carrying drums and debris onto tribal lands. At the boundary of tribal lands and the Mayfield property, a 20' diameter pit had been scoured, or dug out, as a result of the storm. Reportedly a roadside ditch along Pinoliville Road overtopped and ran through Mr. Mayfield's property to this location.

The impound area for damaged and impounded cars is a small locked area near the office. The area is gravel packed. Runoff will sheet flow off the area as it does for most of the Facility. No soil staining was noted. There are no spill controls for the area.

The auto receiving area is in the front of the office. According to Joe, autos are moved to the crusher pad for processing, i.e., fluid removal and parts removal. Cars that are not running, or for other reasons, may be processed where they are without moving to the pad. It was evident during the inspection that auto's are processed off the pad. During the inspection the pad was full of equipment and parts. Fluids are drained into open containers and carried to the oil storage area and dumped into drums. We could not determine the integrity of the pad: it does not a have any berms or containment structures. Two plastic storage containers of batteries, one full the other empty, were noted on the pad.

Motors and transmissions are stored in the building behind the office. Quite a bit of staining on the concrete floor was noted. The building is full and extra transmissions were stored on soil outdoors and covered with a tarp and pop-up canopy. A sheen was noted around this area adjacent to the building. With the exception of the crusher pad the entire work area is dirt and rock; the ground was muddy and rutted. An engine was outside the building. Reportedly this was removed from a vehicle recently and not moved under cover.

The waste oil area appears to meet Health and Safety Code standards for containment; the interior is dirty with obvious spillage. A 500-gallon fuel tank is onsite: it has no roof or secondary containment.

Basically there are car parts and tires stored randomly near the building.

The car storage area, majority of the Facility, was inspected. Cars with working motors may be moved into the yard in order to demonstrate the motor prior to sale. Some working motors are removed from vehicles and the fluids drained before moving into the yard. Not all inoperable cars have their fluids removed before moving to storage. Most batteries were removed, but several cars still had the batteries installed. Mr. Hunt joined us about this time and indicated that fluids are sometime drained just prior to crushing.

*California Environmental Protection Agency*

Recycled Paper

Ukiah Auto Dismantler                    -3-

Cars are stored along the levee adjacent to the drainage ditch. We walked the levee and observed Mr. Mayfield's property from this vantage point. Mr. Hunt uses this property to store cars. Mr. Mayfield runs a general contracting business and rents space to Davy Tree. The property is a random array of cars, trailers and construction debris. The property is dirt with no impervious base. Two above ground tanks are on this property.

When we reached the eastern edge of the property at the fence line a strong oil smell was noted. There was a 20' diameter excavated hole that was capturing runoff. A 12" wide bathtub ring of oil was noted on the rocks around this area. Soil staining on the pit walls indicative of oil was noted. A single hay bale was in the ditch to slow runoff. We did not inspect tribal lands. Water samples were taken of water flowing into the pit from along the levee. Samples were refrigerated and delivered to Sequoia Labs in Petaluma on Friday the 20th. Samples were taken for:

| Chlorinated Solvents | TPH-Gas | BTEX |
| Oil & Grease | Total and Dissolved Metals | Turbidity |

Discussion with Mr. Mayfield who joined the inspection indicated that the CALTRANS roadside ditch was re-routed and was discharging quite a bit of water onto his property. In response he cut a small ditch diagonally across his property to route the water to the back of the property.

During discussions with Mr. Mayfield and Mr. Hunt they indicated the crusher had not been used since summer. Currently, the portable crusher is stored on Mr. Mayfield's property. It would be moved to the pad before use. The SW3P was not onsite: Mr. Hunt stated it was in the Willits office and that Marcy his office manager handles the paperwork.

Summary

- Autos are not always processed atop impermeable surfaces. The lack of concrete/asphalt base suggests there is a potential for spillage and soil contamination resulting in both surface and groundwater problems. The amount of oil along the levee is considerable more than would be expected from small oil spills. The flood picked quite a bit of petroleum product to deposit the amount of oil seen. The OES notification of a release from the Facility is accurate.

- Housekeeping and parts storage exposes automotive fluids and parts to rainfall contact. Insufficient covered parts storage is available. Car parts and tires are exposed throughout the work area. Cars are not always properly drained before reaching the storage area. Engine(s) and transmissions are, or may be, left on the ground. Batteries are not always stored in the proper containers.

- An understanding of the SW3P and its requirements is lacking. Additional training for SW3P issues is needed.

Ukiah Auto Dismantler                    -4-

- Upgrades to the Facility, re, construction of impermeable working surfaces, more roofs, more covered parts storage, storm water containment and treatment are needed. Both a long term plan and interim measure to control and cleanup the existing problems will be needed.

- The need for a soil and groundwater investigation should be evaluated.

## Department of Fish and Game Inspection

Warden Karen Mauer and DFG employee, Kyle Hyatt, inspected the site about a week after our inspection. Digital photos taken during her inspection are appended to this memo and have been placed in the record (A CD of the photos has been placed in the front cover of the file). Warden Mauer verbally, and via follow-up email, informed us of her findings. In summary they were:

- Oil sheens on standing water are very evident and common.
- There is no HAZMAT plan onsite.
- There is no business plan onsite
- No current CUPA permit is onsite. The permit onsite is from 2003
- Mr. Hunt indicates that Marcy has everything in Willits

General site conditions and practices are below average. She directed Mr. Hunt to install a check dam with underflow piping and hale bales to help remove oil and grease from the water before it discharged to the "pit" at the property boundary.

She is concerned about her findings and will work with us since we have the lead on water quality here. A direct discharge to Ackerman Creek is not evident.

## February 6, 2006 Inspection

To assess the potential for a soil and groundwater investigation, Janice Goebel and I re-inspected the Facility on February 6, 2006. The inspection was un-announced. Mr. Hunt was not onsite. Mr. Mayfield and Warden Mauer joined us about ½ way through the inspection. We toured the Facility, along the levee to tribal property and conducted a more thorough inspection of Mr. Mayfield's property. Pictures of the inspection are appended to this memo and have been placed in the file on CD. Salient points of the inspection are:

1. Mr. Hunt's property was similar to our original inspection w.r.t. handling practices. There were more indications of poor handling practices. A few oily parts were present on the ground in the storage yard. One Ford Aerostar had the transmission removed in front of the access gate. There was an oil sheen and/or floating oil globules, on quite a few of the puddles and areas of standing water, which was different than the initial inspection.

*California Environmental Protection Agency*

Recycled Paper

Ukiah Auto Dismantler                    -5-

2. Along the levee at the joint property line between the Tribe and Mr. Mayfield, some changes had been made in response to Warden Mauer's visit. A gravel berm had been placed in the ditch and three-3" diameter pipes placed at the base to allow flow. This was meant to capture floating material. The problem was that the area was capturing quite a bit of floating product, which was then deposited on soil. This leads to the problem of contaminated soil. This area should be lined with plastic or something similar to allow quick cleanup. This would be temporary until a more permanent solution can be implemented. Some soil removal will be needed here.

3. Inspection of Mr. Mayfield's property noted quite a bit of floating petroleum product in the standing water, more so than on Mr. Hunt's property.

4. The crusher, which is stored on Mr. Mayfield's property, had evidence of recent use and oil spill on the ground. Leon later confirmed that a load of cars was crushed last week (17-20 cars, exact # unknown). The crusher is on bare dirt.

5. The above ground red diesel tank was leaking during the inspection. The tank and the cargo container were wiped down, stained soil removed and placed in an open sided cargo container until it can be characterized and disposed of offsite. Janice provided Mr. Mayfield a good description of how to sample soil to determine if all diesel-containing soil had been removed in the area of the excavation.

6. We discussed secondary containment and roofing both above ground tanks with Mr. Mayfield.

7. There is no containment for petroleum products or waste near the shop. We discussed the need to consolidate the material, provided secondary containment and roof for this material.

8. We discussed the need to improve handling practices at the shop in relation to cleanup of outdoor welding and metal work. We suggested indoor operations, which did occur, or daily sweeping to prevent metals from leaving the area. Given the nature of the business, some metals analyses will be part of the storm water monitoring. Consequently, we are trying to address obvious sources of this material beyond the auto dismantling process.

Mr. Mayfield was amenable to suggestions in #8, #7, #6 and #5.

9. We walked the offsite drainage ditch that allowed runoff to flow onto the Mayfield property. Originally, runoff flowed along the road in a ditch (with a berm) eastward to a property boundary then flowed north toward Ackerman Creek. During ditch cleaning (or some other activity) the berm separating the ditch from the adjacent property was removed and/or breached. This modification allowed runoff to flow onto both tribal and Mr. Mayfield's property. Mr. Mayfield offered to cut a new ditch and berm along his property line to route drainage around the Facility. This solution would require cooperation by the tribe since they own the property between the road and Mr. Mayfield's

*California Environmental Protection Agency*

Recycled Paper

Ukiah Auto Dismantler                    -6-

property and any new ditch would need to run across its land. This is a one good solution to prevent flooding on both tribal and Mr. Mayfield's property.

10. While onsite we received a request to allow car crushing. We stated that crushing atop bare soil was not ok. We agreed that the Facility would install a temporary containment structure such as visqueen and berms to contain material and allow cleanup after each usage.

## SUMMARY

- Considerably more floating petroleum product was seen on the property this inspection suggesting ongoing problems or significant previous spillage that was not apparent due to the storm.

- Interim action to cleanup and contain floating product are needed. Long term plans to improve handling practices and treat storm water are needed.

- Discussion between core regulatory and cleanup groups regarding our regulatory response is in order.

- I informed EPA regarding the drainage issue and requested they broach the idea of a new ditch to alleviate flooding at their next meeting with the Tribe.







#31

pit

#29

#30

Mayfield Property Line

#32

#28

??

#27

#26

500 gal

Wa ste oil

#19

#20

#21

Ackerman Creek and Levee

#25

#24

crusher pad

officer and storage

impound

#22

french

#23

Photo Log
1-19-06 Inspection
Azevedo/Sallach/Swan

Ukiah Auto Dismantler                    -7-

## REGIONAL WATER BOARD PHOTO'S
### JANUARY 19, 2006 INSPECTION



P1190021.JPG



P1190020.JPG









P1190025.JPG



P1190026.JPG





F1190028.JPG



P1190029.JPG



P1190040.JPG



P1190032.JPG





Ukiah Auto Dismantler                    -8-

# DEPARTMENT OF FISH AND GAME

## PHOTO'S AND CODE CITATIONS

From:       "Wayne Briley" <brileyw@co.mendocino.ca.us>
To:         <kmaurer@dfg.ca.gov>
Date:       1/26/2006 4:09:12 PM
Subject:    Re: Wayne,

Karen,

Sorry for the delay to your email. I inspect Ukiah Auto Dismantlers every year. This year I did the yearly
inspection on 1/4/06 due to the complaints I received from the Tribe. Every year I find that facility to be
run very well. Yes it is a junk yard. Yes it looks ugly, but I never find any flluids like motor oil, ATF or
antifreeze leaking on the ground. I always choose to do the inspection during a rain strom so I can see
hydrocarbon floating on the rain water. I never see any hydrocarbon sheen anywhere on site. The same
was true this year. The operation is good. They keep their hazardous waste in labeled drums in
seconday containment. I reviewed receipts for proper disposal by a licensed hazardous waste hauler.
As far as the flash flood goes: Clearly I could see where a 3 or 4 foot wall of water went right through the
middle of the wrecking yard. The flood water looked just like the other dozen sites I have been to since
the flood. Some debris from the wrecking yard and from Mayfield's next door floated off of their sites
and onto the neighboring property. A saw a few deposits of grease on the ground. A few pools of water
had some hydrocarbon floating on it. UAD already has absorbent pads socking it up. Wayne Hunt and
Rick Mayfield readily admit that some of their stuff floated down on other properties and they take full
responsibility for cleaning it up. I get the impression that the Tribe does not like Hunt and Mafield, so it
may be a problem for them to get on the other properties to pick up their debris.
From a water standpoint, I did not see any more problem there than any place else I went after the flood.
Hydrocarbon got loose everywhere and there is nothing anyone could do about it at the time. It looked to
me like any oil or grease landed on property next door and not so much in the creek.
I did not see a problem with Hunt's operation. He has been a good operator. I did not see the problems
that the Tribe was discribing. Call me at 463-4066 if you would like to talk more about this.
Wayne Briley

>>> "Karen Maurer" <kmaurer@dfg.ca.gov> 1/23/2006 8:26 PM >>>
Wayne,
Did you find any violations at Ukiah auto dismantlers? Will be looking at it for DFG/hazmat violations.
Karen

Rick Azevedo - DSC\0330.jpg





Rick Azevedo - DSC 0308.jpg







Rick Azevedo - DSCN0331.jpg











66265.18.txt
California Code of Regulations California Office of Administrative Law
    Home   Most Recent Updates   Search   Help   ©
    Welcome to the online source for
    California Code of Regulations

22 CA ADC § 66265.18


    Term

22 CCR s 66265.18

Cal. Admin. Code tit. 22, s 66265.18


BARCLAYS OFFICIAL CALIFORNIA CODE OF REGULATIONS
TITLE 22. SOCIAL SECURITY
DIVISION 4.5. ENVIRONMENTAL HEALTH STANDARDS FOR THE MANAGEMENT OF
HAZARDOUS
WASTE
CHAPTER 15. INTERIM STATUS STANDARDS FOR OWNERS AND OPERATORS OF HAZARDOUS
WASTE TRANSFER, TREATMENT, STORAGE, AND DISPOSAL FACILITIES
ARTICLE 2. GENERAL FACILITY STANDARDS
This database is current through 01/20/2006, Register 2006, No. 3.

s 66265.18. Location Standards.

(a) The placement of any hazardous waste in a salt dome, salt bed
formation, underground mine or cave is prohibited.

(b) A facility located in a 100-year floodplain or within the maximum high
tide shall be designed, constructed, operated and maintained to prevent
washout of any hazardous waste by a 100-year flood or maximum high tide,
unless the owner or operator can demonstrate to the Department's
satisfaction that procedures are in effect which will cause the waste to
be removed safely, before flood waters can reach the facility, to a
location where the wastes will not be vulnerable to flood or tide waters.


Note: Authority cited: Sections 208, 25150 and 25159, Health and Safety
Code. Reference: Sections 25159 and 25159.5, Health and Safety Code; 40
CFR Section 265.18.


HISTORY

1. New section filed 5-24-91; operative 7-1-91 (Register 91, No. 22).
22 CA ADC s 66265.18

END OF DOCUMENT

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.
    Term
Cite List    Docs In Sequence    Table of Contents

    This site is provided by West.
© 2006 West | Privacy | Accessibility

66261.100.txt
California Code of Regulations California Office of Administrative Law
    Home   Most Recent Updates   Search   Help   ©
    Welcome to the online source for
    California Code of Regulations

22 CA ADC § 66261.100


    Term

22 CCR s 66261.100

Cal. Admin. Code tit. 22, s 66261.100


BARCLAYS OFFICIAL CALIFORNIA CODE OF REGULATIONS
TITLE 22. SOCIAL SECURITY
DIVISION 4.5. ENVIRONMENTAL HEALTH STANDARDS FOR THE MANAGEMENT OF
HAZARDOUS
WASTE
CHAPTER 11. IDENTIFICATION AND LISTING OF HAZARDOUS WASTE
ARTICLE 5. CATEGORIES OF HAZARDOUS WASTE
This database is current through 01/20/2006, Register 2006, No. 3.

s 66261.100. RCRA Hazardous Waste.

(a) A hazardous waste is a RCRA hazardous waste if it meets any of the
following criteria:

(1) it exhibits any of the characteristics of ignitability, corrosivity,
reactivity, or toxicity identified in sections 66261.21, 66261.22(a)(1),
66261.22(a)(2), 66261.23, and 66261.24(a)(1);

(2) it is listed as a hazardous waste in article 4 of this chapter and has
not been excluded by the USEPA Administrator from 40 CFR Part 261, Subpart
D pursuant to 40 CFR sections 260.20 and 260.22. Wastes excluded by the
USEPA Administrator pursuant to 40 CFR sections 260.20 and 260.22 are
listed in 40 CFR Part 261, Appendix IX;

(3) it is identified as a hazardous waste pursuant to section
66261.3(a)(2)(B), section 66261.3(a)(2)(D), section 66261.3(a)(2)(E), or
section 66261.3(c)(2).

(b) A hazardous waste is presumed to be a RCRA hazardous waste unless or
until the generator determines that the waste is non-RCRA hazardous waste
pursuant to section 66261.101.

Note: Authority cited: Sections 208, 25141 and 25159, Health and Safety
Code. Reference: Sections 25117, 25120.2, 25141 and 25159, Health and
Safety Code.


    HISTORY

1. New section filed 5-24-91; effective 7-1-91 (Register 91, No. 22).
22 CA ADC s 66261.100

END OF DOCUMENT

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

66261.100.txt

Term
Cite List     Docs In Sequence     Table of Contents

This site is provided by West.
© 2006 West | Privacy | Accessibility

66265.193.txt
California Code of Regulations California Office of Administrative Law
    Home    Most Recent Updates    Search    Help    ©
    Welcome to the online source for
    California Code of Regulations

22 CA ADC § 66265.193


    Term

22 CCR s 66265.193

Cal. Admin. Code tit. 22, s 66265.193


BARCLAYS OFFICIAL CALIFORNIA CODE OF REGULATIONS
TITLE 22. SOCIAL SECURITY
DIVISION 4.5. ENVIRONMENTAL HEALTH STANDARDS FOR THE MANAGEMENT OF
HAZARDOUS
WASTE
CHAPTER 15. INTERIM STATUS STANDARDS FOR OWNERS AND OPERATORS OF HAZARDOUS
WASTE TRANSFER, TREATMENT, STORAGE, AND DISPOSAL FACILITIES
ARTICLE 10. TANK SYSTEMS
This database is current through 01/20/2006, Register 2006, No. 3.

s 66265.193. Containment and Detection of Releases.

(a) In order to prevent the release of hazardous waste or hazardous
constituents to the environment, secondary containment that meets the
requirements of this section shall be provided (except as provided in
subsections (f) and (g) of this section):

(1) for all new tank systems or components, prior to the tank system or
component being put into service;

(2) for all existing tank systems which have been used to transfer, store
or treat EPA Hazardous Waste Nos. F020, F021, F022, F023, F026, and F027,
within two years after the dates indicated below:

(A) January 12, 1987, for tanks containing RCRA hazardous wastes, unless:

1. the owner or operator is a conditionally exempt small quantity
generator as defined in 40 CFR section 261.5, or a 100 to 1000 kg per
month generator as defined in 40 CFR section 265.201, or

2. the owner or operator is not subject to regulation in 40 CFR part 265
pursuant to an exemption in 40 CFR section 265.1;

(B) July 1, 1991, for tanks containing RCRA hazardous wastes, if:

1. the owner or operator is a conditionally exempt small quantity
generator or a 100 to 1000 kg per month generator, or

2. the owner or operator is not subject to regulation in 40 CFR part 265
pursuant to an exemption in 40 CFR section 265.1, but the owner or
operator is subject to the standards of this article.

(3) for those existing tank systems of known and documentable age, within
two years after the dates indicated below, or when the tank systems have
reached 15 years of age, whichever comes later:

66265.193.txt
(A) January 12, 1987, for tanks containing RCRA hazardous wastes, unless:

1. the owner or operator is a conditionally exempt small quantity
generator as defined in 40 CFR section 261.5, or a 100 to 1000 kg per
month generator as defined in 40 CFR section 265.201, or

2. the owner or operator is not subject to regulation in 40 CFR part 265
pursuant to an exemption in 40 CFR section 265.1;

(B) July 1, 1991, for:

1. tanks containing only non-RCRA hazardous wastes, and

2. tanks containing RCRA hazardous wastes, if:

a. the owner or operator is a conditionally exempt small quantity
generator or a 100 to 1000 kg per month generator, or

b. the owner or operator is not subject to regulation in 40 CFR part 265
pursuant to an exemption in 40 CFR section 265.1, but the owner or
operator is subject to the standards of this article.

(4)(A) for those existing tank systems described in subsection (a)(4)(B)
of this section for which the age cannot be documented, within eight years
of January 12, 1987; but if the age of the facility is greater than seven
years as of January 12, 1987, secondary containment shall be provided by
the time the facility reaches 15 years of age, or within two years of
January 12, 1987, whichever comes later;

(B) subsection (a)(4)(A) of this section applies to existing tank systems
containing RCRA hazardous wastes, unless:

1. the owner or operator is a conditionally exempt small quantity
generator or a 100 to 1000 kg per month generator, or

2. the owner or operator is not subject to regulation in 40 CFR part 265
pursuant to an exemption in 40 CFR section 265.1.

(5)(A) for those existing tank systems described in subsection (a)(5)(B)
of this section for which the age cannot be documented, within eight years
from July 1, 1991; but if the age of the facility is greater than seven
years as of July 1, 1991, secondary containment shall be provided by the
time the facility reaches 15 years of age, or within two years from July
1, 1991, whichever comes later;

(B) subsection (a)(5)(A) of this section applies to:

1. existing tank systems containing only non-RCRA hazardous wastes, and

2. existing tank systems containing RCRA hazardous wastes, if:

a. the owner or operator is a conditionally exempt small quantity
generator or a 100 to 1000 kg per month generator, or

b. the owner or operator is not subject to regulation in 40 CFR part 265
pursuant to an exemption in 40 CFR section 265.1, but the owner or
operator is subject to the standards of this article.

(6) for tank systems that transfer, store or treat materials that become
hazardous wastes subsequent to the dates indicated below, within the time
intervals required in subsections (a)(1) through (a)(5) of this section,
except that the date that a material becomes a hazardous waste shall be
used in place of the dates indicated below where these dates appear in

66265.193.txt
subsections (a)(1) through (a)(5) of this section:

(A) January 12, 1987, for tanks containing RCRA hazardous wastes, unless:

1. the owner or operator is a conditionally exempt small quantity
generator as defined in 40 CFR section 261.5, or a 100 to 1000 kg per
month generator as defined in 40 CFR section 265.201, or

2. the owner or operator is not subject to regulation in 40 CFR part 265
pursuant to an exemption in 40 CFR section 265.1;

(B) July 1, 1991, for:

1. tanks containing only non-RCRA hazardous wastes, and

2. tanks containing RCRA hazardous wastes, if:

a. the owner or operator is a conditionally exempt small quantity
generator or a 100 to 1000 kg per month generator, or

b. the owner or operator is not subject to regulation in 40 CFR part 265
pursuant to an exemption in 40 CFR section 265.1, but the owner or
operator is subject to the standards of this article.

(b) Secondary containment systems shall be:

(1) designed, installed, and operated to prevent any migration of wastes
or accumulated liquid out of the system to the soil, ground water, or
surface water at any time during the use of the tank system; and

(2) capable of detecting and collecting releases and accumulated liquids
until the collected material is removed.

(c) To meet the requirements of subsection (b) of this section, secondary
containment systems shall be at a minimum:

(1) constructed of or lined with materials that are compatible with the
waste(s) to be placed in the tank system and shall have sufficient
strength and thickness to prevent the failure due to pressure gradients
(including static head and external hydrological forces), physical contact
with the waste to which they are exposed, climatic conditions, the stress
of installation, and the stress of daily operation (including stresses
from nearby vehicular traffic);

(2) placed on a foundation or base capable of providing support to the
secondary containment system and resistance to pressure gradients above
and below the system and capable of preventing failure due to settlement,
compression, or uplift;

(3) provided with a leak detection system that is designed and operated so
that it will detect the failure of either the primary and secondary
containment structure or any release of hazardous waste or accumulated
liquid in the secondary containment system within 24 hours, or at the
earliest practicable time if the existing detection technology or site
conditions will not allow detection of a release within 24 hours;

(4) sloped or otherwise designed or operated to drain and remove liquids
resulting from leaks, spills, or precipitation. Spilled or leaked waste
and accumulated precipitation shall be removed from the secondary
containment system within 24 hours, or in as timely a manner as is
possible to prevent harm to human health or the environment, if removal of
the released waste or accumulated precipitation cannot be accomplished
within 24 hours.

Page 3

66265.193.txt

(A) If the collected material is a hazardous waste under chapter 11 of this division, it shall be managed as a hazardous waste in accordance with all applicable requirements of chapters 2 through 15 of this division.

(B) If the collected material is discharged through a point source to waters of the United States, the owner or operator shall comply with the requirements of sections 301, 304, and 402 of the Federal Clean Water Act (33 U.S.C. sections 1311, 1314 and 1342, respectively), as amended.

(C) If the collected material is discharged to Publicly Owned Treatment Works (POTWs), the owner or operator shall comply with the requirements of section 307 of the Federal Clean Water Act, as

amended (33 U.S.C. section 1317).

(D) If the collected material is released to the environment, the owner or operator shall comply with the applicable reporting requirements of 40 CFR Part 302.

(d) Secondary containment for tanks shall include one or more of the following devices:

(1) a liner (external to the tank);

(2) a vault;

(3) a double-walled tank; or

(4) an equivalent device as approved by the Department.

(e) In addition to the requirements of subsections (b), (c), and (d) of this section, secondary containment systems shall satisfy the following requirements:

(1) external liner systems shall be:

(A) designed or operated to contain 100 percent of the capacity of the largest tank within its boundary;

(B) designed or operated to prevent run-on and infiltration of precipitation into the secondary containment system unless the collection system has sufficient excess capacity, in addition to that required in subsection (e)(1)(A) of this section, to contain run-on and infiltration. Such additional capacity shall be sufficient to contain run-on and infiltration of precipitation from a 25-year, 24-hour rainfall event;

(C) free of cracks or gaps; and

(D) designed and installed to completely surround the tank and to cover all surrounding earth likely to come into contact with the waste if released from the tank(s) (i.e., capable of preventing lateral as well as vertical migration of the waste).

(2) Vault systems shall be:

(A) designed or operated to contain 100 percent of the capacity of the largest tank within its boundary;

(B) designed or operated to prevent run-on and infiltration of precipitation into the secondary containment system unless the collection system has sufficient excess capacity, in addition to that required in subsection (e)(2)(A) of this section, to contain run-on and infiltration.

Page 4