Michael S. Biggs (SBN. 237640)
BIGGS LAW PC
PO Box 454
Petaluma, CA 94953-0454
Telephone: (707) 763-8000
Facsimile: (707) 763-8010

Attorney for Plaintiff(s
Pinoleville Pomo Nation, Pinoleville Pomo Nation
Environmental Association and Leona Williams

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Pinoleville Pomo Nation, Pinoleville Pomo Nation Environmental Association, and Leona Williams, <br><br> Plaintiffs, <br><br> and <br><br> Ukiah Auto Dismantlers, Wayne Hunt, Isabel Lewright, Warrior Industries, Inc., Richard Mayfield, Ross Junior Mayfield, Paula Mayfield, U.S. Alchemy Corporation, and DOES 1-10, Inclusive. <br><br> Defendants. | Case No.:   C 07 2648 SI <br><br> PLAINTIFF'S EX-PARTE APPLICATION TO CONTINUE DATE OF HEARING ON PRELIMINARY INJUNCTION, AND SET FOR EVIDENTRY HEARING, AND SUPPORTING DECLARATIONS OF MICHAEL S. BIGGS AND GEORGE O. PROVENCHER DIRECTOR OF TRIBAL OPERATIONS FOR THE PINOLEVILLE POMO NATION <br><br> Date: April 23, 2008 <br> Time: 1:00 PM <br> Judge: Susan Illston |

# I. INTRODUCTION

Plaintiff's Pinoleville Pomo Nation, Pinoleville Pomo Nation Environmental Association, and

Leona Williams, ("Plaintiff's)") respectfully submits this *ex parte* application for an Order: (1)

PPN et al v. UAD et al    1    Case No.: C 07 2648 SI
Plaintiff's Ex Parte Application to Continue Date of Hearing
On Preliminary Injunction And Set For Evidentry Hearing

1    continuing the hearing date on Plaintiffs ("Plaintiff") Motion for a Preliminary Injunction (the

2    "Motion"), currently scheduled for April 23, 2008, to June 25,, 2008; and (2) setting an evidentry

3    hearing, as a hearing on declarations alone without the oral testimony of Richard Azevedo of the

4    California Regional Water Quality Control Board would render an incomplete picture of over

5    two years of failed regulatory efforts in bringing Defendant Ukiah Auto Dismantlers (UAD)

6    into compliance with applicable law under the causes of action presented in Plaintiff's original

7    complaint, leaving  serious threats, as revealed in Mr. Azevedo's depositions, and the analysis of

8    KENNEC EARTH ENGINEERING & SCIENCE, to the  publics health and safety as well as

9    ongoing damage to the environment.  A proposed Order continuing the preliminary injunction

10    hearing and setting an evidentry hearing has been submitted along with this *ex parte* application.

## II. FACTS

11

12    1.   Plaintiff's initially initiated scheduling of a hearing on injunctive relief set for February

13    15, 2008. On January 8, 2008, plaintiff's engineering consultant KENNEC EARTH

14    ENGINEERING & SCIENCE, performed a site visit to parameter of UAD operations and

15    conducted sampling activities (See Exhibit 1).

16    2.      On January 11, 2008 a STIPULATION TO RESET HEARING DATE FOR

17    PRELIMINARY INJUNCTION was filed. A new hearing date was set for March 21, 2008. On

18    February 13, 2008, sampling activities by KENNEC were complete, but with a recommendation

19    for more sampling activities.

20    3.    In light of the need for more testing and evaluation by KENNEC Plaintiff at February 15,

21    2008 Case Management Conference requested Court to reschedule hearing on injunction to be

22    held April 16, 2008. Subsequently Mr. Richard Azevedo of the California Regional Water

23    Quality Board was deposed by Plaintiff on February 26, 2008, and his deposition was continued

24    to March 13, 2008, as more time was needed to complete his deposition and the calendars of two

25    defense attorneys and the attorney from the State of California who accompanied Azevedo. In

26    the meantime another stipulation was filed on March 6, 2008; to again extend the hearing on

27    injunction date over to April 23, 2008.

28

PPN et al v. UAD et al                                                    2                        Case No.: C 07 2648 SI
Plaintiff's Ex Parte Application to Continue Date of Hearing
On Preliminary Injunction And Set For Evidentry Hearing

4.      On March 13, 2008 the deposition of Mr. Azevedo resumed. At this second deposition alarming details were revealed as the levels of "lead" at and around he the UAD site, (See Exhibit 2, Azevedo Deposition transcripts PP 164-168 -182-194).

5.      Once the transcript was prepared it was delivered to KENNEC for assessment just two days before the file deadline of March 21, 2008.

6.      After the scheduled file date KENNEC provided a preliminary analysis and declaration on March 25, 2008, that lead levels were dangerously high and recommended more testing which Plaintiff approved.

7.      Other issues arose out of the second deposition of Mr. Azevedo invoking heightened scrutiny in light of serious health and safety concerns, (See Declaration of George O. Provencher in Support of Continuance of Hearing on Preliminary Injunction and Exhibit 3, letter to Head Start Parents Pinoleville Native American Head Start Program).

8.      As Plaintiff was waiting on KENNEC to complete its testing and analysis arising out of new information gained at and around the scheduled file date of March 21, 2008, Plaintiff could not file moving papers on its contemplated motion for preliminary injunction.

9.      Plaintiff notified opposing counsel in a letter dated March 28, 2008, that Plaintiff was postponing the filing of the contemplated motion until further information and evidence was complete.

10.     Plaintiff is now informed and believes that a scheduled hearing date of not earlier than June 25, 2008, would accommodate the briefing requirements of all parties, as well as adequate time for KENNEC to wrap up its activities key to Plaintiffs motion on injunctive relief.

11.     Plaintiff is informed and believes that issues as to UAD's compliance must be resolved prior to mid-fall trial date, in the summer season, as rainy season will begin at time around and subsequent to trial, and remedial work will be blocked by weather, and weather will exasperate pollution discharge and further threat to public health and safety and to harm to the environment

PPN et al v. UAD et al                                          3                    Case No.: C 07 2648 SI
Plaintiff's Ex Parte Application to Continue Date of Hearing
On Preliminary Injunction And Set For Evidentry Hearing

12.    Plaintiff is informed and believes that it would be in the interest of justice and the public's health and safety and protection of the environment for the Court to allow oral testimony and otherwise conduct an evidentry hearing on requested hearing for preliminary injunction.


Dated: April 15, 2008



Respectfully Submitted




Michael S. Biggs
Attorney for Plaintiff's
Pinoleville Pomo Nation, et al

---

### ORDER

The SCHEDULING ORDER as to the hearing and briefing on Preliminary Injunction calendared to be heard on April 23, 2008 at 3:30 PM shall be revised to be heard on June 25, 2008, at 3:30 PM. Court to set evidentry hearing for oral testimony.  Motion to be due May 19, 2008, opposition due June 11, 2008, reply due June 18, 2008.


IT IS SO ORDERED.


Dated: April ____ 2008

_____
Judge of the United States District Court
Northern District of California

PPN et al v. UAD et al                                          4                        Case No.: C 07 2648 SI
Plaintiff's Ex Parte Application to Continue Date of Hearing
On Preliminary Injunction And Set For Evidentry Hearing

Exhibit 1



Kennec, Inc.
765 Baywood drive
Suite 340
Petaluma, CA 94954
Tel: 707.780.8129
E-Fax: 909.354.3291

# SITE VISIT MEMORANDUM

**TO:** DAVID EDMUNDS, MICHAEL BIGGS, AND GEORGE PROVENCHER

**FROM:** JOAQUIN WRIGHT

**SUBJECT:** JANUARY 8TH, 2008. SITE VISIT TO PINOLEVILLE POMO NATION FOR STORMWATER SAMPLING AND SITE OBSERVATION.

**DATE:** 1/11/08

**CC:** DAGAN SHORT

This memorandum documents a site visit to the Pinoleville Pomo Nation (PPN) by Joaquin Wright of Kennec, Inc. (KENNEC). The purpose of the visit was to examine storm water conditions related to water runoff from industrial activities adjacent to the PPN. As part of the visit, KENNEC collected surface water and soil samples as a preliminary measure in evaluating potential impacts to the PPN property from industrial activity on the adjacent property.

## SITE VISIT

KENNEC visited the site on January 8, 2008 to review storm water conditions on the PPN site and an adjacent site. Joaquin Wright, Senior Project Manager and Principal of KENNEC, arrived at approximately 11:30 am. Before the site visit, it had been raining for approximately three days.

### *Observations*

KENNEC toured the PPN by vehicle and on foot to view the storm water drainage conveyance systems and appurtenances associated with the tribal lands and the local waterway, referred to as Ackerman Creek.

The main industrial activity within the tribal lands (but not owned by the PPN) is a local business, Ukiah Auto Dismantlers (UAD). The assessor's parcel numbers for the UAD where industrial activities were observed to be occurring are APN 168-190-048 (48) and APN 168-190-049 (49). The total area of the two parcels is approximately 10 acres. The UAD operation is adjacent to and north of the Tribal Headquarters/Head Start School Facility and between Pinoleville Drive and Ackerman Creek.

KENNEC reviewed a description of the area in a Phase II Environmental Investigation dated March 2003 (Vector Engineering Inc.) as well as visually observed conditions on the UAD facility from PPN land adjacent to parcels 48 and 49. Based on our observations, the majority of the storm water runoff associated with parcels 48 and 49 flows across the parcels from south to north and then from west to east, adjacent to a berm that runs the whole length of parcels 47 and 48 in a east west direction, and then discharge onto Parcel 1 and continue to sheet flow over a creek access path onto parcel 2. A drainage pathway from parcels 1 and 2 connects to Akerman Creek at a point located at the approximate Parcel 1 and Parcel 2 boundary, and shows signs of having diverted water to or from the creek in the past during high flow events.

Pinoleville Pomo Nation
January 14, 2008
Page 2 of 3

During our tour of the PPN, KENNEC observed the following conditions with regard to storm water discharge, and the drainage and conveyance system:

1.  Discharge from the UAD facility onto the adjacent PPN property had very few visible[1] storm water source and treatment controls. Only one check dam for most of the 10 acres site was seen. The check dam drained via pipes to a pond at the confluence of a drainage pathway running south to north on the eastern side of parcel 47. Water from the pond discharged easterly to parcel 1 on the PPN property. The storm water that flowed through the pipes (from the check dam), appeared to be of relatively high velocity and very "cloudy", indicative of elevated Total Suspended Solids (TSS).

2.  Visible operations areas were not on impermeable ground (i.e., paved areas) nor were they covered.

3.  One vehicle's motor, in an apparent work area (evident by adjacent toolbox and open motor compartment door), appeared to be under deconstruction/construction. This work area was immediately adjacent to and connected with a drainage pond created by the check dam at the northeasterly edge of the property.

4.  At least two large piles of debris were visible. The debris piles, which included metal, soil, and miscellaneous aggregate were surrounded by pools of water that flowed into stormwater drainages. The debris piles were not covered nor were storm water source controls present to prevent movement of contaminants from the debris to the storm water or underlying soil.

5.  There were vehicles in various states of disrepair or dismantling, large steel tanks pipes and other vehicular components; all were uncovered and exposed to the elements. There was no clear delineation between storage area or operational working areas.

*Sampling Activities*

KENNEC collected six surface water samples on Parcel 1 and Parcel 2 and one soil sample from parcel 1 from a depth of ___ feet. Sample locations were field located with a handheld GPS unit. The samples were delivered to Brelje and Race for analysis, located in Santa Rosa, Ca., in iced coolers under standard Chain-of-Custody procedures. Samples were tested for the following constituents:

*   Volatile organic compounds (VOCs) by EPA Method 8260B

*   Total petroleum hydrocarbons as diesel and oil

*   Heavy Metals

## INDUSTRY STANDARD FOR AUTO DISMANTLING FACILITIES

Industrial sites in California must comply with current state and federal storm water regulations that typically require implementation of long- and short-term storm water source and treatment controls. These controls prevent impacts to surface water, to groundwater (through infiltration) and to soil. In addition, all industrial sites are required to have an updated Storm Water Pollution Prevention Plan (SWPPP) that specifies appropriate Best Management Practices (BMPs) as well as a monitoring program for documenting and

---

[1] Based on observations from PPN Parcel 1.

Pinoleville Pomo Nation
January 14, 2008
Page 3 of 3

identifying whether the BMPs are performing adequately. To give perspective on the industry standard for storm water management and typical BMPs that one would implement at an auto dismantling facility, the following short list from the California Stormwater Quality Association (CASQA), http://www.cabmphandbooks.com/Industrial.asp, is provided below:

- SC – 22: Vehicle equipment Repair, covered work area, impervious ground cover, covered storage of vehicles

- TC – 10,11,21,22,30,31,60: Infiltration trench, infiltration basin, constructed wetland, extended detention basin, vegetated swale and buffer strip, multiple systems

- EC - 2,9,10,12: Existing vegetation, drainage swales, velocity dissipation devices, berm and bank stabilization

- SE - 2,3,4,5,8,9,10: Sediment basin, sediment trap, check dams, fiber rolls, straw bale and sandbag barriers, storm drain inlet protection

In addition to these recommendations, we have attached for your review, information on BMPs from a few of the many regional and national auto recycling organizations.

If you have any questions about the information provided in the memorandum, please call. After we receive the laboratory results for the surface water and soil samples, we will compare them to potentially applicable water and soil criteria, and submit this information to you in a technical memorandum.

Sincerely,

**KENNEC, Inc.**

Joaquin Wright
Senior Project Manager

Attachments: BMPs and literature from auto recycling organizations

KENNEC, INC.

Exhibit 2

1          IN THE UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3                    - - - -

4

5   PINOLEVILLE POMO NATION,      )
    PINOLEVILLE POMO NATION       )
6   ENVIRONMENTAL ASSOCIATION,    )
    and LEONA WILLIAMS,           )
7                                 )
                   Plaintiffs,    )
8                                 )
        vs.                       )   No.  C 07 2648 SI
9                                 )
    UKIAH AUTO DISMANTLERS,       )
10  WAYNE HUNT, ISABEL            )
    LEWRIGHT, WARRIOR             )
11  INDUSTRIES, INC., RICHARD     )
    MAYFIELD, ROSS JUNIOR         )
12  MAYFIELD, PAULA MAYFIELD,     )
    KENNETH HUNT, U.S. ALCHEMY    )
13  CORP., and DOES 1-50,         )
    inclusive,                    )
14                                )
                   Defendants.    )
15  _____)

16

17                    - - - -

18   DEPOSITION OF RICHARD AZEVEDO, P.E., VOLUME II

19        Held at the Offices of Biggs Law, PC

20           ████████, Petaluma, California

21      Thursday, March 13, 2008, 9:49 a.m.

22                    - - - -

23

24

25

                                              Page 128

1  is no monitoring point, so this hasn't happened.
2      Q.  Thank you.  Moving on to number 3, please.  It
3  says, "While the new percolation sediment basin will
4  prove useful, we have requested that your consultant
5  consider the possibility of installing a lined oil-water
6  separator preceding each basin.  We are concerned that
7  sediment and oils may accumulate at the bottom of the
8  earthen basins necessitating costly soil removal
9  activities.  A lined separator would limit the amount of
10 solid material collected and reduce long-term results."
11     Has UAD done any activities with regard to a
12 new percolation sediment basin that meets the
13 suggestions in the context of paragraph 3?
14     A.  No, they are monitoring the ponds, these
15 percolation ponds, and they have not installed the lined
16 separator, nor have we determined whether we actually
17 need one in terms of -- as additional pollution
18 treatment.
19     Q.  Okay, thank you.  Let us now turn to a
20 document dated October 16th, 2007, and what I'm looking
21 at is captioned California Regional Water Quality
22 Control Board North Coast Region.  It's an interoffice
23 communication from John Short to Richard Azevedo, and
24 could you please look at this document, and do you
25 recognize this document?

Page 161

1      A.  What we're doing is we're analyzing the -- or
2  evaluating the results from the recent soil sample
3  efforts which are not attached here.  But it appears
4  that our review indicates, or finds that there are
5  soluble hydrocarbons in the motor oil range and diesel
6  range at a concentration that may pose a threat to
7  groundwater in the area, the groundwater shallow.
8      The item 2 is a matter of background.  Total
9  petroleum hydrocarbons in the motor oil and diesel range
10 prefer to stick to soil.  It's just the chemical nature
11 of those compounds, depending on the soil type and
12 amount of carbon and things.  So what would happen, and
13 what this refers to is if there's any erosion at the
14 site or turbidity of soil particulate entrained in
15 runoff, the potential is that any surficial
16 contamination would be attached to the soil particles
17 and be carried with the soil particles in that manner
18 rather than in a dissolved fashion.
19     Item 3 is referring to the total lead levels
20 that we have on-site, and they were summarized in the
21 previous section of this memo.  And it points out that
22 the parcel is industrial.  The residential -- the tribal
23 property next door, a parcel away, is residential, so
24 we're looking at what would be the appropriate lead
25 levels, and the concerns of moving from an industrial

Page 163

1      A.  Yes.
2      Q.  Would you thumb through the document and let
3  us know if it's complete to the best of your knowledge.
4  I see three pages.
5      MR. NEARY:  Again, I'm going to object to
6  referring to a document that's not marked.
7      MR. BIGGS:  I'm sorry, will you mark this,
8  please, and that would be October 16th, 2007.
9      (Whereupon, Plaintiffs' Exhibit No. 20 was
10 marked for identification.)
11     THE WITNESS:  This document's not complete.
12 BY MR. BIGGS:
13     Q.  I would like to know, though, if the three
14 pages that we have here stapled are all part of this
15 interoffice communication that you just referenced on
16 page 1.
17     A.  Yes.
18     Q.  What I'd like to refer to here is the
19 conclusions indicated on number 2.  And do you recall
20 reading this memo with regard to the conclusions on page
21 2 here?
22     A.  Actually, I wrote them.
23     Q.  I see.  Can you please, to the best of your
24 ability, explain to us the gist of your conclusions here
25 indicated on page 2 that go on over to page 3.

Page 162

1  site to residential site, so we need to evaluate that
2  aspect of the site.
3      So those are the three items.  Then it goes
4  onto really talk about various particular aspects of the
5  whole -- the pros and cons of what's going on.
6      Do you want me to finish with this --
7  expanding on this here?
8      Q.  If you see fit.
9      A.  Well, what happened was, is the original
10 agreement was to remove soil.  What happened on-site was
11 they regraded the material, moved it from one end to the
12 other of the work area, which we really didn't consider
13 appropriate at the time, so we looked at some soil
14 samples in terms of total and soluble to see if perhaps
15 this material was not soluble, could be left on-site as
16 an encapsulation project rather than a removal project.
17     So we go on to discuss various aspects of the
18 pros and cons of that, that issue.  We talk about what
19 may be important in terms of chemical constituents and
20 what is not important based on the sampling or not a
21 priority.  Zinc and copper, for example, were not
22 considered high enough concentrations to be a problem.
23     So that's what the rest of this memo talks
24 about, and it talks about the asphalt installation being
25 on hold until this item is resolved.

Page 164

10 (Pages 161 to 164)

1   Q.  I also see in here a commentary indicating --
2   this would be in the second paragraph -- wait a minute,
3   not the second paragraph, somewhere in here.  Oh, okay,
4   you wrote, "Encapsulation is an option that has been
5   used but has drawbacks in that the cap must be
6   maintained in perpetuity."
7       What does that mean, the cap must be
8   maintained in perpetuity?
9   **A.  Well, encapsulation refers to leaving**
10  **something in place and encapsulating it in some manner,**
11  **either by putting a liner underneath it, a cap on top of**
12  **it that prevents rainfall from moving through the**
13  **material.  In this case, that would be the asphalt.  So**
14  **if you encapsulate something under asphalt, you then**
15  **need to maintain the asphalt cap and the integrity to**
16  **prevent water from moving through cracks and things like**
17  **that.  So that's a drawback because now you need to**
18  **maintain the asphalt in perpetuity because the material**
19  **will be left on-site in perpetuity.**
20      Q.  You mention in item 3 total lead levels and
21  soil movement potentially containing lead off-site.  How
22  did it come to be that you ascertained that there was
23  lead present, and to what degree did you find the
24  presence of lead?
25  **A.  We probably -- I'm going to have to review the**

Page 165

1   **whole file, but we probably directed them to take lead**
2   **samples because of the dismantling activities and the**
3   **batteries on-site.  Lead's a known problem, and they did**
4   **sample for lead.  We found varying concentrations across**
5   **the site.  Several samples were high enough to raise the**
6   **concern whether that concentration should be left in the**
7   **surface soils with a potential of lead attached to soil**
8   **particulate moving into the storm water and being**
9   **carried off-site on to residential property.**
10      Q.  I see here you did indicate in the fourth --
11  third paragraph on page 3, "Lead levels are elevated
12  with several hot spots," and you went on to write,
13  "Migration will be prevents (sic) or limited with
14  installation of the cap.  Similarly, soluble
15  hydrocarbons will be prevented or limited in their
16  movement."  And then you gone on where you indicate, "We
17  should consider whether a small business is the
18  appropriate entity to maintain a cap over time."
19      Now, I want to ask you, can you recollect how
20  far away the Pinoleville Head Start elementary school is
21  from the area that you ascertained had a lead hot spot?
22  **A.  No.**
23      Q.  I know that the school is located -- actually,
24  if I may, this map over here.
25      MR. NEARY:  Are you going to have that marked?

Page 166

1       MR. BIGGS:  If I was to mark this, could you
2   take it, make a copy of it?
3       THE REPORTER:  Yes.
4       MR. BIGGS:  Yes, we'll do that.  And I
5   actually would like to refer to this map throughout.
6   We'll be needing it a couple other times, and I'd like
7   to pass this around for counsel to take a look at it.
8       MR. NEARY:  I'm familiar with it.
9       MR. BIGGS:  Okay.
10      Q.  I'd like you to, if you would, please, to take
11  a look at this map and --
12      MR. NEARY:  It's a photograph, isn't it?
13  BY MR. BIGGS:
14      Q.  It's a photograph, and I'm using it as a map.
15  And from your experience in this matter, do you
16  recognize that (indicating) as an image of the Ukiah
17  Auto Dismantlers facility?
18  **A.  Yes.**
19      Q.  And now, this image is an old image.  It's not
20  current.  And do you recognize Pinoleville Road on this
21  image?
22  **A.  Yes.**
23      Q.  Which would be the main road.  And do you also
24  recognize the entranceway leading into Ukiah Auto
25  Dismantlers?

Page 167

1   **A.  Yes.**
2       Q.  Now, you've been to the site a few times.
3   Now, the elementary school is not indicated on this old
4   map because it wasn't built yet, but do you remember
5   seeing the elementary school?
6   **A.  Yes, it's on the left-hand side as you enter**
7   **the property.**
8       Q.  And would you point to that location on this
9   map that you're referring to where you think the
10  Pinoleville school is.
11  **A.  No, I wouldn't be able to reference that other**
12  **than just a generic area, couldn't be certain of any**
13  **quadrant.**
14      Q.  Is it a fair assessment, though, based on your
15  limited knowledge, you've only been up here a few times,
16  and I'm not going to ask you to talk about something
17  you're not sure about, but in general terms, is it
18  accurate to say that the elementary school is located in
19  between Pinoleville Road and the wrecking yard as you
20  look at that map?
21  **A.  Yes.**
22      Q.  Okay, thank you.  All right, let's move on,
23  please.  Let's move on to the next correspondence.
24      MR. NEARY:  So that was 21?
25      MR. BIGGS:  Yes, the map.

Page 168

11 (Pages 165 to 168)

77647874-6edf-4abd-bd4a-ce4c6c7e6257

1  compare that number to.
2      Q.  And to the best of your ability, in this
3  context, can you tell us what the standard would be to
4  correlate with?
5      A.  There is -- in the Health and Safety Code,
6  there are specific definitions of concentrations for
7  hazardous material.  That's one comparison you can do to
8  make the materials hazardous.  There are other standards
9  that may apply to EPA screening levels for industrial
10  residential that you can compare to that.  And then you
11  can also compare this number in comparison to what
12  background soils -- background soil may contain in terms
13  of lead and exactly how elevated that might be and
14  whether you might consider it a potential problem for
15  water quality.
16      Q.  And did you have an opportunity to go as far
17  as to perform any assessments in correlating these
18  result values with those indexes you just described?
19      A.  We correlated all the results, these results
20  and UAD's original results in general against several of
21  those standards.
22      Q.  Are you in a position to recollect any of your
23  conclusions from doing that?
24      A.  Some of those conclusions were in a previous
25  memo, and we could refer to that memo.  We've been able

Page 181

1  to roughly determine what background concentrations of
2  lead may be in the area within a certain range, some of
3  the more average concentrations of lead on-site, and
4  where several of the more elevated concentrations would
5  fall in terms of hazardous material or screening for
6  residential review, things of that nature.
7      So the lead on-site was very spotty.  There
8  were several samples that were above what you consider
9  acceptable for residential screening, and above what
10  DTSC may revise the new --
11      THE REPORTER:  I'm sorry, DT --
12      THE WITNESS:  DTSC, Department of Toxic
13  Substance Control.
14  BY MR. BIGGS:
15      Q.  Is that a state agency?
16      A.  That's a state agency that deals with
17  hazardous waste.
18      My review on the Internet found that they were
19  considering revising the hazardous waste lead numbers
20  downward, and they provided a proposed or draft number,
21  and we looked at that proposed or draft number in
22  comparison to the concentrations we found on-site to
23  look at not only the current conditions or the current
24  conditions on-site compared to the current regulation,
25  but what may happen in the future if those numbers were

Page 182

1  revised and spur reevaluation.
2      Q.  So if I understand you correctly, the minimum
3  threshold levels that are for lead may be revised
4  downward in the future?
5      A.  That is -- there was a fact sheet on the
6  Internet put out by the Department of Toxic Substance
7  Control that was proposing to reduce the lead levels,
8  the hazardous waste classification for lead downward,
9  yes.
10      Q.  Thank you.  And I'd like to direct your
11  attention to page 4, if I may, and here again, I see two
12  hand-drawn circles and looks like the same type of
13  chart, and there's a reference to TPH, diesel and motor
14  oil solid.  Can you elaborate on what that goes to, the
15  diesel and motor oil, that is?
16      A.  That would have been -- should have been the
17  analysis they performed, total petroleum hydrocarbons in
18  the diesel range or total petroleum hydrocarbons in the
19  motor oil range.  Solid refers to the matrix, solid as
20  opposed to water.
21      Q.  Now, in looking at the first circle, this
22  would be 02B soil sample, 11/7/07.  We see a result
23  figure of 724, and underneath that, a number expressed
24  as a percentage.  To the best of your ability within the
25  scope of what you do in your capacity here as an

Page 183

1  engineer, could you tell us what that means in
2  layperson's terms?
3      A.  724 is the concentration weight to weight
4  basis of motor oil in soil, and the surrogate is -- the
5  surrogate would be something that they would use sort of
6  to calibrate the machine, so to speak.  So when they
7  have 67 percent recovery on a surrogate, it's reflecting
8  back on how much they think they might recover in a
9  particular matrix.
10      Q.  Can you tell us why you circled that entry?
11      A.  Well, if we go back to the chain of custody
12  there, apparently the lab called and had a question on
13  the labeling of the samples.  They thought there was a
14  problem.  I was out of the office.  Rich Vadness took
15  the call and made a decision on what the sample
16  locations meant, and he got it wrong basically.
17      So we were making notes on the chain of
18  custody as to what we did, and we were making a note on
19  this that the sample identifiers were actually
20  mislabeled or mis-reported compared to our original
21  locations.  What they reported as sample 2B is actually
22  sample 3B in our original sample location.  So it was a
23  note that the sample locations were -- identifiers were
24  transposed.
25      Q.  I see.  And it's been corrected with the

Page 184

Verbatim Reporting Service
800-634-4311

77647874-6edf-4abd-bd4a-ce4c6c7e6257

1  handwriting --
2      **A.  That was the intent.**
3      Q.  -- at the bottom of the page.  I understand.
4      Just in wrapping up here with this graph,
5  previously another graph, I asked you a question about
6  correlating the results, and you told us about indexes
7  and such.  I want to ask a similar question here with
8  these results.  In looking at these numbers, do these
9  numbers -- are they measured against an index?  I think
10  we were talking about a different substance before.
11  Could you just briefly elaborate on the indexes that are
12  used to compare, contrast, measure these figures with.
13      **A.  The regional board has a policy resolution**
14  **number 6816 which talks about protecting water and also**
15  **refers to cleanup to background levels where possible,**
16  **so that is one of our primary goals, is to clean up to**
17  **background or to remove pollution to background.  So**
18  **that's our primary index, is a narrative index at that**
19  **point in time.**
20      **Secondary indices would be practical in**
21  **nature.  What could you leave on-site and not cause a**
22  **threat to water quality surface water or groundwater?**
23  **You're not going to find numeric standards in regulation**
24  **requiring cleanup to a particular level.  It's based on**
25  **interpretations of the narrative and our mandate to**

Page 185

1  asked her to do.  Can we go off the record, please.
2      (Whereupon, there was a discussion off the
3  record.)
4  BY MR. BIGGS:
5      Q.  I would like to go back to a document that we
6  were already looking at, and that would be the
7  interoffice communication of October 16th, 2007, and I'd
8  like to turn to the second page, and I'd like to
9  reference paragraph 5, Roman numeral V, and I think in
10  looking at that, it says, "Elevated concentrations of
11  TPH motor oil are present as well as soluble amounts of
12  motor oil and diesel.  The soluble concentrations of TPH
13  diesel are at roughly the concentration the cleanup unit
14  uses for site closure."
15      Mr. Azevedo, can you elaborate on what is
16  meant by that?
17      **A.  We have a group in our office that focuses on**
18  **soil and groundwater pollution, toxic cleanup,**
19  **underground fuel tanks, and generally we have a**
20  **narrative water quality standard, and we express that**
21  **narrative standard numerically for diesel as pretty much**
22  **the detection limit because of taste and odor.  So the**
23  **standard is 50 to a hundred micrograms per liter, which**
24  **is based on the detection limit for diesel in water.**
25      **So that's what we were referring to, is**

Page 187

1      **protect water quality.**
2      MR. BIGGS:  It's 11:30.  Do you want to go for
3  another --
4      THE WITNESS:  We have two letters left.  I
5  have two letters.  How many do you have.
6      MR. BIGGS:  Actually, you should have more
7  than that.  Let's see, one, two, three, four, five, six,
8  seven, eight, nine.
9      THE WITNESS:  Let's take a break and get some
10  lunch since you have that many.
11      MS. NIEMEYER:  We'll need copies, then, of
12  those that we don't have.
13      (Whereupon, there was a discussion off the
14  record.)
15      (Whereupon, a lunch recess was taken.)
16      MR. BIGGS:  Back on the record.  And we're now
17  looking to the correspondence of November 30 of 2006, if
18  you'll mark that, please.
19      MS. NIEMEYER:  I don't think we have that.
20  The documents we've been looking at recently are all in
21  2007.
22      MR. BIGGS:  May I see that, please?
23      MS. NIEMEYER:  The last document, the date was
24  November 13, 2007.
25      MR. BIGGS:  My assistant misunderstood what I

Page 186

1  earlier we talked about what criteria would you use to
2  evaluate these concentrations in soil and groundwater
3  that we find at the site, and that is one of them, or
4  that concept of applying it in numerical, applying a
5  number to our narrative standard that is in the basin
6  plan for groundwater.
7      Q.  When I read in here that it says, "The soluble
8  concentrations of TPH diesel are roughly the
9  concentration the cleanup unit uses for site closure,"
10  is it fair to say that the soluble concentration of THP
11  diesel at the time this document was generated were high
12  enough to justify potential closure of the site?
13      **A.  No, that's not what I'm inferring at all.  I'm**
14  **simply comparing the laboratory results we have for**
15  **soluble hydrocarbons in soil against various criteria**
16  **that we might use in the office to evaluate how**
17  **significant the problem would be and how we would pursue**
18  **it.**
19      **The cleanup unit for underground fuel tanks**
20  **will close a site with diesel -- well, diesel in the**
21  **water, and again, they use numerical standards to**
22  **interpret our narrative criteria so all I'm doing is**
23  **basically comparing that standard that they would use**
24  **for closing, or the numerical standard that reflects our**
25  **narrative objective in the basin plan against the**

Page 188

16 (Pages 185 to 188)

77647874-6edf-4abd-bd4a-ce4c6c7e6257

1    concentrations we're finding on the site. It's just an
2    evaluation; I'm not recommending closure.
3        Q.   I understand you're not recommending closure,
4    but in looking at this closely, it says, "Elevated
5    concentrations of total TPH motor oil are present as
6    well as soluble amounts of motor oil and diesel. The
7    soluble concentrations of DPH diesel are roughly the
8    concentration the cleanup unit uses for site closure."
9        So are you saying that the concentrations are
10   high enough to where if the cleanup unit exercises their
11   discretion, they could justify closure, it's just that
12   you're not recommending closure?
13       MS. NIEMEYER:  I'm going to object as that
14   being compound, and I think that also I need to object
15   that there's facts not in the record, meaning that the
16   term "closure" hasn't been sufficiently defined.
17   BY MR. BIGGS:
18       Q.   Okay, could you maybe shed some light on what
19   is meant by closure in this context, and then we'll just
20   ask you one question at a time.
21       A.   Okay.  Closure in the terms that a cleanup
22   division staff would use relative, say, to an
23   underground fuel tank, is that concentrations in the
24   groundwater or soil are such that they would require no
25   further action, cleanup or monitoring at that particular

1    time, and they would close the site. They -- we could
2    say they would release the site, the site would go into
3    an inactive area, we're done with it. Concentrations
4    are low enough that it appears not to be a threat to
5    water quality, doesn't violate our standards.
6        So what I'm doing here is I'm simply
7    evaluating the results we have from UAD against
8    potential criteria that we might use to prioritize or
9    evaluate it. So when I say it's close to the closure
10   criteria, I'm saying it's close to a concentration that
11   our cleanup group may find that no further action is
12   required if they choose to accept that, the number of a
13   hundred.
14       Q.   So, in the context of paragraph 5, sub 5, is
15   it true that site closure refers to closure of the case?
16       A.   Yes.
17       Q.   But not closure of the site?
18       A.   It amounts the same thing.
19       Q.   It amounts to the same thing?
20       A.   Yes.  Now, if you have a site with multiple
21   sources, you may say we're done in one particular area.
22   You may have other areas on the site to work on, but if
23   you're working on a site, underground fuel tank with one
24   source, closure means closure of the case, means closure
25   of that site. So it may be relative to the number of

1    pollutant sources at the site or the complexity of the
2    site.
3        Q.   What I want to do now, and it may save us some
4    time and just get down to the nitty-gritty, I want to
5    ask you some follow-up questions from your testimony
6    before, and the first thing I'd like to ask is about the
7    flow of the, I think it's the underground water.
8        A.   Uh-huh.
9        Q.   And it's a little vague.  I think at one point
10   you indicated that it flows north to south and another
11   point west to east.  What I'd like to do, if you could
12   get that map out, I think it's Exhibit -- do you see a
13   number on there?
14       A.   It's 21.
15       Q.   Exhibit 21, and if you could bring that out,
16   that image, and if you could help us to understand in
17   looking at that map, the flow of underground water.
18       MS. NIEMEYER:  I'm going to object. Have we
19   established previously that we knew what the flow was of
20   the groundwater?
21       MR. BIGGS:  Yes, he testified to that and --
22       MS. NIEMEYER:  I don't recall him testifying.
23       MR. NEARY:  I don't recall that.
24       THE WITNESS:  I think what I said is I have
25   not -- there are regional groundwater maps published by

1    the USGS in Mendocino County.  I have not reviewed them
2    for some time.  The specific direction of the water,
3    groundwater movement in this site, I would not commit to
4    from memory.
5        What I would say is generally it's going to be
6    toward the Russian River because that's the dominant
7    grading, so it's going to be moving probably to the east
8    somewhat toward the river.  And the local influence of
9    Ackerman Creek, I don't know about.  It may be flowing
10   north to east.  It really depends.  I think that's what
11   I testified to in the past.  I don't know exactly what
12   the gradings are other than the general regional
13   direction.
14   BY MR. BIGGS:
15       Q.   Now, in your former testimony, you alluded to
16   natural drainage.  Do you recollect speaking to natural
17   drainage?
18       A.   Yes.
19       Q.   And what actually is the definition of natural
20   drainage and how you use it?
21       A.   I'd have to look at what I said in context. I
22   believe we were referring to just the surface water
23   drainage off the site and where it ran.  I would have to
24   look at what we said in context.
25       Q.   Can you recollect whether or not the natural

77647874-6edf-4abd-bd4a-ce4c6c7e6257

1 drainage had ever been altered on these subject
2 properties after these sites, you know, were put into
3 use?
4     MR. NEARY: Well, vague. Just to clarify, the
5 subject properties being the Mayfield and the UAD
6 property?
7     MR. BIGGS: Yes, that's right.
8     THE WITNESS: Put into use as in when the auto
9 wreckers first started there, or my involvement?
10 BY MR. BIGGS:
11    Q. Say their current operations, do you know if
12 the natural drainage was altered?
13    A. No, I don't know that.
14    Q. Do you know if, with regard to Mayfield's
15 property and operation, are they required by your office
16 to have a storm water permit?
17    A. No, they're not.
18    Q. And why is it that UAD is required to have one
19 and they're not?
20    A. The general industrial storm water permit is a
21 program the state administers and was originally adopted
22 into federal regulations. The permit scope is specified
23 by law, and it's focused on certain industries and
24 industrial classifications. There's a general category
25 that allows the regional board to add sites, but a

Page 193

1     A. We don't enforce the Health and Safety Code.
2     Q. I understand.
3     A. But lack of secondary containment is an issue
4 for our office because of spillage, and we were really
5 citing it for that reason more than a violation of the
6 Health and Safety Code, which is enforced by the Cooper
7 people and DTSC, Department of Toxic Substance Control.
8     Q. Okay. I'd like to take you to page 93, lines
9 6 through 9 of your former testimony.
10    MS. NIEMEYER: I just want to say for the
11 record that we haven't yet reviewed the testimony and
12 signed off on it, so at this point we can't say that
13 there haven't been any errors in the testimony. We
14 haven't had the chance to review it yet and plan to.
15    MR. BIGGS: That's a reasonable point. Would
16 it be okay if I direct a question in the form of asking
17 him to read it and clarify it? The questions that I'm
18 going to be asking are just areas that seem to be not as
19 clear as I'd like them to be.
20    MS. NIEMEYER: Sure. I'm just reserving for
21 us the objection, if there was an error in here, we
22 haven't yet reviewed this, so we wouldn't want to be
23 held to something if there was an error.
24    MR. BIGGS: I understand.
25    Q. So if you will please take a look at page 93,

Page 195

1 majority of our storm water program now is focused on
2 those industries that are required by law to be in the
3 program. Auto wreckers are required under law to be in
4 that program.
5     Q. At page 37, lines 3 to 10 ten of your former
6 testimony, you stated that Mr. Mayfield's fuel and waste
7 oil were a problem in terms of not being contained. And
8 I assume that's not being in secondary containment.
9 That's page 37, lines 3 to 10.
10    A. What was your question again?
11    Q. The question, is secondary containment as you
12 refer to it in your statement, normally a requirement
13 for maintaining a permit for this type of operation?
14    A. Secondary containment of material is required
15 under the Health and Safety Code, so for waste oils
16 which are by default considered hazardous material, you
17 need to have secondary containment, which is defined in
18 the regulations in Title 22.
19     So when we were out at the site, the types of
20 products that we saw had no secondary containment which
21 could lead to spillage, and then that in turn would lead
22 to problems in surface water.
23    Q. In your capacity as a regulator in this
24 instance, did you see a violation of Health and Safety
25 Code?

Page 194

1 line 6 through 9, and apparently you state there that
2 the current plan from UAD is to direct runoff to the
3 east instead of the west. Did you mean west instead of
4 east?
5     A. Actually, I probably meant north instead of
6 west. I probably meant north instead of west. The idea
7 was to take the runoff from the asphalt work area and
8 direct it in such a way that it would not run through
9 any more work areas or pick up contamination. And they
10 had a tire pit there to the west that seemed like it
11 could be useful for that. They have chosen to arrange
12 the drainage differently, and this drainage from the
13 asphalt area is going to be draining back to the
14 percolation ponds, which would be toward Ackerman Creek,
15 so rather specifically talking east-west, we could be a
16 little more specific.
17    Q. And you mention a percolation pit and then you
18 just spoke to a tire pit, and if I understood correctly,
19 you thought maybe they could -- I don't want to put
20 words in your mouth -- but convert the tire pit to a
21 percolation pond. Is that what you're saying?
22    A. Yes.
23    Q. Now, with regard to this percolation pond or
24 also known as a tire pit, has UAD submitted any plans to
25 your office in the form of intelligible drawings and

Page 196

18 (Pages 193 to 196)

Verbatim Reporting Service
800-634-4311

77647874-6edf-4abd-bd4a-ce4c6c7e6257

Exhibit 3

# PINOLEVILLE POMO NATION

**500 B Pinoleville Drive, Ukiah, CA 95482 Ph: 707-463-1454 FAX: 707-463-6601**



HEAD START PARENTS

PINOLEVILLE NATIVE AMERICAN HEAD START PROGRAM

April 2, 2008

The purpose of this notice is to advise parents of our Head Start program that the Tribal Organization, Pinoleville Pomo Nation has filed a lawsuit against the Ukiah Auto Dismantlers and the operators of the adjoining Mayfield property, both of which adjoin the northern boundary of the Pinoleville Indian Reservation along the Ackerman Creek.

During recent testimony, it was revealed that some of the soil samples within the boundaries of the two business properties contained known pollutants that are a concern for public health. These hazardous substances include Lead, Mercury, oil, diesel, and several benzene compounds.

We expect that this information, as it becomes known within the public domain, will appear in local newspapers and news media. We believe it is important to advise you, as parents and members of our Head Start family, what precautionary measures we have taken to ensure that our children are not exposed to any of these substances that have been found on the property of Ukiah Auto Dismantlers.

First, you should know that we are not allowing children to walk or play anywhere near the fence line that separates these businesses from Tribal Lands along the northern boundary line.  Secondly, we also do not allow children to walk, play or wander into the area east of these business properties where they adjoin Tribal Lands, and where soil has been found to be contaminated.

Throughout the school day, from the beginning of the day until the end of classes each day, all children are closely supervised and restricted to the classrooms, the playground, and the green fenced area in front of the school, which are located on the southern boundary of the reservation. We expect that you may have questions and concerns, so please contact either Angela James, Family and Community Partnerships Coordinator, or George Provencher, Program Director, if you have any questions.

Sincerely,

George Provencher
Program Director

1  Michael S. Biggs, Esq.  SBN: 237640
   BIGGS LAW PC
2  Post Office Box 454
   Petaluma, CA 94953-0454
3
4  (707) 763-8000 Telephone
   (707) 763-8010 Facsimile
5  Attorney for Plaintiffs
6
7
8              UNITED STATES DISTRICT COURT
9          FOR THE NORTHERN DISTRICT OF CALIFORNIA
10
11  Pinoleville Pomo Nation, Pinoleville Pomo        Case No.: C 07 2648
12  Nation Environmental Association and Leona
    Williams,
13
14  Plaintiffs,                                      DECLARATION OF GEORGE O.
                                                     PROVENCHER IN SUPPORT
15          v.                                       OF PLAINTIFFS APPLICATION FOR
                                                     CONTINUANCE OF HEARING ON
16  Ukiah Auto Dismantlers, Wayne Hunt               PRELIMINARY INJUNCTION
    Isabel Lewright, Warrior Industries, Inc
17  Richard Mayfield, Ross Junior Mayfield,
18  Paula Mayfield, Kenneth Hunt, U.S.
    Alchemy Corporation and DOES 1-50,              Date:   04/23/08
19  Inclusive,                                       Time:   1:30 P.M.
                                                     Dept:   Courtroom C, 15th Floor
20  Defendants.                                      Judge:  Susan Illston
21
22  _____/
23  I GEORGE O. PROVENCHER DECLARE AS FOLLOWS:
24  My name is George O. Provencher.  I have personal knowledge of the facts stated herein, unless
25  expressly alleged on information and belief, and, if called as a witness, I could testify
26  competently thereto.
27
28  1.      I am the Director of Tribal Operations for Pinoleville Pomo Nation, and I am the

Declaration of George O.Provencher              1              C 07 2648 SI
In Support of Ex-Parte Motion To Continue Date of Hearing
On Preliminary Injunction

Director of the Pinoleville Native American Head Start Program.

2.      My background includes a Bachelor of Arts Degree from California State University at Hayward, a Master of Science Degree in Administrative Science from Johns Hopkins University in Baltimore Maryland, and more than thirty years of commercial and Government contracting experience, which includes work in the Nuclear Weapons complex, two National Laboratories, Department of Energy, Department of Defense, Department of Health and Human Services, and over the past five years, the management of a primary care medical facility in the Indian Healthcare System.

3.      I have worked as a Corporate Director of Contracts and Purchasing for two Fortune 500 Corporations and have both international business experience and operations management experience in large facilities. My previous career position before moving to

4.      Mendocino County in 2001 was Vice President of Production for Allied Technologies Group in the field of nuclear waste management. Prior to this, I was the Project Manager on the successful construction and completion of a $30,000,000 nuclear waste treatment facility.

5.      I am an officer and member of the Board of Directors at Consolidated Tribal Health, located in Redwood Valley, where I serve as the Corporate Treasurer. I am a member of the Mendocino Public Health Advisory Board as an advisor to the Mendocino County Board of Supervisors, and a member of the Mendocino County Tobacco Ordinance Appeals Board.

6.      I joined Pinoleville Pomo Nation as Director of Tribal Operations in September of 2006.

7.      I recently witnessed the deposition of Mr. Richard Azevedo, who represents the Northern California Regional Water Quality Control Board,  which occurred on February 23rd and

March 16th, 2008.  I realized from what I learned that there are some very specific chemical compounds and metals that we should be monitoring, on the Ukiah Auto Dismantlers site, the Mayfield Property, and the Tribal lands that have been affected. I have been particularly concerned with the facts that have been revealed surrounding the lack of removal of excavated contaminated soil from the UAD property and the presence of Lead, hydrocarbons, and chemical compounds on the site.

8.      In Mr. Azevedo's March 13th deposition, he indicated that  there are high enough levels of hydrocarbons in the form of diesel fuel and motor oil to also pose a threat to groundwater in the area. I was also surprised to learn for the first time that Mercury had also been found in significant concentrations in a sample taken by RWQCB and tested by Sierra Laboratories.

9.      Earlier in February, approximately ten days prior to Mr. Azevedo's deposition, I received test results from Kennec Environmental, the environmental consultant we have used to conduct some of our own independent testing. We sampled in areas within twenty-five yards of the Ackerman Creek, near the eastern boundary line of the Mayfield property. What we learned from the certified laboratory testes was that out of seven samples taken, we had four samples that had results for Lead, which according to Kennec's  representative, exceeded the EPA's MCL limits for Lead. Those samples also indicated Vanadium, which also exceeded the MCL levels.

10.     Mr. Azevedo's testimony confirmed for us that there are areas of high presence of Lead on the Ukiah Auto Dismantlers site and apparently there is lead in the soil and surface water that is being carried off the Mayfield property, on to Tribal land, and toward Ackerman Creek.

11.     This has prompted our Tribal Office at Pinoleville Pomo nation to order additional testing closer to the Ackerman Creek and in the creek subsurface, as well. We are expecting these test results toward the end of April.

12.    In the meantime, after reviewing approximately 280 documents from pre-discovery documents provided by Ukiah Auto dismantlers, there have been a few more surprises. Mr. Azevedo had made reference to sample results taken on the UAD site by the RWQCB in which there were very high levels of hydrocarbons from motor oil and diesel. What I also learned from pre-discovery documents is that there were, in addition to these constituents, samples tested by Alpha Laboratories for Ukiah Auto Dismantlers at above the PQL (pollution quantity limit) limits for Toluene, Ethyl Benzene, and Xylene established values. Even more importantly, some of the same samples indicated levels of Lead that were several times the PQL limits; for example: 36 versus PQL of 5, 39 versus PQL of 5, and 67 versus PQL of 5.

13.    These samples were taken from soils that we have only recently learned were graded, stockpiled and redistributed on the site, in non-compliance with the abatement plan. This means that the excavated contaminated soil, containing high levels of lead, among other things, is still there on site.

14.    As we have had the opportunity to analyze factual data and information, we are finding that we must prepare contingency plans and take appropriate action to protect the health and safety of our people in the surrounding area. Our single largest concern is the possibility of dust-born Lead from the excavated soil, along with other significant levels of pollutants that have shown up in analytical test results we are only now just seeing.

15.    We have started taking immediate precautions by limiting the areas and activities of our pre-school children and notifying steps we are taking to protect them (please see the notification to Head Start Parents, dated April 2, 2008). We are finding that in addition to our original complaint, we are now having to consider the need to have the remediation of these two sites reviewed and planned by competent and experienced engineers, as we have just learned that the

consulting firm hired by Ukiah Auto Dismantlers , NEST and its principal and founder, is not a registered licensed geological or civil engineer, licensed by the California State Licensing Board, as required specifically in the original Abatement Notice. We have also recently learned that Ukiah Auto Dismantlers, via their consultant NEST, has embarked on a process that the RWQCB does not agree with and believes is technically unsound. We now need to consider additional steps that may have to be taken to ensure that the terms of the original Abatement Order from two years ago are completed in a much more timely fashion.

16.     Pinoleville Pomo Nation's governing body, as well as its employees, tribal members, parents, community partners, and its children cannot withstand two more years of a failed approach toward remediation and protection of our environment and our Tribal lands.

**I DECLARE UNDER THE PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES THAT THE FOREGOING IS TRUE AND CORRECT.**

DATED  4/9/08

Ukiah California

George O. Provencher

1  Michael S. Biggs (SBN. 237640)
   BIGGS LAW PC
2  PO Box 454
   Petaluma, CA 94953-0454
3  Telephone:  (707) 763-8000
   Facsimile:  (707) 763-8010
4
   Attorney for Plaintiff(s
5  Pinoleville Pomo Nation, Pinoleville Pomo Nation
   Environmental Association and Leona Williams
6

7
                    UNITED STATES DISTRICT COURT
8
              FOR THE NORTHERN DISTRICT OF CALIFORNIA
9

10

11 Pinoleville Pomo Nation, Pinoleville Pomo          **Case No.:    C 07 2648 SI**
12 Nation Environmental Association, and Leona
   Williams,                                          **DECLARATION OF MICHAEL S. BIGGS**
13                                                     **IN SUPPORT OF PLAINTIFFS**
                    Plaintiffs,                        **APPLICATION FOR CONTINUANCE**
14                                                     **OF HEARING ON PRELIMINARY**
          and                                          **INJUNCTION**
15 Ukiah Auto Dismantlers, Wayne Hunt, Isabel
16 Lewright, Warrior Industries, Inc., Richard
   Mayfield, Ross Junior Mayfield, Paula              Date: April 23, 2008
17 Mayfield, U.S. Alchemy Corporation, and            Time: 1:00 PM
   DOES 1-10, Inclusive.                              Judge: Susan Illston
18
19 Defendants.
   _____/
20

21
   I MICHAEL S. BIGGS DECLARE AS FOLLOWS:
22
23      1.      I am an attorney duly licensed to practice law in all courts of the State of California
24 and before the United States District Court for the Northern District of California and I am the
25 attorney of record for Plaintiff's Pinoleville Pomo Nation, Pinoleville Pomo Nation
26 Environmental Association, and Leona Williams.
27
28

PPN et al v. UAD et al                                    1          Case No.: C 07 2648 SI
Declaration of Michael S. Biggs in Support of
Plaintiff's Ex Parte Application to Continue Date of Hearing
On Preliminary Injunction And Set For Evidentry Hearing

2.    Plaintiffs have retained an environmental engineering firm KENNEC EARTH ENGINEERING & SCIENCE.

3.    I have had extensive meetings with KENNEC and on three occasions in January, February and March, as information developed as to the status of Defendants sites and the surrounding areas, I learned that "more testing and analysis" would be necessary.

4.    The need for more scientific assessment has been a function of increasing "negative information" as incremental steps in sample testing and analysis of Defendants site operations has led to more serious concerns.

5.    On February 26, 2008 and on March 13, 2008 I conducted depositions upon Mr. Richard Azevedo of the California Regional Water Quality Control Board.

6.    Mr. Azevedo prepared the ORDER ON ABATEMENT AND CLEAN UP of March 2006.

7.    Substantial testimony by Azevedo revealed an alarming situation whereby, by and large, after two years, the ORDER was never substantially complied with.

8.    For example Defendants never complied with ORDER to retain a licensed engineer to correct and implement best management practices as required, amongst an array of other serious failures and non-compliance, now endangering the public's safety and environment.

9.    An evidentry hearing on Plaintiffs contemplated Motion for Preliminary Injunction is necessary because Mr. Azevedo has not provided a declaration and is needed for oral testimony. under oath in court proceedings.

10.    The timing on the scientific work of KENNEC EARTH ENGINEERING &

PPN et al v. UAD et al                                                    2                        Case No.: C 07 2648 SI
Declaration of Michael S. Biggs in Support of
Plaintiff's Ex Parte Application to Continue Date of Hearing
On Preliminary Injunction And Set For Evidentry Hearing

SCIENCE, increasing complexity of the case at hand, and the bifurcation and coordination with three other attorneys on Mr. Azevedo's depositions presented scheduling difficulties.

11.    I notified opposing counsel in a letter dated March 28, 2008, as to issues on delay and apprised counsel that Plaintiff would apply to the Court to continue the date of hearing on preliminary injunction and ask for an evidentry hearing.

I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES THAT THE FOREGOING IS TRUE AND CORRECT AND THAT THIS DECLARATION WAS EXECUTED ON APRIL 15, 2008 AT PETALUMA CALIFORNIA.

Dated; April 15, 2008

Michael S. Biggs
Attorney for Plaintiffs
Pinoleville Pomo Nation et al

PPN et al v. UAD et al                                                    3
Declaration of Michael S. Biggs in Support of
Plaintiff's Ex Parte Application to Continue Date of Hearing
On Preliminary Injunction And Set For Evidentry Hearing

Case No.: C 07 2648 SI