1    BIGGS LAW PC
     Michael S. Biggs, Esq.  SBN: 237640
2    Post Office Box 454
     Petaluma, CA 94953-0454
3
     (707) 763-8000 Telephone
4    (707) 763-8010 Facsimile

5    Attorney for Plaintiffs

6

7

8              IN THE UNITED STATES DISTRICT COURT

9           FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11   Pinoleville Pomo Nation, Pinoleville Pomo    Case No. C 07 2648 SI
12   Nation Environmental Association and Leona
     Williams,                                    NOTICE OF MOTION AND
13                                                MEMORANDUM OF POINTS AND
     Plaintiffs,                                  AUTHORITIES IN SUPPORT OF
14                                                PLAINTIFFS MOTION FOR
                                                  PRELIMINARY INJUNCTION AND
15              v.                                SUPPORTING DECLARATIONS OF
                                                  JOHN GAVELLO, JOAQUIN WRIGHT,
16   Ukiah Auto Dismantlers, Wayne Hunt          GEORGE O. PROVENCHER, LEONA
17   Isabel Lewright, Warrior Industries, Inc    WILLIAMS AND DON SMITH WILLIAMS
     Richard Mayfield, Ross Junior Mayfield,
18   Paula Mayfield, Kenneth Hunt, U.S.           FRCP 65
     Alchemy Corporation and DOES 1-50,
19   Inclusive,                                   Date:  06/25/08
                                                  Time:  1:30 P.M.
20   Defendants.                                  Dept:  Courtroom C, 15th Floor
                                                  Judge: Susan Illston
21

22

23

24   _____ /

25                        .

26
     TO:    ALL PARTIES AND THEIR COUNSEL OF RECORD:
27

28

Date:  June 25, 2008

Time 1:30 pm

PLEASE TAKE NOTICE:

On June 25, 2008 at one thirty p.m., at Courtroom C, 15th Floor, United States District Court for the Northern District of California, 450 Golden Gate Ave., San Francisco, Ca 94102, plaintiffs will move the Court to issue an order requiring site operators UAD and MAYFIELD to Cease and Desist from all industrial operations at UAD and MAYFIELD sites within the exterior boundaries of the PINOLEVILLE POMO NATION pending completion of the following requirements:

Retain licensed engineer or licensed geologist and lodge CV or resume with Court and PPN Tribal Council.

Provide access for PPN Tribal Council TO UAD and MAYFIELD sites over 60 days for PLAINTIFFS sediment and soil testing and further and extensive testing as contemplated in Declaration of Joaquin Wright of KENNEC INC EARTH ENGINEERING & SCIENCE.

Under supervision of licensed engineer or licensed geologist, remove all contaminated soil off UAD and MAYFIELD sites until all hazardous materials and or constituents are below CAL EPA MCL limits, legally and properly, and in compliance with all state and federal regulations, and in a manner when moving dirt about, not to create hazards such as airborne particles such as lead. Provide manifest and written documentation to Court and PPN Tribal Council as to transportation and destination of contaminated soil.

Put down Asphalt where industrial operations are contemplated.

Submit plan for Best Management Practices (BMP) to prevent pollution and illegal discharge of pollution certified and prepared by a licensed engineer or licensed geologist to be lodged with Court and PPN Tribal Council.

Implement BMP'S verified through initial inspection by PPN Tribal Council in order to resume industrial operations, and then twice monthly monitoring for compliance  over 12 month period by PPN Tribal Council.

TABLE OF CONTENTS

I.      INTRODUCTION

        ...........................1

II.     Reporting of Storm Water Drainage 2002

        ..........................2

III.    Reporting of Storm Water Drainage 2006

        ..........................3

IV.     CRWQB Order to Cleanup and Abate Discharge

        Issued on March 2006

        ..........................3

V.      Mr. Richard Azevedo of the CRWQB Made The Inspection Visits To
        UAD on January 28, 2008 and February 6, 2008. AZEVEDO Prepared the
        CRWQB ORDER of March 26, 2006 and While Sworn Under Oath in
        Deposition on February 26, 2008 and March 13, 2008 Gave Testimony
        That UAD and MAYFIELD did and Continues To VIOLATE Material
        Terms of the CRWQB ORDER of March 26
        2006
        ..........................4


VI.     Mr. Azevedo's Testimony Establishes That The Whole Technical
        Approach Taken by UAD is in Complete Violation and Total Defiance of
        the Original Abatements and as such Constitutes an Immediate and
        Unacceptable Risk of Irreparable Harm to the Environment and the Public
        Health and Safety

        .......................... 11


VII.    Mr. Azevedos' Deposition Testimony Reveals Detail on the "Cat and
        Mouse " Game Played by UAD and MAYFIELD Over the Last Two years
        was While Continuing to Pollute the Environment and Present Dangers to
        The Public

        .......................... 11


VIII.   On January 8, 2008 at the Peak of a Winter Rainstorm a Site Investigation
        of The Parameter of UAD and MAYFIELD Was Conducted at the Behest
        of PPN by JOAQUIN WRIGHT of KENNAC INC. Under Storm Water
        Conditions Where Overall Assessment was Conducted Including Photo

Documentation of Site Conditions and Surface Water and Soil Samples Were Taken Under Forensic Standards The UAD Site Was Found Seriously Lacking in Overall "Basic" Best Management Practices as Required Under Law Lacked Storm Water Source and Treatment Controls ........................ 16

a)  KENNEC SITE VISIT MEMORANDUM JANUARY 8, 2008

........................... 17

IX.    Recent Sediment and Soil Samples Performed by KENNEC INC, Indicate Contaminant Levels In Excess of CAL EPA Maximum Contaminate Limits Presenting Ongoing and Immediate Harm To Public Health and Safety and Environmental Integrity ....................... 17

a)  KENNEC SITE VISIT MEMORANDUM APRIL 10, 2008 ........................... 17

b)    Declaration of George O. Provencher Explains the Implication of KENNEC INC. Sediment and Soil Samples ........................... 18

X.    The Defendants Have Failed and Continue To Fail to Implement Adequate BMP's to Prevent the Discharge of Storm Water and Pollutants Resulting in Discharge of Constituents Presenting Immediate Risk of Irreparable Harm To Public Health and Safety and the Integrity of the Environment .......................18

XI.    UAD and MAYFIELD Site Operators Have Had Amble Time to Remediated the Stated "Problems" Mr. Azevedo's Deposition Testimony Confirms UAD and MAYFIELD Between 2006 and 2007 Went Around in " Great Big Circle" and Nothing Necessary to Protection of the Public's Health, Safety and Integrity of the Environment was Accomplished ...…..................... 18

XII.    LEGAL ARGUMENT ............................................................. 22

XIII.    STANDARD OF REVIEW ON MOTION FOR PRELIMINARY INJUNCTION FEDERAL RULES OF CIVIL PROCEDURE RULE 65 ............................................................. 22

A.    LIKELIHOOD OF SUCCESS ON THE MERITS

............................................................. 23

B.   POSSIBILITY OF IRREPARABLE HARM

............................................................23

C.   THE PUBLIC INTEREST

............................................................. 24

XIV.   THE COURT MAY ALTERNATIVELY ORDER INJUNCTIVE
       RELIEF UNDER RCRA "TO TAKE SUCH OTHER ACTION AS MAY
       BE NECESSARY" TO REMEDY THE POLLUTION

............................................................25

XV.    PLAINTIFF IS ENTITLED TO AN AWARD OF COSTS AND NO
       BOND OR EQUIVALENT IS REQUIRED

........................................................ ....27

XVI. AS A  THIRD BASIS FOR THE COURT TO ORDER AN

INJUNCTION THE PLAINTIFF IS ENTITLED TO A PRELIMINARY

INJUNCTION PURSUANT TO THE CALIFORNIA CIVIL CODE

BECAUSE UAD AND MAYFIELD HAS FAILED TO ABATE A

SERIOUS PUBLIC NUISANCE RESULTING FROM STORM WATER

DRAINAGE

............................................................. 28

XVII. AS A  FOURTH  BASIS FOR THE COURT TO ORDER AN
INJUNCTION PINOLEVILLE POMO NATION HAS STANDING  UNDER
FEDERAL AND PPN TRIBAL LAW AND IS ENTITLED TO A
PRELIMINARY INJUNCTION PURSUANT TO  28 U.S. C.A § 1362
BECAUSE UAD AND MAYFIELD HAS FAILED TO ABATE A SERIOUS
PUBLIC NUISANCE RESULTING FROM STORM WATER  DISCHARGE

XVIII.          CONCLUSION

.............................................................31

EXHIBITS:

Exhibit  (1)  Notice of Violation of Tribal Ordinances

Exhibit  (2)  October 11, Frederick Martin

Exhibit  (3)  ORDER TO CLEAN UP AND ABATE DISCHARGES

Exhibit  (4)  Photographs of MAYFIELD and UAD SITES January 8, 2008.

Exhibit  (5)  KENNEC INC-UAD and MAYFIELD site Assessment January 11, 2008

Exhibit  (6)  KENNEC INC-UAD and MAYFIELD site Assessment April 10, 2008

## TABLE OF POINTS AND AUTHORITIES

FEDERAL CASES

Stuhlbarg Int'l Sales Co. v. John D. Brush & Co., Inc., 240 F3d 832 (9th Cir. 2001) ....30

Republic of Philipines v. Marcos, 862 F2d 1355, 1362 (9th Cir. 1988).....30

Sammartano v. First Judicial District Court, 303 F3d 959 (9th Cir. 2002).....30, 32

Los Angeles Memorial Coliseum Commission v. National Football League, 634 F.2d 1197, 1201 (9th Cir.1980) ........30

Caribbean Marine Services Co. v. Baldrige, 844 F.2d 668, 674 (9th Cir.1988),....33

Fund for Animals v. Lujan, 962 F.2d 1391, 1400 (9th Cir.1992) .....33

Westlands Water Dist. v. Natural Resources Defense Council, 43 F.3d 457, 459 (9th Cir.1994).............33

Knight v. Shoshone and Arapahoe Indian Tribes of Wind River Reservation, Wyo.670 F.2d 900C.A.Wyo., 1982................40

FEDERAL STATUTES

Comprehensive Environmental Response, Compensation and Liability Act (CERCLA)  42 USC § § 9601(14) ......   25

Solid Waste Disposal Act (SWDA) [42 USC §§ 6901 et seq.].  .... 26

Resource Conservation and Recovery Act (RCRA) section 7002(a)(l)(A)......33

Resource Conservation and Recovery Act (RCRA) section 7002(a)(l)(B)......33

RCRA. 42 U.S.C. § 6972(a)(l)(A)...............33

42 U.S.C. § 6972(a)(l)(B) .................33

 42 U.S.C. § 6972(a) 6972(c)...................34

42 U.S.C. §6972(a) ...................34

42 U.S.C. § 6928(a) and (g) ................35

42 U.S.C. § 6903(27)......35

42 USC Sec. 6972(e)..............36

28 U.S.C.A. § 1362 .......40

ACTS CITED

Solid Waste Disposal Act (SWDA) [42 USC §§ 6901 et seq.].  .... 18

Comprehensive Environmental Response, Compensation and Liability Act (CERCLA).. ... 18

Resource Conservation and Recovery Act (RCRA) ...........25

Atomic Energy Act of 1954, as amended (68 Stat. 923)(42 U.S.C.2011et seq. ...27

SPECIFIC STATUTES CITED

FEDERAL RULES

Federal Rules of Civil Procedure, Rule 65 ...........   29, 30, 36

PINOLEVILLE POMO NATION ORDINANCES ...........8

Nuisance Ordinance § 5 .......................8, 41

Nuisance Ordinance § 3(a) ...................8,41

Nuisance Ordinance § 3(a)(4) ...............8,41

Water Quality Ordinance § 4(a) ..............8,41

Water Quality Ordinance Section 8 (Clean Up and Abatement) part (a) ......8,41

Pinoleville Band of Pomo Indians Environmental Policy Act (Section 205.1) ....8,41

PINOLEVILLE POMO NATION REGULATIONS

Pinoleville Indian Band of Pomo Indians Environmental Policy Act .......8,41

Section 102 part (c) .......8,41

STATE CASES

Mangini v. Aerojet-General Corp., 230 Cal.App.3d 1125, 1134 (3rd Dist.,1991) .....37

Leslie Salt Co. v. San Francisco Bay Conservation & Dev. Com.,153 Cal.App.3d 605 (1st Dist.,

Div. 2, 1984) .............38

Sprecher v. Adamson Companies, 30 Cal.3d 358 (1981) .................39

Lussier v. SanLorenzo Valley Water Dist., 206 Cal.App. 3d 92, 101 (6th Dist., 1988)

............................ 39

Civil Code

California Code of Civil Procedure § 731 ..........37

Civil Code § 3479 ...............37, 39

Civil Code § 3480 .................37, 39

California Civil Code § 3483 .......37,38

Fish & Game Code § 5650 ......... 39

Fish & Game Code § 5650.1 .............39

Government Code

California Government Code § 66600 ............38

California Government Code § 66682..............38

Health and Safety Code

California Carpenter-Presley-Tanner Hazardous Substance Account Act (HS AA) [California

Health & Safety Code §§ 25300, [et seq.] ..........25

Water Code

Water Code § 13050(e) .........37

Section 13304(a) ....................37

Other Authorities

Rest.2d, Torts, § 839.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. STATEMENT OF FACTS

1.        Plaintiff has proven scientifically through site analytic testing that what is happening on UAD and on the MAYFIELD sites rises to unacceptable levels of serious toxic pollution concerning  LEAD, CHROMIUM, NICKEL, ETHYBENZENE, TOLUENE, XYLENE, and TPH – HYDROCARBONS, adversely affecting the surrounding land, U.S. Trust land (PPN),  the community at large, Ackerman Creek and the Russian River watershed. The Declarations of Leona Williams and Don Smith Williams describe how the land and environment continues to be destroyed by site operators UAD and MAYFIELD.

2.        A serious threat to public health and safety and environmental integrity exists right now and all industrial activities of UAD and MAYFIELD sites must be stopped right now in order to prevent further irreparable harm to public health and the environment and give room to abatement, cleanup and remediation of the dangerous conditions after over two years of site operators UAD and MAYFIELD ignoring the California Water Quality Control Board (hereinafter CRWQCB) and six years since ignoring the Pinoleville Pomo Nation's Tribal Council and citation on MAYFIELD to stop running discharge onto Tribal lands in violation of PPN Tribal Ordinances and Regulations:

Nuisance Ordinance § 5

Nuisance Ordinance § 3(a)

Nuisance Ordinance § 3(a)(4)

Water Quality Ordinance § 4(a)

Water Quality Ordinance § 8 (Clean Up and Abatement) part (a)

1  Pinoleville Band of Pomo Indians Environmental Policy Act (§ 205.1)

2  and PINOLEVILLE POMO NATION REGULATIONS.

3  3.              Pinoleville Indian Band of Pomo Indians Environmental Policy Act,

4  Section 102 part (c), SEE EXH. 1. (Mr. Rick Mayfield R&M Backhoe; Notice of Violation of

5  Tribal Ordinances-dated January 22 2002).

6  4.      Immediate action is required. Defendants own testing submitted to CRWCQB operates to

7  minimize the impacts of other constituents such as Lead , Ethylbenzene, Toluene, and Xylene the

8  same constituents discovered through certified laboratory analysis at behest of Plaintiff by

9  highlighting only the effects of Hydrocarbons in their report of October 11 2007, SEE EXH. 2.

10  5.      The facts stated below are supported by the Declaration of Joaquin Wright of

11  KENNEC INC EARTH ENGINEERING AND SCIENCE, the Declaration of George

12  Provencher Director of Tribal Operations, Pinoleville Pomo Nation Chairperson Leona Williams,

13  Pinoleville Pomo Nation Environmental Association Chairperson Don Williams, John Gavello,

14  Private Investigator and Deposition testimony by Richard Azevedo of the California Regional

15  Water Quality Control Board (hereinafter CRWQCB).

16  **II. Reporting of Storm Water Drainage 2002**

17  6.      In 2002 the MAYFIELD site was documented discharging pollution and waste onto

18  tribal lands. MAYFIELD was cited by the Pinoleville tribal council under PPN ordinances and

19  regulations. PPN's environmental director Nathan Rich served a notice of violations on

20  MAYFIELD to stop discharging pollution and that MAYFIELD would be liable for a fine.

21  (Notice is attached to the complaint on file with the Court-for the Courts convenience the Notice

22  is attached hereto as EXH. 1)

23  7.      MAYFIELD facility located adjacent to UAD is used essentially as a "trucking" facility

24  as heavy equipment and diesel trucks belonging to MAYFIELD business R&M Backhoe are

25  kept on site. MAYFIELD subleases to Davy Tree and a number of heavy trucks belonging to

26  Davy Tree are kept on site as well as above ground fuel yanks and an array of industrial tools

27  and supplies.

28  8.      PPN's notice and demand went ignored. PPN does not have a vehicle for enforcing- its

1   laws other than through the United States District Court.

2         **III. Reporting of Storm Water Drainage 2006**

3   9.     On January 7, 2006, The Pinoleville Pomo Nation (PPN) notified the California Office of

4   Emergency Services (hereinafter OES) that oil and debris were spotted flowing out of the UAD

5   site and the MAYFIELD site onto adjacent lands and into Ackerman Creek. PPN also notified

6   the California Department of Fish and Game,

7   10.    PPN coordinated an unannounced site visit on January 31, 2006, upon UAD and the

8   MAYFIELD site led by San Francisco EPA, and the California Department of Fish and Game,

9   who was joined by the California Regional Water Quality Control Board, Richard Azevedo.

10   10.    A second unannounced site visit was made upon UAD and the MAYFIELD site on

11   February 6, 2006.

12   11.    On March 29 2006, The CRWQB issued an ORDER TO CLEANUP AND ABATE

13   DISCHARGES consolidating the findings of the investigatory agencies (See EXH. 3)

14      **IV. CRWQB Order to Cleanup and Abate Discharges Issued on March 2006**

15   12.    The CRWQB order, set forth three categories for abatement and remediation, which for

16   the most part, two years after issuance of the order, the evidence will show has largely been

17   ignored as UAD played a "cat and mouse" game of "attrition by time" with CRWQB, by making

18   many false promises, submitting sub-standard "non-compliant" proposals not conforming to

19   CWRQB's  order and using a  consultant "NEST consulting" who is not properly qualified as

20   set forth in the order which required a licensed engineer or licensed geologist .

21   13.    All the while UAD openly defied the CRWQB order and meanwhile UAD has continued

22   to cause or threaten to cause pollution, contamination, and failed to reduce or prevent discharge

23   of pollutants associated with industrial activities presenting immediate and irreparable harm to

24   the environment, public health and safety.

25   14.    The three categories contained in the order shown below are identified as a) Short-term

26   abatement and b) Long Term abatement a) Soil and Ground Water Investigation (See EXH. 3 for

27   full text of Order to Cleanup and Abate Discharge)

28

15.    Contends of Order on Abatement and Cleanup # R-2006 – 0036

A. Short-Term, Abatement:
All work performed shall be conducted in accordance with all local ordinances. All necessary permits shall be obtained.
1. Take actions to immediately abate the discharge of storm water containing oily waste, petroleum, and auto-related pollutants forthwith. This shall include, but not limited to:
a. Installation of a temporary, lined oil/water separator, or equivalent, an *oil* collection area and use of adsorbent booms and pads to remove floating product, as needed.
b. Interim measures to prevent, to the extent possible, the discharge of pollutants in storm water, such as installation of an onsite storm water runoff containment area, or surface water mn-on diversion.
c. Cleanup of all floating oil and grease and petroleum products.
d. Containment and disposal of all solid and liquid debris or waste, for example absorbent pads used to remove floating product, leaking cars or other material, that obviously contribute to floating products or discharge of automotive-related pollutants.
e. Temporary containment for the car crusher and implementation of interim operating practices to prevent discharges to soil from the car crushing activities.
I Cleanup of all solid waste, oily materials, and soils discharged offsite during the recent flood events to the extent practicable.
2. By May 13, 2006 submit a report to the Executive Officer documenting all activities undertaken to date. Written descriptions, a site map showing locations, field marking of locations and photo-documentation shall be included in the report.

B. Long Term Abatement
All soil and water investigations and any storm water conveyance and treatment systems shall be conducted in accordance with all local ordinances and under the direction of a California Registered Geologist or Registered Civil Engineer experienced in the investigation and cleanup of petroleum hydrocarbons and pollutants related to auto dismantlers.
1. By June 1, 2006, the Dischargers shall submit a proposal to the Executive Officer detailing long-term Facility improvements, both capital and operational, designed to prevent the discharge of automotive fluids and automotive-related pollutants to soil, surface water and groundwater. This proposal shall include, but not be limited to:
a. Improvements to the automotive processing area such as installation of impermeable working surfaces and roof structures to prevent rainfall from contacting the area, to the extent practicable, in order to prevent discharge of automotive fluids to soil arid groundwater.
b. Containment structures surrounding the automotive processing area to collect and direct all rainfall runoff and spills within the processing area.
c. Improvement to the car crushing process to eliminate discharge of automotive—related pollutants.
d. Treatment or disposal processes to eliminate, or treat storm, water runoff from the automotive processing and car crushing areas.
e. A time schedule to install and implement improvements.
f. Generalized site map of the Facility and improvements.
g. Detailed design drawing of improvements, as needed.
h. Improvements to parts storage and handling to include roofing, impermeable bases, and for a process to clean parts to eliminate automotive-related pollutants from *contacting* storm water.
i. Improved practices to reduce and/or eliminate the discharge of automotive fluids from cars in the storage area.
j. Design of surface water drainages and treatment processes to ensure storm water pollutant removal before discharge from the Facility and the adjacent property.

k. Written operations plan and employee aiming plan to ensure proper operations at the Facility.

C. Soil and Ground Water Investigation
By June 1, 2006, the Dischargers shall prepare and submit a work plan proposing a limited soil and groundwater investigation focusing on assessing the groundwater quality under, and emanating from, the Facility and Adjacent Property and assessing the extent of soil contamination that would impair either surface water or groundwater. The work plan should include, but no be limited to:
a. Map-of-the-Facility, surrounding properties, and Ackerman Creek.
b. Location of all known wells within $\frac{1}{2}$ mile of the Facility.
c. Location of onsite septic or domestic waste disposal systems.
d. Identify location of major activities, current and historical.
e. Proposed soil and groundwater sampling locations, sample techniques, and suite of analytes.
f. Determining the direction of groundwater flow.
g. A time schedule to implement the work plan and submit a final report of results. The time schedule shall be approved by the Executive Officer and activities shall be conducted in accordance with the approved schedule.
If, for any reason, the Discharger is unable to perform any activity or to submit any document in compliance with the schedule set forth herein or in compliance with any work schedule submitted pursuant to this Order and concurred with by the Executive Officer, the Discharger may request, in writing, a specified time extension. The extension request must be received by the Regional Water Board at least five days in advance of the due date, and shall include justification for the delay, including a description of good faith efforts performed to achieve compliance with the due date. The extension request shall also include a proposed time schedule with new performance dates for the due date in question and all dependent dates. An extension may be granted for good cause, in which case this Order will be revised accordingly. A failure to deny a requested extension of time in writing shall not be deemed approval.

**V. Mr. Richard Azevedo of the CRWQB Made The Inspection Visits To UAD on January 28, 2008 and February 6, 2008. AZEVEDO Prepared the CRWQB ORDER of March 26, 2006 and While Sworn Under Oath in Deposition on February 26, 2008 and March 13, 2008 Gave Testimony That UAD and MAYFIELD did and Continues To VIOLATE Material Terms of the CRWQB ORDER of March 26, 2006.**

16.    MR AZEVEDO's Deposition Testimony:

  See Attachment for Copy on Text of Deposition Transcript

    i)    Removal of contaminated soil as contemplated had not been performed as required.

    ii)    Asphalt or impervious surface areas had not been constructed as required.

    iii)    A licensed engineer had never been retained as required.

    iv)    Best management practices (BMP) as required, were seriously lacking.

17.    MR AZEVEDO's Deposition Testimony:

1

<u>See Attachment for Copy on Text of Deposition Transcript</u>

2

Page #18

    23     Q. And in sequence from the very first violation

    24    that you saw, could you tell us about the violations

3

    25     that you saw?

Page # 19

4

    1     A. I could describe them in general categories.

    2     Q. Okay.

5

    3     A. The permit requires a certain level of

    4   paperwork be maintained on-site, the Stormwater

6

    5   Pollution Prevention Plan annual records, that was

    6   generally lacking. The pollution -- permit requires

7

    7   that the facility implement best management practices to

    8   prevent or minimize pollution generation and then some

8

    9   type of pollution treatment or controls prior to

    10   stormwater leaving the site. The facility really did

9

    11   not implement proper best management practices in either

    12   category, and as a result of that, we saw several

10

    13   examples of oil and grease on the ground, practices that

    14   would lead to oil and grease on the ground, which would

11

    15   then become entrained in the stormwater. And so we saw

    16   evidence of oil and grease deposits across the site as

12

    17   well as poor best management practices being

    18   implemented. All of those would be violations of the

13

    19   permit.

    20     Q. With regard to oil and grease on the ground,

14

    21   did you happen to notice if any of this subject oil and

    22   grease was on asphalt?

15

    23     A. Most of the site is bare ground. I don't

    24   really recall if there was any asphalt.

16

    25     Q. And with regard to this subject oil and grease

17

Page # 20

    1   that you saw at this time, as you've described, were you

18

    2   able to ascertain the source of any oil and grease?

    3     A. Well, the source -- that calls for a little

19

    4   supposition. You see oil and grease on the ground, you

    5   see how the facility's operated, and you draw

20

    6   conclusions about what might be causing that. So to

    7   answer that question, the evaluation of the site would

21

    8   indicate it's the operational practices and the lack of

    9   best management practices that would cause that oil and

22

    10   grease to be on the ground and not contained.

    11     Q. Did you see any evidence of oil and grease

23

    12   pooling on the property?

    13     A. What we saw was oil sheens on puddles that --

24

    14   as I said, the facility is basically dirt, so there

    15   would be ruts and uneven ground, and in some of those

25

    16   ruts there would be puddles of water, there would be a

    17   sheen on that. There was apparently oil and grease on

26

    18   the surface that was somewhat emulsified. We did not

    19   see pools of oil, so to speak. What we saw were sheens

27

    20   of oil where oil had ponded on water and water had

    21   either left the site or percolated in, so there was a

28

    22   bathtub ring, so to speak.

    23     Q. With regard to water leaving the site, could

Page # 20 Continued

24  you ascertain where the water was going?

25      A.  The drainage is fairly clear at that site, it

Page # 21

1  seemed.  It seemed that most of the water would end up

2  along the levy, along Ackerman Creek, and then it

3  appears to flow off-site to the west to the neighbor's

4  property along the levy.  We didn't -- we were not there

5  during a rain storm, so we couldn't ascertain if there

6  were any other areas where it would leave the site.

7      Q.  With regard to the sheen that you've

8  described, and with regard to Ackerman Creek, were you

9  able to ascertain how many yards away Ackerman Creek was

10  from the oil sheen?

11      A.  It varied.  There were oil sheens across the

12  site or in various locations of the site, so it could

13  have ranged from right next to the levy which separates

14  Ackerman Creek from the facility to as far away as the

15  back of the main building on Wayne Hunt's property,

16  which would be several hundred feet.

17      Q.  Were you able to ascertain the yardage between

18  the levy and Ackerman Creek?

19      A.  I don't think we made an estimate of that.  We

20  stood on the levy and could look down and see the creek

21  down the bank.  We didn't actually ascertain the

22  distance.  It's fairly close.

23      Q.  Thank you.  With regard to your testimony that

24  water was, I believe -- correct me if I'm wrong, I think

25  you said that in addition to water running off the

Page # 22

1  property, some water was percolating into the soil?

2      A.  The soil at the site is -- basically appears

3  to be on the alluvial, a-l-l-u-v-i-a-l, flood plain

4  deposit, which is generally sand and gravel and fine

5  material.  It has a reasonably high percolation rate,

6  and you would expect, just from knowing a bit about the

7  percolation permeability and soil types, that some of

8  the water would have infiltrated into the soil as well

9  as runoff via the surface drainage.

10      Q.  Did you have an occasion at this time to

11  inspect what I would describe as the Mayfield property

12  at this time in this January 2006 inspection?

13      A.  Yes.

14      Q.  And what did you see on the Mayfield property?

Q.  And what did you see on the Mayfield property?

15      A.  The Mayfield property is adjacent to the auto

16  wreckers and also bounded on the west side by the tribe.

17  I would describe it as a general engineering

18  construction company.  What we saw on-site was

19  consistent with that.  They had fuel storage that was

20  not contained.  The car crusher that belonged to Wayne

21  Hunt was on the Mayfield property at the time.  There

22  were numerous cars being stored on the Mayfield property

23  as well as, I guess you could call it salvage and bits

24  and debris of auto parts and things like that.

Page # 22 Continued

25     Q.  Did you observe any violation on the Mayfield

Page #23

1     property?

2     A.  Yes, I think so.

3     Q.  Can you elaborate, please?

4     A.  Well, the car crusher -- excuse me, the car

5     crusher appeared to be leaking oil and grease onto the

6     ground.  There was definitely oil and material around

7     the car crusher.  The fueling locations for the Mayfield

8     business were not contained in terms of secondary

9     containment.  And there were quite a few cars on-site.

10    We were -- we went along the back of a levy, and we

11    could see -- would be the northeast -- northeast corner

12    of the property along the levy before the water

13    discharged, and then the tribe, a large scour pit that

14    had a bathtub ring of oil in it.  So there would have

15    been a lot of oil carried back to that point, was the

16    evaluation.

17    Q.  Could you elaborate on what you mean by

18    "carried back to that point"?

19    A.  Most of the site appears to be graded towards

20    the levy, so the surface water that would flow onto the

21    site or off of it, across the site appeared to flow back

22    toward the levy, and then the water appeared to flow

23    from west to east along the levy from the Mayfield

24    property onto the tribe.  So the northeast corner

25    appeared to be where water was concentrating and

Page #24

1     scouring and leaving the site.

2     Q.  Can you define what you mean by scouring?

3     A.  Scouring would be the energy in the water

4     actually eroding soil and digging soil up and eroding

5     soil.  So you could use the term, the water eroded some

6     of the soil.  Generally, you can also say it scoured,

7     which is to scour out or to dig out.

8     Q.  You had mentioned runoff onto tribal lands.

9     Can you elaborate as to your observations as to that?

10    A.  Well, as I said, it appeared most of the

11    drainage flowed from the front toward the back of the

12    facility to the levy along Ackerman Creek, and then

13    west -- was directed west to east from the Mayfield

14    property.  Then the natural drainage appeared to drain

15    onto the tribal property along the levy.

16    So what we observed -- we stopped at the fence

17    line on the Mayfield property.  We didn't enter onto the

18    tribal property, we didn't have permission or a tribal

19    representative, but what we saw was discharge from the

20    Mayfield property entering onto tribal property at that

21    time, at that point in time, we could see some debris in

22    terms of drums on the tribal property from that vantage

23    point.

24    Q.  At that time while you were at that vantage

25    point, were you able to ascertain the point source of

Page #25

1     where that drainage was originating from in the first

Page #25 Continued

2    place?

3      A.  No.  Rainfall is generally not considered a

4    point source unless it's directed into a ditch or a

5    culvert.  So there is road runoff from the Pinoleville

6    Road and above it that apparently flooded onto the site,

7    and that would have commingled with rainfall that

8    drained into the back, so there was no point, so to

9    speak, across the site until it reached the drainage

10    ditch along the levy on the tribal property.

11      Q.  Were you able to ascertain if any of the water

12    could have been flowing from UAD on to Mayfield

13    property?

14      A.  It appeared that the natural drainage along

15    the levy was from west to east, so it would go from UAD

16    across Mr. Mayfield's property and continue on to tribal

17    property.

18      Q.  Did you at this time, from this vantage point,

19    observe any, what you described earlier as sheen on the

20    water while it was on the Mayfield property?

21      A.  Yes.

22      Q.  Can you elaborate on that, please?

23      A.  Along the back of the facility at the Ackerman

24    levy at the fence line between Mayfield and tribal

25    property was a scour hole.  The water had dug out a hole

Page #26

1    there, and you can see there was a small amount of water

2    flowing along the levy coming into that.  You could see

3    some oil and sheen on that, and I would have to check my

4    notes to see if there was a sheen across other areas of

5    the property.  I don't want to confuse the general

6    inspection with the follow-up inspection, but we did see

7    additional sheens on the Mayfield property, I believe.

8      Q.  We can just do one inspection at a time to

9    keep things clear.

10      A.  I actually don't recall because the

11    inspections were so close together, I'd probably have to

12    refer to my notes to see what else I had reported as far

13    as observations.

14      Q.  Okay.  Well, right now, if we may, let's stay

15    where you're describing, you know, this vantage point.

16    I think you said that you walked over onto the Mayfield

17    property, you were looking around.  You just referred to

18    the scour hole.  Do you recollect approximately the

19    yardage the scour hole was from Ackerman Creek?

20      A.  Well, the scour hole was roughly at the base

21    of the levy, and the levy separates Ackerman Creek from

22    the Mayfield property, and we did not make an estimate.

23    What I would tell you is the hole was at the base of the

24    levy, and Ackerman Creek was fairly close to the levy on

25    the back side, so it would be -- we could make some

Page #27

1    estimates of less than a hundred feet probably, even

2    closer than, but we did not measure it at the time.

3      Q.  Do you recall about how deep this hole was?

4      A.  No.

Page #27 Continued

5    Q.  Do you recall if you saw any sheen in that
6  hole?
7    A.  What we did see was, let's use the analogy of
8  a bathtub, just use the scour hole as a bathtub.  What
9  we saw was a bathtub ring of oil in the scour hole, so
10  the water entering along the levy had a little bit of
11  sheen on it, but what we did see really markedly was
12  this bathtub ring of oil in the scour hole from a
13  previous -- probably during the storm, was deposited in
14  there and was deposited in the soil and the water
15  receded somehow.
16    Q.  Thank you.  A little bit earlier, with regard
17  to this visit, you mentioned best management practices.
18  Can you elaborate on your observations at this time of
19  any inadequate best management practices?
20    A.  The general operation as a whole appeared
21  substandard in terms of best management practices.

Page #28

1  until they're crushed.
2  If you look at the BMP's for preventing oil,
3  like, from impounded or wrecked cars, there were
4  essentially none.  There were hoods missing off the
5  cars, which exposes the engine block and things to rain.
6  The auto industry generally recommends that the hoods
7  are on the cars or a tarp placed over the cars.  The
8  cars were outdoors on bare ground, which is essentially
9  no BMP's.
10  We do not know how the fluids were drained, we
11  never watched that, but the facility reported they just
12  would use a small tote or bin and drain them out and
13  carry off the oil to the hazardous waste storage area.
14  So all in all, the best management practices were really
15  lacking, which was fairly very noticeable in the general
16  context.

18.    Because UAD and MAYFIELD Has Failed to Comply with the CRWQB ORDER TO CLEANUP AND ABATE DISCHARGE of March 2006 Resulting in Immediate and Ongoing Environmental Deterioration and Continuing Public Health and Safety Exposure Presented by Discharge of Toxic Constituents and Toxic The Court Should Enjoin UAD and MAYFIELD From all Industrial Activities Until UAD and MAYFIELD demonstrate they have done the following

i)    Retain licensed engineer or licensed geologist

ii)    Remove  contaminated soil

iii)    Put down Asphalt where industrial operations are contemplated

iv)    Submit plan for Best Management Practices (BMP) to prevent pollution and illegal discharge of pollution certified and prepared by a licensed engineer or licensed geologist

v)    Implement BMP'S verified through inspection and monitoring by PPN Tribal Council.

19.    There is a reason why licensed engineers are required in building design and maintaining bridges because interest of public safety is at stake. Here UAD and MAYFIELD site operators' have <u>ignored</u> the requirement presented by the CRWQCB ORDER to have a licensed geologist or engineer prepare site evaluations and direct in design and implementation of BMP's.

20.    UAD and MAYFIELD site operations continue to present a serious threat of immediate and  ongoing harm to the public's health and safety  and the integrity of the environment.

21.    In part for the for the following three reasons the UAD and MAYFIELD sites are continue to be dangerous and substandard operations:

a) Technical work not directed by a licensed geologist or licensed engineer presents risk to the public

b) Order on Abatement and Cleanup requires a licensed geologist or licensed engineer who can certify to the performance and sufficiency of the process.

c) No validity to NEST remediation and technical efforts as Engineers stamp is not present anywhere on any all papers submitted by NEST.

**VII. Mr. Azevedos' Deposition Testimony Reveals Detail on  the "Cat and Mouse " Game Played by UAD and MAYFIELD Over the Last Two years was While Continuing to Pollute the Environment and Present Dangers to The Public**

22.    <u>MR AZEVEDO's Deposition Testimony</u>

  See Attachment for Copy on Text of Deposition Transcript

Page #197

25    Q.  Now, with regard to that percolation pond, has

Page #198

1   your office seen any engineering diagrams or materials
2   related to the construction of that pond?
3      A.  We have received something from NEST in a
1   your office seen any engineering diagrams or materials
2   related to the construction of that pond?
3      A.  We have received something from NEST in a
4   schematic drawing of where it's located and a
5   cross-section, a conceptual cross-section of the
6   drawing.
7      Q.  I want to ask you a question about NEST.  I
8   understand that the gentleman with NEST is one Frederick
9   Martin; is that correct?
10     A.  Yes.
11     Q.  Would that be the gentleman that submitted
12  what you just described?
13     A.  Yes.
14     Q.  Do you have any personal knowledge as to his
15  qualifications as an engineer?
16     A.  Beyond what is on his signature block, which
17  says, "Registered Environmental Assessor," I have no
18  information.
19     Q.  Would you happen -- I assume MS stands for
20  master's in science?
21     A.  Yes.
22     Q.  I see, but could you enlighten me as to what
23  the capitals REA might refer to?
24     A.  Registered environmental assessor.
25     Q.  And what is a registered environmental

Page #199

1   assessor?
2   MS. NIEMEYER:  I'm going to object unless he
3   has knowledge, but this isn't something that he
4   necessarily knew about.
5   THE WITNESS:  It's defined in the law.
6   Registered environmental assessor is defined in the law.
7   BY MR. BIGGS:
8      Q.  Do you have any knowledge?  And again, if you
9   don't know, you don't have to guess.
10     A.  I actually don't recall the specific
11  definition.
12     Q.  Would you happen to know, by chance, if
13  there's a licensing requirement for an REA?
14     A.  I believe there's an experience requirement.
15  I don't recall if there's a testing requirement that
16  goes with that.  Certainly, less than any -- anything
17  licensed through the Board of Professional Registration
18  for geologists and engineers.
19     Q.  The reason I'm asking is our records check
20  indicates no licensing whatsoever for this gentleman.
21  Has your office ever done any kind of check on his
22  licensing?

Page #199 Continued
23    A.   No.
24    Q.   Okay, thank you.  So now I want to go back to
25  this list over here.  Now, you already clarified for us

Page #257
21    Q.   By the way, looks like we have three or four
22  items left, so I think, as far as my side is concerned,
23  we'll be wrapping up maybe within ten minutes.
24    A.   Okay.
25    Q.   But this next document, the second document

Page #258
1  that is dated January 6, 2008, I find a little
2  perplexing, so let me spend a little time on this.
3         (Whereupon, Plaintiffs' Exhibit No. 48 was
4  marked for identification.)
5  BY MR. BIGGS:
6    Q.   So we have this document here.  To be frank
7  with you, I don't understand it.  Page 2, we have this N
8  equals N-O with a large E, I-N one-half equals dash
9  0.093 equals 1,732 seasons.  I'm not an engineer, but
10  you are, and will you spend some time -- we're almost
11  done anyway -- and take a look at this, and the best you
12  can so that lay people can understand, tell us what this
13  is about, what Mr. Martin is communicating to your
14  office.
15    A.   The Regional Board posted a notice of public
16  hearing for proposed remedial action, and in that
17  posting was a map that showed some -- the extent of the
18  excavation we thought was reasonable based on the soil
19  samples results that we had to date.  And we had asked
20  for responses from all parties in 30 days.
21  This is the response from Fred Martin with
22  regards to that proposal.  They're essentially making
23  numerous arguments in different directions that it's
24  unnecessary to remove the amount of soil that we
25  considered appropriate, and their capstone is, after all

Page #259
1  these arguments and that sort of thing, they proposed to
2  remove one cubic yard of soil, backfill those locations,
3  and to pave.  That's what they're proposing.
4  And so everything preceding the last paragraph
5  is really their arguments and their rationale for not
6  removing soil, and it ranges from cost, it ranges
7  from we'll use more diesel than is in the soil, it's
8  relatively immobile, and we're using this equation to
9  try to get at the rate of leaching, et cetera, et
10  cetera, et cetera.  So their conclusion is, it's not
11  appropriate to remove that soil.
13    Q.   Anything further on that?
14    A.   I think that covers it in conceptual terms.

Page #252
1  dated October 11, '07.  Do you recognize this document?
2    A.   Yes.
3    Q.   Have you read this document before?

---

Page #252Continued

4    A.  Yes.

5    Q.  What does this document tell us?

6    A.  It describes their soil testing results,
7  basically talks a little bit of how they moved soil in
8  preparation for the paving, talks about some of the
9  things they've encountered.  It talks about the fact
10  that the concentration, hydrocarbon concentrations in
11  the soil increase with depth.  And he has a summary
12  chart of analysis done.  He's basically presenting some
13  information here, summarizing what he's done and making
14  some evaluations.

15    Q.  Do you have anything else to say about this
16  document?

17    A.  We don't agree with some of his conclusions.

18    Q.  Can you specify what those disagreements are,
19  please?

20    A.  They're making the assumption that there's
21  little or no potential for affecting local groundwater
22  quality.  I'm not sure that we would agree with that
23  statement at the time.

24    Q.  Do you not agree -- do you agree with that
25  statement now?

Page #253

1    A.  The Water Board, in November of '07, conducted
2  some sampling, and we've reviewed NEST's sample results
3  in terms of the total insoluble hydrocarbons out there,
4  and it's the conclusion of staff at this point in time
5  that there is some soluble hydrocarbons out there that
6  probably can or could get into the groundwater.

7    Q.  Were those notes, tests, and other materials
8  part of the file that we would have received?

9    A.  The Regional Board sample results and sample
10  events would have been in the file.  I do remember
11  seeing those.

12    Q.  Okay, so they should be here.  Okay.  Thank
13  you.

14    And now we will move to this document.  It's a
15  three-page fax, and if you'll mark that, please.

16    (Whereupon, Plaintiffs' Exhibit No. 46 was
17  marked for identification.)

18  BY MR. BIGGS:

19    Q.  This document is dated October 15th.  It's
20  addressed to you, looks like it's from Mr. Martin of
21  NEST.  Do you recognize this document?

22    A.  Yes.

23    Q.  And have you read this document before?

24    A.  Yes.

25    Q.  Are you able to tell us what this document

Page #254

1  means?

2    A.  The original results that Fred Martin and NEST
3  sent to us had some detail lacking.  For example, the
4  table that's in this refers to detection limits.  The

Page #254 Continued

5  original sample results didn't have detection limits.  A
6  result or a non-detectable result has no meaning unless
7  you actually know what the detection limit is, so you
8  have some perspective on that.
9       So in other words, we asked them to provide
10  the detection limits for the tests that he performed,
11  and that's what this table is.  For the different
12  constituents, he's listed the detection limits for the
13  total petroleum hydrocarbon test and the wet tests.  So
14  that's what these are.
15       And then he's making some analysis regarding
16  the motor oil and diesel oil, and he's making a lot of
17  presentations about lead, what he's done in the past,
18  which generally don't have a lot of merit in terms of
19  supporting what he's proposing.  Again, he's saying
20  asphalt over this would encapsulate it, and we're not
21  accepting what he's proposing, and we don't feel what
22  has been submitted is adequate to document that it's not
23  a problem to water quality now or in the future.
24     Q.  Any further comments on this document?
25     A.  Well, yes, since you mention it.  Look at the

Page #255

1  detection limit on the wet test for lead.  Lead is where
2  the column says PB.  So the detection limit is listed as
3  0.1 milligrams -- parts per million.  That's really a
4  hundred micrograms per liter.  Fortunately, the current
5  groundwater standard for lead in water is considerably
6  less than a hundred micrograms, so when you do a soluble
7  test that has a detection limit higher than water
8  quality standard, the tests have no meaning.  The test
9  results have no validation.  The detection limits were
10  too high, so essentially we rejected all the wet tests
11  for lead because of that reason.  So that's probably the
12  most striking thing that you would see here.
13     Q.  Anything further?
14     A.  No.
15     Q.  Thank you.  Let us now turn to a document here
16  dated January 6 of 2008.
17       (Whereupon, Plaintiffs' Exhibit No. 47 was
18  marked for identification.)
19  BY MR. BIGGS:
20     Q.  This document is from Mr. Martin of NEST.
21  It's addressed to you, and as I read this, it has a lot
22  of formulas, a lot of math in here.
23       MS. NIEMEYER:  I'm sorry, the next document
24  is --
25       MR. BIGGS:  January 6.

Page #256

1       MR. NEARY:  There's two of them.
2       THE WITNESS:  There's two of them.
3       MS. NIEMEYER:  So you're referring to --
4       MR. BIGGS:  Yes.
5       MS. NIEMEYER:  So I don't think that --

Page #256 Continued

6      MR. NEARY:  That's the problem we have if we
7  don't mark the document.
8      MR. BIGGS:  She just marked this one, so --
9      THE REPORTER:  I marked this.
10     MR. BIGGS:  Oh, you did.  Let's back up to
11 that one, then, stay on that one, then we'll go to the
12 other one.
13     So are we all on the same page?
14     MS. NIEMEYER:  The one she --
15     MR. BIGGS:  Okay.
16  Q.  Do you recognize this document?
17  A.  Yes.
18  Q.  And this is basically a one-paragraph letter
19 from Frederick Martin to Mr. Azevedo, and it goes to,
20 regarding payment -- pavement on R & M Backhoe facility.
21 It says, "Mr. Rick Mayfield tells me that you requested
22 him to obtain a third party confirmation of a paved area
23 for his facility."  What's that all about?
24  A.  Initially we found petroleum hydrocarbons at
25 sample location A-1, which is on the Mayfield property

Page #257

1  where the car crusher was stored during our original
2  inspection.  There has been discussion between our
3  office and Mr. Mayfield about how he's progressing in
4  cleaning up his site and things of that nature.  And
5  what we asked to have done was, because there were
6  petroleum hydrocarbons detected, was to show us that the
7  petroleum hydrocarbons had been removed and cleaned up,
8  because he had mentioned he had scraped the area and
9  found pavement.  And we had suggested that it would be
10 best that a third party document that that material had
11 been removed and cleaned up.
12     That led to this letter with Fred Martin.
13 Unfortunately, for some reason, we get this letter like
14 this, and we really need more than just there's pavement
15 there.  We need to know that the hydrocarbons have been
16 removed.  So somehow there was a disconnect between what
17 we needed and what we got.
18  Q.  Okay.  Thank you.  Anything further on that
19 point?
20  A.  No, I think that clarifies it.


**VIII. On January 8, 2008 at the Peak of  a Winter Rainstorm a Site Investigation of The Parameter of UAD and MAYFIELD Was Conducted at the Behest of PPN by JOAQUIN WRIGHT of KENNAC INC. Under Storm Water Conditions Where Overall Assessment was Conducted Including Photo Documentation of Site Conditions and Surface Water and Soil Samples Were Taken Under Forensic Standards The UAD Site Was Found Seriously Lacking in Overall "Basic" Best**

**Management Practices as Required Under Law Lacked Storm Water Source and Treatment Controls.s**

## a) KENNEC SITE VISIT MEMORANDUM JANUARY 8, 2008

23.    Joaquin Wright of KENNAC visited the "site" on January 8, 2008, See Declaration of Joaquin Wright (hereinafter Wright Dec.).  During that visit licensed private investigator John Gavello accompanied Mr. Wright and took photographs of the site, <u>SEE</u>, Photographs, identified in Gavello Declaration, EXH. 4 - 1-17, taken by private investigator Gavello in his support of Mr. Wright's January 8, 2008, assessment, showing the UAD and MAYFIELD sites (1) illegal discharge of storm water (2) Industrial operations on bare ground and gross and systemic failure and absence of BMP's, and blatant disregard for the CRWQCB ORDER TO CLEAN UP AND ABATE DISCHARGES - nearly two years after issuance of that ORDER.

24.    Mr. Wright prepared a site visit memorandum. <u>SEE</u> site visit memorandum January 11, 2008, EXH. 5.

25.    Mr. Wright's observations lead to the inescapable conclusion that as of January 2008 UAD had failed to operate under Best Management Practices (BMP) that are in compliance with applicable standards, <u>SEE,</u> Wright Dec. Mr. Wright's observations and conclusions are reiterated in his Declaration at PP 3-7 indicating to what amounts to an absence of any "Best Management Practices".

26.    Also <u>SEE,</u> KENNEC January 8, 2008, site visit memorandum attached page 2, indicating failure of UAD BMP's pertaining to storm water discharge, and the drainage and conveyance system.

### IX. Recent Sediment and Soil Samples Performed by KENNEC INC, Indicate Contaminant Levels In Excess of CAL EPA Maximum Contaminate Limits Presenting Ongoing and Immediate Harm To Public Health and Safety and Environmental Integrity

**c) <u>KENNEC SITE VISIT MEMORANDUM APRIL 10, 2008</u>**

<u>Sampling Activities:</u>

27.    KENNAC collected nine soil and sediment samples – See Site Visit Memorandum of APRIL 10, 2008, EXH. 6, AND Wright Dec. PP 7-8. Soil and sediment samples in eight of the nine samples were above California EPA Maximum Contaminate Limits (MCL) showing lead, nickel and chromium in the drainage pathways and the creek bed (Ackerman Creek) See, Wright Dec. Page 8.

**d) <u>Declaration of George O. Provencher Explains the Implication of KENNEC Inc. Sediment and Soil Samples:</u>**

28.    Mr. Provencher  possesses masters in science from John Hopkins University and has been employed by the U.S. Department of Energy and U.S. Department of Defense and managed a nuclear facility, as well as worked at the U.S. National Laboratories.

29.    Provencher in his Declaration offers succinct scientific analysis on the KENNAC, INC,  and ALPHA ANALYTICAL LABORATORIES sampling results, and over all failure of MAYFIELD and UAD site operations,  and failed and pretextual remedial efforts as arising to "grave" and "seriously dangerous" implications on the public health and safety and environmental integrity, and verifies that both PPN U.S. Trust land has been affected by UAD and MAYFIELD toxic waste as well as Ackerman Creek which crosses through U.S. Trust land (PPN) SEE, Declaration George O. Provencher.

**X. <u>The Defendants Have Failed and Continue To Fail to Implement Adequate BMP's to Prevent the Discharge of Storm Water and Pollutants Resulting in Discharge of Constituents Presenting Immediate Risk of Irreparable Harm To Public Health and Safety and the Integrity of the Environment</u>**

31.    The drainage discharge and industrial activities on "bare naked earth" by site operators UAD and MAYFIELD contains hazardous substances within the meaning of the

1  federal Comprehensive Environmental Response, Compensation and Liability Act (CERCLA)

2  [42 USC § § 9601(14)] and the California Carpenter-Presley-Tanner Hazardous Substance

3  Account Act (HS AA) [California Health & Safety Code §§ 25300, et seq.] The substances are

4  also solid wastes within the meaning of the Solid Waste Disposal Act (SWDA) [42 USC §§ 6901

5  et seq.].

6  32.    Such Constituents as described herein the Declarations of Mr. Wright and Mr.

7  Provencher are a present danger to the public health and safety and the integrity of the

8  environment.

9  **XI. UAD and MAYFIELD Site Operators Have Had Amble Time to Remediated**
   **the Stated "Problems" Mr. Azevedo's Deposition Testimony Confirms UAD and**
10 **MAYFIELD Between 2006 and 2007 Went Around in " Great Big Circle" and**
   **Nothing Necessary to Protection of the Public's Health, Safety and Integrity of the**
11 **Environment was Accomplished.**

12

13

14    MR AZEVEDO's Deposition Testimony:

15  See Attachment for Copy on Text of Deposition Transcript

16

17  Page # 89
         15    Q. Okay, thank you. Referring to number 8,
18       16  installation of formal oil-water separators is necessary
         17  in select locations.  What are formal oil-water
19       18  separators?
         19  A.  Let's put that in context to the facility.
20       20  During January and February, we had oil in the surface
         21  water running off, and Warden Mauer had them create sort
21       22  of an oil-water separator or a way to skim oil off the
         23  surface water, but it was very temporary.  It was
22       24  earthen-lined, it was made out of hay bales, gravel
         25  pipe. What we want to see is a commercial or a proper
23  Page #90
          1  oil-water separator, which is made out of a -- which is
24        2  a structure.  It has a base, it has side walls, it has a
          3  way to scrape oil/water out.  It has a weir, w-e-i-r,
25        4  for water to overflow.
          5  So when we say formal, that would be as
26        6  opposed to the temporary in-ground structure they had
          7  constructed.  You could have replaced that with a word
27        8  such as "commercial" or "appropriately designed"
          9  structure.
28       10  And the oil-water separator, I think, is --

Page #90 Continued

11  are you familiar with oil-water separators?

12    Q.  Not really.  Can you elaborate?

13    A.  Generally, they're an open -- they can be an

14  open-topped container, water flows in, and the oil is

15  allowed to either sometimes settle at the bottom, if it

16  has sediment, or it's -- generally oil floats, so it's

17  meant to take the floating oil off the water before it's

18  discharged, and then those structures are cleaned out

19  and the oil removed.  They're pretty much a standard

20  device used where you find oil and water at most

21  industries.

22    Q.  In your office's order on abatement of

23  March 2006, was a reference made to lack of oil-water

24  separators?

25    A.  Would you repeat that while I take a look at

Page #91

1  this.

2    Q.  In reference to your office's order and

3  abatement and cleanup of March 2006, was any reference

4  made to the lack of oil-water separators or inadequate

5  oil-water separators?

6      MR. NEARY:  Just for the record, I want to

7  object as asked and answered.

8  BY MR. BIGGS:

9    Q.  You may answer the question.

10    A.  Okay.  The short-term abatement, A-1-A,

11  requested the installation of temporary lined oil-water

12  separators or equivalent, and I don't actually see where

13  we require oil-water separators in the long-term

14  abatement.  However, when we're talking about item B-1,

15  which is capital and operational improvements designed

16  to prevent discharge, oil-water separators are pretty

17  standard BMP, so they would be used as needed at the

18  facility.

18      (Whereupon, Plaintiffs' Exhibit No. 12  was

Page #119

4    Q.  Now, in this memorandum, I'll call it, of

5  May 24th, '06, you stated essentially, "Our review

6  indicates that UAD needs more parts storage, more

7  impermeable base and stormwater treatment units such as

8  oil-water separators and operational BMP's."  Is that

9  correct?

10    A.  Yes.

11    Q.  Now, isn't it just true that you testified as

12  to the content of a memorandum dated May of '07, and you

13  were asking UAD to perform the same tasks?

14    A.  Let's take a look at that.

15      The May '07 letter was specifically geared

16  toward the sample results that they had sent in, and we

17  were responding specifically to the sample results that

18  were taken in and around the collection pond.  That's

19  May of '07.

20      Now, this inspection, which was May of '06, we

Page #119 Continued

21   had not received what we considered a final report from
22   UAD under the terms of cleanup and abatement order, and
23   they had not really formalized everything that they had
24   wanted to do.  We're making observations that they still
25   need parts storage, impermeable working surface,

Page #120

1    stormwater treatment.
2        You have to remember that our first inspection
3    was January, February, and this is in May, so we had
4    just received a preliminary report in April, so very
5    little work had been done on-site beyond the interim
6    cleanup and removing cars and oily waste and drums and
7    things like that.  We had not approved a final long-term
8    solution or, excuse me, just a long-term solution, nor
9    had they begun to implement it.
10       Q.  Isn't it true in the order on abatement and
11   cleanup, there's a section in there that addresses
12   long-term solution?
13       A.  Yes.
14       Q.  I am having difficulty locating that
15   correspondence from May of '07.  I'm kind of shuffling
16   papers around here.  Does somebody have an extra copy?
17       MS. NIEMEYER:  Which one, the one we just
18   looked at?
19       MR. BIGGS:  It would be No. 11, I believe, or
20   12.  May of '07.
21       Thank you.
22       MR. HERB:  You may want to wind it up.
23       MR. BIGGS:  We're going to conclude in a

Page # 120 Continued

24   minute.
25       Q.  May I direct your attention back to the letter

Page #121

1    of May of '07, specifically paragraph number 4.  And do
2    you see in the last sentence the statement there
3    beginning, "or other BMP's and how they will discharge,"

Page #121 Continued

4    BMP's referring to best management practices?
5        A.  Uh-huh, yes.
6        Q.  Wouldn't it be accurate to say that with
7    regard to the comment in the letter of May 24th, '06,
8    the one the year before, essentially your office was
9    referring to the same BMP's in general discharge
10   practices, for example?
11       A.  The May '07 letter is requesting a grading
12   map, location and sizing of stormwater treatment
13   features or other BMP's and how will discharge.
14       Q.  Referring back to the letter of May 24th, '06,
15   second paragraph, very last sentence, the last words
16   say -- I'll read the last sentence, says, "Essentially,
17   our review indicates that UAD needs more parts storage,
18   more impermeable base and stormwater treatment units
19   such as oil-water separators and operational BMP's."

Page #121 Continued

20  I'd like to ask you what you meant by operational BMP's

21  here?

22    A.  Operational BMP is an operational management

23  practice, how is the facility going to operate to

24  minimize or prevent pollution to the extent possible

25  that you could do -- just how you conduct your business

Page #122

1  outside of treatment units, physical treatment units.

2  So if -- an operational BMP would be to drain your

3  fluids indoors rather than outdoors.

4    Q.  So is it fair to say it's a general term?

5    A.  Yes, it's how you operate to minimize your

6  problems.

7      MR. NEARY:  I really --

8      MR. BIGGS:  We're going -- excuse me, I'm

9  finishing.  You don't get up and walk out, that's

10  just -- hold on.

11      MR. NEARY:  I thought I said precisely 4:30.

12      MR. BIGGS:  Actually, you, sir, have

13  45 seconds.  You're eating up my time, and I don't

14  appreciate it.  That kind of conduct is unprofessional,

15  and I won't tolerate it.

16    Q.  Mr. Azevedo?

17    A.  Yes, sir.

18    Q.  Excuse the interruption of Mr. Neary, who just

19  used a dilatory tactic to obfuscate what I'm doing here,

20  but isn't it true that UAD and Nest essentially strung

21  your office along because on May 24th of '06, you were

22  asking them to come up with BMP's that work, and then

23  again May of '07 you're still asking them for BMP's that

24  work?

25      MS. NIEMEYER:  I'm going to object to leading,

Page #123

1  argumentative --

2      MR. BIGGS:  You can object all you want.

3    Q.  I instruct you to answer.

4    A.  In May of '06, as you pointed out, our --

5  we're asking for operational BMP's, very generic.  And

6  if you consider the time frame, we had just received a

7  report that wasn't adequate and we were sending it back.

8  In May of '07, we're talking about -- we're

9  being more specific about locations and sizing of BMP's,

10  so we're moving along.  They are still -- they still

11  haven't completed the work we need to in terms of every

12  BMP and designing them and sizing them, but we've moved

13  from '06 when we're at the beginning stages to '07 when

14  we're being much more specific and focusing in on things

15  that are not adequate, so this wasn't done.

16    Q.  This was not done.  I'll conclude there.

## XII. LEGAL ARGUMENT

## XIII. STANDARD OF REVIEW ON MOTION FOR PRELIMINARY INJUNCTION FEDERAL RULES OF CIVIL PROCEDURE RULE 65

33.    The procedure for motions for preliminary injunctions is set forth in Federal Rules of Civil Procedure, Rule 65. The standard of review to be applied to motions for a preliminary injunction is that the moving party must show either: 1) a combination of probable success on the merits and the possibility of irreparable injury; or 2) serious questions as to these matters and the balance of hardships tips sharply in favor of the moving party.  Stuhlbarg Int'l Sales Co. v. John D. Brush & Co., Inc., 240 F3d 832 (9th Cir. 2001).

34.    "Serious questions" means questions that involve a fair chance of success on the merits that cannot be resolved one way or the other at the hearing on the injunction, "and as to which the court perceives the need to preserve the status quo lest one side prevent resolution of the questions or execution of any judgment by altering the status quo." Republic of Philipines v. Marcos, 862 F2d 1355, 1362 (9th Cir. 1988).

35.    The court must also weigh whether the public interest favors issuance of the injunction.  Sammartano v. First Judicial District Court, 303 F3d 959 (9th Cir. 2002).

36.    To be entitled to a preliminary injunction the moving party must demonstrate the probability of success on the merits and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in its favor, Los Angeles Memorial Coliseum Commission v. National Football League, 634 F.2d 1197, 1201 (9th Cir.1980).

## A.  LIKELIHOOD OF SUCCESS ON THE MERITS

37.    The deposition testimony of Mr. Richard Azevedo, and the evidence as described above herein, submitted with the attached declarations, and in light that it is "indisputable" that

the site operators UAD and MAYFIELD have amongst an array of other violations committed serious violations of CWA and RICRA, as described in the CRQCB ORDER ON CLEANUP AND ABATEMENT and Plaintiff's complaint, Strongly favor that Plaintiffs et al, will succeed on the merits of the case.

38.     "The illegal discharges of pollution have been verified" SEE ORDER ON CLEANEUP AND ABATEMENT OF DISCHARGES, KENNEC INC site assessment and sediment and soil sampling results.

40.     Moreover, under doctrine of Res Ipsa Loquitur (the thing speaks for itself) MAYFIELD and UAD instrumentality causing pollution was in Defendants exclusive control and the illegal discharges arose at minimum, notwithstanding evidence of intentional conduct, from Defendants lack of care.

## B.  POSSIBILITY OF IRREPARABLE HARM

41.     The Deposition testimony of Mr. Richard Azevedo entails over two years of UAD and MAYFIELD failure to remediate their sites into compliance with the law. In the meantime these demonstrated "perpetual polluters" have continued their industrial practices without adequate BMP's and have failed to remove contaminated soil and lay down asphalt.

42.     The sediment and soil samples performed by KENNEC and elaborated upon through the Declarations of Joaquin Wright and George Provencher show strong evidence of "ongoing" and potential "greater" harm, to the public health, safety and integrity of the environment.

43.     The levels of lead and other constituents that are now verified as exceeding MCL's as detected can cause serious medical problems, SEE Declaration of. George Provencher.

44.     The Pinoleville Head Start School children are at risk of irreparable harm as well as are the steelhead trout and salmon and every human being and living thing in the area.

45.    Continuation of illegal practices as described herein will cause even more harm to public health and safety and the integrity of the environment.

46.    If MAYFIELD and UAD site operators are not compelled by an order of the United States District Court to comply with the law,  and their sites are allowed to continue to operate illegally, until the time of trial currently calendared to take place in fall 2008, the <u>rainy season will be on</u> and the contemplated site remediation such as contaminated soil removal and asphalt surfaces installed- will be thwarted and year number three –since the ORDER ON ABATEMENT and CLEAN UP  was issued, will pass by, and another year will come and go- and the games will continue to be played at great expense to the public's health and safety and the integrity of the environment, as the Defendants continue to enrich themselves by and through their "bare bones" "minimal expense" industrial operations,  as they maximize their profits with "low over-head" - and all the while more toxic constituents will be discharged or deposited into the environment.


## C. THE PUBLIC INTEREST

47.    The public interest is at issue as the public's health safety and integrity of the environment is at issue. The Russian River watershed is a resource shared by and relied upon by the public at large as well as home for a vast population of insects, bird fish, animal and wildlife and not so vast population of Coho salmon and other "at risk" populations or "endangered" wildlife which are just barely hanging on and don't need Defendants illegal practices threatening their survival.

48.    In deciding on a preliminary injunction on the facts at hand- The Court may examine the public's interest in determining the appropriateness of a preliminary injunction.

49.    In <u>Sammartano</u> v. <u>First Judicial District Court</u>, 303 F3d 959 (9th Cir. 2002) the Court

moved to protect the "public's interest" and the Court said:

"Finally, our precedent requires that we examine the public interest in determining the appropriateness of a preliminary injunction. While we have at times subsumed this inquiry into the balancing of the hardships, see, e.g., <u>Caribbean Marine Services Co. v. Baldrige, 844 F.2d 668, 674 (9th Cir.1988)</u>, it is better seen as an element that deserves separate attention in cases where the public interest may be affected. See <u>Fund for Animals v. Lujan, 962 F.2d 1391, 1400 (9th Cir.1992)</u>; see also <u>Westlands Water Dist. v. Natural Resources Defense Council, 43 F.3d 457, 459 (9th Cir.1994)</u> ("If the public interest is involved, the district court must also determine whether the public interest favors the [movant].").

50.    Similarly the Court in the instant case should consider the "public's interest" at large,

and should decisively move to protect the public's interest.

## XIV. THE COURT MAY ALTERNATIVELY ORDER INJUNCTIVE RELIEF UNDER RCRA "TO TAKE SUCH OTHER ACTION AS MAY BE NECESSARY" TO REMEDY THE POLLUTION

51.    The Resource Conservation and Recovery Act (RCRA) section 7002(a)(l)(A) provides

that any person may commence a civil action against any person or governmental entity alleged

to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or

order which has become effective pursuant to RCRA. <u>42 U.S.C. § 6972(a)(l)(A)</u>. RCRA

7002(a)(l)(B) provides that any person may commence a civil action against any person or

governmental entity including a past or present generator, transporter, owner or operator of a

treatment, storage or disposal facility who has contributed to the past or present handling,

storage, treatment, transportation, or disposal of any solid or hazardous waste which may present

an imminent and substantial endangerment to health or the environment. <u>42 U.S.C. § 6972(a)(l)(B)</u>.

52.    The Complaint in this action includes a claim under RCRA. A plaintiff must first

provide particular notices as prerequisite to an action under RCRA.

53.     No action may be commenced under paragraph (a)(2) of this section prior to sixty days after the plaintiff has given notice to the Administrator that he will commence such action, except that such action may be brought immediately after such notification in the case of an action under this section respecting a violation of subchapter III of this chapter. Notice under this subsection shall be given in such manner as the Administrator shall prescribe by regulation. Any action respecting a violation under this chapter may be brought under this section only in the judicial district in which such alleged violation occurs.

42 USC Sec. 6972(c).

54.     PLAINTIFF(S) have provided the requisite notices as a prerequisite to filing this action against site operators UAD and MAYFIELD (on file with the Court in the complaint). RCRA allows citizens suits for injunctive relief against persons responsible for environmental pollution. Section 6972(a) of RCRA provides:

55.     Except as provided in subsection (b) or (c) of this section, any person may commence a civil action on his own behalf- (1) (A) against any who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to this chapter; or (B) against any person ... any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment;

56.     [T]he district court shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce the permit, standard, regulation, condition,

1  requirement, prohibition, or order, referred to in paragraph (1)(A), to restrain any person who has

2  contributed or who is contributing to the past or present handling, storage, treatment,

3  transportation, or disposal of any solid or hazardous waste referred to in paragraph (1)(B), to

4  order such person to take such other action as may be necessary, or both, or to order the

5  Administrator to perform the act or duty referred to in paragraph (2), as the case may be, and to

6  7  apply any appropriate civil penalties under section 6928(a) and (g) of this title.

8  57.    Site operators MAYFIELD and UAD are "past or present generators, past or present

9  transporters, or past or present owners or operators of a treatment, storage, or disposal facility,

10  who has contributed or who is contributing to the past or present handling, storage, treatment,

11  12  transportation, or disposal of [a] solid ... waste." This fact is clear on the face of the CRWQCB

13  ORDER ON CLEAN UP AND ABATEMENT OF DISCHARGE .

14  58.    RCRA broadly defines a "solid waste" as follows: The term "solid waste" means any

15  garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air

16  17  pollution control facility and other discarded material, including solid, liquid, semisolid, or

18  contained gaseous material resulting from industrial, commercial, mining, and agricultural

19  operations, and from community activities, but does not include solid or dissolved material in

20  domestic sewage, or solid or dissolved materials in irrigation return flows or industrial

21  22  discharges which are point sources subject to permits under section 1342 of title 33, or source,

23  special nuclear, or byproduct material as defined by the Atomic Energy Act of 1954, as amended

24  (68 Stat. 923)(42 U.S.C.2011et seq.) 42 U.S.C. § 6903(27).

25  59.    The Declarations of Joaquin Wright, George Provencher, and Deposition testimony of

26  Richard Azevedo, and the CRWQCB ORDER ON CLEANUP AND ABATEMENT clearly

27  point to solid waste, as defined under RCRA that has been and continues to be discharged from

28

1   UAD and MAYFIELD storm water drainage and otherwise dumped or discarded at their sites.

2   60.        The solid waste presents an "imminent and substantial endangerment to the public's

3   health and safety and the integrity of the environment."

## XV. PLAINTIFF IS ENTITLED TO AN AWARD OF COSTS AND NO BOND OR EQUIVALENT IS REQUIRED

8   61.        Costs may be awarded to the plaintiff under 42 USC Sec. 6972(e):

9   62.        The court, in issuing any final order in any action brought pursuant to this section or

10  section 6976 of this title, may award costs of litigation (including reasonable attorney and expert

11  witness fees) to the prevailing or substantially prevailing party, whenever the court determines

12  such an award is appropriate. The court may, if a temporary restraining order or preliminary

13  injunction is sought, require the filing of a bond or equivalent security in accordance with the

14  Federal Rules of Civil Procedure.

15  63.        Pinoleville Pomo Nation, et al, requests an award of costs on the present motion,

16  according to proof and subject to further hearing.

17  64.        Further, no bond should be required under the Federal Rules of Civil Procedure 65. The

18  Pinoleville Pomo Nation has already incurred thousands of dollars in expense responding to

19  UAD and MAYFIELDS's releases of solid waste and discharge of pollution, and MAYFIELD

20  was cited in 2002 by the PPN Tribal Council at up to $1000.00 per day of violation on tribal

21  environmental ordinances and regulations, for nuisance and for discharging storm water of which

22  MAYFIELDS ignored – leaving the land polluted and now subject to CERCLA.  It would be

23  inequitable to require PPN et al,  to obtain a bond under these circumstances especially in light of

24  MAYFIELDS and UAD economically enriching themselves by minimizing their operations

25  expenses by not following the law in order to maximize their profits at the expense of

26  endangering human health , public safety and the integrity of the environment.

## XVI.  AS A  THIRD BASIS FOR THE COURT TO ORDER AN INJUNCTION

**THE PLAINTIFF IS ENTITLED TO A PRELIMINARY INJUNCTION PURSUANT TO THE CALIFORNIA CIVIL CODE BECAUSE UAD AND MAYFIELD HAS FAILED TO ABATE A SERIOUS PUBLIC NUISANCE RESULTING FROM STORM WATER DISCHARGE**

65.      This alternative basis for injunctive relief is based on California nuisance law. See Mangini v. Aerojet-General Corp., 230 Cal.App.3d 1125, 1134 (3rd Dist.,1991). PPN's authority to bring the action for injunctive relief to abate public or private nuisances is set forth in California Code of Civil Procedure § 731:      An action may be brought by any person whose property is injuriously affected, or whose personal enjoyment is lessened by a nuisance, as the same is defined in section thirty-four hundred and seventy-nine of the Civil Code, and by the judgment in such action the nuisance may be enjoined or abated as well as damages recovered therefore. Civil Code § 3479 broadly defines a "nuisance" as follows: Anything which is injurious to health, including, but not limited to, the illegal sale of controlled substances, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, or river, bay, stream, canal, or basin, or any public park, square, street, or highway, is a nuisance.

67.      The discharge pollution from industrial activities and storm water drainage from the UAD and MAYFIELD site operations constitutes a public nuisance. Civil Code § 3480 defines a "public nuisance" as "one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal."

68.      To the extent the discharged pollution and storm water drainage harms or threatens to harm waters of the State of California, a public resource, the discharged pollution from industrial activities and storm water drainage is a public nuisance.

69.      Water Code § 13050(e) defines "waters of the State" to mean "any water, surface or groundwater, including saline waters, within the boundaries of the State."

70.      Section 13304(a) of the California Water Code provides, in relevant part, that any person who has caused or permitted, causes or permits, or threatens to cause or permit any waste

to be discharged or deposited where it is or probably will be discharged into waters of the state and creates, or threatens to create, a condition of pollution or nuisance, shall clean up the waste or abate the effect of the waste.

71.     California Civil Code § 3483 states that, "Every successive owner of property who neglects to abate a continuing nuisance upon, or in the use of, such property, created by a former owner, is liable therefore in the same manner as the one who first created it." The Restatement of Torts, Second, states that a possessor of land is liable for a nuisance caused by an abatable artificial condition, when: (a) the possessor knows or should know of the condition and the nuisance or unreasonable risk of nuisance involved; (b) he knows or should know that the condition exists without the consent of those affected by it; and (c) he has failed after a reasonable opportunity to take reasonable steps to abate the condition or to protect affected persons. Rest.2d, Torts, § 839.

72.     California state law is in accord with the Restatement. Failure to abate a public nuisance resulted in liability in Leslie Salt Co. v. San Francisco Bay Conservation & Dev. Com.,153 Cal.App.3d 605 (1st Dist., Div. 2, 1984).   Defendant San Francisco Bay Conservation and Development District issued an order requiring the current owner plaintiff to remove unauthorized bay fill from its property within the district's jurisdiction, notwithstanding lack of evidence that plaintiff placed the fill, authorized anyone to do so, or knew of its existence prior to the defendant's investigation. In considering the case, the court of appeals first determined that Title 7.2 of the California Government Code §§ 66600 through 66682 represented the exercise by government of its traditional power to regulate public nuisances. Thus, because the legislation does not expressly purport to depart from or alter the common law, the court construed that section in light of common law principles. Id. at 618-19. In that regard, the court noted that, "[a]ll that is required to establish that particular conduct constitutes the tort or common law crime of public nuisance is that the conduct interferes with a right common to the general public." Id. That stated, the court concluded that "[u]nder common law, liability for a public nuisance may result from the failure to act as well as from affirmative conduct." Id. Thus, whether the context be civil or criminal, liability and the duty to take affirmative action flow not

1   from the landowner's active responsibility for a condition of his land that causes widespread

2   harm to others or his knowledge of or intent to cause such harm but rather, and quite simply,

3   from his very possession and control of the land in question. Id. at 622 (citing Sprecher v.

4   Adamson Companies, 30 Cal.3d 358 (1981). See also Lussier v. SanLorenzo Valley Water Dist.,

5   206 Cal.App. 3d 92, 101 (6th Dist., 1988) ("Thus, despite the Sprecher court's expressly limited

6   focus on negligence actions, its holding extends further and leads ineluctably to the conclusion

7   that a possessor of land is no longer absolutely immune from nuisance liability for injuries

8   caused by natural conditions.")

9   73.        UAD and MAYFIELDS's liability to abate the nuisance is based on its current

10  ownership and maintenance of industrial operations on its property, which discharges pollution

11  from industrial activities and storm water drainage, onto property owned by Plaintiffs, and

12  members of the public, and threatens waters of the State. The discharge of pollution from

13  industrial activities and storm water drainage constitutes a nuisance within the meaning of

14  California Civil Code §§ 3479 and 3480 because the discharge is "injurious to health ... or is

15  indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere

16  with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or

17  use, in the customary manner, of any navigable lake, or river, bay, stream ..." The discharge

18  pollution from industrial activities and storm water drainage is further a public nuisance in that it

19  is deleterious to waters of the state for which the PPN et al, is empowered to seek injunctive

20  relief pursuant to Fish & Game Code §§ 5650 and 5650.1,

21  74.        UAD's and MAYFIELDS's discharged pollution from industrial activities and

22  storm water drainage constitutes a public nuisance within the meaning of Civil Code § 3480

23  since it "is one which affects at the same time an entire community or neighborhood, or any

24  considerable number of persons." Thus UAD and MAYFIELD et al, is liable as owner and/or

25  successive owner of the property from which the mine tunnel drainage emanates, pursuant to the

26  above authority.

27  75.        The origin and ownership of the discharged pollution from industrial activities and

28  storm water drainage is not in dispute. As set forth in the ORDER ON ABATEMENT AND

1    CLEANUP "discharge of pollution and toxic waste and hazardous constituents emanates from

2    the Industrial activities owned by UAD and MAYFIELD , et al, and discharges onto  PPN U.S.

3    TRUST LAND  and other lands and into Ackerman Creek." SEE  Declaration Joaquin Wright,

4    SEE Declaration George Provencher, SEE Declaration Leona Williams, SEE Declaration Don

5    Williams.

6

7    **XVII.  AS A  FOURTH  BASIS FOR THE COURT TO ORDER AN INJUNCTION**
     **PINOLEVILLE POMO NATION HAS STANDING  UNDER FEDERAL AND PPN**
8    **TRIBAL LAW AND IS ENTITLED TO A PRELIMINARY INJUNCTION PURSUANT**
     **TO  28 U.S. C.A  § 1362 BECAUSE UAD AND MAYFIELD HAS FAILED TO ABATE A**
9    **SERIOUS PUBLIC NUISANCE RESULTING FROM STORM WATER  DISCHARGE**

10

11   28 U.S.C.A. § 1362 Provides that:

12

13   76.       The district courts shall have original jurisdiction of all civil actions, brought by any

14   Indian tribe or band with a governing body duly recognized by the Secretary of the Interior,

15   wherein the matter in controversy arises under the Constitution, laws, or treaties of the United

16   States.

17

18   77.       Moreover authority exists that allows a federally recognized Tribal Government such

19   as Pinoleville Pomo nation standing and subject matter jurisdiction to enforce its ordinances on

20   non-Indians on fee land such as is the case with site operators UAD and MAYFIELD

21

22   78.       Shoshone and Arapahoe Indian Tribes brought suit to enforce tribal zoning ordinance.

23   The United States District Court ordered partial summary judgment and preliminary injunction

24   requiring compliance with zoning ordinance, and developer appealed. The Court of Appeals,

25   held that: (1) tribes have the authority to control use of fee lands by non-Indians without

26   delegation by Congress of such power; (2) tribal zoning code was valid and enforceable; and (3)

27   preliminary injunction was properly entered. SEE  Knight v. Shoshone and Arapahoe Indian

Tribes of Wind River Reservation. Wyo.670 F.2d 900C.A.Wyo., 1982.

79.    The following ordinances and regulations duly ratified by the Pinoleville Pomo Nation

Tribal Council were in effect 2002 and cited in PPN"S notice of violations against site operator

MAYFIELD, and stand as authority in the sough after injunctive relief and fines and penalties

subject to prove up hearing,  SEE EXH. 1.

Nuisance Ordinance § 3(a)

Nuisance Ordinance § 3(a)(4)

Water Quality Ordinance § 4(a)

Water Quality Ordinance Section 8 (Clean Up and Abatement) part (a)

Pinoleville Band of Pomo Indians Environmental Policy Act (Section 205.1)

Pinoleville Indian Band of Pomo Indians Environmental Policy Act,

Section 102 part (c)

## XVIII. CONCLUSION

Based on the foregoing authorities, Plaintiff the Pinoleville Pomo Nation, et al,

respectfully requests that this Court issue an order requiring site operators UAD and

MAYFIELD to Cease and Desist from all industrial operations at UAD and MAYFIELD sites

within the exterior boundaries of the PINOLEVILLE POMO NATION pending completion of

the following requirements:

    i)    Retain licensed engineer or licensed geologist and lodge CV or resume with Court
          and PPN Tribal Council.

    ii)   Provide access for PPN Tribal Council TO UAD and MAYFIELD sites over 60 days
          for PLAINTIFFS sediment and soil testing and further and extensive testing as

1    contemplated in Declaration of Joaquin Wright of KENNEC INC EARTH
     ENGINEERING & SCIENCE.

2

iii)   Under supervision of licensed engineer or licensed geologist, remove all
3      contaminated soil off UAD and MAYFIELD sites until all hazardous materials and or
       constituents are below CAL EPA MCL limits, legally and properly, and in
4      compliance with all state and federal regulations, and in a manner when moving dirt
       about, not to create hazards such as airborne particles such as lead. Provide manifest
5      and written documentation to Court and PPN Tribal Council as to transportation and
6      destination of contaminated soil.

7    iv)   Put down Asphalt where industrial operations are contemplated.

8
     v)    Submit plan for Best Management Practices (BMP) to prevent pollution and illegal
9          discharge of pollution certified and prepared by a licensed engineer or licensed
           geologist to be lodged with Court and PPN Tribal Council.
10

     vi)   Implement BMP'S verified through initial inspection by PPN Tribal Council in order
11         to resume industrial operations, and then twice monthly monitoring for compliance
12         over 12 month period  by PPN Tribal Council.

13

14   Dated: May 19, 2008

15

16

17                                    /S/  Michael S. Biggs
                                     Michael S. Biggs, Attorney for Plaintiffs
18                                   Pinoleville Pomo Nation, et al

19

20

21

22

23

24

25

26

27

28

1   Michael S. Biggs, Esq.  SBN: 237640
    BIGGS LAW PC
2   Post Office Box 454
    Petaluma, CA 94953-0454
3
    (707) 763-8000 Telephone
4   (707) 763-8010 Facsimile

5   Attorney for Plaintiffs

6

7                    UNITED STATES DISTRICT COURT

8            FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10  Pinoleville Pomo Nation, Pinoleville Pomo       Case No.: **Case No.: C 07 2648**
    Nation Environmental Association and Leona
11  Williams,
12
    Plaintiffs,                                     **DECLARATION OF JOHN L.**
13                                                  **GAVELLO IN SUPPORT OF**
                                                    **PLAINTIFFS MOTION FOR**
14              v.                                  **PRELIMINARY INJUNCTION,**
                                                    **FRCP 65**
15  Ukiah Auto Dismantlers, Wayne Hunt
    Isabel Lewright, Warrior Industries, Inc
16  Richard Mayfield, Ross Junior Mayfield,
    Paula Mayfield, Kenneth Hunt, U.S.              Date:   ~~04/23/08~~ 6-25-08
17  Alchemy Corporation and DOES 1-50,             Time:   1:30 P.M.
18  Inclusive,                                      Dept:   Courtroom C, 15th Floor
                                                    Judge:  Susan Illston
19  Defendants.

20

21

22  _____

23

24  I John L. Gavello declare:

25        I have personal knowledge of the facts contained herein unless expressly alleged on

26  information and belief. As to those facts I believe them to be true.

27  1.    I am a licensed State of California Private Investigator, licensed through the Bureau of

28

                                            1

Security and Investigative Services (BSIS), License Number 25348.

## My Assignment

2.    I was retained by Michael S. Biggs, Attorney at Law to obtain photographic documentation of various locations contained within the property of the Pinoleville Pomo Nation, located in Ukiah, California.

## Background:

3.    My background includes, however not limited to, a Masters Printed Circuit Board Design Certificate from Masters P.C. Design School located in Santa Clara, California, a Police Academy Peace Officers Standards and Training Certificate (POST) from Santa Rosa Junior College located in Santa Rosa, California, and additional educational course work related to the occupations of Electro-Mechanical Design and Law Enforcement.

4.    I have worked as Draftsman, Senior Draftsman and a Electro-Mechanical Designer for Intel Corporation, Cooper-Lazar Sonics and Microsource, thereafter fulfilling a desire to enter the field of law enforcement.

5.    I worked as a patrol officer (a civilian police-security department) at the Department of Defense Housing Facility, United State Air Force Base, located in Novato California and as a Civilian Director of Police-Security for the United Stated Coast Guard, located on Coast Guard Island, ISC Alameda California.

6.    I am currently the owner of The Legal Process Group, a licensed California Private Investigations Agency since December 20, 2006.

7.    Additionally, I am a member of C.A.L.I. (California Association of Licensed Investigators), an association for licensed private investigators to communicate P.I. related case matters, laws, regulations, etc.

### Weather Data for January 08, 2008, Day of Photographs

8.    Weather conditions per the National Weather Service were as follows:  The average temperature was 45 degrees, rainfall of 1.10 inches, fully clouded sky, average wind speed of 5.1 (9 maximum).  Rain conditions were light to moderate during the photograph process.

### Photographic Documentation/Evidence & Location

9.    On January 08, 2008, I took several photographs which provide photo documentation of samples (of the containers) and the location of the samples taken by Joaquin Wright, an Environmental Engineer with a company called Kennec Incorporated.

10.    The approximate location for this testing was outside the south/east corner area of the business name of Ukiah Auto Dismantlers, a business locate next to a child care facility, the Pinoleville Pomo Nation Office, and several residences.

11.    The actual samples were taken within a close proximity from a flow of water emitting from bare land where exist older vehicles with opened engine compartments and apparent damage to their exteriors and interiors.

### Photographs of Samples

12.    I observed Environmental Engineer, Joaquin Wright select the location for the sampling and witnessed him gather, then place the sample inside the containers. He sealed the containers, placed a label over the lid, wrote on the label, then placed the items on the ground next to the area sampled.

### Area Photos

13.    I took several other photographs of early model inoperative motor vehicles, containers, tires, land and others objects not known to me, as seen within the confines of

the Ukiah Auto Dismantlers property.

**Preparation of Photographic Documentation / Evidence for Counsel**

14.    On the back side of each photograph I wrote the date and time the photographs were taken, along with my initials. I placed each photograph inside of a transparent sheet protector, then assembled all 68 photographs together in a black binder.

15.    I am prepared to testify in this or any Court that the photographs provided as indicated above were taken on the date, time and location as provided in my declaration.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is True and Correct.


Dated on the 25th day of March 2008

Rohnert Park, California

John L. Gavello

1    BIGGS LAW PC
    Michael S. Biggs, Esq. SBN: 237640
2    Post Office Box 454
    Petaluma, CA 94953-0454
3
    (707) 763-8000 Telephone
4    (707) 763-8010 Facsimile

5    Attorney for Plaintiffs

6

7            **UNITED STATES DISTRICT COURT**

8       **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

9

10    Pinoleville Pomo Nation, Pinoleville Pomo     **Case No.: C 07 2648**
    Nation Environmental Association and Leona
11    Williams,

12
    Plaintiffs,                      DECLARATION OF JOAQUIN
13                                    WRIGHT IN SUPPORT
                                   OF PLAINTIFFS MOTION FOR
14             v.                PRELIMINARY INJUNCTION,
                                   FRCP 65
15    Ukiah Auto Dismantlers, Wayne Hunt
    Isabel Lewright, Warrior Industires, Inc
16    Richard Mayfield, Ross Junior Mayfield,
    Paula Mayfield, Kenneth Hunt, U.S.
17    Alchemy Corporation and DOES 1-50,     Date:   06/25/08
    Inclusive,                         Time:   1:30 P.M.
18                                    Dept:   Courtroom C, 15th Floor
    Defendants.                      Judge:   Susan Illston
19

20

21

22    _____

23

24         **My name is Joaquin Wright. I have personal knowledge of the facts stated herein**

25 **unless expressly alleged on information and belief, and, if called as a witness, I could testify**

26 **competently thereto.**

27

28 1. This declaration documents my site visit to the Pinoleville Pomo Nation (PPN).  The

purpose of the visit was to examine storm water conditions related to water runoff from industrial activities adjacent to the PPN.  As part of the visit I collected photo documentation of site conditions and surface water and soil samples as a preliminary measure in evaluating potential contaminants to the PPN property from industrial activity on the fee lands within the PPN Rancheria Boundaries.

2. I have over 10 years of consulting experience as an Environmental Engineer.  I am the Senior Vice President and co-founder of KENNEC INC.  I received my Bachelors of Science degree from the Environmental Resource Engineering Program at Humboldt State University. I am a Certified Professional in Erosion and Sediment Control (CPESC) and a Waste Tire Reuse Specialist.  I am also responsible for the management and implementation of the CALEPA CIWMB civil engineering application programs 06008, 05058, 04054, 03031, and 02022. I have performed onsite project and construction management for landfill construction, industrial facility remediation projects, and have worked extensively on large earth moving construction projects. I have extensive landfill design development and environmental engineering experience, including cell expansion designs, master plan development, modeling of surface and ground water, water quality sampling and analysis, soil loss, construction management and construction quality assurance services for industrial, civil and private projects throughout California. I have managed and performed hydrology analysis, construction level design packages, erosion control design and implementation plans, road grading designs, methane removal system designs, and associated projects.

3. I visited the site on January 8, 2008 to review storm water conditions on the PPN Rancheria, and arrived at approximately 11:30 AM.  Before the site visit, it had been raining for approximately three days. I toured the PPN by vehicle and on foot to view the storm water

drainage conveyance systems and appurtenances associated with the tribal lands and the local waterway, referred to as Ackerman Creek.

4. The main industrial activity within the tribal lands (but not owned by the PPN) is a local business, Ukiah Auto Dismantlers (UAD). The assessor's parcel numbers for the UAD where industrial activities were observed to be occurring are APN 168-190-047 (47) and APN 168-190-048 (48). The total area of the two parcels is approximately 10 acres. The UAD operation is adjacent to and north of the Tribal Headquarters/Head Start School Facility and between Pinoleville Drive and Ackerman Creek. I reviewed a description of the area in a Phase II Environmental Investigation dated March 2003 (Vector Engineering Inc.) as well as visually observed conditions on the UAD facility from PPN land adjacent to Parcel 47 and 48. Based on my observations, the majority of the storm water runoff associated with Parcel 47 and 48 sheet flows across the parcels from south to north, where it forms a concentrated flow from west to east, adjacent to a berm that runs the whole length of Parcel 47 and 48 in a east west direction, and then discharge onto Parcel 1 and continues to flow over a creek access path onto parcel 2. A drainage pathway from Parcel 1 and 2 connects to Ackerman Creek at a point located on the approximate Parcel 1 and Parcel 2 boundary, and appears to be a preferential flow path to the creek in past high flow events. During my tour of the PPN, I observed the following conditions with regard to storm water discharge, and the drainage and conveyance system:

5. Discharge from the UAD facility onto the adjacent PPN property had very few visible[1] storm water source and treatment controls. Only one check dam for the site was observed. The check dam drainage pipes (culverts) where placed with out a proper outfall structure, such as riprap

---

[1] Based on observations from PPN Parcel 1.

erosion protection BMP/ energy dissipation structure, and most likely are contributing to erosion and adding sediments to the discharged surface storm water.   The check dam drains via these pipes to a pond at the confluence of a drainage pathway running south to north on the eastern side of Parcel 47.   Water from the pond is discharged easterly thru a break in the east west property berm separating Parcel 1 from the Parcel 47, onto the PPN property (Parcel 1).  The Storm water discharging through the pipes (from the check dam), appeared to be of relatively high velocity and very "cloudy", indicative of elevated Turbidity levels.   Please see attached photos 1, 9 and 10 in Attachment 01

6.  Visible operations areas were not on impermeable ground (i.e., paved areas) nor were they covered.  This allows surface flow to pick up debris, sediment, and any constituents of concern from the operations on site and transport it to the drainage flow paths with out any BMPs, such as fiber rolls, oil water separators, or drainage swales with treatment train components.  The storm water generated on the "bare naked earth" also saturates the underlying soils and groundwater with potential constituents of concern.  Please see attached photos 45, 51, 53, and 54 in Attachment 02.

7.  One vehicle's motor, in an apparent work area (evident by adjacent toolbox and open motor compartment door), appeared to be under deconstruction/construction.   This work area was immediately adjacent to and connected with a detention basin created by the check dam at the northeasterly edge of the property. Please see attached photos 15 and 16 in Attachment 03.

8.   The detention basin created by the check dam is not lined, and may be undersized for a moderate precipitation event as is evident by the quantity and velocity of the storm water exiting the discharge pipes. Basin storm water was in direct contact with a debris pile of scrap metal, soil

and asphalt debris (presumed to be scrapings of surface soils from the work areas). Please see attached photos 13 and 34 in Attachment 04.

9. Three large piles of debris were visible. The debris piles, which included metal, soil, and miscellaneous aggregate, were surrounded by flowing surface water that flowed into stormwater drainages. The debris piles were not covered nor were storm water source controls present to prevent movement of contaminants from the debris to the storm water or underlying soil. The storm water generated from these areas, which appeared to be on "bare naked earth", has the potential to saturate the underlying soils and groundwater with potential contaminants of concern carried from the debris piles. Please see attached photos 12, 49 and 50 in Attachment 05.

10. There were many vehicles in various states of disrepair or dismantling, large tanks of steel or aluminum, pipes and other vehicular components; all were uncovered or poorly covered and exposed to the elements, as well as being on pervious ground, "bare naked earth". On Parcel 47, there appeared to be no clear delineation between storage area and operational working areas. Please see attached photos 7, 8, 18, 21, 25, 26, 63 and 67 in Attachment 06.

11. Industrial sites in California must comply with current state and federal NPDES storm water regulations that typically require implementation of long- and short-term storm water source and treatment controls. These controls prevent impacts to surface water, to groundwater (through infiltration) and to soil. In addition, all industrial sites are required to have an updated Storm Water Pollution Prevention Plan (SWPPP) that specifies appropriate Best Management Practices (BMPs) as well as a monitoring program for documenting and identifying whether the BMPs are performing adequately.

12. I have reviewed many SWPPP documents and inspected many industrial and construction

sites for erosion and sediment control BMP placement and inspection. The conditions I observed during this day revealed a business operation that does not implement BMPS on a frequent basis (no signs of BMPS that should have been implemented well before the rainy season began, straw logs, silt fences etc.), which in itself shows a poorly implemented SWPPP. All approved SWPPPs I have seen have a set of BMPs to implement before the rainy season, usually the least costly BMPs such as fiber rolls and silt fences.

13.  To give a perspective on the industry standard for storm water management and typical BMPs that I would implement at an auto dismantling facility, or industrial facility, or construction site, the following short list from the California Stormwater Quality Association (CASQA), http://www.cabmphandbooks.com/Industrial.asp, is provided below:

- SC – 22:  Vehicle equipment Repair, covered work area, impervious ground cover, covered storage of vehicles

- TC –21,22,30,31:    Constructed wetland, extended detention basin, and vegetated swale and buffer strip, multiple systems

- EC - 2,9,10,12:  Existing vegetation, drainage swales, velocity dissipation devices, berm and bank stabilization; and

- SE - 2,3,4,5,8,9,10:  Sediment basin, sediment trap, check dams, fiber rolls, straw bale and sandbag barriers, storm drain inlet protection

14.  I collected six surface water samples on Parcel 1 and Parcel 2 and one soil sample from parcel 1 from a depth of 0.5 feet. Sample locations were field located with a handheld Global Positioning System (GPS) unit. The samples were delivered to Brelje and Race for analysis,

located in Santa Rosa, CA, in iced coolers under standard Chain-of-Custody procedures. Samples were tested for standard storm water constituents of concern. Please see Attachment 07 and Attachment 08.

15.  Due to the timing of the sampling event, I would not anticipate high concentrations of concern contaminants.  This sampling event occurred during the third substantial precipitation event of the season, and after two to three days of continuous precipitation.  Nonetheless, constituents of concern such as Barium, chromium, copper, lead, nickel, and zinc did appear (even thou most were in low levels). As well, samples KS2 and KS4 showed low levels of TPH as Diesel and TPH as Motor Oil.

16.  One contaminant, lead, appeared in samples KS5, and KS6 at levels over the EPAs MCL. Historically, the highest levels of "storm water contaminants" are observed in the first precipitation events of the season. Considering the timing of this sampling event it is likely that significant dilution of potential storm water contaminants has occurred. Given that lead levels were above the MCL at this point in the precipitation season it is possible that much higher levels would be present in other areas of the site.  Further and extensive testing of the site soil is recommended to quantify the extent of any possible soil and ground water contamination.

17.  On April 2nd, at the request of the PPN, KENNEC's field environmental engineer Andrew Murphy performed soil and sediment sampling at areas on PPN property within the UAD storm water drainage flow path to further evaluate potential impacts to the PPN property and the adjacent Ackerman Creek.  Nine soil and sediment samples where collected and sent to the Brelje and Race Laboratories inc. in Santa Rosa California.  Further descriptions of the sampling

activities and test results are presented in the Site Visit Memorandum dated April 10th, 2008 addressed to Michael Biggs from Joaquin Wright.

18. Of the nine samples retrieved on April 2nd, 2008 eight showed contaminant levels over the CALEPAs current MCL.  Historically, the highest levels of "storm water contaminants" are observed in the first precipitation events of the season. Considering the timing of this sampling event it is likely that significant dilution of potential storm water contaminants has occurred. Given that lead, nickel and chromium levels in eight of the nine samples taken in the drainage pathways and creek bed were above the MCL at this point in the precipitation season, it is possible that much higher levels would be present in up-gradient and source areas of the drainage pathway.  Further and extensive testing of the properties up-gradient of the PPN property parcels 1 and 2 is recommended to quantify the extent and source of these and other possibly contaminants.

19.  Considering the constituents found in these samples and there locations within the zone of influence for Ackerman Creek, a comprehensive biological study of the viability of the Creeks ecosystem to support native historical aquatic and riparian habitat is recommended.

**I DECLARE UNDER THE PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES THAT THE FOREGOING IS TRUE AND CORRECT.**

DATED 5/14/08

Petaluma California

_____
Joaquin Wright, Sr. Vice President

Kennec Inc.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1   Michael S. Biggs, Esq. SBN: 237640
    BIGGS LAW PC
2   Post Office Box 454
    Petaluma, CA 94953-0454
3
    (707) 763-8000 Telephone
4   (707) 763-8010 Facsimile
5   Attorney for Plaintiffs
    Pinoleville Pomo Nation, et al
6

7

8                   UNITED STATES DISTRICT COURT
9              FOR THE NORTHERN DISTRICT OF CALIFORNIA
10

11
12   Pinoleville Pomo Nation, Pinoleville Pomo        Case No.: C 07 2648
     Nation Environmental Association and Leona
13   Williams,
14   Plaintiffs,                                      **DECLARATION OF GEORGE O.
                                                      PROVENCHER IN SUPPORT
15                        v.                          OF PLAINTIFFS MOTION FOR RULE
                                                      65 INJUNCTION**
16
17   Ukiah Auto Dismantlers, Wayne Hunt
     Isabel Lewright, Warrior Industries, Inc
18   Richard Mayfield, Ross Junior Mayfield,          Date:   06/25/08
     Paula Mayfield, Kenneth Hunt, U.S.               Time:   1:30 P.M.
19   Alchemy Corporation and DOES 1-50,               Dept:   Courtroom C, 15th Floor
     Inclusive,                                       Judge:  Susan Illston
20
21   Defendants.
22
23   _____/

24        **My name is George O. Provencher. I have personal knowledge of the facts stated**
25
     **herein, unless expressly alleged on information and belief, and, if called as a witness, I**
26
     **could testify competently thereto.**
27
28   1.    I am the Director of Tribal Operations for Pinoleville Pomo Nation, and I have also

been the Director of the Pinoleville Native American Head Start Program since
September of 2006.

2.    My background includes a Bachelor of Arts Degree from California State University
at Hayward, a Master of Science Degree in Administrative Science from Johns Hopkins
University in Baltimore Maryland, and more than thirty years of commercial and
Government contracting experience, which includes work in the Nuclear Weapons
complex, two National Laboratories, Department of Energy, Department of Defense,
Department of Health and Human Services, and over the past five years, the management
of a primary care medical facility in the Indian Healthcare System.

3.    I have worked as a Corporate Director of Contracts and Purchasing for two Fortune
500 Corporations and have both international business experience and operations
management experience in large facilities.

4.    My previous career position before moving to Mendocino County in 2001 was Vice
President of Production for Allied Technologies Group in the field of nuclear waste
management. Prior to this, I was the Project Manager on the successful construction and
completion of a $30,000,000 nuclear waste treatment facility.

5.    I am an officer and member of the Board of Directors at Consolidated Tribal Health,
located in Redwood Valley, where I serve as the Corporate Treasurer. I am a member of
the Mendocino Public Health Advisory Board as an advisor to the Mendocino County
Board of Supervisors, and a member of the Mendocino County Tobacco Ordinance
Appeals Board.

6.    On February 23rd and March 16th, 2008, I witnessed the deposition of Mr. Richard
Azevedo, who represents the Northern California Water Quality Control Board.  His

testimony highlighted the fact that high concentrations of Lead, Mercury, TPH (total

petroleum hydrocarbons) as diesel and motor oil, as well as dangerous chemical

compounds such as Ethyl Benzene, Toluene, and Xylene, are present in the soil in several

locations on the Ukiah Auto Dismantlers site. He also indicated in testimony that

contrary to his instructions and recommendations, contaminated soil had not been

removed, but rather had been stockpiled on the site. Also, I and other members of the

Tribal Office have observed that soil was scraped from the surface and moved around,

but not to a depth that would result in removal of all contaminants. Also, in my review of

disclosure documents collected from Ukiah Auto Dismantlers, it does not appear that any

follow-up sampling has been conducted as recommended by Mr. Azevedo.

7.    Approximately ten days prior to Mr. Azevedo's deposition, I received test results

from Kennec Earth Engineering and Science, the environmental consultant we have used

to conduct our own independent testing. We had sampled in areas within twenty-five

yards of the Ackerman Creek, near the eastern boundary line of the Mayfield property,

also known as Parcel 169-190-47 on the Mendocino County Survey Map. Of the seven

samples we had taken at this time, four of the samples had results for Lead, which

according to Kennec's representative all exceeded the federal EPA's maximum

contamination limit (MCL) for Lead. Those samples also indicated levels of Vanadium,

also a toxic substance, which also exceeded the MCL limits.

8.    In Ukiah Auto Dismantlers production documents, PDD #0056, Mr. Frederick

Martin, environmental consultant to Mr. Wayne Hunt of Ukiah Auto Dismantlers,

submitted a report to Mr. Richard Azevedo, representative of the Northern California

Water Quality Control Board, on December 8, 2006. Included with the written report was

a sample summary of nine samples taken from various locations on the Ukiah Auto

Dismantlers site. Mr. Martin submitted a document labeled "Sample Summary for UAD",

which according to the document, had been prepared by him on September 11, 2006,

referenced as Ukiah Auto Dismantlers PDD #0053. This document summarized data

from a laboratory report issued by Alpha Analytical Laboratories. Mr. Martin's written report to

Mr. Azevedo indicated high levels of hydrocarbons found in samples A2, A3,

and A6, exceeding pollution quantity limits, PQL's, for oil and diesel, and indicate4d that

although they were high, they essentially posed no problem to ground water. His written

report omitted the fact that the same three samples, A2, A3, and A6 were also reported as

very high for Lead, according to Alpha Labs' report, with A2 at 37 milligrams per liter

versus a PQL of 5, A3 at 39 versus PQL of 5, and A6 at 67 versus PQL of 5.

9.    In a laboratory report issued by Alpha Analytical Laboratories, dated 3/13/07, titled

"Alpha Analytical Laboratories Chemical Examination Report (Ukiah Auto Dismantlers

PDD #0006), test results indicated high levels of Toluene at 1.0 versus PQL limit of .5,

Ethylbenzene at .64 versus PQL of .5, and Xylene at 4.0 versus PQL of .5 milligrams per

liter. The sample identification was UAD07B070789-01. These are very dangerous

chemical compounds, and they are known carcinogens and terratogens known to cause

rare forms of leukemia, birth defects, and spontaneous abortions in pregnant mothers.

10.    In the Alpha Analytical Laboratories Chemical Examination Report, dated 3/13/07,

sample UAD Pond (07B0722-01) results indicated total petroleum hydrocarbons (TPH)

of 980 ug/l versus a PQL limit of 50 and TPH as motor oil of 3000 ug/l versus a PQL

limit of 100, referenced by Ukiah Auto Dismantlers PDD #0011 and #0012. The results

for sample WEST Pond (07B0722-02) indicated TPH of 7800 for diesel versus PQL of

1  50, and TPH of 17000 for motor oil versus PQL of 100. This indicates very high levels of

2  hydrocarbons in the collection ponds constructed by Ukiah Auto Dismantlers.

3  11.    Mr. Azevedo's testimony during deposition confirmed high quantities of

4  hydrocarbons found in the collection ponds, and he stated that he disagreed with Mr.

5  Martin's assertion that hydrocarbons are entrained in soil and do not present a hazard to

6

7  ground water. He further stated that he believes that with such high concentrations of

8  hydrocarbons, some portion of those concentrations have to be finding their way into

9  groundwater. He stated that he does not believe Mr. Martin's approach is technically

10  sound, that the location of the collection ponds are contrary to his, Mr. Azevedo's,

11

12  recommendations, and that the collection ponds should be lined to prevent migration of

13  contaminants into groundwater.

14  12.    I am also concerned that one of the original conditions of the abatement order

15  issued by the Northern California Regional Water Quality Control Board required that

16  Ukiah Auto Dismantlers and their associates who own and operate the Mayfield property

17

18  under several corporate entities, utilize a licensed geological or civil engineer, licensed by

19  the California State Licensing Board, be utilized to oversee the abatement and

20  remediation efforts. This has not been done, and the results of continuing non-compliance

21  with the now two year-old abatement order and Tribal Ordinances, and the continuing

22

23  pollution of Tribal Lands and the waters of the Pinoleville Indian Reservation, including

24  the Ackerman Creek are a reflection of this.

25  13.    According to Mr. Azevedo's testimony and Ukiah Auto Dismantlers PDD #0040,

26  Ukiah Auto Dismantlers and the owners and operators of the Mayfield property, they

27  have proposed and constructed collection ponds on each of the properties that are

28

connected by a drainage ditch. These collection ponds are designed to overflow during

storm events and drain ,west to east, to a collection pond on the Mayfield property. When

this pond overflows, it discharges onto Tribal Land and into the Ackerman Creek. The

discharge is an accumulation of water that has flowed through and originated on the

Ukiah Auto Dismantlers site, carrying with it all the constituents that have been revealed

through analytical testing. The collection pond on the Mayfield property is lined with a

plastic tarp. The pond on Ukiah Auto Dismantlers has no form of lining at all. Mr.

Azevedo has stated in his testimony that he believes this approach is counter to his

recommendation and is technically unsound.

14.    As a follow-up to the aforementioned soil sampling and analytical work ordered by

the Tribal Office of Pinoleville Pomo Nation, our review of analytical testing

documents for work performed on behalf of Ukiah Auto Dismantlers, and separate

studies conducted on behalf of the Northern California Water Quality Control Board, I

requested soil sampling and analysis conducted by Kennec Earth engineering and

Science, hereinafter referred to as Kennec.  The purpose of this round of sampling and

analysis was to confirm and demonstrate scientifically that polluted storm water flowing

from Ukiah Auto Dismantlers (Parcel 169-190-48) and channeled and collected by the

owners and operators of the adjacent property east of Ukiah Auto Dismantlers,

hereinafter referred to as the Mayfield property and Parcel Number 169-190- 47 on the

land survey map, has been discharging and pooling onto Tribal Lands and has been

polluting the Ackerman Creek, which flows through the Pinoleville Indian Reservation,

via both surface and ground water, from defendants operations.

15.    The analytical results of the latest round of sampling, which took place on April 2,

2008, were both alarming and overwhelming, with levels of toxic chemicals that were substantially higher than anyone in our Environmental Department and our Tribal Office expected.  On April 2, 2008, a total of nine samples were taken from soils and sludges from the deepest flowing channel of Ackerman Creek, portions of dry creek bed, areas close to the point of discharge onto Tribal Land, pooling areas between the point of discharge and the creek, and areas of encroachment onto Tribal Land.  In every case, analytical results from a certified laboratory confirmed highly toxic chemicals that greatly exceeded established minimum contamination levels (MCL's).  In one case the tested value for Lead was 160 milligrams per liter, compared to an MCL value of 5 milligrams per liter (32 times the MCL limit), not far from the point of discharge onto Tribal Land.

16.    The breakdown and description of the areas sampled are as follows:  Three samples, 0804133-006A, 084133-007A, and 0804133-008A, were taken at the confluence of two channels of the Ackerman Creek, which passes through several parcels of federal trust land within the boundaries of the Pinoleville Indian Reservation. A fourth sample, 084133-004A, was taken from a dry portion of the creek bed.  These were all in the outflow areas where both surface storm water runoff and ground water converge and flow into the creek at the northeastern corner of the Mayfield property and down grade from the point of discharge of storm-water. In addition to this portion of Ackerman Creek being part of the waters of the Pinoleville Indian Reservation, Ackerman Creek is also part of the Russian River watershed. Three more samples were taken from pooling areas in line with the point of discharge from the Mayfield property and located on Parcels 169-211-1 and 169-211-2, which are federal trust properties

1    located adjacent to and immediately to the east of Parcel 169-190-47, the Mayfield

2    property. Parcel Number 169-211-2 is also property owned in federal trust by Mrs. Leona

3    Williams, who is also the Tribal Chairperson for Pinoleville Pomo Nation. The last

4    sample was collected from a location on Tribal Land just south of the southeast corner of

5    Parcel Number 169-190-48, Ukiah Auto Dismantlers, an area where Ukiah Auto

6    Dismantlers is presently encroaching significantly on Tribal Land.

7

8    17.    The laboratory analytical work performed on the nine samples was reported by

9    Brelje & Race Laboratories, Inc., 425 South E Street, in Santa Rosa, California, DHS

10   ELAP Certification No. 1644. The following is a summary of the hazardous and toxic

11   chemicals found and their levels compared to established MCL limits:  Samples

12   0804133-001A, 0804133-002A, and 0804133-003A taken from Parcels 169-211-1 and

13   169-211-2 on federal trust land contained higher than MCL limits for TPH, total

14

15   petroleum hydrocarbons as diesel and motor oil. These same three samples also contained

16   Lead in milligrams per liter at 24, 51, and 160, respectively, versus the federal EPA MCL

17   limit of 5. Nickel was at  98, 110, and 130 versus MCL limit of 50. Chromium was 82,

18   110, and 110, versus MCL limit of 50. All the highest levels were on Mrs. Leona

19   Williams' federal trust property located on Tribal Land.  For Sample 0804133-004A,

20   Lead was 6 versus MCL of 5, Nickel was 97 versus MCL of 50, and Chromium was 78

21

22   versus MCL of 50. for Sample 0804133-005A, Lead was 7.4 versus MCL of 5, Nickel

23   was 120 versus MCL of 50, and Chromium was 110, versus MCL of 50.

24

25   18.    Samples 0804133-006A, 0804133-007A, and 0804133-008A are what we have

26   referred to as "sludge" samples, taken from the flowing channel and deepest portion of

27   the creek, where it passes through the reservation, and through Parcel Number 169-211-2,

28

which is the federal trust property owned by Mrs. Leona Williams within the boundaries

of the Pinoleville Indian Reservation. Respective values for Lead, 4.0, 4.7, and 4.8 were

very close to the MCL limit of 5. Values for Nickel were 59, 73, and 77, versus MCL

limit of 50. Values for Chromium were 48, 71, and 72, versus MCL limit of 50. Sample

0804133-009A, which was located in the area of encroachment from Ukiah Auto

Dismantlers at the southeast corner of Parcel Number 169-190-47, had the following

values: Lead, 16, versus MCL of 5; Nickel, 94, versus MCL of 50, and Chromium 79,

versus MCL of 50.

19.    The accumulation of all the toxic chemical compounds and heavy metal

constituents, petroleum hydrocarbons, Lead, Nickel, Mercury, Chromium, Toluene,

Ethylbenzene, and Xylene present an ominous public safety and health threat to residents,

employees, pre-school children, staff members, and tribal members of the Pinoleville

Indian Reservation and the Pinoleville Pomo Nation, as well as to the community

downstream of the creek, and the users of the Russian River watershed. The lands and

waters of the Pinoleville Indian Reservation are undergoing continuous and dangerous

levels of pollution of toxic and hazardous chemicals, such that they pose and eminent

threat to public safety and public health.  The Pinoleville Pomo Nation Tribal

Environmental Department is presently working to have quarantine signs posted

along the Ackerman Creek in areas where it passes through Tribal Lands because there

are still a few steelhead fish that have been recently caught and eaten by people fishing

there.

20.    Petroleum hydrocarbons cause certain cancers of the kidneys, liver, stomach, and

intestinal tract if ingested or routinely exposed to the skin. they can cause lesions and

respiratory failure for birds and other wildlife. Lead gets into the bloodstream through ingestion or inhalation and causes lead poisoning, brain damage, loss of motor control and slows developmental growth in small children. It can cause birth defects in fetuses, spontaneous abortions, and death. It is especially known as a terratogen and toxin in fetuses and small children. It interferes with the reproduction and fertilization of fish eggs in streams, creeks, and riverbeds. Chromium and Nickel can cause cancers of the liver, stomach, pancreas, and kidneys if ingested. They also cause certain rare leukemia(s) if exposed to the skin or introduced into the bloodstream. If inhaled, they cause lung cancer. They are known terratogens that can cause birth defects in fetuses and spontaneous abortions if pregnant mothers are exposed.

21.    The Pinoleville Pomo Nation Environmental Department is presently considering plans to restore Ackerman Creek in areas within the Pinoleville Indian Reservation and downstream. However, before we can consider any future restoration projects, the ongoing pollution  must be stopped, the operations contributing to it cleaned up completely, the sediments in the creek cleaned and remediated, as well as polluted areas of trust land, and the areas currently being encroached upon by Ukiah Auto Dismantlers and the owners and operators of the Mayfield property.  This will require the massive removal of contaminated soils, silt, and sludge's from the two operating sites under abatement, areas of Tribal Lands trespassed and encroached upon, and the silt and dry stream beds of areas polluted in Ackerman Creek. Industrial areas once remediated, will need to be paved or sealed to prevent further pollution of ground water.  A system of total containment will need to be put into effect to prevent future pollution of Tribal Lands and the Ackerman Creek. Re-sampling and testing will need to be done to ensure that

remedial measures are actually working.  This will be a very expensive process, both for

the remediation of the industrial sites and for the remediation and restoration of Tribal

Lands, Ackerman Creek, and the waters of the Pinoleville Indian Reservation.

22.    Recent scientific sampling and analysis indicates a preponderance of evidence that

the sites where samples have been taken are badly contaminated and need to be

professionally remediated and made safe. The recent and current practices of abatement,

including the grading of soil by Ukiah Auto Dismantlers and owners and operators of the

Mayfield property, without properly licensed and qualified technical oversight, also

present hazards to health, safety, and the environment. for example, just with the

introduction of airborne dust from moving contaminated dirt around  can carry these

constituents, and expose people and wildlife in the immediate area.  More testing and

analysis need to be done, while current operations and practices cease. This will be a

costly process, requiring technical solutions, scientific expertise, and engineering

capabilities, which have been lacking in the conduct and abatement of these operations.

This will also have to be accomplished in a manner that will not further endanger public

safety, the residents of Pinoleville Indian Reservation, Tribal Office and program

personnel and employees, and the staff members and children of the Pinoleville Native

American Head Start pre-school, as well as the owners and employees of Ukiah Auto

Dismantlers and owners and operators of the Mayfield property.

**I DECLARE UNDER THE PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES THAT THE FOREGOING IS TRUE AND CORRECT.**

DATED  5/19/08

Ukiah California

George O. Provencher



Alpha Analytical Laboratories Inc.
e-mail: clientservices@alpha-labs.com • Phone: (707) 468-0401 • Fax: (707) 468-5267

208 Mason St. Ukiah, California 95482

## CHEMICAL EXAMINATION REPORT

Page 2 of 4

Nest Environmetal Services
1040 Grant Road, Suite 155, PMB 325
Mountain View, CA 94014
Attn: Fred Martin

Report Date:  03/12/07 16:12
Project No:  Ukiah Auto Dismantlers
Project ID:  Ukiah Auto Dismantlers

| der Number | Receipt Date/Time | Client Code | Client PO/Reference |
|---|---|---|---|
| 7B0789 | 02/26/2007  14:40 | ZNEST | |

### Alpha Analytical Laboratories, Inc.

| | METHOD | BATCH | PREPARED | ANALYZED | DILUTION | RESULT | PQL | NOTE |
|---|---|---|---|---|---|---|---|---|
| **kiah Auto-UAD (07B0789-01)** | | | **Sample Type: Water** | | | **Sampled: 02/26/07 13:30** | | |
| *Volatile Organic Compounds by EPA Method 8260B* | | | | | | | | |
| Benzene | EPA 8260B | AC70802 | 03/05/07 | 03/06/07 | 1 | ND ug/l | 0.30 | |
| Toluene | " | " | " | " | " | 1.0 " | 0.30 | |
| Ethylbenzene | " | " | " | " | " | 0.64 " | 0.50 | |
| Xylenes (total) | " | " | " | " | " | 4.0 " | 0.50 | |
| *Surrogate: Bromofluorobenzene* | " | " | " | " | | 114 % | 75-126 | |
| *Surrogate: Dibromofluoromethane* | " | " | " | " | | 78.4 % | 61-105 | |
| *Surrogate: Toluene-d8* | " | " | " | " | | 99.2 % | 69-115 | |
| **kiah Auto-West (07B0789-02)** | | | **Sample Type: Water** | | | **Sampled: 02/26/07 13:30** | | |
| *Volatile Organic Compounds by EPA Method 8260B* | | | | | | | | |
| Benzene | EPA 8260B | AC70802 | 03/05/07 | 03/06/07 | 1 | ND ug/l | 0.30 | |
| Toluene | " | " | " | " | " | ND " | 0.30 | |
| Ethylbenzene | " | " | " | " | " | ND " | 0.50 | |
| Xylenes (total) | " | " | " | " | " | ND " | 0.50 | |
| *Surrogate: Bromofluorobenzene* | " | " | " | " | | 110 % | 75-126 | |
| *Surrogate: Dibromofluoromethane* | " | " | " | " | | 77.2 % | 61-105 | |
| *Surrogate: Toluene-d8* | " | " | " | " | | 100 % | 69-115 | |
| **Ukiah Auto-R&M (07B0789-03)** | | | **Sample Type: Water** | | | **Sampled: 02/26/07 14:00** | | |
| *Metals by EPA 6000/7000 Series Methods* | | | | | | | | |
| Copper | EPA 6010 | AB72713 | 02/27/07 | 03/07/07 | 1 | ND mg/l | 0.10 | |
| Lead | " | " | " | " | " | 0.071 " | 0.050 | |
| Zinc | " | " | " | " | " | 0.19 " | 0.10 | |

**Ukiah Auto Dismantlers**
**# 0006**

*The results in this report apply to the samples analyzed in accordance with the chain
of custody document. This analytical report must be reproduced in its entirety*

Bruce L. Gove
Laboratory Director

3/12/2007



### Alpha

Alpha Analytical Laboratories Inc.

208 Mason St. Ukiah, California 95482
e-mail  clientservices@alpha-labs.com  •  Phone  (707) 468-0401  •  Fax. (707) 468-5267

## CHEMICAL EXAMINATION REPORT

Page 1 of 4

Nest Environmetal Services
1040 Grant Road, Suite 155, PMB 325
Mountain View, CA 94014
Attn: Fred Martin

Report Date:  03/13/07 09:17
Project No:  Ukiah Auto Dismantlers
Project ID:  Ukiah Auto Dismantlers

| Order Number | Receipt Date/Time | Client Code | Client PO/Reference |
|---|---|---|---|
| 07B0722 | 02/22/2007  16:25 | ZNEST | |

## ANALYTICAL REPORT FOR SAMPLES

| Sample ID | Laboratory ID | Matrix | Date Sampled | Date Received |
|---|---|---|---|---|
| East Pond | 07B0722-01 | Water | 02/22/07 15:55 | 02/22/07 16:25 |
| West Pond | 07B0722-02 | Water | 02/22/07 15:15 | 02/22/07 16:25 |

*Ukiah Auto Dismantlers*
*# 0011*

The results in this report apply to the samples analyzed in accordance with the chain of custody document. This analytical report must be reproduced in its entirety.

Bruce L. Gove
Laboratory Director

3/13/2007



## alpha

Alpha Analytical Laboratories Inc.                    208 Mason St. Ukiah, California 95482
e-mail  clientservices@alpha-labs.com  •  Phone  (707) 468-0401  •  Fax  (707) 468-5267

### CHEMICAL EXAMINATION REPORT                                   Page 2 of 4

Nest Environmetal Services                 Report Date:  03/13/07 09:17
1040 Grant Road, Suite 155, PMB 325        Project No:  Ukiah Auto Dismantlers
Mountain View, CA 94014                    Project ID:  Ukiah Auto Dismantlers
Attn: Fred Martin

| Order Number | Receipt Date/Time | Client Code | Client PO/Reference |
|---|---|---|---|
| 7B0722 | 02/22/2007  16:25 | ZNEST | |

## Alpha Analytical Laboratories, Inc.

| | METHOD | BATCH | PREPARED | ANALYZED | DILUTION | RESULT | PQL | NOTE |
|---|---|---|---|---|---|---|---|---|
| **AD Pond (07B0722-01)** | | | Sample Type: Water | | | Sampled: 02/22/07 15:55 | | |
| **Metals by EPA 6000/7000 Series Methods** | | | | | | | | |
| Copper | EPA 6010 | AB72713 | 02/27/07 | 03/07/07 | 1 | 0.14 mg/l | 0.10 | |
| Lead | " | " | " | " | " | ND " | 0.050 | |
| Zinc | " | " | " | " | " | 0.28 " | 0.10 | |
| **Conventional Chemistry Parameters by APHA/EPA Methods** | | | | | | | | |
| pH | EPA 150.1 | AB72622 | 02/22/07 | 03/22/07 | 1 | 7.1 pH Units | 1.0 | |
| Specific Conductance (EC) | EPA 120.1 | " | " | " | " | 110 umhos/cm | 20 | |
| Total Suspended Solids | EPA 160.2 | AB72813 | 02/28/07 | 03/05/07 | " | 720 mg/l | 1.0 | |
| **TPH by EPA/LUFT GC/GCMS Methods** | | | | | | | | |
| TPH as Diesel | 8015DRO | AB72640 | 02/26/07 | 02/28/07 | 1 | 980 ug/l | 50 | |
| TPH as Motor Oil | " | " | " | " | " | 3000 " | 100 | |
| *Surrogate: Tetratetracontane* | " | " | " | " | | 96.2 % | 20-152 | |
| **West Pond (07B0722-02)** | | | Sample Type: Water | | | Sampled: 02/22/07 15:15 | | |
| **Metals by EPA 6000/7000 Series Methods** | | | | | | | | |
| Copper | EPA 6010 | AB72713 | 02/27/07 | 03/07/07 | 1 | 0.67 mg/l | 0.10 | |
| Lead | " | " | " | " | " | 1.1 " | 0.050 | |
| Zinc | " | " | " | " | " | 2.8 " | 0.10 | |
| **Conventional Chemistry Parameters by APHA/EPA Methods** | | | | | | | | |
| pH | EPA 150.1 | AB72622 | 02/22/07 | 03/22/07 | 1 | 7.3 pH Units | 1.0 | |
| Specific Conductance (EC) | EPA 120.1 | " | " | " | " | 74 umhos/cm | 20 | |
| Total Suspended Solids | EPA 160.2 | AB72813 | 02/28/07 | 03/05/07 | " | 2700 mg/l | 1.0 | |

*Ukiah Auto Dismantlers*
*# 0012*

*The results in this report apply to the samples analyzed in accordance with the chain
of custody document. This analytical report must be reproduced in its entirety*

Bruce L. Gove
Laboratory Director                                          3/13/2007

# NEST Environmental Services

1040 Grant Road, Suite 155, PMB 325, Mountain View, California 94040-3296

January 9, 2007

North Coast Regional Water Quality Control Board
5550 Skyline Boulevard, Suite A
Santa Rosa, CA 95403

Attn.:  Mr. Richard Azevedo
Re.:    Brief progress report for Ukiah Auto Dismantlers

Dear Mr. Azevedo:

   This week I made another brief visit to UAD. The building is finished and vehicle crushing will start up again so that the inventory of old vehicles can be reduced.

   We missed getting a water sample during the last storm but UAD will collect water samples in the next significant storm event. The storm water will be sampled where it enters the settling pond on the UAD facility and where it enters the settling pond on the Mayfield facility in the northeast corner. The samples will be analyzed for: pH, Conductivity, Total Suspended Solids (TSS), THP for motor oil, THP for diesel, BTEX, Cu, Pb, Zn.

   Visually, the collection pond appears to be working, collecting the water which runs off from the storage yard and trapping the silt in the water. You mentioned the possibility of filtering the water before it enters the settling pond. Most of the pollution carried by the water is in the form of suspended solids. From an engineering perspective, the settling pond is the most efficient method for trapping suspended solids; any filter placed in the water flow would need constant cleaning, which would be an operational burden. As an example, we recently had some extensive work done on the road system where I live. This work was done under a grant from the DFG. The engineer installed four settling basins to collect the runoff where the silt was collected before the water drained into the local salmon bearing creeks. Those settling basins worked very well and they are easily cleaned out once a year.

   As and example of TSS, I have enclosed the results from our Group Program for auto dismantlers from last year. We have found that hydrocarbons and metals are directly correlated with the suspended solids. Trapping the suspended solids also collects the hydrocarbon and metals in the runoff.

   In the next couple of weeks, we expect to have a new SWPPP for the facility.

*Ukiah Auto Dismantlers*
*# 0040*

Sample Summary for UAD, September 11, 2006

| Material | PQL | Note | A1 | A2 | A3 | A4 | A5 | A6 | A7 | A8 | A9 | EPA Method |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Copper | 10 | | 23 | 130 | 38 | 21 | 20 | 51 | 24 | 20 | 25 | 6010 |
| Lead | 5 | | 9.4 | 37 | 39 | ND | 5.1 | 67 | 14 | 6.4 | 15 | 6010 |
| Zinc | 10 | | 65 | 54 | 75 | 31 | 33 | 180 | 46 | 33 | 51 | 6010 |
| O&G | 250 | | 490 | 460 | 920 | ND | ND | 2700 | 550 | 2200 | ND | 9071B |
| pH | 1 | | 6.2 | 7.5 | 7.3 | 7.8 | 7.7 | 7.2 | 8.3 | 6.9 | 8.7 | 9045B |
| TPH as Diesel | 1 | D-09 | 18 | 22 | 47 | ND | ND | 100 | 2.6 | ND | 2.7 | 8015DRO |
| TPH as Gasoline | 1 | | ND | ND | ND | ND | ND | 9 ND | ND | ND | ND | 8015GRO |
| Benzene | 0.005 | | ND | " | " | " | " | 0.0084 | ND | ND | ND | 8260B |
| Toluene | 0.005 | | " | " | " | " | " | 0.012 | " | " | " | 8260B |
| Ethylbenzene | 0.005 | | " | " | " | " | " | ND | " | " | " | 8260B |
| Xylenes | 0.005 | | " | " | " | " | " | 0.097 | " | " | " | 8260B |
| MTBE | 0.005 | | " | " | " | " | " | ND | " | " | " | 8260B |

All results in parts per million
D-09 indicates diesel overlaps with O&G
PQL = Practical Quantiative Limit

Confirmation Samples for O&G, September 28, 2006

| | O&G in PPM |
|---|---|
| Pasture Land at Martin Residence | ND |
| Ackerman Creek near sample A4 | 280 |
| Storage/Driveway near A9 | ND |

ND means < PQL = 250 ppm

Ukiah Auto Dismantlers
# 0053

# NEST Environmental Services

1040 Grant Road, Suite 155, PMB 325, Mountain View, California 94040-3296

December 8, 2006
North Coast Regional Water Quality Control Board
5550 Skyline Boulevard, Suite A
Santa Rosa, CA 95403

*Ukiah Auto Dismantlers*
*# 0056*

Attn.:  Mr. Richard Azevedo
Re.:    Brief progress report for Ukiah Auto Dismantlers

Dear Mr. Azevedo:

On December 7, 2006, I toured the subject facility with Wayne Hunt. We reviewed the recent results from the soil samples, the progress to date, and future work at Ukiah Auto Dismantlers.

The steel structure for the new building and some of the side panels have been installed. The building should be ready for use in the next few weeks and the crushing of old vehicles can recommence. In addition, 120 cubic yards of cut-up tires have been removed from the site. The sight was inspected by the Department of Environmental Health, Mendocino County, and a report will be coming to UAD.

As we mentioned in our letter of November 15, we sampled some soil from the sides of the settling pond. In addition, we requested that the original nine samples be analyzed for motor oil. The results of these tests are given in the updated summary enclosed with this note. Also, there is significant overlap of motor oil with diesel fuel.

The results show that there is no significant contamination in Ackerman Creek, samples A4 and A5. The samples taken from around the work shop area, A2, A3, A6 show some significant contamination from oil/diesel. The two samples taken from the sides of the pond, about two feet below the surface, show only minor possibility of the presence of petroleum hydrocarbon. The remaining samples are symptomatic of localized spots of small quantities of oil spilled onto the ground. There is no evidence for the widespread release of gasoline or its components. Based on our experience of 12 years working with auto dismantlers, neither this site nor the Mayfield site appear out of the ordinary circumstances for this type of facility.

Regarding your letter of November 30, 2006, we believe that our current work plan addresses the issues raised in the letter as summarized briefly in our letter of November 15, and the original work plan submitted last June.

1.  The shop area identified by samples A2, A3, and A6 will be excavated to 4 to 6 inches and replaced with asphalt. The dirt will be stockpiled until it can be dealt with appropriately. We shall sample the soil and have it tested for oil, diesel, and gasoline. Once the asphalt is in place any residual oils and gasoline will be encapsulated and will have no potential for migration off site.
2.  Wayne Hunt and Rick Mayfield will visually inspect the facility and remove any spots of soil showing the presence of oil. This will depend on weather conditions

1    Michael S. Biggs, Esq. SBN: 237640
     BIGGS LAW PC
2    Post Office Box 454
     Petaluma, CA 94953-0454

3
     (707) 763-8000 Telephone
4    (707) 763-8010 Facsimile

5    Attorney for Plaintiffs

6

7                     UNITED STATES DISTRICT COURT

8             FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10   Pinoleville Pomo Nation, Pinoleville Pomo        Case No.: **Case No.: C 07 2648**
11   Nation Environmental Association and Leona
     Williams,

12
     Plaintiffs,                                      **DECLARATION OF LEONA L.**
13                                                    **WILLIAMS IN SUPPORT**
                                                      **OF PLAINTIFFS MOTION FOR**
14                   v.                               **PRELIMINARY INJUNCTION,**
                                                      **FRCP 65**
15   Ukiah Auto Dismantlers, Wayne Hunt
     Isabel Lewright, Warrior Industires, Inc
16   Richard Mayfield, Ross Junior Mayfield,
17   Paula Mayfield, Kenneth Hunt, U.S.               Date: ~~04/23/08~~ 6-25-08
     Alchemy Corporation and DOES 1-50,              Time: 1:30 P.M.
18   Inclusive,                                       Dept: Courtroom C, 15th Floor
                                                      Judge: Susan Illston
19   Defendants.

20

21

22   _____

23

24       My name is Leona L. Williams. I have personal knowledge of the facts contained herein

25   unless expressly alleged on information and belief. As to those facts I believe them to be true.

26   1.      I live on the reservation, and I am the Chairperson for the Pinoleville Pomo Nation. I

27   have been the Tribal Chairperson since 1994, and prior to that, I worked at the U.S. Department

28

                                                1

of Labor at the Federal Building in San Francisco.

2.    I completed high school and two years of Business College with credits in Business Administration courses. Additionally, I have an Associate in Arts Degree in Liberal Studies.

3.    I have always emphasized education in my family, and my two daughters have Bachelors Degrees in Business Administration and Strategic Planning.

4.    As the leader of Tribal Government for Pinoleville Pomo Nation, I represent the Tribal Council and oversee our Self-Governance program, our government-to-government relationship with the U.S. Department of the Interior, our land and trust management, and our social service programs, which include vocational rehabilitation, housing, the Indian Child Welfare Act program, our Head Start pre-school program, our Youth Program, Culture and Traditions program, and our Environmental Management program.

5.    I have many concerns about what I am witnessing within the boundaries of our reservation. After more than two years since the Tribe issued its complaint notice and the abatement order was served on Mr. Hunt and Mr. Mayfield and their operation, there has been very little progress and very few steps taken to effectively stop the pollution of our reservation lands and Ackerman Creek.

6.    There is still debris left on the reservation from the flooding and pollution that occurred in late 2005. There are still poor environmental management practices going on the site despite the many reviews and reports that have been made.

7.    I am concerned about our pre-school and our children. We have had to take precautions to restrict them to playing in the schoolyard and the playground and to make sure they are not exposed to any oil or chemicals or anything else.

8.      They can't just play anywhere on the reservation and especially anywhere on the eastern side of the Mayfield property, which is close to my home. Nothing has been done to prevent water carrying oil and pollution from being channeled onto the reservation.

9.      We are tired of being dumped on and being evacuated from or run off our land for any reason, environmental or otherwise.

10.     The pollution of this site is a concern for the future of our tribal lands, or environment, our children, and the natural waterway that runs along the border of our reservation.

**I DECLARE UNDER THE PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES THAT THE FOREGOING IS TRUE AND CORRECT.**

DATED 3/21/08

Ukiah California

Leona Williams
Leona Williams

3

1   Michael S. Biggs, Esq.  SBN: 237640
    BIGGS LAW PC
2   Post Office Box 454
    Petaluma, CA 94953-0454
3
    (707) 763-8000 Telephone
4   (707) 763-8010 Facsimile

5   Attorney for Plaintiffs

6

7                       UNITED STATES DISTRICT COURT

8               FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10  Pinoleville Pomo Nation, Pinoleville Pomo      Case No.: **Case No.: C 07 2648**
    Nation Environmental Association and Leona
11  Williams,

12
    Plaintiffs,                                    **DECLARATION OF DON SMITH**
13                                                 **WILLIAMS IN SUPPORT**
                                                   **OF PLAINTIFFS MOTION FOR**
14              v.                                 **PRELIMINARY INJUNCTION,**
                                                   **FRCP 65**
15  Ukiah Auto Dismantlers, Wayne Hunt
    Isabel Lewright, Warrior Industires, Inc
16  Richard Mayfield, Ross Junior Mayfield,
    Paula Mayfield, Kenneth Hunt, U.S.             Date:  ~~04/23/08~~ 6-25-08
17  Alchemy Corporation and DOES 1-50,             Time:  1:30 P.M.
    Inclusive,                                     Dept:  Courtroom C, 15th Floor
18                                                 Judge:  Susan Illston
    Defendants.
19

20

21

22  _____

23

24       My name is Don Smith Williams. I have personal knowledge of the facts contained herein

25  unless expressly alleged on information and belief. As to those facts I believe them to be true.

26  1.      I am sixty-three years old. I was born on the Pinoleville Reservation.

27
    After graduating from High School, I became a Teamster Mechanic and later became
28

                                          1

a union member of the Operating Engineers as a Certified Welder in Willits, Ca.

2.    I am the Chairman of the Pinoleville Environmental Association, and I am retired.

3.    I received my first HAZMAT training at age thirty-eight and took courses offered by Operating Engineers for hazardous materials training and first responder training, with yearly refresher courses. I have also had experience with tank removal and asbestos removal.

4.    As a child, I did a lot of fishing in the Ackerman Creek, and I am knowledgeable of the history of the creek. I am very concerned about the levee along the creek where it runs along the Hunt and Mayfield properties. It was placed there by the Corps of Engineers years ago, but it cannot prevent the flow of polluted water from getting into the creek.

5.    There is nothing being done to prevent polluted water from flowing into the ground and getting into the creek. There is environmental erosion that has resulted in a large hole in the ground, and a pond has been made, and there is a growing accumulation of oil and hazardous waste in those ponds. I'm also concerned about how many tires have been buried out there.

6.    There has been no cleanup of the Miller and Williams properties that have scattered drums, fuel tanks, tires, and miscellaneous debris from those properties when one of the ponds overflowed and carried all that stuff onto Tribal land.

**I DECLARE UNDER THE PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES THAT THE FOREGOING IS TRUE AND CORRECT.**

DATED 3-21-08

Windsor California

Don Smith Williams

Exhibit  (1)  Notice of Violation of Tribal ordinances



# PINOLEVILLE INDIAN RESERVATION

**367 N. State St., Suite 204  Ukiah, CA  95482  Ph: 707-463-1454  FAX: 707-463-6601**

January 22, 2002

Mr. Rick Mayfield
R&M Backhoe
500 Pinoleville Drive
Ukiah, CA 95482

Subject:    Notice of Violation of Tribal Ordinances
Dated: January 19, 2003
Violation Location:  500 Pinoleville Drive, Ukiah 95482
NE corner of Mendocino
APN #169-190-047

The Pinoleville Band of Pomo Indians is issuing this violation notice to you for illegally diverting storm water run-off from your property onto adjacent lands. This action is a direct violation of The Pinoleville Indian Reservation's Nuisance Ordinance, Section 5 (Nuisance Prohibited), actions defined in Section 3 (Acts Constituting Nuisance) part (a) & part (a)(4), and the Water Quality Ordinance, Section 4 (Prohibited Activities) part (a).

Violation of these Ordinances obligates the Tribe to exercise its duty to protect the environmental quality within Reservation boundaries under the Pinoleville Band of Pomo Indians Environmental Policy Act, Section 102 part (c).  We have included the sections pertaining to your violations and their corresponding penalties.

On December 5th, 2001, the Tribe's Environmental Coordinator responded to a complaint that a trench had been dug on the northeast corner of your property that directly led to flooding on two adjacent parcels to the east of yours.  The Tribe's Environmental Coordinator observed a large trench, approximately 5 feet across and 5feet high at the mouth of the trench (where it opened up onto adjacent land).  A steady flow of polluted water 2 to 3 inches deep and 3 to 6 feet wide was observed at this time.  The trench ran back (SW) through the Mayfield property approximately 100 feet and curved to the right around a pile of cars.

Nuisance Ordinance, Section 5 (Nuisance Prohibited) part (a) of the Pinoleville Indian Reservation requires:

(a)    "…No person shall cause or maintain a nuisance, whether a public or private nuisance, within the Reservation or other territory over which the Tribe has jurisdiction."

Mr. Rick Mayfield                    Page 2                    January 2002

Nuisance Ordinance, Section 3 (Acts Constituting Nuisance) part (a) & part (a)(4) of the Pinoleville Indian Reservation states:

(a)      "…Anything which is injurious to health or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property…"

(a)(4)  "…unlawful dredge or discharge, which means any surface or groundwater to be diverted, obstructed, or impeded, or discharging any material into any waters without legal authority."

Water Quality Ordinance, Section 4 (Prohibited Activities) part (a) of the Pinoleville Indian Reservation requires:

(a)      "…No person shall discharge any pollutant into the waters or wetlands of the Reservation or other territory over which the Tribe has jurisdiction."

The evidence observed by the Tribe's Environmental Coordinator, as described above, clearly indicates that a violation of these regulations has taken place.

These violations are subject to legal action.  Pinoleville Indian Reservation's Nuisance Ordinance, Section 8 (Penalties) provides that any person violating any provision of this Ordinance is subject to a civil fine up to **$1,000.00 per violation**.

The Pinoleville Indian Reservation's Water Quality Ordinance, Section 6 (Civil Penalty) provides that any person engaging in any activity prohibited under this Ordinance is subject to a civil fine up to **$5,000.00 for each day in which the violation occurs.**

Water Quality Ordinance Section 8 (Clean Up and Abatement) part (a) of the Pinoleville Indian Reservation's requires:

"…Any person who discharges any pollutant into the waters of the Reservation or other territory over which the Tribe has jurisdiction shall be liable for all costs associated with or necessary to clean up, abate, or remove said pollutants from the waters of the Reservation or other territory over which the Tribe has jurisdiction and restore the quality of the waters of the Reservation or other territory over which the Tribe has jurisdiction to their condition as they existed immediately prior to the discharge."

Mr. Rick Mayfield                    Page 3                    January 2002

Under the authority of the PBPI's Environmental Policy Act (Section 205.1), the Chairperson of the Pinoleville Environmental Protection Agency (PEPA) will be issuing an Emergency Restraining Order for any action associated with diversion of storm water on your property until further notice. Your adherence to this Order will significantly influence how your case will be handled in the future.

It is the policy of The Tribe, whenever possible, to settle matters like this outside of court in lieu of filling civil action. Prior to filing any legal action, the Tribe would like to offer you the opportunity to rectify these violations. If you would like to explore this option, please contact Don Rich, Tribal Administrator, at the Tribal Office at 707-463-1454.

Please be aware that if you do not respond to this notice within ten days as specified above, and by either contacting the Tribe for further discussion or paying the civil penalty, the case will be turned over to the District Attorney for further action.

The California Regional Water Quality Control Board (North Coast Region) has been informed of these violations and will be conducting an investigation of their own.


Sincerely,

Nathan A. Rich
Environmental Coordinator
Pinoleville Band of Pomo Indians
367 N. State St., #204
Ukiah CA, 95482

Cc:    John Short, California Regional Water Quality Control Board, North Coast
       Region, 5550 Skylane Boulevard, Suite A, Santa Rosa, California 95403

       Wayne Briley, Mendocino County Division of Environmental Health
       501 Low Gap Road, Ukiah CA 95482

       Eugene Bromley, US EPA, Region 09
       75 Hawthorne St. San Francisco, CA 94105-3901

Exhibit  (2)  October 11, Frederick Martin

Considering that the levels of contamination in this soil are generally in line with our experience with other auto dismantlers and that the DI Wet analysis shows little to no potential for affecting the local ground water, I believe that paving this area would be entirely appropriate. We seek your approval for paving, if you have any questions please call me.

Sincerely yours,

Frederick Martin, MS, REA-I 04775
Founder and Principal
Phone 707 895 2607

Encl.: Pavement Drawing
      Summary Table
Cc:   Wayne Hunt
      Rick Mayfield
      Christopher Neary, Attorney



Sample Locations: G1—G8

Entrance & Work Area
Proposed Asphalt Pavement with Soil Samples in the underlying ground

Ulciab Auto Dismantlers

WEST Environmental Services
Fred Martin, MS, REA
September 10, 2007
[Not To Scale]

Exhibit  (3)  ORDER TO CLEAN UP AND ABATE
DISCHARGES



# California Regional Water Quality Control Board
## North Coast Region
### William R. Massey, Chairman

Alan C. Lloyd, Ph.D.
*Agency Secretary*

www.waterboards.ca.gov/northcoast
5550 Skylane Boulevard, Suite A, Santa Rosa, California 95403
Phone: (877) 721-9203 (toll free) • Office: (707) 576-2220 • FAX: (707) 523-0135



Arnold
Schwarzenegger
*Governor*

March 29, 2006

Mr. Wayne Hunt                    Mr. Richard Mayfield
Ms. Isabel Lewright               Mr. Ross Mayfield Junior
Ukiah Auto Dismantlers            500-C Pinoleville Road
500 D Pinoleville Drive           Ukiah, CA  95482
Ukiah, CA  95482

Subject:  Order to Cleanup and Abate Discharges

File:     Storm Water - Ukiah Auto Dismantler

On January 19 and February 6, 2006, staff from our office inspected the Ukiah Auto Dismantlers in response to the recent flood events and OES notification regarding offsite discharge of storm water containing oily waste.

Observations during the inspections noted that a majority of the Facility's activities are conducted on bare soil with no storm water treatment or Best Management Practices to contain and treat oil and petroleum products.   A considerable amount of oil and grease was noted in areas of standing water.  In fact, the February 6, 2006 inspection noted an increase in the amount of oil seen at the Facility.

Based on our inspection, operations at the Facility are such that petroleum products and other automotive-related pollutants may be entrained in storm water and then discharged offsite. Discharge of waste has caused, or threatened to cause, pollution of soil and groundwater. Considering the proximity of the Facility to Ackerman Creek, there is a concern that any ground water pollution would flow toward and impact the Creek.

To address these issues, our office is issuing the enclosed Cleanup and Abatement Order No. R1-2006-0036 for this facility.  This Order is effective upon receipt and addresses three major topics at the Facility:

1.  Immediate cleanup of material contributing to discharge of petroleum wastes and automotive-related pollutants.

2.  Requirement for upgrades to the Facility's infrastructure and operations to avoid future discharges.

*California Environmental Protection Agency*

Recycled Paper

Lady and Gentlemen                    -2-                    March 29, 2006

3.  Requirement for a limited of soil and groundwater investigation to insure protection of existing uses of surface and groundwater in the immediate area.

In consideration of the issues at the Facility and the need for more frequent sampling and reporting, our office is terminating Ukiah Auto Dismantlers participation in the Group Monitoring Program of the General Industrial Storm Water Permit, immediately.  Upon receipt of this letter, the Facility will comply with the monitoring and reporting provisions of the General Permit applicable to individual sites.  This action does not impact your current arrangement with your consultants with the exception of the monitoring and reporting provisions of the General Permit.  If you or your consultants have any questions how to make this transition please contact the Regional Water Board staff responsible for oversight of the Facility.  When you submit the 2005-06 annual report in June 2006, a cover letter should be attached discussing how the Facility has implemented this change.  The following constituents will comprise the monitoring program:

| | |
|---|---|
| Oil and Grease | Total Petroleum Hydrocarbons–Gas Range |
| Copper | Zinc |
| Lead | pH                Total Suspended Solids |

Regional Water Board staff will be available to discuss interim and long term solutions with you and your consultants as the need arises in order to arrive at a complete and technically sound work product.  If you have any question please contact John Short or Richard Azevedo of my staff at jshort@waterboards.ca.gov, 707-576-2065 and razevedo@waterboards.ca.gov, 707 576-22679, respectively.

Sincerely,

for Catherine Kulman
Executive Officer

032906_RGA_UADTrans4CAO

cc:   Leo Cosentini, State Water Resources Control Board, Water Quality Division
      Karen Maurer, Department of Fish and Game, P.O. Box 1165, Cloverdale, CA 95425
      David Koppel, Mendocino County Health Department, 501 Low Gap Road, Room 1326,
         Ukiah, CA 95482
      Veronica Swan, Environmental Protection Agency, 75 Hawthorne Street (CED-3),
         San Francisco, CA 94105
      Andrew Sallach, Environmental Protection Agency, 75 Hawthorne Street (CED-3),
         San Francisco, CA 94105
      Michael Biggs, Pinoleville Pomo Nation, P.O. Box 454, Petaluma, CA 94953
      Pinoleville Indian Community, 357 N State Street, Ukiah, CA 95482
      NEST Environmental Services, 1040 Grant Road, Suite 155-325,
         Mountain View, CA 94040

California Regional Water Quality Control Board
North Coast Region

CLEANUP AND ABATEMENT ORDER NO. R1-2006-0036
and
WATER CODE SECTION 13267(b) ORDER

FOR

WAYNE HUNT
ISABEL B. LEWRIGHT
dba
UKIAH AUTO DISMANTLERS
ID NO. 1 231017330
and
RICHARD MAYFIELD
dba
WARRIOR INDUSTRIES INC.
and
ROSS JUNIOR AND PAULA MAYFIELD

Mendocino County

The California Regional Water Quality Control Board, North Coast Region (hereinafter Regional Water Board) finds that:

1.  The Ukiah Auto Dismantlers, APN 169-19-048 (hereinafter Facility) is an auto dismantler with retail parts sales and car crushing located at 520 Pinoleville Road approximately one mile west of Ukiah, California. The property is owned by Wayne Hunt and Isabel B. Lewright and operated by Mr. Hunt. An adjacent parcel immediately to the east of the Facility is owned by Richard Mayfield dba Warrior Industries Inc, and Ross Junior and Paula Mayfield, APN 169-19-047 (hereinafter Adjacent Property Owner). The Facility uses a portion of the adjacent property to store the car crusher and a portion of the cars. The Facility, the Facility owners and operators, and the owners of both properties are collectively referred to herein as "the Dischargers."

2.  The Facility submitted a Notice of Intent for coverage under the Statewide General Permit for Discharges of Storm Water Associated With Industrial Activities (hereinafter General Permit) on June 18, 2002. The General Permit prohibits discharges of material other than storm water that are not authorized by the General Permit and discharge of pollutants that may cause a pollution or nuisance.

3.  The scope of this Order with respect to the Adjacent Property and Adjacent Property Owner is limited to those historical, existing and future activities related to operations and usage of the Facility by the Dischargers.

4.  A levee separates several parcels located within the 100-year floodplain, including the Facility and the Adjacent Property Owner's site, from Ackerman Creek. The majority of surface runoff from the Property flows northward via sheet flow until it reaches the levee separating the Facility from Ackerman Creek. Storm water is diverted along a ditch eastward and parallel to Ackerman Creek to a retention basin located on the Adjacent Property Owner's parcel. During recent storm events, the retention basin overflows onto lands owned by the Pinoleville Pomo Nation.

5.  Based on interviews during the inspections, floodwaters reportedly overtopped, or flowed around, the levee during the flood events experienced in late December 2005 and early 2006. Ackerman Creek is a tributary to the Russian River. The Russian River provides habitat for steelhead trout, chinook salmon, and coho salmon, which are listed as threatened under the Endangered Species Act.

Cleanup and Abatement                -2-
Order No. R1-2006-0036

6. In January 2006, the Office of Emergency Services informed the Regional Water Board staff via electronic mail of a potential discharge of oily waste from the Facility. On January 19, 2006 and February 6, 2006 Regional Water Board staff conducted site inspections. The Department of Fish and Game inspected the Facility in late-January 2006 and accompanied Regional Water Board staff during the February 6, 2006 inspection.

7. Regional Water Board staff inspections (Attachment A to this Order) found: 1) Lack of impervious working surfaces and containment structures for auto dismantling 2) Car crushing activities off the impervious pad designated for such activities; 3) Lack of covered and contained parts storage; 4) Handling practices that would allow automotive fluids to contact soil and potentially become entrained in surface water runoff as well having the potential to enter groundwater; 5) Offsite discharge of storm water containing floating oil and numerous areas on the Facility and the Adjacent Property where spillage or floating oil was noted, and; 6) The Storm Water Pollution Prevention Plan was not onsite and not available during the initial inspection.

8. Results of the Department of Fish and Game's inspection noted several potential violations related to the lack of a hazardous materials business plan and contingency plans onsite, and lack of a current CUPA permit.

9. Beneficial uses of Ackerman Creek, a tributary to the Russian River, are:

Existing:
a. Municipal and domestic water supply (MUN)
b. Agricultural supply (AGR)
c. Industrial service supply (IND)
d. Ground water recharge (GWR)
e. Freshwater replenishment (FRESH)
f. Navigation (NAV)
g. Contact water recreation (REC-1)
h. Non-contact (REC-2) water recreation
i. Commercial and Sport fishing (COMM)
j. Warm freshwater habitat (WARM)
k. Cold freshwater habitat (COLD)
l. Wildlife habitat (WILD)
m. Preservation of rare, threatened or endangered species (RARE)
n. Migration of aquatic organisms (MIGR)
o. Spawning, reproduction, and/or early development (SPWN).

Potential:
p. Shellfish harvesting (SHELL)
q. Aquaculture (AQUA).

10. The beneficial uses of the groundwater, as designated in the Basin Plan, include:

Existing:
a. Municipal and Domestic Supply (MUN)
b. Agricultural Supply (AGR)
c. Industrial Service Supply (IND)
d. Native American Culture (CUL)

Cleanup and Abatement                    -3-
Order No. R1-2006-0036

Potential:
e. Industrial Process Supply (PRO)

11. The Dischargers named in this Order have caused or permitted or threatened to cause or permit, waste to be discharged where it is, or probably will be, discharged into waters of the State and create, or threaten to create, a condition of pollution or nuisance. The discharge and threatened discharge of contaminants may have unreasonably affected water quality in that the discharge or threatened discharge is deleterious to the above described beneficial uses of State waters, and may have impaired water quality to a degree which creates a threat to public health and public resources and therefore, constitutes a condition of pollution or nuisance. These conditions threaten to continue unless the discharge or threatened discharge is abated.

12. The California Water Code, and regulations and policies developed thereunder, require cleanup and abatement of discharges, and threatened discharges of waste to the extent feasible. Cleanup to background levels is the presumptive standard. Alternative cleanup levels greater than background concentrations shall be permitted only if the Dischargers demonstrate that: it is not feasible to attain background levels; the alternative cleanup levels are consistent with the maximum benefit to the people of the State; alternative cleanup levels will not unreasonably affect present and anticipated beneficial uses of such water; and they will not result in water quality less than prescribed in the Basin Plan and Policies adopted by the State and Regional Water Board. Any proposed alternative that will not achieve cleanup to background levels, must be supported with evidence that it is technologically or economically infeasible to achieve background levels, and that the pollutant will not pose a substantial present or potential hazard to human health or the environment for the duration of the exceedence of background levels (SWRCB Res. Nos. 68-16 and 92-49, Title 23, California Code of Regulations Section 2550.4, subds. (c), and (d)).

13. Discharge prohibitions contained in the Basin Plan apply to this Site. State Water Resources Control Board Resolution 68-16 (Non-Degradation Policy) applies to this Site. State Water Resources Control Board Resolution 92-49 applies to this Site and sets out the "Policies and Procedures for Investigation and Cleanup and Abatement of Discharges under Section 13304 of the California Water Code."

14. The Water Quality Control Plan for the North Coast Region (Basin Plan), Chapter 3, contains specific standards and provisions for maintaining high quality waters of the state that provide for the beneficial uses listed above. In the Basin Plan, the section entitled OBJECTIVES FOR INLAND SURFACE WATERS, ENCLOSED BAYS AND ESTURARIES includes the following water quality objectives, which are violated or threatened to be violated:

a. Floating Material - *"Waters shall not contain floating material, including solids, liquids, foams, and scum, in concentrations that cause nuisance or adversely affect beneficial uses."*

b. Oil and Grease - *"Waters shall not contain oils, greases, waxes, or other materials in concentrations that result in a visible film or coating on the surface of the water or on objects in the water, that cause nuisance, or that otherwise adversely affect beneficial uses."*

Cleanup and Abatement                    -4-
Order No. R1-2006-0036

    c.  Toxicity - *"All waters shall be maintained free of toxic substances in concentrations that are toxic to, or that produce detrimental physiological responses in human, plant, animal or aquatic life."*

    d.  Chemical Constituents - *"Waters designated for use as domestic or municipal supply (MUN) shall not contain concentrations of chemical constituents in excess of the limits specified in California Code of Regulations, Title 22, Chapter 15, Division 4, Article 4, Section 64435 (Tables 2 and 3), and Section 64444.5 (Table 5) and listed in Table 3-2 of the Plan".*

    e.  Taste and Odor – *"Waters shall not contain taste or odor-producing substances in concentrations that impart undesirable tastes or odors to fish flesh or other edible products of aquatic origin, or that causes nuisance or adversely affect beneficial uses."*

15. Water Quality Order No. 97-03 DWQ (General Storm Water Permit) regulates storm water discharges and authorized non-storm water discharges from specific categories of industries. Applicable portions of the Permit that are being violated, or threatened to be violated, are:

    a.  Discharge Prohibitions A.1 – *"Except as allowed in Special Conditions (D.1) of this General Permit, materials other than storm water (non-storm water discharges) that discharge directly or indirectly to waters of the United States are prohibited. Prohibited non-storm water discharges must be either eliminated or permitted by a separate NPDES permit."*

    b.  Discharge Prohibitions A.2 - *"Storm Water discharges and authorized non-storm water discharges shall not cause or threaten to cause pollution, contamination, or nuisance."*

    c.  Effluent Limitations B.3 - *"Facility operators covered by this General Permit must reduce or prevent pollutants associated with industrial activity in storm water discharges and authorized non-storm water discharges through implementation of BAT[1] for toxic and non-conventional pollutants and BCT[2] for conventional pollutants. Development and implementation of an SWPPP[3] that complies with the requirements in Section A of the General Permit and that includes BMP's[4] that achieve BAT/BCT constitutes compliance with this requirement."*

    d.  Receiving Water Limitations C.1 - *" Storm water discharges and authorized non-storm water discharges to any surface water of ground water shall not adversely impact human health or the environment."*

    e.  Storm Water Pollution Prevention Plan Requirements Section A.2 - *"... The SWPPP shall be revised whenever appropriate and shall be readily available for review by facility employees or Regional Water Board inspectors."*

16. The following sections of the Porter-Cologne Water Quality Control Act authorize the Regional Water Board Executive Officer to make the following requirements for persons

---

[1]  Best Available Technology Economically Achievable
[2]  Best Conventional Pollutant Control Technology
[3]  Storm Water Pollution Prevention Plan defined in Section A of the General Permit
[4]  Best Management Practices

Cleanup and Abatement                    -5-
Order No. R1-2006-0036

suspected of violating the applicable Waste Discharge Requirements and Basin Plan prohibitions:

a. Section 13267(a) - *"A regional board, in establishing or reviewing any water quality control plan or waste discharge requirements, or in connection with any action relating to any plan or requirement or authorized by this division, may investigate the quality of any waters of the state within its region."*

b. Section 13267(b) - *"In conducting an investigation specified in subdivision (a), the regional board may require that any person who has discharged, discharges, or proposes to discharge waste within its region...that could affect the quality of waters within its region shall furnish, under penalty of perjury, technical or monitoring program reports which the regional board requires."*

c. Section 13267(c) - *"In conducting an investigation pursuant to subdivision (a), the regional board may inspect the facilities of any person to ascertain whether the purposes of this division are being met and waste discharge requirements are being complied with. The inspection shall be made with the consent of the owner or possessor of the facilities or, if the consent is withheld, with a warrant duly issued pursuant to the procedure set forth in Title 13 (commencing with Section 1822.50) of Part 3 of the Code of Civil Procedure. However, in the event of an emergency affecting the public health or safety, an inspection may be performed without consent or the issuance of a warrant."*

d. Section 13304(a) - *"Any person who has discharged or discharges waste into the waters of this state in violation of any waste discharge requirement or other order or prohibition issued by a regional board or the state board, or who has caused or permitted, causes or permits, or threatens to cause or permit any waste to be discharged or deposited where it is, or probably will be, discharged into waters of the state and creates, or threatens to create, a condition of pollution or nuisance, shall upon order of the regional board, clean up the waste or abate the effects of the waste, or, in the case of threatened pollution or nuisance, take other necessary remedial action, including, but not limited to, overseeing cleanup and abatement efforts."*

17. All of the technical reports required by this Order are necessary to ensure that the prior harm and future threat to water quality created by the discharges described above are properly abated and controlled. The financial burdens of preparing these reports bear a reasonable relationship to the needs for the reports and the benefits to be obtained from the reports.

18. Reasonable costs incurred by Regional Water Board staff in overseeing cleanup or abatement activities are reimbursable under Section 13304(c)(1) of the California Water Code.

19. This Order in no way limits the authority of this Regional Board to institute additional enforcement actions or to require additional investigation and cleanup at the facility consistent with California Water Code. This Order may be revised by the Executive Officer as additional information becomes available.

20. This enforcement action is being taken for the protection of the environment and, therefore, is exempt from the provisions of the California Environmental Quality Act (Public Resources Code, Section 21000 et seq.) in accordance with Section 15321, Chapter 3, Title 14, California Code of Regulations.

Cleanup and Abatement                          -6-
Order No. R1-2006-0036

21. Failure to comply with the terms of this Order may result in enforcement under the
California Water Code. Any person failing to provide technical reports containing
information required by this Order by the required date(s) or falsifying any information in
the technical reports is, pursuant to Water Code Section 13268, guilty of a misdemeanor
and may be subject to administrative civil liabilities of up to one thousand dollars
($1,000.00) for each day in which the violation occurs. Any person failing to clean up or
abate threatened or actual discharges as required by this Order is, pursuant to Water Code
Section 13350(e), subject to administrative civil liabilities no less than five hundred
dollars per day ($500.00) for each day of violation and up to five thousand dollars
($5,000.00) per day for each day of violation; or ten dollars ($10) per gallon of waste
discharged.

22. Any person affected by this action of the Regional Water Board may petition the State
Water Resources Control Board (State Water Board) to review the action in accordance
with California Water Code Section 13320 and Title 23, California Code of Regulations,
Section 2050. The petition must be received by the State Water Board within 30 days of
the date of this Order. Copies of the law and regulations applicable to filing petitions will
be provided upon request.

In addition to filing a petition with the State Board, any person affected by this Order
may request the full Regional Water Board to reconsider this Order. To be timely, any
such request must be made within 30 days of the date of this Order. Note that even if
reconsideration by the Regional Water Board is sought, filing a petition with the State
Water Board within the 30-day period is necessary to preserve the petitioner's legal
rights. If a request to reconsider this Order is made to the Regional Water Board or a
petition filed with the State Water Board, all terms of the Order remain in effect and must
be complied with while the request for reconsideration and/or petition is considered.

**THEREFORE, IT IS HEREBY ORDERED** that, pursuant to California Water Code Sections
13267(b) and 13304, the Dischargers shall cleanup and abate the discharge and threatened
discharge of the pollutants described above and shall comply with the following provisions:

A. Short-Term Abatement:

All work performed shall be conducted in accordance with all local ordinances. All
necessary permits shall be obtained.

1. Take actions to immediately abate the discharge of storm water containing oily waste,
petroleum, and auto-related pollutants forthwith. This shall include, but not limited to:

   a. Installation of a temporary, lined oil/water separator, or equivalent, an oil collection
   area and use of adsorbent booms and pads to remove floating product, as needed.

   b. Interim measures to prevent, to the extent possible, the discharge of pollutants in
   storm water, such as installation of an onsite storm water runoff containment area, or
   surface water run-on diversion.

   c. Cleanup of all floating oil and grease and petroleum products.

   d. Containment and disposal of all solid and liquid debris or waste, for example
   absorbent pads used to remove floating product, leaking cars or other material, that

Cleanup and Abatement                    -7-
Order No. R1-2006-0036

        obviously contribute to floating products or discharge of automotive-related pollutants.

    e.  Temporary containment for the car crusher and implementation of interim operating practices to prevent discharges to soil from the car crushing activities.

    f.  Cleanup of all solid waste, oily materials, and soils discharged offsite during the recent flood events to the extent practicable.

2.  By May 13, 2006 submit a report to the Executive Officer documenting all activities undertaken to date. Written descriptions, a site map showing locations, field marking of locations and photo-documentation shall be included in the report.

## B. Long Term Abatement

All soil and water investigations and any storm water conveyance and treatment systems shall be conducted in accordance with all local ordinances and under the direction of a California Registered Geologist or Registered Civil Engineer experienced in the investigation and cleanup of petroleum hydrocarbons and pollutants related to auto dismantlers.

1.  By June 1, 2006, the Dischargers shall submit a proposal to the Executive Officer detailing long-term Facility improvements, both capital and operational, designed to prevent the discharge of automotive fluids and automotive-related pollutants to soil, surface water and groundwater. This proposal shall include, but not be limited to:

    a.  Improvements to the automotive processing area such as installation of impermeable working surfaces and roof structures to prevent rainfall from contacting the area, to the extent practicable, in order to prevent discharge of automotive fluids to soil and groundwater.

    b.  Containment structures surrounding the automotive processing area to collect and direct all rainfall runoff and spills within the processing area.

    c.  Improvement to the car crushing process to eliminate discharge of automotive–related pollutants.

    d.  Treatment or disposal processes to eliminate, or treat storm, water runoff from the automotive processing and car crushing areas.

    e.  A time schedule to install and implement improvements.

    f.  Generalized site map of the Facility and improvements.

    g.  Detailed design drawing of improvements, as needed.

    h.  Improvements to parts storage and handling to include roofing, impermeable bases, and /or a process to clean parts to eliminate automotive-related pollutants from contacting storm water.

    i.  Improved practices to reduce and/or eliminate the discharge of automotive fluids from cars in the storage area.

Cleanup and Abatement                    -8-
Order No. R1-2006-0036

    j.   Design of surface water drainages and treatment processes to ensure storm water pollutant removal before discharge from the Facility and the adjacent property.

    k.   Written operations plan and employee training plan to ensure proper operations at the Facility.

C.  Soil and Ground Water Investigation

By June 1, 2006, the Dischargers shall prepare and submit a workplan proposing a limited soil and groundwater investigation focusing on assessing the groundwater quality under, and emanating from, the Facility and Adjacent Property and assessing the extent of soil contamination that would impair either surface water or groundwater.  The workplan should include, but no be limited to:

    a.   Map of the Facility, surrounding properties, and Ackerman Creek.

    b.   Location of all known wells within ½ mile of the Facility.

    c.   Location of onsite septic or domestic waste disposal systems.

    d.   Identify location of major activities, current and historical.

    e.   Proposed soil and groundwater sampling locations, sample techniques, and suite of analytes.

    f.   Determining the direction of groundwater flow.

    g.   A time schedule to implement the workplan and submit a final report of results.  The time schedule shall be approved by the Executive Officer and activities shall be conducted in accordance with the approved schedule.

If, for any reason, the Discharger is unable to perform any activity or to submit any document in compliance with the schedule set forth herein or in compliance with any work schedule submitted pursuant to this Order and concurred with by the Executive Officer, the Discharger may request, in writing, a specified time extension.  The extension request must be received by the Regional Water Board at least five days in advance of the due date, and shall include justification for the delay, including a description of good faith efforts performed to achieve compliance with the due date.  The extension request shall also include a proposed time schedule with new performance dates for the due date in question and all dependent dates.  An extension may be granted for good cause, in which case this Order will be revised accordingly.  A failure to deny a requested extension of time in writing shall not be deemed approval.

Ordered by _____

              for Catherine Kuhlman
              Executive Officer

March 30, 2006