Exhibit  (4)  Photographs 1-17 of MAYFIELD and
UAD SITES January 8, 2008.

EXHIBIT 4
Page 1 of
17 Pages



EXHIBIT _4_
Page _2_ of
_17_ Pages



EXHIBIT 4
Page 3 of
17 Pages



EXHIBIT _4_
Page _4_ of
_17_ Pages



EXHIBIT 4
Page 5 of
17 Pages



EXHIBIT ___4___
Page ___6___ of
___17___ Pages



EXHIBIT  4
Page ____7____ of
____17____ Pages



EXHIBIT 4
Page 8 of
17 Pages



EXHIBIT __4__
Page ___9___ of
___17___ Pages



EXHIBIT  4
Page    10    of
     17    Pages



EXHIBIT _4_
Page __11__ of
__17__ Pages



EXHIBIT 4
Page 12 of
17 Pages



EXHIBIT 4
Page 12 of
17 Pages



EXHIBIT 4

Page 14 of

17 Pages



EXHIBIT  4
Page  15  of
  17  Pages



EXHIBIT 4
Page 16 of
17 Pages



EXHIBIT 4
Page 17 of
17 Pages



Exhibit  (5)  KENNEC INC-UAD and MAYFIELD site
Assessment January 11,2008



**Kennec, Inc.**
765 Baywood drive
Suite 340
Petaluma, CA 94954
Tel: 707.780.8129
E-Fax: 909.354.3291

# SITE VISIT MEMORANDUM

**TO:**      DAVID EDMUNDS, MICHAEL BIGGS, AND GEORGE PROVENCHER

**FROM:**    JOAQUIN WRIGHT

**SUBJECT:** JANUARY 8TH, 2008. SITE VISIT TO PINOLEVILLE POMO NATION FOR STORMWATER SAMPLING AND SITE OBSERVATION.

**DATE:**    1/11/08

**CC:**      DAGAN SHORT

This memorandum documents a site visit to the Pinoleville Pomo Nation (PPN) by Joaquin Wright of Kennec, Inc. (KENNEC). The purpose of the visit was to examine storm water conditions related to water runoff from industrial activities adjacent to the PPN. As part of the visit, KENNEC collected surface water and soil samples as a preliminary measure in evaluating potential impacts to the PPN property from industrial activity on the adjacent property.

## SITE VISIT

KENNEC visited the site on January 8, 2008 to review storm water conditions on the PPN site and an adjacent site. Joaquin Wright, Senior Project Manager and Principal of KENNEC, arrived at approximately 11:30 am. Before the site visit, it had been raining for approximately three days.

### *Observations*

KENNEC toured the PPN by vehicle and on foot to view the storm water drainage conveyance systems and appurtenances associated with the tribal lands and the local waterway, referred to as Ackerman Creek.

The main industrial activity within the tribal lands (but not owned by the PPN) is a local business, Ukiah Auto Dismantlers (UAD). The assessor's parcel numbers for the UAD where industrial activities were observed to be occurring are APN 168-190-048 (48) and APN 168-190-049 (49). The total area of the two parcels is approximately 10 acres. The UAD operation is adjacent to and north of the Tribal Headquarters/Head Start School Facility and between Pinoleville Drive and Ackerman Creek.

KENNEC reviewed a description of the area in a Phase II Environmental Investigation dated March 2003 (Vector Engineering Inc.) as well as visually observed conditions on the UAD facility from PPN land adjacent to parcels 48 and 49. Based on our observations, the majority of the storm water runoff associated with parcels 48 and 49 flows across the parcels from south to north and then from west to east, adjacent to a berm that runs the whole length of parcels 47 and 48 in a east west direction, and then discharge onto Parcel 1 and continue to sheet flow over a creek access path onto parcel 2. A drainage pathway from parcels 1 and 2 connects to Akerman Creek at a point located at the approximate Parcel 1 and Parcel 2 boundary, and shows signs of having diverted water to or from the creek in the past during high flow events.

Pinoleville Pomo Nation
January 14, 2008
Page 2 of 3

During our tour of the PPN, KENNEC observed the following conditions with regard to storm water discharge, and the drainage and conveyance system:

1. Discharge from the UAD facility onto the adjacent PPN property had very few visible[1] storm water source and treatment controls. Only one check dam for most of the 10 acres site was seen. The check dam drained via pipes to a pond at the confluence of a drainage pathway running south to north on the eastern side of parcel 47. Water from the pond discharged easterly to parcel 1 on the PPN property. The storm water that flowed through the pipes (from the check dam), appeared to be of relatively high velocity and very "cloudy", indicative of elevated Total Suspended Solids (TSS).

2. Visible operations areas were not on impermeable ground (i.e., paved areas) nor were they covered.

3. One vehicle's motor, in an apparent work area (evident by adjacent toolbox and open motor compartment door), appeared to be under deconstruction/construction. This work area was immediately adjacent to and connected with a drainage pond created by the check dam at the northeasterly edge of the property.

4. At least two large piles of debris were visible. The debris piles, which included metal, soil, and miscellaneous aggregate were surrounded by pools of water that flowed into stormwater drainages. The debris piles were not covered nor were storm water source controls present to prevent movement of contaminants from the debris to the storm water or underlying soil.

5. There were vehicles in various states of disrepair or dismantling, large steel tanks pipes and other vehicular components; all were uncovered and exposed to the elements. There was no clear delineation between storage area or operational working areas.

*Sampling Activities*

KENNEC collected six surface water samples on Parcel 1 and Parcel 2 and one soil sample from parcel 1 from a depth of ____ feet. Sample locations were field located with a handheld GPS unit. The samples were delivered to Brelje and Race for analysis, located in Santa Rosa, Ca., in iced coolers under standard Chain-of-Custody procedures. Samples were tested for the following constituents:

- Volatile organic compounds (VOCs) by EPA Method 8260B

- Total petroleum hydrocarbons as diesel and oil

- Heavy Metals

## INDUSTRY STANDARD FOR AUTO DISMANTLING FACILITIES

Industrial sites in California must comply with current state and federal storm water regulations that typically require implementation of long- and short-term storm water source and treatment controls. These controls prevent impacts to surface water, to groundwater (through infiltration) and to soil. In addition, all industrial sites are required to have an updated Storm Water Pollution Prevention Plan (SWPPP) that specifies appropriate Best Management Practices (BMPs) as well as a monitoring program for documenting and

---

[1] Based on observations from PPN Parcel 1.

Pinoleville Pomo Nation
January 14, 2008
Page 3 of 3

identifying whether the BMPs are performing adequately. To give perspective on the industry standard for storm water management and typical BMPs that one would implement at an auto dismantling facility, the following short list from the California Stormwater Quality Association (CASQA), http://www.cabmphandbooks.com/Industrial.asp, is provided below:

- SC – 22: Vehicle equipment Repair, covered work area, impervious ground cover, covered storage of vehicles

- TC – 10,11,21,22,30,31,60: Infiltration trench, infiltration basin, constructed wetland, extended detention basin, vegetated swale and buffer strip, multiple systems

- EC - 2,9,10,12: Existing vegetation, drainage swales, velocity dissipation devices, berm and bank stabilization

- SE - 2,3,4,5,8,9,10: Sediment basin, sediment trap, check dams, fiber rolls, straw bale and sandbag barriers, storm drain inlet protection

In addition to these recommendations, we have attached for your review, information on BMPs from a few of the many regional and national auto recycling organizations.

If you have any questions about the information provided in the memorandum, please call. After we receive the laboratory results for the surface water and soil samples, we will compare them to potentially applicable water and soil criteria, and submit this information to you in a technical memorandum.

Sincerely,

**KENNEC, Inc.**

Joaquin Wright
Senior Project Manager

Attachments: BMPs and literature from auto recycling organizations

Exhibit  (6)  KENNEC INC-UAD and MAYFIELD site
Assessment April 10, 2008



**Kennec, Inc.**
765 Baywood drive
Suite 340
Petaluma, CA  94954
Tel: 707.780.8129
E-Fax: 909.354.3291

# SITE VISIT MEMORANDUM

**TO:**     MICHAEL BIGGS

**FROM:**   JOAQUIN WRIGHT

**SUBJECT:** APRIL 2ND , 2008. SITE VISIT TO PINOLEVILLE POMO NATION FOR SEDIMENT/SOIL
SAMPLING OF STORMWATER DRAINAGE AREAS AND ACKERMAN CREEK..

**DATE:**   4/10/08

**CC:**     DAGAN SHORT

This memorandum documents a site visit to the Pinoleville Pomo Nation (PPN) by Andrew Murphy of Kennec, Inc. (KENNEC) on April 2nd of 2008.  The purpose of the visit was to perform soil and sediment sampling at predetermined general areas within stormwater drainage areas and Ackerman Creek.   This sampling event was performed at the request of the PPM  to  further evaluate the potential impacts to the PPN property from industrial activity on the adjacent property.

## SITE DESCRIPTION

The main industrial activity within the tribal lands (but not owned by the PPN) is a local business, Ukiah Auto Dismantlers (UAD).The assessor's parcel numbers (APN) for the UAD where industrial activities were previously observed and document to be occurring are APN 168-190-048 (48) and APN 168-190-049 (49) (hereafter referred to as parcel 47, 48, etc.).   The total area of the two parcels is approximately 10 acres.  The UAD's operations  are adjacent to and north of the Tribal Headquarters/Head Start School Facility and between Pinoleville Drive and Ackerman Creek, and are directly adjacent to parcel 47 to the east and parcel 50 to the south .  From east to west,  the parcels are 49, 48, 47, 1, and 2.

## SITE VISIT

KENNEC visited the site to perform soil and sediment sampling within stormwater drainage areas that are directly adjacent to the UAD and the stream that flows through the PPN, Ackerman Creek, that is believed to be the receiving waters for stormwater flow from the UAD.   Andrew Murphy, Senior Project Engineer for KENNEC, arrived at approximately 1:00 pm  and completed sampling activities at approximately 7:00 pm..

## OBSERVATIONS

Pinoleville Pomo Nation
April 10, 2008
Page 2 of 4

The weather at time of arrival was partly sunny and warm. The stormwater drainage areas adjacent to the UAD were dry and Ackerman Creek was flowing with an approximated maximum depth of 1.5 feet.

Based on previously documented observations and those made during this site visit, the majority of the storm water runoff associated with parcel 48 and 49 flows across the parcels from south to north and then from west to east in a drainage area adjacent to a manmade berm constructed along Ackerman Creek. The berm and drainage area are continuous for the entire width of parcels 48, 47, and 1. There is an access pathway constructed between parcels 1 and 2 in which the berm elevation is substantially lower. The access pathway includes a culvert to allow stormwater flow towards the east. At the time of this site visit it was observed that the culvert appeared to be mostly clogged with debris. The berm within parcel 2 appears to be continuous; however, it appears that the drainage area along the berm terminates on parcel 2 due to an increase in elevation to the east. This is apparent by observable high water mark deposition of debris (wood, plastic containers, etc.) in the near area of the pathway on parcel 1 and 2. These signs may indicate that stormwater was diverted to or from the creek in the past during high flow events through the lower elevation in the berm.

Based on conversations with PPN and observable indications (i.e. debris and fine sediments) some stormwater from the UAD's operations area pools in an area outside their area to the south of the south east corner of parcel 48 on parcel 50.

## SAMPLING ACTIVITIES

KENNEC collected nine samples during the event. Three samples were collected from within the dry stormwater drainage area adjacent to the berm in parcel 1 and 2; one sample was collected on the stream side of the access pathway; one sample was collected from within the dry channel of Ackerman Creek; three samples were collected from the flowing channel of Ackerman Creek; and one sample was collected from parcel 50 to the south of the south east corner of parcel 48. The sample locations were document using a handheld GPS and with photos. Descriptions of the sampling locations are as follows:

- Sample 1 (SS1-040208) was collected from what appeared to be the center of the dry drainage area channel along the berm in parcel 1 approximately 45 feet to the west of the access pathway.

- Sample 2 (SS2-040208) was collected from beneath debris apparently deposited during high water events on the west side of the access pathway to the north of the culvert on parcel 1.

- Sample 3 (SS3-040208) was collected from what appeared to be the center of the dry drainage way/pool next to the berm on parcel 2.

Pinoleville Pomo Nation
April 10, 2008
Page 3 of 4

- Sample 4 (SS4-040208) was collected from the dry sediments/soil on the north east side of the access pathway where indications of water flow in the dry channel of Ackerman Creek were observed.

- Sample 5 (SS5-040208) was collected from Ackerman Creek Sediments within the southernmost dry channel a couple hundred feet to the west of the access pathway between parcel 1 and 2, upstream.

- Sample 6 (SS6-040208) was collected from Ackerman Creek sediments at what appeared to be the confluence of the two channels. The northernmost is still flowing while the southernmost is dry on the surface.

- Sample 7 (SS7-040208) was collected from Ackerman Creek sediments to the north of the deepest channel flow downstream of Sample 6.

- Sample 8 (SS8-040208) was collected from a standing pool south of the flowing channel but at a similar downstream distance from Sample 6.

The methodologies used for collecting samples were as follows:

- Samples 1 through 5 and 9 are composite samples collected from the surface to a maximum depth of approximately six inches below ground surface (bgs) using a stainless steal spade to place soil into a stainless steal bowl. The soil was then mixed until it appeared to be uniform in consistency using a stainless steal spoon and then after rinsing and drying the spoon sample material was transferred into a 12 ounce jar filled to minimize head space. The sampling equipment was then brushed off washed with a dilute solution of isopropyl alcohol twice and then rinsed with deionized water and dried.

- Samples 6 through 8 were collected by a driven tube method. A washed and rinsed two inch diameter section of PVC pipe with 3 inch increments marked on the side was driven to a depth of 9 to twelve inches below the sediment surface. The approximate depth of water and the depth of the sample were recorded. To extract the sample the pipe was filled with stream water and capped. The pipe was slowly extracted until the lower end was exposed. When exposed it was capped and the sample was transported carefully to the where it would be composited. The water was drained by cutting a small slot in the pipe above the sample depth. The contents was then transferred into a stainless steal bowl and composited and transferred into 12 ounce sample jars using the same method describe above.

The samples were delivered to Brelje and Race Laboratories, Inc. in Santa Rosa, California on morning of April 3rd in an iced cooler under standard chain-of-custody procedures. Samples were submitted for total petroleum hydrocarbon (diesel and oil range) and metal analysis.

Pinoleville Pomo Nation
April 10, 2008
Page 4 of 4

Sincerely,

**KENNEC, Inc.**

Joaquin Wright
Senior Project Manager

**BRELJE AND RACE**



**LABORATORIES, INC.**   425 SOUTH E STREET • SANTA ROSA, CALIFORNIA 95404 • (707) 544-8807

April 17, 2008

Sample Collected:   04/03/08
Sample Received:    04/03/08
Collected By      :   AM

Kennec
235 East Broadway
Long Beach, CA. 90802
Attention: Joaquin Wright

| LOG NUMBER | Sample Description | Metals mg/Kg |
|---|---|---|
| 408-7435 | SS1-040208 | Please see attached Reports |
| 408-7436 | SS2-040208 | |
| 408-7437 | SS3-040208 | |
| 408-7438 | SS4-040208 | |
| 408-7439 | SS5-040208 | |
| 408-7440 | SS6-040208 | |
| 408-7441 | SS7-040208 | |
| 408-7442 | SS8-040208 | |
| 408-7443 | SS9-040208 | |

Analyses performed by approved outside laboratories.

VERY TRULY YOURS,

**BRELJE AND RACE LABORATORIES, INC.**

ANN HILL, LABORATORY MANAGER

AH:ljc

**BRELJE AND RACE**



**LABORATORIES, INC.**      325 SOUTH E STREET • SANTA ROSA, CALIFORNIA 95404 • (707) 544-8807

April 17, 2008

Sample Collected:    04/03/08
Sample Received:    04/03/08
Collected By    :    AM

Kennec
235 East Broadway
Long Beach, CA. 90802
Attention: Joaquin Wright

| LOG NUMBER | Sample Description | TPH – Diesel & TPH – Motor Oil  mg/Kg |
|------------|-------------------|----------------------------------------|
| 408-7435 | SS1-040208 | Please see attached Reports |
| 408-7436 | SS2-040208 | |
| 408-7437 | SS3-040208 | |
| 408-7438 | SS4-040208 | |
| 408-7439 | SS5-040208 | |
| 408-7440 | SS6-040208 | |
| 408-7441 | SS7-040208 | |
| 408-7442 | SS8-040208 | |
| 408-7443 | SS9-040208 | |

Analyses performed by approved outside laboratories.

VERY TRULY YOURS,

**BRELJE AND RACE LABORATORIES, INC.**

ANN HILL, LABORATORY MANAGER

AH:ljc

| McCampbell Analytical, Inc. | | 1534 Willow Pass Road, Pittsburg, CA 94565-1701 Web: www.mccampbell.com    E-mail: main@mccampbell.com Telephone: 877-252-9262    Fax: 925-252-9269 | | |
|---|---|---|---|---|
| "When Quality Counts" | | | | |
| Brelje & Race Labs., Inc. | Client Project ID: #408-7435,36,37,38,39,40,41,42,43 | Date Sampled: 04/02/08 | | |
| 425 South E Street | | Date Received  04/04/08 | | |
| | Client Contact:  Ann Hill | Date Extracted  04/04/08 | | |
| Santa Rosa, CA 95404 | Client P.O.: | Date Analyzed  04/07/08-04/08/08 | | |

### Metals*

| | Lab ID | 0804133-001A | 0804133-002A | 0804133-003A | 0804133-004A | Reporting Limit for DF =1; ND means not detected above the reporting limit | |
|---|---|---|---|---|---|---|---|
| | Client ID | 408-7435 | 408-7436 | 408-7437 | 408-7438 | | |
| | Matrix | S | S | S | S | S/SLUDGE | W |
| | Extraction Type | TOTAL | TOTAL | TOTAL | TOTAL | mg/kg | mg/L |

### ICP-MS Metals, Concentration*

Analytical Method: 6020A    Extraction Method: SW3050B/SW3050B    Work Order: 0804133

| Dilution Factor | 1 | 1 | 1 | 1 | 1 | 1 |
|---|---|---|---|---|---|---|
| Antimony | 0.82 | 0.54 | 1.5 | ND | 0.5 | NA |
| Arsenic | 5.8 | 6.0 | 8.3 | 5.2 | 0.5 | NA |
| Barium | 170 | 160 | 250 | 140 | 5.0 | NA |
| Beryllium | ND | ND | 0.64 | ND | 0.5 | NA |
| Cadmium | 1.4 | 0.42 | 2.5 | ND | 0.25 | NA |
| Chromium | 110 | 82 | 110 | 78 | 0.5 | NA |
| Copper | 41 | 30 | 72 | 20 | 0.5 | NA |
| Lead | 51 | 24 | 160 | 6.0 | 0.5 | NA |
| Mercury | 0.13 | 0.065 | 0.20 | ND | 0.05 | NA |
| Nickel | 110 | 98 | 130 | 97 | 0.5 | NA |
| Selenium | ND | ND | ND | ND | 0.5 | NA |
| Silver | ND | ND | ND | ND | 0.5 | NA |
| Thallium | ND | ND | ND | ND | 0.5 | NA |
| Vanadium | 57 | 49 | 71 | 43 | 0.5 | NA |
| Zinc | 160 | 100 | 560 | 46 | 5.0 | NA |
| %SS: | 98 | 98 | 95 | 97 | | |

### Comments

*water samples are reported in µg/L, product/oil/non-aqueous liquid samples and all TCLP / STLC / DISTLC / SPLP extracts are reported in mg/L, soil/sludge/solid samples in mg/kg, wipe samples in µg/wipe, filter samples in µg/filter.

# means surrogate diluted out of range; ND means not detected above the reporting limit; N/A means not applicable to this sample or instrument

J) analyte detected between reporting limits (RLs) and method detection limits (MDLs).

TOTAL = acid digestion.
WET = Waste Extraction Test (STLC).
DI WET = Waste Extraction Test using de-ionized water.

i) aqueous sample containing greater than ~1 vol. % sediment; for DISSOLVED metals, this sample has been preserved prior to filtration; for TOTAL metals, a representative sediment-water mixture was digested. j) reporting limit raised due to insufficient sample amount; k) reporting limit raised due to matrix interference; m) estimated value due to low/high surrrogate recovery; n) results are reported on a dry weight basis, p) see attached narrative.

DHS ELAP Certification Nº 1644

Angela Rydelius, Lab Manager

## McCampbell Analytical, Inc.
### "When Quality Counts"

1534 Willow Pass Road, Pittsburg, CA 94565-1701
Web: www.mccampbell.com   E-mail: main@mccampbell.com
Telephone: 877-252-9262   Fax: 925-252-9269

| Brelje & Race Labs., Inc. | Client Project ID:  #408-7435,36,37,38,39,40,41,42,43 | Date Sampled:  04/02/08 |
|---|---|---|
| 425 South E Street | | Date Received  04/04/08 |
| | Client Contact:  Ann Hill | Date Extracted  04/04/08 |
| Santa Rosa, CA 95404 | Client P.O.: | Date Analyzed  04/07/08-04/08/08 |

### Metals*

| | Lab ID | 0804133-005A | 0804133-006A | 0804133-007A | 0804133-008A | Reporting Limit for DF =1; ND means not detected above the reporting limit | |
|---|---|---|---|---|---|---|---|
| | Client ID | 408-7439 | 408-7440 | 408-7441 | 408-7442 | | |
| | Matrix | S | SLUDGE | SLUDGE | SLUDGE | S/SLUDGE | W |
| | Extraction Type | TOTAL | TOTAL | TOTAL | TOTAL | mg/kg | mg/L |

### ICP-MS Metals, Concentration*

Analytical Method: 6020A          Extraction Method:  SW3050B/SW3050B          Work Order:  0804133

| Dilution Factor | 1 | 1 | 1 | 1 | 1 | 1 |
|---|---|---|---|---|---|---|
| Antimony | ND | ND | ND | ND | 0.5 | NA |
| Arsenic | 6.3 | 4.5 | 4.1 | 4.3 | 0.5 | NA |
| Barium | 130 | 95 | 80 | 120 | 5.0 | NA |
| Beryllium | ND | ND | ND | ND | 0.5 | NA |
| Cadmium | ND | ND | ND | ND | 0.25 | NA |
| Chromium | 110 | 72 | 48 | 71 | 0.5 | NA |
| Copper | 24 | 16 | 18 | 20 | 0.5 | NA |
| Lead | 7.4 | 4.8 | 4.7 | 4.0 | 0.5 | NA |
| Mercury | ND | ND | ND | ND | 0.05 | NA |
| Nickel | 120 | 77 | 59 | 73 | 0.5 | NA |
| Selenium | ND | ND | ND | ND | 0.5 | NA |
| Silver | ND | ND | ND | ND | 0.5 | NA |
| Thallium | ND | ND | ND | ND | 0.5 | NA |
| Vanadium | 51 | 39 | 32 | 41 | 0.5 | NA |
| Zinc | 54 | 42 | 40 | 43 | 5.0 | NA |
| %SS | 98 | 98 | 96 | 95 | | |

### Comments

*water samples are reported in µg/L, product/oil/non-aqueous liquid samples and all TCLP / STLC / DISTLC / SPLP extracts are reported in mg/L, soil/sludge/solid samples in mg/kg, wipe samples in µg/wipe, filter samples in µg/filter.

# means surrogate diluted out of range; ND means not detected above the reporting limit; N/A means not applicable to this sample or instrument

J) analyte detected between reporting limits (RLs) and method detection limits (MDLs).

TOTAL = acid digestion.
WET = Waste Extraction Test (STLC).
DI WET = Waste Extraction Test using de-ionized water.

i) aqueous sample containing greater than ~1 vol. % sediment; for DISSOLVED metals, this sample has been preserved prior to filtration; for TOTAL metals, a representative sediment-water mixture was digested; j) reporting limit raised due to insufficient sample amount; k) reporting limit raised due to matrix interference; m) estimated value due to low/high surrogate recovery; n) results are reported on a dry weight basis; p) see attached narrative.

DHS ELAP Certification N° 1644

Angela Rydelius, Lab Manager

## McCampbell Analytical, Inc.

"When Quality Counts"

1534 Willow Pass Road, Pittsburg, CA 94565-1701
Web: www.mccampbell.com    E-mail: main@mccampbell.com
Telephone: 877-252-9262   Fax: 925-252-9269

| Brelje & Race Labs., Inc. | Client Project ID: #408-7435,36,37,38,39,40,41,42,43 | Date Sampled: 04/02/08 |
|---|---|---|
| 425 South E Street | | Date Received  04/04/08 |
| | Client Contact:  Ann Hill | Date Extracted  04/04/08 |
| Santa Rosa, CA 95404 | Client P.O.: | Date Analyzed  04/07/08-04/08/08 |

### Metals*

| | | | | | | Reporting Limit for DF =1; ND means not detected above the reporting limit | |
|---|---|---|---|---|---|---|---|
| Lab ID | 0804133-009A | | | | | | |
| Client ID | 408-7443 | | | | | | |
| Matrix | S | | | | | S/SLUDGE | W |
| Extraction Type | TOTAL | | | | | mg/kg | mg/L |

### ICP-MS Metals, Concentration*

Analytical Method: 6020A                    Extraction Method: SW3050B/SW3050B                    Work Order: 0804133

| Dilution Factor | 1 | | | | | 1 | 1 |
|---|---|---|---|---|---|---|---|
| Antimony | 0.55 | | | | | 0.5 | NA |
| Arsenic | 5.9 | | | | | 0.5 | NA |
| Barium | 150 | | | | | 5.0 | NA |
| Beryllium | ND | | | | | 0.5 | NA |
| Cadmium | ND | | | | | 0.25 | NA |
| Chromium | 79 | | | | | 0.5 | NA |
| Copper | 26 | | | | | 0.5 | NA |
| Lead | 16 | | | | | 0.5 | NA |
| Mercury | ND | | | | | 0.05 | NA |
| Nickel | 94 | | | | | 0.5 | NA |
| Selenium | ND | | | | | 0.5 | NA |
| Silver | ND | | | | | 0.5 | NA |
| Thallium | ND | | | | | 0.5 | NA |
| Vanadium | 49 | | | | | 0.5 | NA |
| Zinc | 69 | | | | | 5.0 | NA |
| %SS: | 99 | | | | | | |

### Comments

*water samples are reported in µg/L, product/oil/non-aqueous liquid samples and all TCLP / STLC / DISTLC / SPLP extracts are reported in mg/L, soil/sludge/solid samples in mg/kg, wipe samples in µg/wipe, filter samples in µg/filter.

# means surrogate diluted out of range; ND means not detected above the reporting limit; N/A means not applicable to this sample or instrument.

J) analyte detected between reporting limits (RLs) and method detection limits (MDLs).

TOTAL = acid digestion.
WET = Waste Extraction Test (STLC).
DI WET = Waste Extraction Test using de-ionized water.

i) aqueous sample containing greater than ~1 vol. % sediment; for DISSOLVED metals, this sample has been preserved prior to filtration, for TOTAL metals, a representative sediment-water mixture was digested. j) reporting limit raised due to insufficient sample amount; k) reporting limit raised due to matrix interference; m) estimated value due to low/high surrogate recovery; n) results are reported on a dry weight basis. p) see attached narrative.

DHS ELAP Certification N° 1644

Angela Rydelius, Lab Manager

## McCampbell Analytical, Inc.

"When Quality Counts"

1534 Willow Pass Road, Pittsburg, CA 94565-1701
Web: www.mccampbell.com    E-mail: main@mccampbell.com
Telephone: 877-252-9262    Fax: 925-252-9269

| Brelje & Race Labs., Inc. | Client Project ID: #408-7435,36,37,38,39,40,41,42,43 | Date Sampled: 04/02/08 |
| --- | --- | --- |
| 425 South E Street | | Date Received: 04/04/08 |
| | Client Contact: Ann Hill | Date Extracted: 04/04/08 |
| Santa Rosa, CA 95404 | Client P.O.: | Date Analyzed: 04/05/08-04/08/08 |

**Total Extractable Petroleum Hydrocarbons***

Extraction method: SW3550C                Analytical methods: SW8015C                Work Order    0804133

| Lab ID | Client ID | Matrix | TPH-Diesel (C10-C23) | TPH-Motor Oil (C18-C36) | DF | % SS |
| --- | --- | --- | --- | --- | --- | --- |
| 0804133-001A | 408-7435 | S | 10,g,b | 34 | 1 | 109 |
| 0804133-002A | 408-7436 | S | 15,g,b | 52 | 1 | 109 |
| 0804133-003A | 408-7437 | S | 8.1,g,b | 26 | 1 | 108 |
| 0804133-004A | 408-7438 | S | ND | ND | 1 | 118 |
| 0804133-005A | 408-7439 | S | ND | ND | 1 | 117 |
| 0804133-006A | 408-7440 | SLUDGE | ND | ND | 1 | 114 |
| 0804133-007A | 408-7441 | SLUDGE | ND | ND | 1 | 118 |
| 0804133-008A | 408-7442 | SLUDGE | ND | ND | 1 | 118 |
| 0804133-009A | 408-7443 | S | ND | ND | 1 | 118 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

| Reporting Limit for DF =1; ND means not detected at or above the reporting limit | W | NA | NA | | ug/L |
| --- | --- | --- | --- | --- | --- |
| | /SLUDGE | 1.0 | 5.0 | | mg/Kg |

* water samples are reported in µg/L, wipe samples in µg/wipe, soil/solid/sludge samples in mg/kg, product/oil/non-aqueous liquid samples in mg/L, and all DISTLC / STLC / SPLP / TCLP extracts are reported in µg/L.

# cluttered chromatogram resulting in coeluted surrogate and sample peaks; or, surrogate peak is on elevated baseline; or, surrogate has been diminished by dilution of original extract.

+The following descriptions of the TPH chromatogram are cursory in nature and McCampbell Analytical is not responsible for their interpretation: a) unmodified or weakly modified diesel is significant; b) diesel range compounds are significant; no recognizable pattern; c) aged diesel? is significant; d) gasoline range compounds are significant; e) unknown medium boiling point pattern that does not appear to be derived from diesel (asphalt?); f) one to a few isolated peaks present; g) oil range compounds are significant; h) lighter than water immiscible sheen/product is present; i) liquid sample that contains greater than ~1 vol. % sediment; j) sample diluted due to matrix interference; k) kerosene/kerosene range/jet fuel; l) bunker oil; m) fuel oil; n) stoddard solvent/mineral spirit; o) mineral oil; p) see attached narrative.

DHS ELAP Certification N° 1644                                    Angela Rydelius, Lab Manager

1            IN THE UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3                      - - - -

4

5    PINOLEVILLE POMO NATION,        )
     PINOLEVILLE POMO NATION         )
6    ENVIRONMENTAL ASSOCIATION,      )
     and LEONA WILLIAMS,             )
7                                    )
                        Plaintiffs,  )
8                                    )
          vs.                        )    No.  C 07 2648 SI
9                                    )
     UKIAH AUTO DISMANTLERS,         )
10   WAYNE HUNT, ISABEL              )
     LEWRIGHT, WARRIOR               )
11   INDUSTRIES, INC., RICHARD       )
     MAYFIELD, ROSS JUNIOR           )
12   MAYFIELD, PAULA MAYFIELD,       )
     KENNETH HUNT, U.S. ALCHEMY      )
13   CORP., and DOES 1-50,           )
     inclusive,                      )
14                                   )
                        Defendants.  )
15   _____)

16

17                      - - - -

18        DEPOSITION OF RICHARD AZEVEDO, P.E.

19        Held at the Offices of Biggs Law, PC

20         765 Baywood, Petaluma, California

21     Tuesday, February 26, 2008, 10:30 a.m.

22                      - - - -

23

24

25

# Verbatim ■

1    your office to be able to make that visit?

2        A.    The general stormwater permit, which is issued

3    to the facility, has a provision that allows the

4    Regional Board and EPA access to the facility and its

5    records to conduct inspections.

6        Q.    And what was the purpose of your visit?

7        A.    Well, we were responding to the complaint

8    about off-site discharge of oily material and auto

9    wrecker debris, so we inspected the facility in that

10   regard and for general compliance with the provisions of

11   the industrial stormwater permit as well as our basin

12   plan.

13       Q.    Now, you told us you spent several hours at

14   the site, and I'd like to ask you, as you began this

15   inspection, did you see any practices or conditions that

16   were out of compliance with the general stormwater

17   permit?

18            MR. NEARY:    Objection, compound.

19   BY MR. BIGGS:

20       Q.    I'll rephrase.    When you began your

21   inspection, did you see any violations?

22       A.    Yes.

23       Q.    And in sequence from the very first violation

24   that you saw, could you tell us about the violations

25   that you saw?

### Verbatim

1       A.   I could describe them in general categories.

2       Q.   Okay.

3       A.   The permit requires a certain level of

4 paperwork be maintained on-site, the Stormwater

5 Pollution Prevention Plan annual records, that was

6 generally lacking.  The pollution -- permit requires

7 that the facility implement best management practices to

8 prevent or minimize pollution generation and then some

9 type of pollution treatment or controls prior to

10 stormwater leaving the site.  The facility really did

11 not implement proper best management practices in either

12 category, and as a result of that, we saw several

13 examples of oil and grease on the ground, practices that

14 would lead to oil and grease on the ground, which would

15 then become entrained in the stormwater.  And so we saw

16 evidence of oil and grease deposits across the site as

17 well as poor best management practices being

18 implemented.  All of those would be violations of the

19 permit.

20       Q.   With regard to oil and grease on the ground,

21 did you happen to notice if any of this subject oil and

22 grease was on asphalt?

23       A.   Most of the site is bare ground.  I don't

24 really recall if there was any asphalt.

25       Q.   And with regard to this subject oil and grease

1   that you saw at this time, as you've described, were you

2   able to ascertain the source of any oil and grease?

3        A.   Well, the source -- that calls for a little

4   supposition.  You see oil and grease on the ground, you

5   see how the facility's operated, and you draw

6   conclusions about what might be causing that.  So to

7   answer that question, the evaluation of the site would

8   indicate it's the operational practices and the lack of

9   best management practices that would cause that oil and

10  grease to be on the ground and not contained.

11       Q.   Did you see any evidence of oil and grease

12  pooling on the property?

13       A.   What we saw was oil sheens on puddles that --

14  as I said, the facility is basically dirt, so there

15  would be ruts and uneven ground, and in some of those

16  ruts there would be puddles of water, there would be a

17  sheen on that.  There was apparently oil and grease on

18  the surface that was somewhat emulsified.  We did not

19  see pools of oil, so to speak.  What we saw were sheens

20  of oil where oil had ponded on water and water had

21  either left the site or percolated in, so there was a

22  bathtub ring, so to speak.

23       Q.   With regard to water leaving the site, could

24  you ascertain where the water was going?

25       A.   The drainage is fairly clear at that site, it

## Verbatim ▪

1    seemed.   It seemed that most of the water would end up

2    along the levy, along Ackerman Creek, and then it

3    appears to flow off-site to the west to the neighbor's

4    property along the levy.   We didn't -- we were not there

5    during a rain storm, so we couldn't ascertain if there

6    were any other areas where it would leave the site.

7         Q.   With regard to the sheen that you've

8    described, and with regard to Ackerman Creek, were you

9    able to ascertain how many yards away Ackerman Creek was

10   from the oil sheen?

11        A.   It varied.   There were oil sheens across the

12   site or in various locations of the site, so it could

13   have ranged from right next to the levy which separates

14   Ackerman Creek from the facility to as far away as the

15   back of the main building on Wayne Hunt's property,

16   which would be several hundred feet.

17        Q.   Were you able to ascertain the yardage between

18   the levy and Ackerman Creek?

19        A.   I don't think we made an estimate of that.   We

20   stood on the levy and could look down and see the creek

21   down the bank.   We didn't actually ascertain the

22   distance.   It's fairly close.

23        Q.   Thank you.   With regard to your testimony that

24   water was, I believe -- correct me if I'm wrong, I think

25   you said that in addition to water running off the

**Verbatim**

1    property, some water was percolating into the soil?

2        A.    The soil at the site is -- basically appears

3    to be on the alluvial, a-l-l-u-v-i-a-l, flood plain

4    deposit, which is generally sand and gravel and fine

5    material.    It has a reasonably high percolation rate,

6    and you would expect, just from knowing a bit about the

7    percolation permeability and soil types, that some of

8    the water would have infiltrated into the soil as well

9    as runoff via the surface drainage.

10       Q.    Did you have an occasion at this time to

11   inspect what I would describe as the Mayfield property

12   at this time in this January 2006 inspection?

13       A.    Yes.

14       Q.    And what did you see on the Mayfield property?

15       A.    The Mayfield property is adjacent to the auto

16   wreckers and also bounded on the west side by the tribe.

17   I would describe it as a general engineering

18   construction company.    What we saw on-site was

19   consistent with that.    They had fuel storage that was

20   not contained.    The car crusher that belonged to Wayne

21   Hunt was on the Mayfield property at the time.    There

22   were numerous cars being stored on the Mayfield property

23   as well as, I guess you could call it salvage and bits

24   and debris of auto parts and things like that.

25       Q.    Did you observe any violation on the Mayfield

**Verbatim** ▪

1    property?

2        A.    Yes, I think so.

3        Q.    Can you elaborate, please?

4        A.    Well, the car crusher -- excuse me, the car

5    crusher appeared to be leaking oil and grease onto the

6    ground.  There was definitely oil and material around

7    the car crusher.  The fueling locations for the Mayfield

8    business were not contained in terms of secondary

9    containment.  And there were quite a few cars on-site.

10   We were -- we went along the back of a levy, and we

11   could see -- would be the northeast -- northeast corner

12   of the property along the levy before the water

13   discharged, and then the tribe, a large scour pit that

14   had a bathtub ring of oil in it.  So there would have

15   been a lot of oil carried back to that point, was the

16   evaluation.

17       Q.    Could you elaborate on what you mean by

18   "carried back to that point"?

19       A.    Most of the site appears to be graded towards

20   the levy, so the surface water that would flow onto the

21   site or off of it, across the site appeared to flow back

22   toward the levy, and then the water appeared to flow

23   from west to east along the levy from the Mayfield

24   property onto the tribe.  So the northeast corner

25   appeared to be where water was concentrating and

**Verbatim** ®∎

1    scouring and leaving the site.

2        Q.    Can you define what you mean by scouring?

3        A.    Scouring would be the energy in the water

4    actually eroding soil and digging soil up and eroding

5    soil.  So you could use the term, the water eroded some

6    of the soil.  Generally, you can also say it scoured,

7    which is to scour out or to dig out.

8        Q.    You had mentioned runoff onto tribal lands.

9    Can you elaborate as to your observations as to that?

10       A.    Well, as I said, it appeared most of the

11   drainage flowed from the front toward the back of the

12   facility to the levy along Ackerman Creek, and then

13   west -- was directed west to east from the Mayfield

14   property.  Then the natural drainage appeared to drain

15   onto the tribal property along the levy.

16            So what we observed -- we stopped at the fence

17   line on the Mayfield property.  We didn't enter onto the

18   tribal property, we didn't have permission or a tribal

19   representative, but what we saw was discharge from the

20   Mayfield property entering onto tribal property at that

21   time, at that point in time, we could see some debris in

22   terms of drums on the tribal property from that vantage

23   point.

24       Q.    At that time while you were at that vantage

25   point, were you able to ascertain the point source of

1   where that drainage was originating from in the first

2   place?

3       A.    No.   Rainfall is generally not considered a

4   point source unless it's directed into a ditch or a

5   culvert.  So there is road runoff from the Pinoleville

6   Road and above it that apparently flooded onto the site,

7   and that would have commingled with rainfall that

8   drained into the back, so there was no point, so to

9   speak, across the site until it reached the drainage

10  ditch along the levy on the tribal property.

11      Q.    Were you able to ascertain if any of the water

12  could have been flowing from UAD on to Mayfield

13  property?

14      A.    It appeared that the natural drainage along

15  the levy was from west to east, so it would go from UAD

16  across Mr. Mayfield's property and continue on to tribal

17  property.

18      Q.    Did you at this time, from this vantage point,

19  observe any, what you described earlier as sheen on the

20  water while it was on the Mayfield property?

21      A.    Yes.

22      Q.    Can you elaborate on that, please?

23      A.    Along the back of the facility at the Ackerman

24  levy at the fence line between Mayfield and tribal

25  property was a scour hole.  The water had dug out a hole

**Verbatim**

1    there, and you can see there was a small amount of water

2    flowing along the levy coming into that. You could see

3    some oil and sheen on that, and I would have to check my

4    notes to see if there was a sheen across other areas of

5    the property. I don't want to confuse the general

6    inspection with the follow-up inspection, but we did see

7    additional sheens on the Mayfield property, I believe.

8        Q.   We can just do one inspection at a time to

9    keep things clear.

10       A.   I actually don't recall because the

11   inspections were so close together, I'd probably have to

12   refer to my notes to see what else I had reported as far

13   as observations.

14       Q.   Okay. Well, right now, if we may, let's stay

15   where you're describing, you know, this vantage point.

16   I think you said that you walked over onto the Mayfield

17   property, you were looking around. You just referred to

18   the scour hole. Do you recollect approximately the

19   yardage the scour hole was from Ackerman Creek?

20       A.   Well, the scour hole was roughly at the base

21   of the levy, and the levy separates Ackerman Creek from

22   the Mayfield property, and we did not make an estimate.

23   What I would tell you is the hole was at the base of the

24   levy, and Ackerman Creek was fairly close to the levy on

25   the back side, so it would be -- we could make some

**Verbatim** ▪

1    estimates of less than a hundred feet probably, even

2    closeer than, but we did not measure it at the time.

3         Q.    Do you recall about how deep this hole was?

4         A.    No.

5         Q.    Do you recall if you saw any sheen in that

6    hole?

7         A.    What we did see was, let's use the analogy of

8    a bathtub, just use the scour hole as a bathtub.  What

9    we saw was a bathtub ring of oil in the scour hole, so

10   the water entering along the levy had a little bit of

11   sheen on it, but what we did see really markedly was

12   this bathtub ring of oil in the scour hole from a

13   previous -- probably during the storm, was deposited in

14   there and was deposited in the soil and the water

15   receded somehow.

16        Q.    Thank you.  A little bit earlier, with regard

17   to this visit, you mentioned best management practices.

18   Can you elaborate on your observations at this time of

19   any inadequate best management practices?

20        A.    The general operation as a whole appeared

21   substandard in terms of best management practices.

22             To give you an overview, cars are brought in,

23   either wrecked cars or police impounds, and they're

24   brought in and stored, so paperwork is processed or

25   impounds paid.  They're stored in the yard reportedly

**Verbatim**

1    until they're crushed.

2         If you look at the BMP's for preventing oil,

3    like, from impounded or wrecked cars, there were

4    essentially none.  There were hoods missing off the

5    cars, which exposes the engine block and things to rain.

6    The auto industry generally recommends that the hoods

7    are on the cars or a tarp placed over the cars.  The

8    cars were outdoors on bare ground, which is essentially

9    no BMP's.

10         We do not know how the fluids were drained, we

11   never watched that, but the facility reported they just

12   would use a small tote or bin and drain them out and

13   carry off the oil to the hazardous waste storage area.

14   So all in all, the best management practices were really

15   lacking, which was fairly very noticeable in the general

16   context.

17         Q.   At this time on this inspection, did you ask

18   any UAD employees to produce written or file

19   documentation that went to stormwater permits?

20         A.   I would have to check my notes.  I believe I

21   would have to check my notes.

22         Q.   At this time, do you recall if you ever asked

23   any UAD employees to produce a sweet pea?

24             THE REPORTER:  A what?

25             THE WITNESS:  It's a Stormwater Pollution

## Verbatim

1    the proposed existing building is needed to process

2    autos."  First I want to ask you, do you have any

3    knowledge as to whether they've complied with that?

4         A.    They have not.

5         Q.    And what was the reason for your office

6    insisting that they provide an additional concrete base

7    from the gate?

8         A.    Well, during the January and February

9    inspections, it was clear that they were processing

10   autos off the crusher on bare dirt.  They were changing

11   fluids and taking parts out.  We could see parts stored

12   around the building, on the ground, covered with tarps.

13   People would bring in -- the description by the owner

14   was people would just sometimes bring in cars and drop

15   them at the front gate.  It was really apparent that

16   they needed to contain the crusher operation, but they

17   also needed someplace where they could actually work,

18   process autos, dismantle, store a car on some type of

19   asphalt or concrete base where then they could control

20   spills and they could observe spills and things like

21   that.  So that was our very leading type of suggestion

22   to them as the building itself was not sufficient to

23   provide proper operation.

24        Q.    Anything further on that point?

25        A.    No.

1      Q.   Okay.   Thank you.   Next sentence:   "Relocating

2  the hazardous waste storage to the new building and

3  using existing building for other storage is

4  recommended."   What was your reasoning with regard to

5  that?

6      A.   Well, the new building that they were

7  proposing was 50 to 100 feet from the existing hazardous

8  waste storage building.   So if you were to drain fluids,

9  you'd have to somehow tote them across the yard, which

10  they were doing in buckets at that point in time.   It

11  makes a lot more sense from an efficiency standpoint and

12  potential for preventing spills to have the hazardous

13  waste storage in or adjacent to the crusher building, so

14  you simply go from that point to 20, 15 feet across the

15  facility, never go out of the facility, out in the rain,

16  tote buckets around.   So our recommendation was to

17  consolidate those two areas together.   It would be

18  better for their operation.

19      Q.   Anything further on that point?

20      A.   No.

21      MR. BIGGS:   How you holding up?   You want to

22  get something to eat?

23      THE WITNESS:   We're going to get something to

24  eat pretty quick.

25      MR. BIGGS:   Why don't we do that.

1    What is this aboveground tank you're referring to?

2        A.    The facility had roughly a 500-gallon fuel

3    tank on-site.  It was on stilts.  It's kind of

4    traditional to put a tank on stilts five, six feet off

5    the ground to give enough head to fill your tanks.

6    However, it was on stilts, there was no secondary

7    containment for spillage, so it's really appropriate to

8    take that tank and add an impermeable base and something

9    around it for spill control in case of problems.

10        They reported the tank was not in use, which  08:22

11    is the last clause of, if it was in use, but the tank

12    was not in use at the time.  But if they did want to use

13    it, we were simply reminding them of the requirements to

14    put a secondary containment on it.

15        Q.    Okay, thank you.  Referring to number 8,

16    installation of formal oil-water separators is necessary

17    in select locations.  What are formal oil-water

18    separators?

19        A.    Let's put that in context to the facility.

20    During January and February, we had oil in the surface  08:23

21    water running off, and Warden Mauer had them create sort

22    of an oil-water separator or a way to skim oil off the

23    surface water, but it was very temporary.  It was

24    earthen-lined, it was made out of hay bales, gravel

25    pipe.  What we want to see is a commercial or a proper

1  oil-water separator, which is made out of a -- which is

2  a structure.  It has a base, it has side walls, it has a

3  way to scrape oil/water out.  It has a weir, w-e-i-r,

4  for water to overflow.

5          So when we say formal, that would be as

6  opposed to the temporary in-ground structure they had

7  constructed.  You could have replaced that with a word

8  such as "commercial" or "appropriately designed"

9  structure.

10          And the oil-water separator, I think, is --    08:24

11  are you familiar with oil-water separators?

12     Q.    Not really.  Can you elaborate?

13     A.    Generally, they're an open -- they can be an

14  open-topped container, water flows in, and the oil is

15  allowed to either sometimes settle at the bottom, if it

16  has sediment, or it's -- generally oil floats, so it's

17  meant to take the floating oil off the water before it's

18  discharged, and then those structures are cleaned out

19  and the oil removed.  They're pretty much a standard

20  device used where you find oil and water at most    08:25

21  industries.

22     Q.    In your office's order on abatement of

23  March 2006, was a reference made to lack of oil-water

24  separators?

25     A.    Would you repeat that while I take a look at

## Verbatim ■

1    this.

2        Q.    In reference to your office's order and

3    abatement and cleanup of March 2006, was any reference

4    made to the lack of oil-water separators or inadequate

5    oil-water separators?

6            MR. NEARY:   Just for the record, I want to

7    object as asked and answered.

8    BY MR. BIGGS:

9        Q.    You may answer the question.

10       A.    Okay.   The short-term abatement, A-1-A,          08:25

11   requested the installation of temporary lined oil-water

12   separators or equivalent, and I don't actually see where

13   we require oil-water separators in the long-term

14   abatement.   However, when we're talking about item B-1,

15   which is capital and operational improvements designed

16   to prevent discharge, oil-water separators are pretty

17   standard BMP, so they would be used as needed at the

18   facility.

19       Q.    Okay, thank you.   At this time, does your

20   office have any information as to whether or not UAD has  08:26

21   installed formal oil-water separators?

22       A.    The oil-water separator that we had negotiated

23   with UAD was meant to capture the runoff from the

24   asphalt pad around the crusher building.   The asphalt

25   has not been installed, so the oil-water separator has

1    and is still in there.  It was moved from one location

2    to another?

3         A.    Yes.

4         Q.    Now, in this memorandum, I'll call it, of

5    May 24th, '06, you stated essentially, "Our review

6    indicates that UAD needs more parts storage, more

7    impermeable base and stormwater treatment units such as

8    oil-water separators and operational BMP's."  Is that

9    correct?

10        A.    Yes.                                          04:25

11        Q.    Now, isn't it just true that you testified as

12   to the content of a memorandum dated May of '07, and you

13   were asking UAD to perform the same tasks?

14        A.    Let's take a look at that.

15             The May '07 letter was specifically geared

16   toward the sample results that they had sent in, and we

17   were responding specifically to the sample results that

18   were taken in and around the collection pond.  That's

19   May of '07.

20             Now, this inspection, which was May of '06, we 04:26

21   had not received what we considered a final report from

22   UAD under the terms of cleanup and abatement order, and

23   they had not really formalized everything that they had

24   wanted to do.  We're making observations that they still

25   need parts storage, impermeable working surface,

1    stormwater treatment.

2            You have to remember that our first inspection

3    was January, February, and this is in May, so we had

4    just received a preliminary report in April, so very

5    little work had been done on-site beyond the interim

6    cleanup and removing cars and oily waste and drums and

7    things like that.  We had not approved a final long-term

8    solution or, excuse me, just a long-term solution, nor

9    had they begun to implement it.

10       Q.   Isn't it true in the order on abatement and      04:27

11   cleanup, there's a section in there that addresses

12   long-term solution?

13       A.   Yes.

14       Q.   I am having difficulty locating that

15   correspondence from May of '07.  I'm kind of shuffling

16   papers around here.  Does somebody have an extra copy?

17            MS. NIEMEYER:  Which one, the one we just

18   looked at?

19            MR. BIGGS:  It would be No. 11, I believe, or

20   12.  May of '07.                                          04:28

21            Thank you.

22            MR. HERB:  You may want to wind it up.

23            MR. BIGGS:  We're going to conclude in a

24   minute.

25       Q.   May I direct your attention back to the letter

**Verbatim**

1    of May of '07, specifically paragraph number 4.  And do

2    you see in the last sentence the statement there

3    beginning, "or other BMP's and how they will discharge,"

4    BMP's referring to best management practices?

5         A.    Uh-huh, yes.

6         Q.    Wouldn't it be accurate to say that with

7    regard to the comment in the letter of May 24th, '06,

8    the one the year before, essentially your office was

9    referring to the same BMP's in general discharge

10   practices, for example?                              04:29

11        A.    The May '07 letter is requesting a grading

12   map, location and sizing of stormwater treatment

13   features or other BMP's and how will discharge.

14        Q.    Referring back to the letter of May 24th, '06,

15   second paragraph, very last sentence, the last words

16   say -- I'll read the last sentence, says, "Essentially,

17   our review indicates that UAD needs more parts storage,

18   more impermeable base and stormwater treatment units

19   such as oil-water separators and operational BMP's."

20   I'd like to ask you what you meant by operational BMP's  04:30

21   here?

22        A.    Operational BMP is an operational management

23   practice, how is the facility going to operate to

24   minimize or prevent pollution to the extent possible

25   that you could do -- just how you conduct your business

**Verbatim** ▪

1    outside of treatment units, physical treatment units.

2    So if -- an operational BMP would be to drain your

3    fluids indoors rather than outdoors.

4         Q.   So is it fair to say it's a general term?

5         A.   Yes, it's how you operate to minimize your

6    problems.

7              MR. NEARY:   I really --

8              MR. BIGGS:   We're going -- excuse me, I'm

9    finishing.  You don't get up and walk out, that's

10   just -- hold on.                                          04:31

11             MR. NEARY:   I thought I said precisely 4:30.

12             MR. BIGGS:   Actually, you, sir, have

13   45 seconds.  You're eating up my time, and I don't

14   appreciate it.  That kind of conduct is unprofessional,

15   and I won't tolerate it.

16        Q.   Mr. Azevedo?

17        A.   Yes, sir.

18        Q.   Excuse the interruption of Mr. Neary, who just

19   used a dilatory tactic to obfuscate what I'm doing here,

20   but isn't it true that UAD and Nest essentially strung   04:31

21   your office along because on May 24th of '06, you were

22   asking them to come up with BMP's that work, and then

23   again May of '07 you're still asking them for BMP's that

24   work?

25             MS. NIEMEYER:   I'm going to object to leading,

1    argumentative --

2           MR. BIGGS:  You can object all you want.

3       Q.   I instruct you to answer.

4       A.    In May of '06, as you pointed out, our --

5    we're asking for operational BMP's, very generic.  And

6    if you consider the time frame, we had just received a

7    report that wasn't adequate and we were sending it back.

8           In May of '07, we're talking about -- we're

9    being more specific about locations and sizing of BMP's,

10   so we're moving along.  They are still -- they still      04:32

11   haven't completed the work we need to in terms of every

12   BMP and designing them and sizing them, but we've moved

13   from '06 when we're at the beginning stages to '07 when

14   we're being much more specific and focusing in on things

15   that are not adequate, so this wasn't done.

16      Q.    This was not done.  I'll conclude there.

17           We went over one minute courtesy of Mr. Neary,

18   and this deposition is not concluded, and I will see

19   everybody back here on March 13th.

20           THE REPORTER:  And just one more thing for the   04:33

21   record.  Would all counsel present like a transcript of

22   the deposition?

23           (Whereupon, there was a discussion off the

24   record.)

25           MR. NEARY:  I'd like electronic format,

## Verbatim ■

ORIGINAL

1              IN THE UNITED STATES DISTRICT COURT

2                NORTHERN DISTRICT OF CALIFORNIA

3                        - - - -

4

5    PINOLEVILLE POMO NATION,      )
     PINOLEVILLE POMO NATION       )
6    ENVIRONMENTAL ASSOCIATION,    )
     and LEONA WILLIAMS,           )
7                                  )
                    Plaintiffs,    )
8                                  )
          vs.                      )    No.  C 07 2648 SI
9                                  )
     UKIAH AUTO DISMANTLERS,       )
10   WAYNE HUNT, ISABEL            )
     LEWRIGHT, WARRIOR             )
11   INDUSTRIES, INC., RICHARD     )
     MAYFIELD, ROSS JUNIOR         )
12   MAYFIELD, PAULA MAYFIELD,     )
     KENNETH HUNT, U.S. ALCHEMY    )
13   CORP., and DOES 1-50,         )
     inclusive,                    )
14                                 )
                    Defendants.    )
15   _____)

16

17                        - - - -

18        DEPOSITION OF RICHARD AZEVEDO, P.E., VOLUME II

19           Held at the Offices of Biggs Law, PC

20             765 Baywood, Petaluma, California

21           Thursday, March 13, 2008, 9:49 a.m.

22                        - - - -

23

24

25

**Verbatim**

1    elevations or plans prepared by a licensed engineer as

2    to putting that tire pit or that pond into use, as has

3    been contemplated here?

4            MS. NIEMEYER:  I'm going to object to that

5    question.  I think it's leading.  I don't think there's    01:17

6    been any establishment that there is that requirement.

7            MR. NEARY:  I'll join in that objection.

8    BY MR. BIGGS:

9        Q.   Let me see what we have here.  Maybe that

10   question had too many things going on in it.    01:18

11           With regard to the pit, okay, the percolation

12   pond, do you have any personal knowledge right now as to

13   how that is being implemented?

14       A.   Well, when you refer to "the pit," we

15   generally -- that, in my mind, says the tire pit.  When    01:18

16   you refer to "the pond," I think of the new percolation

17   pond in the back.  So I'm confused by your question

18   because you're using both terms.

19       Q.   Well, actually you just clarified it for me.

20   So there's a percolation pond --    01:18

21       A.   Yes.

22       Q.   -- that stands alone and apart from the tire

23   pit right now?

24       A.   Yes.

25       Q.   Now, with regard to that percolation pond, has    01:19

1    your office seen any engineering diagrams or materials

2    related to the construction of that pond?

3        A.    We have received something from NEST in a

4    schematic drawing of where it's located and a

5    cross-section, a conceptual cross-section of the          01:19

6    drawing.

7        Q.    I want to ask you a question about NEST.    I

8    understand that the gentleman with NEST is one Frederick

9    Martin; is that correct?

10       A.    Yes.                                            01:19

11       Q.    Would that be the gentleman that submitted

12   what you just described?

13       A.    Yes.

14       Q.    Do you have any personal knowledge as to his

15   qualifications as an engineer?                           01:19

16       A.    Beyond what is on his signature block, which

17   says, "Registered Environmental Assessor," I have no

18   information.

19       Q.    Would you happen -- I assume MS stands for

20   master's in science?                                     01:20

21       A.    Yes.

22       Q.    I see, but could you enlighten me as to what

23   the capitals REA might refer to?

24       A.    Registered environmental assessor.

25       Q.    And what is a registered environmental         01:20

**Verbatim**

1    assessor?

2            MS. NIEMEYER:  I'm going to object unless he

3    has knowledge, but this isn't something that he

4    necessarily knew about.

5            THE WITNESS:  It's defined in the law.                01:20

6    Registered environmental assessor is defined in the law.

7    BY MR. BIGGS:

8       Q.   Do you have any knowledge?  And again, if you

9    don't know, you don't have to guess.

10      A.   I actually don't recall the specific                  01:20

11   definition.

12      Q.   Would you happen to know, by chance, if

13   there's a licensing requirement for an REA?

14      A.   I believe there's an experience requirement.

15   I don't recall if there's a testing requirement that         01:20

16   goes with that.  Certainly, less than any -- anything

17   licensed through the Board of Professional Registration

18   for geologists and engineers.

19      Q.   The reason I'm asking is our records check

20   indicates no licensing whatsoever for this gentleman.        01:21

21   Has your office ever done any kind of check on his

22   licensing?

23      A.   No.

24      Q.   Okay, thank you.  So now I want to go back to

25   this list over here.  Now, you already clarified for us      01:21

1    where it was pushed around to.

2        Q.    When you say "east to west," can you paint a

3    picture of that, to the best of your ability?  Maybe

4    describe a well-known feature, a landmark at UAD?

5        A.    Well, if you look at the new crusher building    08:08

6    and the new -- you look at the property line, the

7    Mayfield property, from near the property line, just

8    inside the property line, I don't know how many feet,

9    that would have been the area where they excavated soil,

10   and then they made -- they excavated it and pushed it    08:08

11   toward the west, toward the crusher building and built

12   up a little bit behind the crusher building.  So it

13   would be -- the low spot would be the driveway entrance

14   where you came in, and that general or south direction,

15   and the area that was built up would be behind the    08:09

16   crusher building.

17       Q.    Okay.  Thank you.  Now, I have here this

18   document that I found in the records.  It says, "Please

19   deliver this four-page fax to Richard Azevedo."  It's a

20   fax transmission from Fred Martin, dated October 11th,    08:09

21   2007.

22            (Whereupon, Plaintiffs' Exhibit No. 45 was

23   marked for identification.)

24   BY MR. BIGGS:

25       Q.    This document is addressed to you, and it's    08:10

## Verbatim ▪

1    dated October 11, '07.  Do you recognize this document?

2        A.    Yes.

3        Q.    Have you read this document before?

4        A.    Yes.

5        Q.    What does this document tell us?                03:10

6        A.    It describes their soil testing results,

7    basically talks a little bit of how they moved soil in

8    preparation for the paving, talks about some of the

9    things they've encountered.  It talks about the fact

10   that the concentration, hydrocarbon concentrations in   03:10

11   the soil increase with depth.  And he has a summary

12   chart of analysis done.  He's basically presenting some

13   information here, summarizing what he's done and making

14   some evaluations.

15       Q.    Do you have anything else to say about this    03:11

16   document?

17       A.    We don't agree with some of his conclusions.

18       Q.    Can you specify what those disagreements are,

19   please?

20       A.    They're making the assumption that there's     03:11

21   little or no potential for affecting local groundwater

22   quality.  I'm not sure that we would agree with that

23   statement at the time.

24       Q.    Do you not agree -- do you agree with that

25   statement now?                                           03:11

1        A.    The Water Board, in November of '07, conducted

2    some sampling, and we've reviewed NEST's sample results

3    in terms of the total insoluble hydrocarbons out there,

4    and it's the conclusion of staff at this point in time

5    that there is some soluble hydrocarbons out there that          08:11

6    probably can or could get into the groundwater.

7        Q.    Were those notes, tests, and other materials

8    part of the file that we would have received?

9        A.    The Regional Board sample results and sample

10    events would have been in the file.  I do remember          08:12

11    seeing those.

12        Q.    Okay, so they should be here.  Okay.  Thank

13    you.

14            And now we will move to this document.  It's a

15    three-page fax, and if you'll mark that, please.          08:12

16            (Whereupon, Plaintiffs' Exhibit No. 46 was

17    marked for identification.)

18    BY MR. BIGGS:

19        Q.    This document is dated October 15th.  It's

20    addressed to you, looks like it's from Mr. Martin of          08:13

21    NEST.  Do you recognize this document?

22        A.    Yes.

23        Q.    And have you read this document before?

24        A.    Yes.

25        Q.    Are you able to tell us what this document          08:13

## Verbatim

1    means?

2        A.    The original results that Fred Martin and NEST

3    sent to us had some detail lacking.  For example, the

4    table that's in this refers to detection limits.  The

5    original sample results didn't have detection limits.  A

6    result or a non-detectable result has no meaning unless

7    you actually know what the detection limit is, so you

8    have some perspective on that.

9            So in other words, we asked them to provide

10   the detection limits for the tests that he performed,

11   and that's what this table is.  For the different

12   constituents, he's listed the detection limits for the

13   total petroleum hydrocarbon test and the wet tests.  So

14   that's what these are.

15           And then he's making some analysis regarding

16   the motor oil and diesel oil, and he's making a lot of

17   presentations about lead, what he's done in the past,

18   which generally don't have a lot of merit in terms of

19   supporting what he's proposing.  Again, he's saying

20   asphalt over this would encapsulate it, and we're not

21   accepting what he's proposing, and we don't feel what

22   has been submitted is adequate to document that it's not

23   a problem to water quality now or in the future.

24       Q.    Any further comments on this document?

25       A.    Well, yes, since you mention it.  Look at the

1    detection limit on the wet test for lead.  Lead is where

2    the column says PB.  So the detection limit is listed as

3    0.1 milligrams -- parts per million.  That's really a

4    hundred micrograms per liter.  Fortunately, the current

5    groundwater standard for lead in water is considerably    08:16

6    less than a hundred micrograms, so when you do a soluble

7    test that has a detection limit higher than water

8    quality standard, the tests have no meaning.  The test

9    results have no validation.  The detection limits were

10   too high, so essentially we rejected all the wet tests    08:16

11   for lead because of that reason.  So that's probably the

12   most striking thing that you would see here.

13       Q.    Anything further?

14       A.    No.

15       Q.    Thank you.  Let us now turn to a document here    08:16

16   dated January 6 of 2008.

17           (Whereupon, Plaintiffs' Exhibit No. 47 was

18   marked for identification.)

19   BY MR. BIGGS:

20       Q.    This document is from Mr. Martin of NEST.         08:17

21   It's addressed to you, and as I read this, it has a lot

22   of formulas, a lot of math in here.

23           MS. NIEMEYER:  I'm sorry, the next document

24   is --

25           MR. BIGGS:  January 6.                              08:17

# Verbatim ■

1          MR. NEARY:  There's two of them.

2          THE WITNESS:  There's two of them.

3          MS. NIEMEYER:  So you're referring to --

4          MR. BIGGS:  Yes.

5          MS. NIEMEYER:  So I don't think that --          03:17

6          MR. NEARY:  That's the problem we have if we

7    don't mark the document.

8          MR. BIGGS:  She just marked this one, so --

9          THE REPORTER:  I marked this.

10         MR. BIGGS:  Oh, you did.  Let's back up to          03:17

11   that one, then, stay on that one, then we'll go to the

12   other one.

13         So are we all on the same page?

14         MS. NIEMEYER:  The one she --

15         MR. BIGGS:  Okay.          03:18

16   Q.    Do you recognize this document?

17   A.    Yes.

18   Q.    And this is basically a one-paragraph letter

19   from Frederick Martin to Mr. Azevedo, and it goes to,

20   regarding payment -- pavement on R & M Backhoe facility. 03:18

21   It says, "Mr. Rick Mayfield tells me that you requested

22   him to obtain a third party confirmation of a paved area

23   for his facility."  What's that all about?

24   A.    Initially we found petroleum hydrocarbons at

25   sample location A-1, which is on the Mayfield property          03:18

**Verbatim**

1    where the car crusher was stored during our original

2    inspection.  There has been discussion between our

3    office and Mr. Mayfield about how he's progressing in

4    cleaning up his site and things of that nature.  And

5    what we asked to have done was, because there were          03:19

6    petroleum hydrocarbons detected, was to show us that the

7    petroleum hydrocarbons had been removed and cleaned up,

8    because he had mentioned he had scraped the area and

9    found pavement.  And we had suggested that it would be

10   best that a third party document that that material had  03:19

11   been removed and cleaned up.

12          That led to this letter with Fred Martin.

13   Unfortunately, for some reason, we get this letter like

14   this, and we really need more than just there's pavement

15   there.  We need to know that the hydrocarbons have been  03:19

16   removed.  So somehow there was a disconnect between what

17   we needed and what we got.

18       Q.   Okay.  Thank you.  Anything further on that

19   point?

20       A.   No, I think that clarifies it.                    03:19

21       Q.   By the way, looks like we have three or four

22   items left, so I think, as far as my side is concerned,

23   we'll be wrapping up maybe within ten minutes.

24       A.   Okay.

25       Q.   But this next document, the second document    03:20

**Verbatim** ■

1   that is dated January 6, 2008, I find a little

2   perplexing, so let me spend a little time on this.

3            (Whereupon, Plaintiffs' Exhibit No. 48 was

4   marked for identification.)

5   BY MR. BIGGS:                                        08:20

6        Q.   So we have this document here.  To be frank

7   with you, I don't understand it.  Page 2, we have this N

8   equals N-O with a large E, I-N one-half equals dash

9   0.093 equals 1,732 seasons.  I'm not an engineer, but

10  you are, and will you spend some time -- we're almost    08:21

11  done anyway -- and take a look at this, and the best you

12  can so that lay people can understand, tell us what this

13  is about, what Mr. Martin is communicating to your

14  office.

15       A.   The Regional Board posted a notice of public   08:21

16  hearing for proposed remedial action, and in that

17  posting was a map that showed some -- the extent of the

18  excavation we thought was reasonable based on the soil

19  samples results that we had to date.  And we had asked

20  for responses from all parties in 30 days.              08:22

21            This is the response from Fred Martin with

22  regards to that proposal.  They're essentially making

23  numerous arguments in different directions that it's

24  unnecessary to remove the amount of soil that we

25  considered appropriate, and their capstone is, after all 08:22

1   these arguments and that sort of thing, they proposed to

2   remove one cubic yard of soil, backfill those locations,

3   and to pave.  That's what they're proposing.

4        And so everything preceding the last paragraph

5   is really their arguments and their rationale for not        08:23

6   removing soil, and it ranges from cost, it ranges

7   from we'll use more diesel than is in the soil, it's

8   relatively immobile, and we're using this equation to

9   try to get at the rate of leaching, et cetera, et

10  cetera, et cetera.  So their conclusion is, it's not        08:23

11  appropriate to remove that soil.

12       Q.   Anything further on that?

13       A.   I think that covers it in conceptual terms.

14       Q.   Okay.  Now I would like to take a look at this

15  e-mail, and I'll give this to you to mark that.             08:23

16            (Whereupon, Plaintiffs' Exhibit No. 49 was

17  marked for identification.)

18  BY MR. BIGGS:

19       Q.   Okay, I have here what appears to be an e-mail

20  from Fred Martin to you.  It's dated January 8, 2008,       08:24

21  subject UAD.  Do you recognize this e-mail?

22       A.   Yes.

23       Q.   Okay.  He says he was in contact with Wayne

24  and Marcy, and that UAD was inspected by the County on

25  January 4th.  Do you have any information about that        08:24

**Verbatim**