1  Hans W. Herb, Esq. SBN 136018
   LAW OFFICES OF HANS W. HERB
2  P. O. Box 970
   Santa Rosa, CA  95402
3  707/576-0757
   707/575-0364 Fax
4  hans@tankman.com

5  Attorney for Defendant and
   Cross-Claimant, Rick Mayfield
6

7

8              UNITED STATES DISTRICT COURT

9            NORTHERN DISTRICT OF CALIFORNIA

10 | PINOLEVILLE POMO NATION, *et al.*,    | **Case No.: C-07-2648 SI**

11 |              Plaintiffs,               | **OPPOSITION BY DEFENDANT
                                             RICHARD MAYFIELD TO PLAINTIFFS'
12 | v.                                     | MOTION FOR PRELIMINARY
                                             INJUNCTION**
13 | UKIAH AUTO DISMANTLERS, *et al.*,

14 |              Defendants.

15 | ─────────────────────────              | Date:  June 25, 2008
                                             Time:  1:30 p.m.
16 | RICHARD MAYFIELD                       | Dept:  C, 15th Floor

17 |              Cross-Claimant,           | Hon, Susan Illston

18 | v.

19 | PINOLEVILLE POMO NATION;
     PINOLEVILLE POMO NATION
20 | ENVIRONMENTAL ASSOCIATION;
     LEONA WILLIAMS; and, UKIAH AUTO
21 | DISMANTLERS,

22 |              Cross-Defendants.

23

24

25

26

27

28

1

## <u>TABLE OF CONTENTS</u>

|  |  |  | Page |
|---|---|---|---|
| TABLE OF CONTENTS | | ................................................................ | i |
| TABLE OF AUTHORITIES | | ............................................................ | iii |
| TABLE OF EXHIBITS | | ................................................................ | vi |
| I. | INTRODUCTION | .................................................................. | 1 |
| II. | BACKGROUND | ..................................................................... | 1 |
|  | A | Parties ............................................................ | 1 |
|  | B. | Situs ............................................................ | 2 |
|  | C. | The Claims in the Lawsuit .................................... | 5 |
| III. | THERE ARE NUMEROUS AND SERIOUS PROCEDURAL INADEQUACIES AND DEFICIENCIES IN THE PLAINTIFFS' MOTION (AND COMPLAINT) ............................................. | | 6 |
|  | A. | Parties Cannot Be Enjoined Until They Are Served ................................................... | 7 |
|  | B. | It is Not Clear to Whom the Motion is Directed ............... | 7 |
|  | C. | As the Injunction Appears Only Related to Mayfield and Not UAD, Contrary to the Plaintiffs' Prior Contention, Rick Mayfield has been Prejudiced as a Result...................... | 8 |
|  | D. | Notice/Order Issues Abound ..................................... | 9 |
|  | E. | Rick Mayfield Has Not Had an Opportunity to Participate in a Case Management Conference or Alternative Dispute Resolution Process ........................ | 10 |
|  | F. | Summary of Procedural Issues .................................. | 10 |
| IV. | SUBSTANTIVE ISSUES .................................................. | | 11 |
|  | A. | Standard of Review .............................................. | 11 |
|  | B. | There is Nothing for Rick Mayfield to do, as Everything Requested has Already Been Done............... | 11 |
|  | C. | The Plaintiffs' Own Experts Confirm No Problem Exists Requiring Any Injunction .....................…............. | 13 |

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

2          D.    There is No Imminent and Substantial
                 Endangerment ................................................................    15
3          E.    Even as to Alleged Past Violations, There is No
                 Basis for Injunctive Relief ...…………………………………    15
4
           F.    Injunctive Relief Against Rick Mayfield is Moot ..............    16
5
           G.    The Activity being Undertaken by the RWQCB
6                Eliminates the Need for the Court's Intervention.............    17

7    V.    NUMEROUS OTHER CONSIDERATIONS REQUIRE DENIAL
           OF THE MOTION .................................................................    18

8    VI.   CONCLUSION .....................................................................    21

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CASE NO. C-07-2648 SI
OPPOSITION BY DEFENDANT RICK MAYFIELD
TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF AUTHORITIES

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Page**

**Cases**

*Atkinson Trading v. Shirley*, 532 U.S. 645 [121 S.Ct. 1825] (2001)........... 3

*Alaska Dept. of Enviornmental Conservation v. EPA*,
540 U.S. 461, 488 [157 L.Ed.2d 967, 124 S.Ct. 983] (2004)................... 17

*Baker v. Burbank-Glendale-Pasadena Airport Authority*,
39 Cal.3d 862 [218 Cal.Rptr. 293 (1985) ............................................ 16

*Bodine v. Rheman Co.*, 811 F.Supp. 218 (1993) ................................ 16

*Brendale v. Confederated Tribes and Bands of Yakima Indian Nation*,
492 U.S. 408 [109 S.Ct. 2994] (1989) ................................................ 3

*Calderon v. Anderson*, 45 Cal.App.4th 607, 613
[52 Cal.Rptr.2d 846]  (1996) ............................................................ 17

*Californians for Political Reform Foundation v. Fair Political Practices
Com.*, 61 Cal.App.4th 472, 484 [71 Cal.Rptr.2d 606] (1998) ................. 17

*Camsi IV v. Hunter*, 230 Cal.App.3d 1525 (1991) .............................. 15

*Caribbean Marine Service Co. v. Baldridge*, 844 F.2d 668, 674
(9th Cir. 1988) ............................................................................ 15

*Communities for a Better Environment v. State Water Resources Control
Board*, 132 Cal.App.3d 1313 [34 Cal.Rptr.3d 396] (2005) .................... 17

*Governing Council of Pinoleville Community v. Mendocino County Board
of Supervisors*, 684 F.Supp. 1042 (1988) .......................................... 3

*Hardwick v. United States*, No. C-79-1710SW (N.D. Cal. 1979) ............. 3

*Helix Land Co. v. City of San Diego*, 82 Cal.App.3d 932, 950 [147
Cal.Rptr. 683] (1978) ...................................................................... 16

*In re the Trusteeship of the Pinoleville Indians, Leona Williams v. Pracilla
Hunter*, 2004 Cal.App. Unpub., LEXIS 5603) .................................... 2

*King v. Gildersleeve*, 79 Cal. 504 [21 P. 961] (1889) .......................... 1

*Koll-Irvine Center Property Owners Assn. v. County of Orange*, 24
Cal.App.4th 1036, 1041 [29 Cal.Rptr.2d 664] (1994) ........................... 16

1   *Lyles v. State of California*, 153 Cal.App.4[th] 281      16
        [62 Cal.Rptr.3d 696] (2007) ...............................................
2

  *Mangini v. Aerojet General Corp.*, 230 Cal.App.3d 1125      16
3   [281 Cal.Rptr. 827] (1991) ...............................................

4   *Meghrig v. KFC*, 516 US 479 [116 S.Ct. 1251] (1996) ....................... 15

5   *Nevada v. Hicks*, 533 U.S. 353 [121 S.Ct. 2304] (2001) ...................... 3

6   *Price v. U.S. Navy*, 39 F.3d 1011 (9th Cir. 1994) ............................. 15

7   *Sierra Club v. Chevron U.S.A.*, 834 F.2d 1517 (9th Cir.1987) ................. 15-16

8   *Washington State Dept. of Social and Health Servs. v. Guardianship*    17
        *Estate of Keffeler*, 537 U.S. 371, 385 [154 L.Ed.2d 972,
9   123 S.Ct. 1017] (2003) ...............................................

10  *Yamaha Corp. of America v. State Bd. Of Equalization*,      17
     19 Cal.4[th] 1 [78 Cal.Rptr.2d 1; 960 P.2d 1031] (1998) ........................
11

12

13 **Other Cases**

14 N.D. Cal. Bankruptcy Case No. 9510669 ............................................ 4

15 N.D. Cal. Bankruptcy Case No. 9212774 ............................................ 4

16

17 **Statutes**

18 ***Federal***

19 18 USC §1151 ................................................................ 3

20 28 USC § 2462 ............................................................... 15

21 Clean Water Act, 33 USC § 1251 .............................................. 15

22 Resource Conservation & Recovery Act, 42 USC § 6901 ..................... 16

23 28 USCA §1362 .............................................................. 11

24

25 ***California***

26 Business & Professions Code §17200 .......................................... 5

27 Civil Code § 3479, *et seq.* .................................................. 15

28

Code of Civil Procedure § 338 .................................................... 15

Code of Civil Procedure § 338.1 ................................................. 15


**Federal Rules**

Rule of Civil Procedure 4(m) .................................................... 7

Rule of Civil Procedure 65 ...................................................... 15


**Legislation**

Act of August 18, 1958, Pub.L. 85-671, 72 Stat. 619,                2-3
as amended by The Rancheria Act, 78 Stat. 390 (Aug. 11, 1964) ...........


**Other**

Schwarzer Tashima & Wagstaff, <u>Cal. Prac. Guide:</u>              7, 15
<u>Fed. Civ. Pro. Before Trial</u> (The Rutter Group 2008) ...........................

CASE  NO. C-07-2648 SI
OPPOSITION BY DEFENDANT RICK MAYFIELD
TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

1

## TABLE OF EXHIBITS

2

3

**Exhibit**

4    **Declaration of Hans W. Herb**

5    Notice of Taking Deposition of Person Most Knowledgeable and
     Demand for Documents ...................................................................    A

6

7    Deposition of Person Most Knowledgeable ( Excerpts) – Pinoleville
     Pomo Nation Environmental Association (April 7, 2008) ...................    B

8

9    Deposition of Person Most Knowledgeable ( Excerpts) –
     Alicia Webb (April 7, 2008) ...........................................................    C

10

11   Pinoleville.Org Website ...............................................................    D

12
     Vector Engineering, Inc., Final Report Phase II Environmental
13   Investigation for the  Pinoleville Indian Reservation, Ukiah, CA (March
     2003)                                                                                        E
14

15   California Regional Water Quality Control Board Letter to Richard           F
     Mayfield (May 19, 2008)

16
     Hans W. Herb, Photograph of Billboard near Ukiah, California, re Ross
17   Mayfield, Jr. (May 31, 2008) ........................................................    G

18   Deposition of Person Most Knowledgeable ( Excerpts) –
     David Ponton (April 7, 2008) .........................................................    H

19

20   **Declaration of Rick Mayfield**

21   Taggart Engineering, Ukiah, California, Revised Flood Hazard Report        A
     for #MS 81-83 Johnson (July 18, 1984)

22
     California Regional Water Quality Control Board Letter to Richard          B
23   Mayfield (May 19, 2008)

24

25

26

27

28

CASE  NO. C-07-2648 SI
OPPOSITION BY DEFENDANT RICK MAYFIELD
TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# I.
# INTRODUCTION

The plaintiffs' motion (like much of their entire suit) is so convoluted it is hard to know where to start.[1]  The bottom line is that the plaintiffs are not entitled to any ordinary relief, let alone the extraordinary relief of an injunction.  There are numerous fatal procedural and substantive deficiencies in the motion (and the lawsuit itself) that require the motion be denied.  Hence, Defendant Richard (aka "Rick") Mayfield requests the Court deny the motion.  Further, he requests the Court set this case for an initial Case Management conference once all parties are served.

# II.
# BACKGROUND

## A. Parties

The plaintiffs in this case are three related entities.  The first is the Pinoleville Pomo Nation ("PPN").  According to plaintiffs' complaint, PPN is a duly recognized sovereign nation.  (Plaintiffs' Complaint at ¶ 6.)

The second is the Pinoleville Pomo Nation Environmental Association ("PPNEA"), which is described in the complaint as a "unincorporated public interest association dedicated to protecting traditional Pomo lands from environmental harm."  (Plaintiffs' Complaint at ¶ 7.)  According to deposition testimony of the most knowledgeable principals within the PPNEA, that association is run by the brother of the third plaintiff.  (See Declaration of Hans W. Herb ("Herb Decl.") at ¶ 5 & Exhibit C thereto.)

---

[1] The Plaintiffs' papers are reminiscent of the kind of kind presented to the California Supreme Court in *King v. Gildersleeve*, 79 Cal. 504 [21 P. 961] (1889).  In that case, the court noted:
> "We are inclined to doubt the correctness of the ruling of the court below, on account of the extreme length of the brief of the learned counsel for the respondent in its support.  Knowing the ability of counsel and their accurate knowledge of the law, a brief of *eighty-five pages* coming from them in support of a single ruling of the court below casts great doubt upon such ruling.  **However, the learned counsel may not have had *time* to prepare a *short* brief, and for that reason have cast upon us the unnecessary labor of reading and extracting therefrom the points made.  If we overlook any of them, counsel will readily understand the reason**."  (Some emphasis in original.)

1    The third plaintiff is Leona Williams, who is a "U.S. citizen and member of the

2    Pinoleville Pomo Nation." (Plaintiffs' Complaint at ¶ 8.)  Plaintiff Leona Williams has

3    represented herself as being the tribal chairperson of PPN, and public records suggest that

4    to be true (*i.e.*, Leona Williams is the chairperson of the PPN and sister of the president of

5    the affiliated environmental association plaintiff and the personal plaintiff individual involved

6    in this lawsuit).  (See *In re the Trusteeship of the Pinoleville Indians, Leona Williams v.*

7    *Pracilla Hunter*, 2004 Cal.App. Unpub., LEXIS 5603.)

8    The defendants are minimally described in Plaintiffs' Complaint at paragraphs 10 and

9    11.  According to the plaintiffs, defendant Ukiah Auto Dismantlers ("UAD") is owned by

10    Wayne Hunt and Isabelle Lewright.  UAD allegedly recycles automobile parts.  (Plaintiffs'

11    Complaint at ¶ 50.)

12    A Kenneth Hunt is allegedly an individual who operates U.S. Alchemy Corporation.

13    The complaint is devoid of any allegations as to what these parties do at the site or the

14    reason for their involvement in the lawsuit.  (Complaint at ¶ 11.)

15    Again, according to plaintiffs' complaint, Rick Mayfield, Ross Junior Mayfield and

16    Paula Mayfield are individuals who own and operate Warrior Industries, Inc. ("Warrior"), a

17    suspended California corporation.  (Plaintiffs' Complaint at ¶ 11.) Again, there are no

18    specific allegations as to what these defendants are alleged to have done.  However, the

19    plaintiffs' motion says they "operate" a truck parking lot on a property within the PPN

20    reservation.  (Plaintiffs' Memorandum of Points & Authorities in Support of Injunction ("PPN

21    Memo of P&A") at ¶ 7.)

### B. Situs

23    This lawsuit involves property located at or near 500 Pinoleville Drive in Ukiah,

24    California.  The site has a unique and fairly complicated history.

25    Without going into all of the complex details, in 1911, under appropriate acts passed

26    by Congress in 1908, the United States purchased approximately 99.53 acres of land for the

27    benefit of the Pomo Indians in the Pinoleville area of California.  Pursuant to congressional

28    legislation (Act of August 18, 1958, Pub.L. 85-671, 72 Stat. 619, as amended by the Act of

1 | August 11, 1964, 78 Stat. 390 (hereinafter The Rancheria Act)), numerous reservation
2 | areas, including the Pinoleville Rancheria lost their status as Indian land.

3 |     At Pinoleville, when the reservation was closed, individuals members of the rancheria
4 | received fee simple title to 19 parcels of property.  Some Indian owners thereafter sold or
5 | otherwise transferred all or portions of their property to non-members of the tribe.  Both
6 | Indians and non-Indians now own property within the original boundaries of the rancheria.
7 | The two properties at issue in this lawsuit are privately owned properties within the
8 | boundary of the Pinoleville reservation.

9 |     In 1979, Indians from the original rancheria joined in a class action lawsuit to restore
10 | the reservation status of numerous lands, including those at Pinoleville (*Hardwick v. United*
11 | *States*, No. C-79-1710SW (N.D. Cal. 1979)).  Pursuant to settlement stipulations with
12 | Mendocino County and the United States, judgments were entered against the federal
13 | government restoring the Pinoleville Rancheria.

14 |     The effect of the judgments was that all land within the Pinoleville Rancheria
15 | boundaries as they existed immediately prior to the termination were declared to be "Indian
16 | country" as defined by 18 USC §1151.  As a result of this process, non-Indian people who
17 | had purchased property in the tribal boundary now had new governmental neighbors.
18 | However, they were generally not subject to Indian laws.  (See *Atkinson Trading v. Shirley*,
19 | 532 U.S. 645 [121 S.Ct. 1825] (2001) and *Nevada v. Hicks*, 533 U.S. 353 [121 S.Ct. 2304]
20 | (2001); see also *Brendale v. Confederated Tribes and Bands of Yakima Indian Nation*, 492
21 | U.S. 408 [109 S.Ct. 2994] (1989).)

22 |     On or about October 1, 1986, Ross Mayfield Jr., Paula Mayfield, Brent Mayfield and
23 | others entered into a purchase agreement with Don Lowell Johnson for a portion of the
24 | publicly owned property in the PPN rancheria.  At that time, the portion of the Johnson
25 | property was being developed and used for a concrete batching plant and an asphalt plant,
26 | as well as other construction-related activities.  In other words, in 1986, industrial activity
27 | was ongoing at the property.  (See *Governing Council of Pinoleville Community v.*
28 | *Mendocino County Board of Supervisors*, 684 F.Supp. 1042 (1988).)

1    Adjacent to the Mayfield property was an automobile dismantling facility known as
2   Ukiah Auto Dismantlers ("UAD").  At the time Ross Mayfield, Jr., purchased the property,
3   UAD was operated by a different owner.  However, the uses on that parcel have remained
4   the same.

5    Ross Mayfield, Jr., eventually entered into a business arrangement with Rick
6   Mayfield (among others) that resulted in the formation of a corporation known as Warrior
7   Industries, Inc.  Warrior, however, had its own unfortunate history.  By the mid 1990s,
8   Warrior ran into business trouble and a number of its principals, including Ross Mayfield, Jr.,
9   and Brent Mayfield, were forced into bankruptcy.  (N.D. Cal. Bankruptcy Cases 95-10669
10   and 92-12774.)  In the process active operations at the Mayfield property ceased to exist.

11    As a result of the foregoing, virtually no active operations are currently conducted on
12   what has been described as the Mayfield property.  The batch plants referred to above have
13   long since shut down and been disassembled and removed.  Since approximately 1991, the
14   only active connection Defendant Rick Mayfield has with the property operationally is that
15   he parks his own construction equipment on the property.  In addition, as discussed below,
16   towed vehicles were once temporarily stored on the property.[2]

17    As is described in the documents attached to the plaintiffs' complaint, the Mayfield
18   property is the final downgradient dumping ground for most of the PPN properties.  (See
19   Exhibit "D" to Plaintiffs' Complaint.)  Specifically, the drainage from all of PPN's industrial
20   operations heads directly toward the Mayfield property, which is generally considered the
21   lowest parcel in the rancheria.  (*Id.*)

22    Although it is true that some surface waters previously flowed from the adjoining UAD
23   parcel to the Mayfield parcel, since institutional controls were constructed some time ago,
24   no discharges from the UAD parcel to the Mayfield property have occurred.  (*Id.*; see Decl.
25   of Rick Mayfield at ¶¶ 7, 8 & 9.)  Discharges from the PPN's property, however, still impact
26   the Mayfield property.

27

28
_____
[2] A small portion of the property is also used by to Davey Tree for their parking of vehicles.

1   Along the boundary with Ackerman Creek, on the north side of the Mayfield property,
2   is a dike constructed by the PPN or its successors using junked automobiles to berm up the
3   creek. According to the Pinoleville.org website, the levee was built in the 1950s in order to
4   take care of rising waters in the creek during the winter and the runoff from the road
5   overpass.
6       The tribe's website states: "The tribal members sunk old automobiles tied together
7   by a cable to make the levee . . . . **It is not known if the automobiles were completely**
8   **drained of fluids before they were used for the levee**." (Emphasis added.)[3]
9       The bottom line is that the PPN used junk automobiles to create levees in the nearby
10  creek in the 1950s. Those automobiles remain in the creek today.
11      The only other notable information presented thus far in the lawsuit concerning
12  environmental conditions in the disputed area of the rancheria are those contained in the
13  Vector Report produced by the plaintiffs. That report, from 2003, found that there <u>no</u>
14  <u>significant environmental concerns at either the Mayfield or UAD properties</u>! (See Exhibit E
15  to Herb Decl. and ¶ 9 referring thereto.)

16                              ### C. The Claims in the Lawsuit

17      The plaintiffs' claims in the lawsuit include violation of the Clean Water Act
18  (Complaint at ¶¶ 23, *et seq.*); violation of the Resource Conservation Recovery Act
19  ("RCRA") (Complaint at ¶¶ 33, *et seq.*); unfair business practices under California Business
20  & Professions Code §17200 (Complaint at ¶¶ 48, *et seq.*); negligence per se (Complaint at
21  ¶¶ 54, *et seq.*); intentional violation of a statutory duty (Complaint at ¶¶ 61, *et seq.*);
22  negligence (Complaint at ¶¶ 64, *et seq.*); public and private nuisance (Complaint at ¶¶ 68, *et*
23  *seq.*); and, trespass (Complaint at ¶¶ 90, *et seq.*).

---

27  [3] Anecdotal reports indicate the cars' seams were filled with lead! This was done to "secure" the vehicles. The
    only other information regarding the levee is contained in the engineering report attached to the Declaration of
28  Rick Mayfield as Exhibit A, discussed his declaration at ¶¶ 2-4. That information appears to confirm the
    statements of the Nation's website.

1      In addition, plaintiff Leona Williams has filed separate personal injury claims for

2  intentional infliction of emotional distress (Complaint at ¶¶ 93, *et seq.*); and negligent

3  infliction of emotional distress (Complaint at ¶¶ 98, *et seq.*).

4      The gist of the lawsuit ,and the present motion, to the extent it can be determined, is

5  fairly simple.  Plaintiffs allege they have filed a number of complaints at virtually every public

6  agency possible seeking to get further enforcement action taken against the defendants.

7  However, despite complaining repeatedly to federal, state and local officials, plaintiffs claim

8  that not enough is being done to address environmental conditions at the site.  Hence, they

9  are asking this Court to completely shut down and eliminate all operations at the facilities to

10  address their claimed harm and damages.  (See PPN Memo of P&A at pp. 43, *et seq.*)

11      However, plaintiffs offer no evidence to support these claims.  In fact, their own

12  evidence persuasively suggests there is no environmental problem to abate.[4]

13                                             III.
**THERE ARE NUMEROUS AND SERIOUS PROCEDURAL INADEQUACIES AND
14      DEFICIENCIES IN THE PLAINTIFFS' MOTION (AND COMPLAINT)**

15      As a practical matter, it if virtually impossible to respond to all of the procedural and

16  substantive problems with the plaintiffs' motion.  Since many of these deficiencies are fatal

17  to the motion, however, Rick Mayfield will address a few of them herein.  Rick Mayfield's

18  responses address procedural, substantive and miscellaneous issues.

---

[4] As indicated, the comprehensive assessment commissioned by the plaintiffs (performed by Vector Engineering, Inc., in March of 2003) states:

> No evidence of subsurface contamination was observed during the field investigation, either within the drilling cuttings, soil samples, or within the groundwater samples.  In addition, no evidence of surface contamination, such as significant fuel spills or obvious waste materials, was observed within the vicinity of the boring locations, although minor waste products were present in the area.  On a larger scale, some fuel spills on the ground were observed in areas outside of the immediate drilling area, typical of the type of spill expected within an automobile dismantling yard.  These spills, however, did not appear to represent large volume spills that would have resulted in long term ponding and possible infiltration of large quantities of liquid waste products.  (Emphasis added.)

See Paragraph 5.0 on page 8 of the report attached to Herb Decl. at Exhibit E.

1

## A. Parties Cannot Be Enjoined Until They Are Served

It is extremely difficult to determine exactly what relief from whom is being sought in the plaintiffs' motion.  The parties to be enjoined are simply referred to as the "**site operators UAD and Mayfield**."  At no point are the specific Mayfields involved in the motion identified (three Mayfields are named in the complaint), **nor are any of the alleged operations defined**.

As noted in Schwarzer Tashima & Wagstaff, Cal. Prac. Guide:  Fed. Civ. Pro. Before Trial (The Rutter Group 2008) at ¶ 13:21:

> "An injunction is the ultimate form of "in personam" relief . . . because it commands the *personal obedience* of the person enjoined.  Thus, the court must also have personal jurisdiction over the parties to be enjoined; generally, **it may not enjoin defendants not yet served or otherwise before the court** [numerous citations]."  (Some emphasis in original.)

Here, the <u>only</u> Mayfields currently listed on the title of the property (Ross Mayfield, Jr., and Paula Mayfield), <u>have not even been served with process in this action!</u>  What makes this particularly disturbing is that the case has been on file for over a year!  (The original complaint was filed on May 18, 2007.)

It certainly would not be difficult to locate Ross Mayfield, Jr., as he is currently running for supervisor in Mendocino County.  As is discussed in the Declaration of Hans W. Herb (Herb Decl.) at paragraphs 16-18 and shown on Exhibit G, there are numerous campaign signs throughout the county clearly identifying Ross Mayfield, Jr., and even having his photo.  Why he has never been served with this action is a mystery.[5]

## B. It is Not Clear to Whom the Motion is Directed

In its original Case Management Conference Statement ("CMS") and Proposed Order filed in December 2007, the plaintiffs indicated they needed to file an injunctive relief application immediately because "irreparable harm to the environment is substantially certain to occur."

_____

[5] Furthermore, it would appear that under Federal Rule 4(m), since the two additional Mayfields were not served within 120 days after the date the complaint was filed, the Court must dismiss the action.

1    At that point, the plaintiffs indicated that the injunctive relief sought was going to be

2  solely "**against UAD operations until UAD demonstrates full compliance with all**

3  **applicable regulations, statutes and orders and agency mandates**."  (Plaintiffs' CMS at

4  ¶ 11, lines 21, *et seq.*, emphasis added)  At no time did plaintiffs indicate any desire to bring

5  any injunctive relief claims against any  Mayfield defendants he had served.[6]

6    After blowing through a number of court-imposed deadlines for the filing of its

7  injunctive relief application, the plaintiffs eventually applied for their fourth date within which

8  to file their motion.  Although the Court established yet another scheduling order for the

9  motion, it required the motions to be due by May 19, 2008.

10    However, defendant Rick Mayfield did not even receive the plaintiffs' preliminary

11  injunction motion until ten days later on May 28th, when it arrived by FedEx.  It had been

12  sent a day earlier.  **But the late-filed motion was even stranger in that it only addressed**

13  **the Mayfield parcel and all but ignored the UAD parcel**.  Clearly, plaintiffs should at least

14  identify who they are seeking to enjoin.

15
### C. As The Injunction Appears Only Related to Mayfield and Not UAD, Contrary to the Plaintiffs' Prior Contention, Rick Mayfield has been Prejudiced as a Result

16

17    When defendant Rick Mayfield first learned of this action, he immediately contacted

18  the plaintiffs in an effort to find an acceptable resolution.  He indicated he would do anything

19  necessary to comply with reasonable requests, in order to avoid litigation with his neighbors.

20  However, from the beginning of the case to the present, the plaintiffs have always

21  contended that the "target" of their suit was UAD and not the Mayfield defendants.

22    However, despite those contentions, the current motion appears to be directed solely

23  and exclusively against the "Mayfield" defendants.  The plaintiffs do not discuss the UAD

24  operations in any meaningful sense.  It contains not a single photo of the UAD operation.  It

25  _____

26  [6] This, of course, was logical because, by the time the lawsuit was filed, all active operations related to UAD
had completely ceased on the Mayfield parcel.  While, as is described below, county and state officials had
27  overwhelmed UAD's storage capacity by bringing in numerous vehicles that were temporarily stored on the
Mayfield property, those uses had long since ceased and no active industrial operations were being conducted
28  on the Mayfield property when this was filed, let alone when the injunctive relief application was finally filed.

1   does not discuss the UAD operations in any detail.  At the same time, it extensively

2   discusses the "Mayfield defendants'" operations, including referring to disputes that arose

3   between these parties more than six years ago.  Clearly, this is not the motion the plaintiffs

4   told the Court and the parties it intended to file for the last year.

5          Because defendant Rick Mayfield was told at the inception of this action that he was

6   not the target defendant and was not part of any injunctive relief aspect of the case, Rick

7   Mayfield participated only marginally in the litigation processes up until now.  Specifically,

8   the deposition processes to date have focused on what was (purportedly) necessary to

9   obtain an injunction against UAD.

10         As is demonstrated in the deposition transcripts, counsel for Rick Mayfield repeatedly

11  indicated that, since the injunction motion was not directed to his clients, he was reserving

12  his right not to ask any questions at that time, but to address any questions after the

13  injunctive relief process had occurred.  (Herb Decl. at ¶ 15.)  Now it appears the motion is

14  only against the Mayfields, some of whom have not even been served!

15         The bottom line is that, after telling the Court that the only party to be involved in the

16  injunctive relief portion of the case was UAD; after asking for expedited hearings and activity

17  related to solely UAD; after taking the position in discovery that the only party involved in the

18  injunctive relief is UAD; the plaintiffs now seek to bring their injunctive relief solely against a

19  totally different and unrelated defendant – the Mayfields.  (Even then, as indicated above,

20  most Mayfields have not even been served.)  That alone is reason to deny or at least delay

21  the motion.

22                    **D. Notice/Order Issues Abound**

23         There are also a number of issues related to the **notice** of this motion and what

24  would be required even if an injunctive **order** could issue.  As indicated, in addition to being

25  late, directed to parties not served with process and that is not clear to whom the motion is

26  directed, it is not clear what activity, if any, would be enjoined on the Mayfield parcel, even if

27  an injunction were to issue.  **Specifically, since no industrial operations are being**

28

1   **undertaken at the Mayfield property, what would be enjoined if the injunction were**

2   **granted?**[7]

3   ### E. Rick Mayfield Has Not Had an Opportunity to Participate in a Case Management
        Conference or Alternative Dispute Resolution Process

4

5        Another frustrating aspect of this case has been the inability of defendant Rick

6   Mayfield and the plaintiffs to engage in any meaningful alternative dispute resolution

7   process.  As indicated above, when this matter first came to Rick Mayfield's attention, it was

8   represented that he was a *de minimus* defendant and probably should not be a defendant at

9   all.  As a result, Rick Mayfield made every effort humanly possible to find a common sense

10  business-oriented resolution that eliminated the need for him to even participate in this

11  lawsuit.  However, all efforts to do so have been thwarted.

12       Because this responding party has not even had an opportunity to participate in a

13  case management conference, the Court has not had an opportunity to even consider, let

14  alone act on the fact, that many of these procedural deficiencies (parties have not been

15  served, alternative dispute resolution processes have not been completed, *etc.*), have not

16  been responded to on a timely basis.

17       At a minimum, if the plaintiffs have changed their strategy and decided to make the

18  Mayfield defendants their primary target, as opposed to UAD, they should at least be

19  required to serve the unserved Mayfields with service of process, so they can retain counsel

20  and appear.  Further, the parties should be allowed to pursue alternative dispute resolution

21  processes before proceeding with this process.

22                        ### F. Summary of Procedural Issues

23       As indicated above, this is just a highlight of a few of the procedural problems

24  associated with the plaintiffs' motion vis-à-vis the Mayfield defendants.  Since some of these

25  appear to be fatal to the plaintiffs' motion, there would be little to be gained by proceeding

26  _____

27  [7] Furthermore, because there is no proposed order attached to the injunction papers, there is not even
    anything to discuss or negotiate.  Again, Rick Mayfield wants to be a good neighbor.  If there is something

28

1    on to the merits.  However, to provide comfort to the Court that nothing of merit is being

2    discharged by denying the motion on procedural grounds, this defendant will respond to the

3    substantive allegations as set forth below.

### IV.
### SUBSTANTIVE ISSUES

#### A. Standard of Review

As best as can be determined by Rick Mayfield, plaintiffs make their claims for injunctive relief on four grounds.  First, they cite Federal Rule of Civil Procedure 65.  (PPN Memo of P&A at p. 32.)  Second, plaintiffs request an injunction pursuant to RCRA.  (PPN Memo of  P&A at p. 35.)  Third, plaintiffs claim a right to an injunction to abate a nuisance, pursuant to California law.  (PPN  Memo of P&A at p. 39.)  Fourth, and finally, in a cursory fashion, plaintiffs claim a right to relief under 28 USCA §1362, which relates to claims between Indian tribes and the government.[8]

#### B. There is Nothing for Rick Mayfield to do, as Everything Requested has Already Been Done

Simply put, the plaintiffs' best claim is that for a period of time in 2006 a number of abandoned vehicles were temporarily stored on the Mayfield property.  These vehicles were brought to the Mayfield property as part of Mendocino County's vehicle abatement program.

Under the vehicle abatement program, vehicles are brought into a licensed auto recovery facility where they are inventoried, inspected and held for the statutory period of time, giving the owners the right to recoup the vehicles.  If the owner does not recoup the vehicle, the vehicle is then demolished and sold for scrap or otherwise dealt with according to the law.  (See Decl. of Rick Mayfield at ¶¶ 10, 11 & 12.)

---

specific that his neighbors would like done to improve their conditions, he is happy to sit down and discuss it. However, with no indication of what is even being requested from him, it is virtually impossible to respond.
[8] While this issue is raised, no argument is presented that addresses the claims in this matter.

1    Because of aggressive abatement actions taken by Mendocino County to address

2   junked automobiles in its jurisdiction, too many vehicles were brought to the UAD property

3   to be safely stored.  As a result, some of the vehicles were temporarily stored on the

4   Mayfield property until they could be crushed and disposed of according to law.  However,

5   once the initial urgency of the situation abated and there was room back on UAD for the

6   storage of vehicles, all active operations on the Mayfield property ceased.

7    This was done long before the present lawsuit was filed, a fact which the plaintiffs

8   knew well.  Simply put, the Mayfields, being the good neighbors that they are, allowed

9   federal, state and local officials to temporarily store impounded vehicles on their property

10  pending their disposal.  When the officials ceased their recovery operations, that was the

11  end of the involvement of the Mayfields in this whole process.  The only exception is now

12  the present lawsuit.

13   As soon as the Mayfields received the 2006 complaint notice from the California

14  Regional Water Quality Control Board ("RWQCB"), they immediately initiated all corrective

15  actions requested by the RWQCB.  It is worthy of note that the Mayfields' involvement in the

16  RWQCB order is limited by the following critical language:  "**The scope of this Order with**

17  **respect to the Adjacent Property and Adjacent Property Owner [Mayfield] is limited to**

18  **those historical, existing and future activities related to operations and usage of the**

19  **Facility by the Dischargers [UAD]**."  (Emphasis added.)

20   Not only have they initiated all of the action, but they have completed virtually all of

21  the actions!  If there is any question in the Court's mind as to whether or not the Mayfield

22  defendants complied, the Court is directed to consider the letter attached as Exhibit B to the

23  Declaration of Rick Mayfield (also attached as Exhibit F to the Herb Decl.).

24   The May 19, 2008 letter from John Short, the Senior Engineer at the RWQCB, points

25  out that the Mayfield property was originally included in the order limited to the activities

26  associated with the adjacent UAD operations (quoted above).  The RWQCB then notes:

27   "**Site improvements have included items beyond the original scope of the**
    **order in order to address hydrocarbon-related issues at the site.  We**
28  **appreciate your efforts to date in this regard.  At this time, it appears that**

**all necessary operational and structural improvements to control**
**potential future discharges of petroleum hydrocarbons have been made**."
(Emphasis added.)

Simply put, it is hard to imagine a good faith argument for a preliminary injunction to issue against an entity that has received communications from the primary responsible agency indicating that they have done <u>more</u> than what is required to comply with the applicable laws.  However, that is precisely what plaintiffs are apparently seeking.

**C. <u>The Plaintiffs' Own Experts Confirm No Problem Exists Requiring Any Injunction</u>**

In addition, there is the issue of the key evidence in this case – the March 2003 Vector Report commissioned by the PPN. (See Herb Decl. at ¶ 9 and Exhibit E attached thereto.)  That report, which had as its goal finding some problem on the UAD or Mayfield property, noted:

**4.1    General Findings**

During the field investigation, <u>no evidence of massive contamination was</u>
<u>observed</u> based on the cuttings retrieved from the drilling process, the soil
sampling, or from the groundwater sampling.  Visual evidence of small isolated
spills of fuels or motor oil on the ground surface was present within the two
parcels.  No visual surface spills were noted in the vicinity of the soil borings.

\* \* \*

**5.0    CONCLUSIONS**

**5.1    General Description**

<u>No evidence of subsurface contamination was observed</u> during the field
investigation, either within the drilling cuttings, soil samples, or within the
groundwater samples.  <u>In addition, no evidence of surface contamination, such</u>
<u>as significant fuel spills or obvious waste materials, was observed</u> within the
vicinity of the boring locations, although minor waste products were present in
the area.  On a larger scale, some fuel spills on the ground were observed in
areas outside of the immediate drilling area, typical of the type of spill
expected within an automobile dismantling yard.  These spills, however, did
not appear to represent large volume spills that would have resulted in long
term ponding and possible infiltration of large quantities of liquid waste
products.

\* \* \*

**5.3    Relation of Contamination of Soil and Groundwater**

With the exception of minor surface contamination of TPH-Diesel detected in a
soil sample from B471, <u>no organic contaminants were detected within any of</u>

<u>the soil samples</u> retrieved from the borings, nor from the groundwater samples. For this reason, <u>no evidence exists to suggest that a correlation between contaminants found in the groundwater and the soil is present</u>.

Although there does appear to be a possible correlation between the groundwater and the soils for the inorganic constituents, this correlation is not suggestive of environmental contamination. As mentioned previously, the analytical testing methods used, namely EPA Method 200.8, records the metal concentration in both the liquid and solid components of a sample. This occurrence may result in the mistaken conclusion that an aquifer contains metals contamination when, in fact, the individual samples collected contained a high quantity of silt particles.

Results of the soil analytical testing of samples retrieved from boring B483 show relatively high concentrations of zinc and lead from the 2 and 7 foot depths, respectively. In addition, the groundwater sample collected from this boring showed relatively high concentrations of these two metals, as well as nickel and chromium. As mentioned, these high concentrations are likely the result of silt present within the water sample.

**5.4    Source(s) of Detected Contamination**

As mentioned, the only detected organic contaminant found in the groundwater and soil samples collected as part of this investigation was a small amount of Total Petroleum Hydrocarbons as Diesel which was found in the 2 foot sample in boring B471. Given the presence of surface contamination within the parcel due to the automobile dismantling activities, the source of this contamination is very likely related to spilled fuel on the ground surface in the vicinity of the boring. **<u>No evidence was observed during the drilling activity, nor is any evidence present in the analytical testing results, that suggests a heavy degree of contamination to the subsurface soils and groundwater beneath these two parcels</u>**.

\* \* \*

**5.5    Transport Mechanisms and Exposure Pathways**

No major soil or groundwater contamination was detected as part of this investigation, therefore, a transport mechanism and exposure pathway of this contamination does not presently exist.

\* \* \*

**5.6.2  Future Uses**

With appropriate removal of the solid waste materials, automobile parts, and equipment from the site, a detailed surface soil removal program can be initiated. It is expected that this remedial activity would include no more than the removal and disposal of surface soils that have been contaminated by small and confined spills of liquid wastes such as fuels and oils. Once the parcels have been cleaned, the future use of the parcels will be limited only by zoning and local ordinance restrictions.

(Emphasis added.)

1  **Simply put, the plaintiffs' own expert belies their contention!**

2  **D. There is No Imminent and Substantial Endangerment**

3  In considering the motion, whether the Court considers Federal Rule of Civil

4  Procedure 65, RCRA or California nuisance law, all of them require an imminent and

5  substantial endangerment for a preliminary injunction to issue.[9]

6  While Rick Mayfield would be happy to provide the Court with a full discussion of all

7  of the case law that demonstrates the inappropriateness of injunctive relief in matters such

8  as this (see, for example, *Price v. U.S. Navy*, 39 F.3d 1011 (9th Cir,. 1994)), Rick Mayfield

9  believes the facts are clear on their face.  No industrial operations are currently being

10  conducted on the Mayfield property.  No industrial operations have been conducted since

11  1991!!  Hence, there is nothing about to imminently occur under any circumstances.

12  Consequently, the motion must be denied.

13  **E. Even as to Alleged Past Violations, There is No Basis for Injunctive Relief**

14  In addition to the obvious issue of laches in this matter (plaintiffs claim rights to

15  proceed to enjoin an incident they allege occurred in 2002), there is a more fundamental

16  defense to any claims the plaintiffs may have against Rick Mayfield.  Specifically, **all of the**

17  **plaintiffs' specific claims against the Mayfields are barred by every possible statute**

18  **of limitations**.

19  Under state law, the plaintiffs' 2002 claims are all barred by CCP §§ 338 & 338.1

20  (*Camsi IV v. Hunter*, 230 Cal.App.3d 1525 (1991).  Under the Clean Water Act, all of the

21  plaintiffs' 2002 claims are barred by 28 USC § 2462 (*Sierra Club v. Chevron U.S.A.*, 834

22

23  _____

24  [9] Plaintiffs "must demonstrate immediate threat and harm" to obtain an injunction under FRCP 65.  *Caribbean*

25  *Marine Service Co. v. Baldridge*, 844 F.2d 668, 674 (9th Cir. 1988).  Establishing a risk of irreparable harm in
the indefinite future is not enough.  The harm shown must be imminent. (See Schwarzer Tashima & Wagstaff,

26  Cal. Prac. Guide: Fed. Civ. Pro. Before Trial (The Rutter Group 2008), at 13-55.1 for citations); "RCRA's
citizen suit provision was not intended to provide a remedy for past cleanup costs . . . [it] permits a private

27  party to bring suit only upon a showing that the solid or hazardous waste at issue may present an imminent
and substantial endangerment to health or the environment.  The meaning of this timing restriction is plain:  an

28  endangerment can only be imminent if it threatens to occur immediately" (*Meghrig v. KFC*, 516 US 479 [116
S.Ct. 1251] (1996)); Cal. Civil Code § 3479, *et seq.*

1  F.2d 1517 (9th Cir.1987).  Under RCRA, the 2002 claims are also time-barred by statute as

2  the case law recognized in *Bodine v. Rheman Co.*, 811 F.Supp. 218 (1993).

3         Under the longest possible statute of limitations, the last possible date for any of the

4  plaintiffs to sue defendant Rick Mayfield for any of the claims arising out of the purported

5  2002 storm water problem (PPN Memo of  P&A at ¶ 6) was five years later -- on January 22,

6  2007.  This suit was not filed until May 18, 2007.  Hence, even if injunctive relief for past

7  violations could be granted (and it cannot), all of the claims would be time-barred.  (Note:

8  Most likely all claims would be barred in three years – not five in any event.)

9         In that regard, the case of *Lyles v. State of California*, 153 Cal.App.4[th] 281 [62

10  Cal.Rptr.3d 696] (2007), is instructive.  In *Lyles*, the plaintiff sued the state for an alleged

11  storm water discharge that occurred in February of 1998.  However, the suit was not filed

12  until 2004.  The Court noted:

13         Thus, assuming that defendants' **faulty drainage system constitutes a
           nuisance, it is of the permanent variety that requires plaintiffs to sue**
14         **within three years of being damaged.**  This action is therefore untimely.  We
           recognize that plaintiffs disagree with *Mangini* and assert that the word
15         "continuing" in "continuing nuisance" refers to the continuing existence of the
           offensive condition rather than continuing damage from the offensive
16         condition.  But they cite no authority for the proposition.  Plaintiffs' fear of
           future harm does not transform a permanent nuisance into a continuing
17         nuisance.  "[A] private nuisance action cannot be maintained for an
           interference in the use and enjoyment of land caused solely by the fear of
18         future injury."  (*Koll-Irvine Center Property Owners Assn. v. County of Orange*
           *(1994) 24 Cal.App.4[th] 1036, 1041-1042 [29 Cal.Rptr.2d 664]; cf. Helix Land*
19         *Co. v. City of San Diego (1978) 82 Cal.App.3d 932, 950 [147 Cal.Rptr. 683]*
           [future flooding threat]; see *Baker, supra*, 39 Cal.3d at p. 869 ["[p]rospective
20         damages are unavailable"].)  (Emphasis added.)

21         The same is true here.  Assuming plaintiffs ever had any claim of damage against

22  Rick Mayfield, that claim became time-barred after three years.[10]  As can be seen, there is

23  no basis for any claims against Rick Mayfield.

24                    **F. Injunctive Relief Against Rick Mayfield is Moot**

25         As indicated, the only "industrial operations" on the Mayfield property in the last

26  several years was the temporary storage of some impounded vehicles on the property for a

27  _____

28  [10] Even if the maximum five-year statutes were to apply, the claims are still time-barred.

1  short period of time. (Mayfield Decl. at ¶ 11.)  Those vehicles are long since gone. No active

2  operations exist on the property today, nor have they existed since approximately 1991.  At

3  most, it is a truck parking lot, like every other truck parking lot in America.  Clearly, no

4  injunction is required.  The motion is moot.

5  ### G. The Activity being Undertaken by the RWQCB
   ### Eliminates the Need for the Court's Intervention

6

7  The RWQCB has been monitoring the site and proceeding with an agreed

8  compliance schedule.  In that regard, *Communities for a Better Environment v. State Water
   Resources Control Board*, 132 Cal.App.3d 1313 [34 Cal.Rptr.3d 396] (2005) is instructive.

9  There, the court noted:

10

11         Three separate administrative agencies, the Regional Board, the State
       Board, and the EPA, approved the schedule of compliance.  The schedule

12     was imposed based on the State Board's interpretation of the 1995 basin plan.
       As we noted in our prior opinion: "Generally, we extend considerable

13     deference to an administrative agency's interpretation of its own regulations or
       the regulatory scheme which the agency implements or enforces.  The agency

14     interpretation is entitled to great weight unless unauthorized or clearly
       erroneous. *(See, e.g., Californians for Political Reform Foundation v. Fair

15     Political Practices Com. (1998) 61 Cal.App.4th 472, 484 [71 Cal.Rptr.2d 606];
       Calderon v. Anderson (1996) 45 Cal.App.4th 607, 613 [52 Cal.Rptr.2d 846].)*

16     The factors governing the degree of judicial deference to agency
       interpretations are set forth in *Yamaha Corp. of America v. State Bd. Of

17     Equalization (1998) 19 Cal.4th 1 [78 Cal.Rptr.2d 1; 960 P.2d 1031] (Yamaha)*.
       These factors include the court's assumption that the agency has the technical

18     knowledge and expertise to interpret complex regulations in a technical or
       complex scheme. They also include the likelihood that agency officials have

19     reached the interpretation after careful and studied review and input from the
       public. *(See Yamaha, supra, at pp. 12-13.)" (CBE I, supra, 19 Cal.App.4th at

20     p. 1107.)*

21     * * *
       We have stated, above, the need for our deference to the expertise of

22     administrative agencies and their interpretations of the regulations they
       implement or enforce.  Appellants argue we should not extend such deference

23     to reliance on the WET Policy, because that policy is (supposedly) an informal
       guidance document. But "[c]ogent" informal administrative interpretations

24     "nevertheless warrant respect." [Citation.] *(Alaska Dept. of Environmental
       Conservation v. EPA (2004) 540 U.S. 461, 488 [157 L.Ed.2d 967, 124 S.Ct.

25     983], quoting Washington State Dept. of Social and Health Servs. v.
       Guardianship Estate of Keffeler (2003) 537 U.S. 371, 385 [154 L.Ed.2d 972,

26     123 S.Ct. 1017].)* (Emphasis added.)

27  Here, a similar argument is presented.  The RWQCB, North Coast Region, as well as

28  Mendocino County officials and others (Fish & Game, USEPA, *etc.*) have undertaken to

1  supervise the cleanup and abatement of alleged harm at these sites.  The RWQCB cleanup

2  and abatement order already issued carries with it a number of sanctions for non-

3  compliance.[11]

4      There is simply no reason for the Court to interfere with the ongoing regulatory

5  process, when there is absolutely no showing that the cleanup work is ineffective or not

6  proceeding properly.  Hence, the application for a preliminary injunction should be denied

7  on that basis alone.

8  **V.**

**NUMEROUS OTHER CONSIDERATIONS REQUIRE DENIAL OF THE MOTION**

9

10      Rick Mayfield does not want to waste a great deal of the Court's time and effort

11  wading through all of the issues that have been thrown on the wall by the plaintiffs.

12  Nevertheless, Rick Mayfield feels compelled to at least provide some response to a few of

13  these issues.

14      For example, as is demonstrated in Rick Mayfield's cross-complaint, this whole

15  process is essentially a shakedown intended to have the Mayfields convey title to the

16  Mayfield property to the plaintiffs.  Specifically, when Rick Mayfield asked what he could do

17  to appease his neighbors' complaints about his activities, the response was that he could

18  simply turn over the property to the plaintiffs.  He was then assured he could continue the

19  very operations he has today for as long as he wanted.  (Herb Decl. at ¶ 13.)

20      If such a horrible harm is occurring, why would the plaintiffs be willing to exchange

21  ownership of the Mayfield property for them to be allowed to continue their bad conduct?

22      Clearly, this is a simple act of extortion.  (See Rick Mayfield's cross-claim.)  The only

23  spin is that the plaintiffs are asking the Court to help them.  The Court should refuse the

24  invitation to participate in the shakedown.

25

26

27  [11] But the RWQCB has other tools available to them should additional enforcement be required.  As indicated above, the RWQCB does not believe additional work is required at this point, but plaintiffs certainly have the right to complain to the RWQCB in an effort to try to have them increase enforcement activity.  The RWQCB

28  has authority to issue time schedule orders, administrative civil liability (fines) and other remedies.

1    With regard to the registered geologist/professional engineer qualifications argument,
2  Rick Mayfield has not been involved in the day-to-day activities of dealing with the RWQCB
3  or the cleanup.  As the RWQCB's order itself indicates, the primary responsibility for
4  responding to the order rests with UAD.  (See Cleanup & Abatement Order ("CAO") at ¶ 3
5  attached as Exhibit 3 to plaintiffs' motion.)  To Rick Mayfield's knowledge, everything
6  required to be done is being done.  (See Mayfield Decl. at ¶¶ 5-6.)

7    However, at no point was Rick Mayfield ever informed or advised that the individuals
8  retained by UAD to respond to the RWQCB orders was unqualified or otherwise
9  inappropriate for the tasks assigned.  To Rick Mayfield's knowledge, the RWQCB never
10 complained about the qualifications, and the only complaint has been by the plaintiffs.  Even
11 then, as soon as Rick Mayfield learned that there was an issue regarding the consultant's
12 qualifications, Rick Mayfield contacted UAD.  At that time, he was informed that UAD had
13 retained another consultant with all proper qualifications.

14    Rick Mayfield has done everything he has ever been asked to do to address
15 environmental conditions at the site.  He has cleaned up all the properties in the reservation
16 (often at no charge) in an effort to be a good neighbor.

17    Rick Mayfield has helped the PPN clean up its own toxic pollution.  He has helped
18 the county clean up its abandoned automobiles.  He has helped his neighbor, UAD, in
19 complying with cleanup goals.  Why he is now the key defendant in this injunction process is
20 bizarre.

21    It is also worthy of note that Rick Mayfield himself is an Indian.  Perhaps that is why
22 he has always tried to do what is right for the PPN.  Yet, despite his actions, this is the
23 "thanks" he gets.  Why Indians would seek to attack one of their own in this case is also a
24 mystery.

25    Most importantly, as is discussed in the attached Declarations of Rick Mayfield,
26 parcels of the PPN owned by the Nation itself have contained major environmental hazards.
27 In fact, at numerous times throughout history, Rick Mayfield has been asked by the plaintiffs
28 to abate nuisances on property owned by PPN.  (Mayfield Decl. at ¶¶ 7, 8 & 9.)

1    In fact, even as of today, discharges from the PPN property continue to invade and

2    impact the Mayfield parcel.  Hence, if any injunction is to be granted against anyone, it

3    should be an injunction against the plaintiffs to have their contamination stopped from

4    entering onto the Mayfield parcel.

5    Another point deserves particular mention.  The only deposition taken by Rick

6    Mayfield in this case was a deposition of the person most knowledgeable ("PMK") of the

7    PPNEA.  That deposition was indeed enlightening.

8    First, the plaintiffs showed up en masse.  More than 30 people demanded access to

9    the deposition claiming they had critical evidence that needed to be presented.  However,

10    when several of the "key" deponents (represented as PMKs) were questioned under oath, it

11    was clear that the entire process was a charade.  **In fact, the PPNEA's own health and**

12    **safety expert testified that not only was he unaware of any environmental harm**

13    **impacting members, he had not even heard of any harm impacting members**.  (See

14    Herb Decl. at ¶ 19 and Exhibit H.)

15    Finally, the issue of the bond needs to be considered.  Rick Mayfield has no quarrel

16    with the general proposition that in most cases governmental entities should be excused

17    from bonding requirements.  However, this is not an appropriate case for the application of

18    such a rule.

19    Here, the plaintiffs are an Indian tribe, its chief (personally) and its chief's brother's

20    private association.  Denying the requirement of a bond in this case would allow private

21    individuals to abuse their governmental position in an effort to obtain unfair advantage.

22    Given the allegations in this case (regarding the shakedown, *etc.*), a substantial bond

23    should be required, even if an injunction should issue (and an injunction should not issue).

24

25

**VI.**
**CONCLUSION**

26    The plaintiffs' request for a preliminary injunction is so procedurally and substantively

27    deficient that it is hard to imagine how it could even be considered by the Court.  It is

28    directed to parties who have not even been served with process in this action, let alone

1  appeared.  However, even if all the procedural requirements were maintained, there is

2  simply no merit for the claims, as there is nothing to be enjoined.  There are numerous

3  deficiencies that cannot be corrected in the context of this motion.  Therefore, the motion

4  must be denied.

5        For the foregoing reasons, defendant Rick Mayfield requests that the motion for

6  preliminary injunction be denied.[12]

7  Dated:  June 10, 2008                              Respectfully submitted,

8                                                     LAW OFFICES OF HANS W. HERB

9                                                     /s/

10

11                                                    _____

12                                                    Hans W. Herb
                                                      Attorney for Rick Mayfield

13

14

15

16

17

18

19

20

21

22

23

24

25

26   _____

27   [12] Furthermore, Rick Mayfield respectfully requests the Court set the matter for another case management
     conference (or hold a case management conference during the time set aside for the injunction hearing on this
28   matter) and that the Court order the parties to an alternative dispute resolution process forthwith.