1    CHRISTOPHER J. NEARY
2    Attorney at Law, #69220
     110 South Main Street, Suite C
3    Willits, CA 95490

4    (707) 459-5551

5
     Attorney for defendants, U.S. ALCHEMY CORPORATION,
6    dba UKIAH AUTO DISMANTLERS and WAYNE HUNT

7                    UNITED STATES DISTRICT COURT

8                   NORTHERN DISTRICT OF CALIFORNIA

9
10   PINOLEVILLE    POMO    NATION,  )  Case No. C 07-02648 EMC
     PINOLEVILLE    POMO    NATION   )
11   ENVIRONMENTAL ASSOCIATION and   )
     LEONA WILLIAMS,                 )  DECLARATION OF WAYNE HUNT IN
12                                   )  OPPOSITION   TO   PRELIMINARY
                                     )  INJUNCTION
13          Plaintiffs,              )
                                     )
14   v.                             )
                                     )
15                                   )
     UKIAH AUTO DISMANTLERS, WAYNE   )
16   HUNT, ISABEL LEWRIGHT, WARRIOR  )
     INDUSTRIES,   INC.,   RICHARD   )
17   MAYFIELD, ROSS JUNIOR MAYFIELD, )
     PAULA MAYFIELD, KENNETH HUNT,   )
18   U.S. ALCHEMY CORPORATION and    )
19   DOES 1-50, Inclusive,           )
                                     )
20          Defendants.              )
                                     )
21   _____ )

22        I, WAYNE HUNT, declare as follows:

23        1.    I am an officer and sole owner of U.S. ALCHEMY CORPORATION,

24   dba UKIAH AUTO DISMANTLERS, defendant herein and I am personally named as a

25   defendant herein.  I make this declaration of my own personal knowledge except as to those

26   matters stated upon information and belief and as to those matters I believe them to be

27   true.  If called upon to testify to the matters stated herein, I could and would competently

28   do so.

C. J. NEARY
ATTORNEY AT LAW
110 SOUTH MAIN STREET,
SUITE C
WILLITS, CALIFORNIA 95490
(707) 459-5551

                              - 1 -    DECLARATION OF WAYNE HUNT

2.    I purchased the property located at 500 Pinoleville Road, Ukiah, California (A.P.N.s 169-190-10 and 169-190-48 in 2001). I also purchased the automobile towing and recycling business known as Ukiah Auto Dismantlers in 2001 from U.S. Alchemy Corporation, a California corporation. In purchasing the Corporation, I also acquired its grandiose name.

3.    The facility was first operated as an automobile recycling facility in March 1983 pursuant to Mendocino County Use Permit No. 25-83. Currently it receives wrecked and abandoned vehicles which are recycled as scrap metal by crushing.

4.    I am the only owner of the business which I operate myself with several employees.

5.    The Ukiah Auto Dismantlers business is a principal source of my support. The gross revenues of the facility are approximately $200,000 per month.

6.    On New Year's Day 2006, Ackerman Creek adjacent to my property overran its banks and flooded my property and all of the adjoining property in the vicinity. The floodwaters carried materials in my yard across the adjoining Mayfield Property and even as far as some property owned by plaintiff PINOLEVILLE POMO NATION. In response to the flood, I immediately undertook efforts to cleanup the aftermath of the flood and to retrieve the items which washed off of my property.

7.    Almost immediately after the flood, the Plaintiff filed a complaint with the Regional Water Quality Control Board which visited my facility several times in January 2006.

8.    The Regional Water Quality Control Board on March 30, 2006 issued a Cleanup and Abatement Order bearing No. R1-2006-0036, a true and correct copy of which is attached hereto as Exhibit 1 and incorporated herein by this reference. The actual Order commences at page 6 and is comprised of three elements: short-term abatement; long-term abatement; and soil and groundwater investigation.

C. J. NEARY
ATTORNEY AT LAW
110 SOUTH MAIN STREET,
SUITE C
WILLITS, CALIFORNIA 95490
(707) 459 - 5551

- 2 -    DECLARATION OF WAYNE HUNT

9.      Immediately, I retained the services of NEST Environmental Services, Inc. which is a firm which specializes in providing environmental services to the auto recycling industry.

10.     On June 29, 2006, the compliance with the short-term abatement measures was truthfully reported to the State Board.  A true and correct copy of a letter dated June 29, 2006 constituting such report is attached hereto as Exhibit "2" and incorporated herein by this reference.  A further truthful report as to the status of compliance was forwarded on October 14, 2006, a true and correct copy of which is attached hereto as Exhibit "3" and incorporated herein by this reference.

11.     As to long term abatement, the Regional Board required two primary capital improvements: enclosure of auto processing operations (CAO B(1)(a)-(d)); and design of surface water drainage and treatment processes to ensure stormwater pollutant removal before discharge from the facility (CAO B(1)(j)).   The CAO also included a requirement that operations be "improved."

12.     As to the auto processing area, I immediately started preparation for the building of an auto processing enclosure.   I retained a civil engineer to engineer the foundation as required by the Mendocino County Department of Planning and Building, and obtained Mendocino County Building Permit No. 06-71 on September 8, 2006, after the engineering was completed.    In the fall of 2006, I constructed 3,080 square foot building on an engineered foundation at a designated cost of $122,880 to enclose the auto processing and crushing operations under roof and on an impermeable surface with discharge controls.

13.     In compliance with the requirement that pollutants be removed from stormwater prior to discharge from the facility, NEST Environmental Services designed and I constructed two collection facilities at the Northeasterly corner of the processing facility (not the Northeastern corner of the Property).    These collection ponds are

C. J. NEARY
ATTORNEY AT LAW
110 SOUTH MAIN STREET,
SUITE C
WILLITS, CALIFORNIA 95490
(707) 459-5551

DECLARATION OF WAYNE HUNT

1    connected and are designed to capture stormwater to permit pollutants to percolate prior

2    to water being discharged from the facility.   As a practical result, the collection ponds to

3    which the entire processing facility drains operates to prevent any stormwater discharge

4    from the facility during major storm events such as were experienced in January 2008.

5

6         14.    The Regional Board in furtherance of its regulatory authorities and beyond

7    the confines of the CAO ordered the soil to be tested in the immediate vicinity of the

8    crushing operation.   NEST Environmental Services provided the Regional Board with a

9    number of soil tests which, in my understanding, produced lower than expected levels of

10   contamination.   In the fall of 2007, the Regional Board conducted its own soil testing.   It

11   is my understanding that the soil testing conducted by the Regional Board was very close

12   to that of the test results collected by NEST Environmental Services at my request.

13        15.    As a result of the soil being characterized, the Regional Board ordered

14   excavation of the soil in the immediate vicinity of the auto dismantling facility and

15   encapsulation of the ground at that location by paving.  I stood ready to pave in July 2007,

16   but the extent of the excavation had not yet been determined by the Regional Board.  It has

17   now been determined and the excavation has been accomplished.   With the onset of dry

18   weather, it is expected that the paving will be accomplished in the next thirty (30) days.

19

20        16.    Part of the delay in conducting the excavation and paving was related to the

21   need for the Regional Board to provide public notice, which public notice was provided in

22   December 2007 with the comment period ending in January 2008.   Once the public notice

23   period was closed, it was too wet to conduct excavation and paving until May 2008, when

24   the excavation was accomplished.

25        17.    Additionally, in response to the CAO, I requested that NEST Environmental

26   Services provide an updated Stormwater Pollution Prevention Plan contained Best

27   Management Practices.   NEST Environmental Services prepared such a Plan which was

28   submitted to the Regional Board.   The Regional Board has requested amendments to the

C. J. NEARY
ATTORNEY AT LAW
110 SOUTH MAIN STREET.
SUITE C
WILLITS, CALIFORNIA 95490
(707) 459 - 5551

- 4 -        DECLARATION OF WAYNE HUNT

SWPP.    I have retained The McEdwards Group to work with NEST Environmental Services in amending the SWPP to the satisfaction of the Regional Board.

18.    In January 2008, and specifically in the first week of January 2008, there was a substantial storm event.  In the midst of the storm, I was visited by a representative of the Mendocino County Department of Environmental Health who indicated that a complaint was made that polluted stormwater was being discharged from my facility.  I permitted access to the facility by the Mendocino County Hazmat Inspector and showed him the two collection ponds which had been built at the Northeast corner of the auto dismantling facility.   The ponds were capturing all of the stormwater discharge from the auto dismantling facility and preventing the discharge of any stormwater from the facility, even at the height of the storm. In essence, the collection ponds were operating at a higher level than that required by the CAO.   Since the time the collection ponds have been constructed, the January 2008 storm event was the most severe storm event.  During that event I did show to the County of Mendocino Hazmat Inspector that there was stormwater being diverted from the Pinoleville Pomo Nation Property to the immediate west of my property, onto my Property.  The collection ponds were also operating to collect all of the stormwater exiting the Pinoleville Pomo Nation Property onto my property.    I am informed and believe that the upgradient Pinoleville Pomo Nation Property is a former industrial site having been operated as a sawmill for many years up until the early 1970s.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this _13_ day of June, 2008 at Willits, California.


_Wayne Hunt_
WAYNE HUNT

C. J. NEARY
ATTORNEY AT LAW
110 SOUTH MAIN STREET.
SUITE C
WILLITS. CALIFORNIA 95490
(707) 459 - 5551

DECLARATION OF WAYNE HUNT

California Regional Water Quality Control Board
North Coast Region

CLEANUP AND ABATEMENT ORDER NO. R1-2006-0036
and
WATER CODE SECTION 13267(b) ORDER

FOR

WAYNE HUNT
ISABEL B. LEWRIGHT
dba
UKIAH AUTO DISMANTLERS
ID NO. 1 23J017330
and
RICHARD MAYFIELD
dba
WARRIOR INDUSTRIES INC.
and
ROSS JUNIOR AND PAULA MAYFIELD

Mendocino County

The California Regional Water Quality Control Board, North Coast Region (hereinafter Regional Water Board) finds that:

1. The Ukiah Auto Dismantlers, APN 169-19-048 (hereinafter Facility) is an auto dismantler with retail parts sales and car crushing located at 520 Pinoleville Road approximately one mile west of Ukiah, California. The property is owned by Wayne Hunt and Isabel B. Lewright and operated by Mr. Hunt. An adjacent parcel immediately to the east of the Facility is owned by Richard Mayfield dba Warrior Industries Inc, and Ross Junior and Paula Mayfield, APN 169-19-047 (hereinafter Adjacent Property Owner). The Facility uses a portion of the adjacent property to store the car crusher and a portion of the cars. The Facility, the Facility owners and operators, and the owners of both properties are collectively referred to herein as "the Dischargers."

2. The Facility submitted a Notice of Intent for coverage under the Statewide General Permit for Discharges of Storm Water Associated With Industrial Activities (hereinafter General Permit) on June 18, 2002. The General Permit prohibits discharges of material other than storm water that are not authorized by the General Permit and discharge of pollutants that may cause a pollution or nuisance.

3. The scope of this Order with respect to the Adjacent Property and Adjacent Property Owner is limited to those historical, existing and future activities related to operations and usage of the Facility by the Dischargers.

4. A levee separates several parcels located within the 100-year floodplain, including the Facility and the Adjacent Property Owner's site, from Ackerman Creek. The majority of surface runoff from the Property flows northward via sheet flow until it reaches the levee separating the Facility from Ackerman Creek. Storm water is diverted along a ditch eastward and parallel to Ackerman Creek to a retention basin located on the Adjacent Property Owner's parcel. During recent storm events, the retention basin overflows onto lands owned by the Pinoleville Pomo Nation.

5. Based on interviews during the inspections, floodwaters reportedly overtopped, or flowed around, the levee during the flood events experienced in late December 2005 and early 2006. Ackerman Creek is a tributary to the Russian River. The Russian River provides habitat for steelhead trout, chinook salmon, and coho salmon, which are listed as threatened under the Endangered Species Act.



EXHIBIT NO. 2
VERBATIM REPORTING SERVICE

**EXHIBIT 1**

Cleanup and Abatement
Order No. R1-2006-0036                    -2-

6. In January 2006, the Office of Emergency Services informed the Regional Water Board staff via electronic mail of a potential discharge of oily waste from the Facility. On January 19, 2006 and February 6, 2006 Regional Water Board staff conducted site inspections. The Department of Fish and Game inspected the Facility in late-January 2006 and accompanied Regional Water Board staff during the February 6, 2006 inspection.

7. Regional Water Board staff inspections (Attachment A to this Order) found: 1) Lack of impervious working surfaces and containment structures for auto dismantling 2) Car crushing activities off the impervious pad designated for such activities; 3) Lack of covered and contained parts storage; 4) Handling practices that would allow automotive fluids to contact soil and potentially become entrained in surface water runoff as well having the potential to enter groundwater; 5) Offsite discharge of storm water containing floating oil and numerous areas on the Facility and the Adjacent Property where spillage or floating oil was noted, and; 6) The Storm Water Pollution Prevention Plan was not onsite and not available during the initial inspection.

8. Results of the Department of Fish and Game's inspection noted several potential violations related to the lack of a hazardous materials business plan and contingency plans onsite, and lack of a current CUPA permit.

9. Beneficial uses of Ackerman Creek, a tributary to the Russian River, are:

   Existing:
   a. Municipal and domestic water supply (MUN)
   b. Agricultural supply (AGR)
   c. Industrial service supply (IND)
   d. Ground water recharge (GWR)
   e. Freshwater replenishment (FRESH)
   f. Navigation (NAV)
   g. Contact water recreation (REC-1)
   h. Non-contact (REC-2) water recreation
   i. Commercial and Sport fishing (COMM)
   j. Warm freshwater habitat (WARM)
   k. Cold freshwater habitat (COLD)
   l. Wildlife habitat (WILD)
   m. Preservation of rare, threatened or endangered species (RARE)
   n. Migration of aquatic organisms (MIGR)
   o. Spawning, reproduction, and/or early development (SPWN).

   Potential:
   p. Shellfish harvesting (SHELL)
   q. Aquaculture (AQUA).

10. The beneficial uses of the groundwater, as designated in the Basin Plan, include:

   Existing:
   a. Municipal and Domestic Supply (MUN)
   b. Agricultural Supply (AGR)
   c. Industrial Service Supply (IND)
   d. Native American Culture (CUL)

Cleanup and Abatement
Order No. R1-2006-0036                          -3-

Potential:
e.  Industrial Process Supply (PRO)

11. The Dischargers named in this Order have caused or permitted or threatened to cause or
permit, waste to be discharged where it is, or probably will be, discharged into waters of
the State and create, or threaten to create, a condition of pollution or nuisance. The
discharge and threatened discharge of contaminants may have unreasonably affected
water quality in that the discharge or threatened discharge is deleterious to the above
described beneficial uses of State waters, and may have impaired water quality to a
degree which creates a threat to public health and public resources and therefore,
constitutes a condition of pollution or nuisance. These conditions threaten to continue
unless the discharge or threatened discharge is abated.

12. The California Water Code, and regulations and policies developed thereunder, require
cleanup and abatement of discharges, and threatened discharges of waste to the extent
feasible. Cleanup to background levels is the presumptive standard. Alternative cleanup
levels greater than background concentrations shall be permitted only if the Dischargers
demonstrate that: it is not feasible to attain background levels; the alternative cleanup
levels are consistent with the maximum benefit to the people of the State; alternative
cleanup levels will not unreasonably affect present and anticipated beneficial uses of such
water; and they will not result in water quality less than prescribed in the Basin Plan and
Policies adopted by the State and Regional Water Board. Any proposed alternative that
will not achieve cleanup to background levels, must be supported with evidence that it is
technologically or economically infeasible to achieve background levels, and that the
pollutant will not pose a substantial present or potential hazard to human health or the
environment for the duration of the exceedence of background levels (SWRCB Res. Nos.
68-16 and 92-49, Title 23, California Code of Regulations Section 2550.4, subds. (c),
and (d)).

13. Discharge prohibitions contained in the Basin Plan apply to this Site. State Water
Resources Control Board Resolution 68-16 (Non-Degradation Policy) applies to this Site.
State Water Resources Control Board Resolution 92-49 applies to this Site and sets out
the "Policies and Procedures for Investigation and Cleanup and Abatement of Discharges
under Section 13304 of the California Water Code."

14. The Water Quality Control Plan for the North Coast Region (Basin Plan), Chapter 3,
contains specific standards and provisions for maintaining high quality waters of the state
that provide for the beneficial uses listed above. In the Basin Plan, the section entitled
OBJECTIVES FOR INLAND SURFACE WATERS, ENCLOSED BAYS AND
ESTURARIES includes the following water quality objectives, which are violated or
threatened to be violated:

a.  Floating Material - *"Waters shall not contain floating material, including solids,
liquids, foams, and scum, in concentrations that cause nuisance or adversely affect
beneficial uses."*

b.  Oil and Grease - *"Waters shall not contain oils, greases, waxes, or other materials in
concentrations that result in a visible film or coating on the surface of the water or on
objects in the water, that cause nuisance, or that otherwise adversely affect beneficial
uses."*

Cleanup and Abatement
Order No. R1-2006-0036

-4-

c. Toxicity - *"All waters shall be maintained free of toxic substances in concentrations that are toxic to, or that produce detrimental physiological responses in human, plant, animal or aquatic life."*

d. Chemical Constituents - *"Waters designated for use as domestic or municipal supply (MUN) shall not contain concentrations of chemical constituents in excess of the limits specified in California Code of Regulations, Title 22, Chapter 15, Division 4, Article 4, Section 64435 (Tables 2 and 3), and Section 64444.5 (Table 5) and listed in Table 3-2 of the Plan".*

e. Taste and Odor – *"Waters shall not contain taste or odor-producing substances in concentrations that impart undesirable tastes or odors to fish flesh or other edible products of aquatic origin, or that causes nuisance or adversely affect beneficial uses."*

15. Water Quality Order No. 97-03 DWQ (General Storm Water Permit) regulates storm-water discharges and authorized non-storm water discharges from specific categories of industries. Applicable portions of the Permit that are being violated, or threatened to be violated, are:

a. Discharge Prohibitions A.1 – *"Except as allowed in Special Conditions (D.1) of this General Permit, materials other than storm water (non-storm water discharges) that discharge directly or indirectly to waters of the United States are prohibited. Prohibited non-storm water discharges must be either eliminated or permitted by a separate NPDES permit."*

b. Discharge Prohibitions A.2 - *"Storm Water discharges and authorized non-storm water discharges shall not cause or threaten to cause pollution, contamination, or nuisance."*

c. Effluent Limitations B.3 - *"Facility operators covered by this General Permit must reduce or prevent pollutants associated with industrial activity in storm water discharges and authorized non-storm water discharges through implementation of BAT[1] for toxic and non-conventional pollutants and BCT[2] for conventional pollutants. Development and implementation of an SWPPP[3] that complies with the requirements in Section A of the General Permit and that includes BMP's[4] that achieve BAT/BCT constitutes compliance with this requirement."*

d. Receiving Water Limitations C.1 - *"Storm water discharges and authorized non-storm water discharges to any surface water of ground water shall not adversely impact human health or the environment."*

e. Storm Water Pollution Prevention Plan Requirements Section A.2 - *"... The SWPPP shall be revised whenever appropriate and shall be readily available for review by facility employees or Regional Water Board inspectors."*

16. The following sections of the Porter-Cologne Water Quality Control Act authorize the Regional Water Board Executive Officer to make the following requirements for persons

---

[1] Best Available Technology Economically Achievable
[2] Best Conventional Pollutant Control Technology
[3] Storm Water Pollution Prevention Plan defined in Section A of the General Permit
[4] Best Management Practices

Cleanup and Abatement
Order No. R1-2006-0036                    -5-

suspected of violating the applicable Waste Discharge Requirements and Basin Plan
prohibitions:

a. Section 13267(a) - *"A regional board, in establishing or reviewing any water quality
control plan or waste discharge requirements, or in connection with any action
relating to any plan or requirement or authorized by this division, may investigate the
quality of any waters of the state within its region."*

b. Section 13267(b) - *"In conducting an investigation specified in subdivision (a), the
regional board may require that any person who has discharged, discharges, or
proposes to discharge waste within its region...that could affect the quality of waters
within its region shall furnish, under penalty of perjury, technical or monitoring
program reports which the regional board requires."*

c. Section 13267(c) - *"In conducting an investigation pursuant to subdivision (a), the
regional board may inspect the facilities of any person to ascertain whether the
purposes of this division are being met and waste discharge requirements are being
complied with. The inspection shall be made with the consent of the owner or
possessor of the facilities or, if the consent is withheld, with a warrant duly issued
pursuant to the procedure set forth in Title 13 (commencing with Section 1822.50) of
Part 3 of the Code of Civil Procedure. However, in the event of an emergency
affecting the public health or safety, an inspection may be performed without consent
or the issuance of a warrant."*

d. Section 13304(a) - *"Any person who has discharged or discharges waste into the
waters of this state in violation of any waste discharge requirement or other order or
prohibition issued by a regional board or the state board, or who has caused or
permitted, causes or permits, or threatens to cause or permit any waste to be
discharged or deposited where it is, or probably will be, discharged into waters of the
state and creates, or threatens to create, a condition of pollution or nuisance, shall
upon order of the regional board, clean up the waste or abate the effects of the waste,
or, in the case of threatened pollution or nuisance, take other necessary remedial
action, including, but not limited to, overseeing cleanup and abatement efforts."*

17. All of the technical reports required by this Order are necessary to ensure that the prior
harm and future threat to water quality created by the discharges described above are
properly abated and controlled. The financial burdens of preparing these reports bear a
reasonable relationship to the needs for the reports and the benefits to be obtained from
the reports.

18. Reasonable costs incurred by Regional Water Board staff in overseeing cleanup or
abatement activities are reimbursable under Section 13304(c)(1) of the California Water
Code.

19. This Order in no way limits the authority of this Regional Board to institute additional
enforcement actions or to require additional investigation and cleanup at the facility
consistent with California Water Code. This Order may be revised by the Executive
Officer as additional information becomes available.

20. This enforcement action is being taken for the protection of the environment and,
therefore, is exempt from the provisions of the California Environmental Quality Act
(Public Resources Code, Section 21000 et seq.) in accordance with Section 15321,
Chapter 3, Title 14, California Code of Regulations.

Cleanup and Abatement                    -6-
Order No. R1-2006-0036

21. Failure to comply with the terms of this Order may result in enforcement under the
    California Water Code. Any person failing to provide technical reports containing
    information required by this Order by the required date(s) or falsifying any information in
    the technical reports is, pursuant to Water Code Section 13268, guilty of a misdemeanor
    and may be subject to administrative civil liabilities of up to one thousand dollars
    ($1,000.00) for each day in which the violation occurs. Any person failing to clean up or
    abate threatened or actual discharges as required by this Order is, pursuant to Water Code
    Section 13350(e), subject to administrative civil liabilities no less than five hundred
    dollars per day ($500.00) for each day of violation and up to five thousand dollars
    ($5,000.00) per day for each day of violation; or ten dollars ($10) per gallon of waste
    discharged.

22. Any person affected by this action of the Regional Water Board may petition the State
    Water Resources Control Board (State Water Board) to review the action in accordance
    with California Water Code Section 13320 and Title 23, California Code of Regulations,
    Section 2050. The petition must be received by the State Water Board within 30 days of
    the date of this Order. Copies of the law and regulations applicable to filing petitions will
    be provided upon request.

    In addition to filing a petition with the State Board, any person affected by this Order
    may request the full Regional Water Board to reconsider this Order. To be timely, any
    such request must be made within 30 days of the date of this Order. Note that even if
    reconsideration by the Regional Water Board is sought, filing a petition with the State
    Water Board within the 30-day period is necessary to preserve the petitioner's legal
    rights. If a request to reconsider this Order is made to the Regional Water Board or a
    petition filed with the State Water Board, all terms of the Order remain in effect and must
    be complied with while the request for reconsideration and/or petition is considered.

**THEREFORE, IT IS HEREBY ORDERED** that, pursuant to California Water Code Sections
13267(b) and 13304, the Dischargers shall cleanup and abate the discharge and threatened
discharge of the pollutants described above and shall comply with the following provisions:

A. Short-Term Abatement:

    All work performed shall be conducted in accordance with all local ordinances. All
    necessary permits shall be obtained.

1.  Take actions to immediately abate the discharge of storm water containing oily waste,
    petroleum, and auto-related pollutants forthwith. This shall include, but not limited to:

    a.  Installation of a temporary, lined oil/water separator, or equivalent, an oil collection
        area and use of adsorbent booms and pads to remove floating product, as needed.

    b.  Interim measures to prevent, to the extent possible, the discharge of pollutants in
        storm water, such as installation of an onsite storm water runoff containment area, or
        surface water run-on diversion.

    c.  Cleanup of all floating oil and grease and petroleum products.

    d.  Containment and disposal of all solid and liquid debris or waste, for example
        absorbent pads used to remove floating product, leaking cars or other material, that

Cleanup and Abatement
Order No. R1-2006-0036

-7-

  obviously contribute to floating products or discharge of automotive-related
  pollutants.

  e.  Temporary containment for the car crusher and implementation of interim operating
      practices to prevent discharges to soil from the car crushing activities.

  f.  Cleanup of all solid waste, oily materials, and soils discharged offsite during the
      recent flood events to the extent practicable.

2.  By May 13, 2006 submit a report to the Executive Officer documenting all activities
    undertaken to date. Written descriptions, a site map showing locations, field marking of
    locations and photo-documentation shall be included in the report.

B. Long Term Abatement

All soil and water investigations and any storm water conveyance and treatment systems
shall be conducted in accordance with all local ordinances and under the direction of a
California Registered Geologist or Registered Civil Engineer experienced in the investigation
and cleanup of petroleum hydrocarbons and pollutants related to auto dismantlers.

1.  By June 1, 2006, the Dischargers shall submit a proposal to the Executive Officer
    detailing long-term Facility improvements, both capital and operational, designed to
    prevent the discharge of automotive fluids and automotive-related pollutants to soil,
    surface water and groundwater. This proposal shall include, but not be limited to:

  a.  Improvements to the automotive processing area such as installation of impermeable
      working surfaces and roof structures to prevent rainfall from contacting the area, to
      the extent practicable, in order to prevent discharge of automotive fluids to soil and
      groundwater.

  b.  Containment structures surrounding the automotive processing area to collect and
      direct all rainfall runoff and spills within the processing area.

  c.  Improvement to the car crushing process to eliminate discharge of automotive–related
      pollutants.

  d.  Treatment or disposal processes to eliminate, or treat storm water runoff from the
      automotive processing and car crushing areas.

  e.  A time schedule to install and implement improvements.

  f.  Generalized site map of the Facility and improvements.

  g.  Detailed design drawing of improvements, as needed.

  h.  Improvements to parts storage and handling to include roofing, impermeable bases,
      and /or a process to clean parts to eliminate automotive-related pollutants from
      contacting storm water.

  i.  Improved practices to reduce and/or eliminate the discharge of automotive fluids
      from cars in the storage area.

Cleanup and Abatement
Order No. R1-2006-0036

-8-

    j.  Design of surface water drainages and treatment processes to ensure storm water pollutant removal before discharge from the Facility and the adjacent property.

    k.  Written operations plan and employee training plan to ensure proper operations at the Facility.

C.  Soil and Ground Water Investigation

By June 1, 2006, the Dischargers shall prepare and submit a workplan proposing a limited soil and groundwater investigation focusing on assessing the groundwater quality under, and emanating from, the Facility and Adjacent Property and assessing the extent of soil contamination that would impair either surface water or groundwater. The workplan should include, but no be limited to:

    a.  Map of the Facility, surrounding properties, and Ackerman Creek.

    b.  Location of all known wells within ½ mile of the Facility.

    c.  Location of onsite septic or domestic waste disposal systems.

    d.  Identify location of major activities, current and historical.

    e.  Proposed soil and groundwater sampling locations, sample techniques, and suite of analytes.

    f.  Determining the direction of groundwater flow.

    g.  A time schedule to implement the workplan and submit a final report of results. The time schedule shall be approved by the Executive Officer and activities shall be conducted in accordance with the approved schedule.

If, for any reason, the Discharger is unable to perform any activity or to submit any document in compliance with the schedule set forth herein or in compliance with any work schedule submitted pursuant to this Order and concurred with by the Executive Officer, the Discharger may request, in writing, a specified time extension. The extension request must be received by the Regional Water Board at least five days in advance of the due date, and shall include justification for the delay, including a description of good faith efforts performed to achieve compliance with the due date. The extension request shall also include a proposed time schedule with new performance dates for the due date in question and all dependent dates. An extension may be granted for good cause, in which case this Order will be revised accordingly. A failure to deny a requested extension of time in writing shall not be deemed approval.

Ordered by _____

             Catherine Kuhlman
             Executive Officer

March 30, 2006

# *NEST Environmental Services*

1040 Grant Road, Suite 155, PMB 325, Mountain View, California 94040-3296

*Extra Copy*
*Rick —*

June 29, 2006

North Coast Regional Water Quality Control Board
5550 Skyline Boulevard, Suite A
Santa Rosa, CA 95403

Attn.:  Mr. Richard Azevedo
Re.:    Order to Cleanup and Abate to Ukiah Auto Dismantlers, March 29, 2006

Dear Mr. Azevedo:

     On behalf of Mr. Wayne Hunt, Ukiah Auto Dismantlers, we have prepared a Cleanup and Abatement Plan as directed in your Order No. R1-2006-0036.
     Beginning on Page 6 of this Order, there is a list of issues that must be addressed. As you will see, the Plan we have prepared addresses these issues and is organized as a check list of specific tasks that can be completed and documented. Each task has been assigned a date of completion and therefore the Plan can be closely monitored for its progress.
     We hope that this Plan meets with your approval. If you have any questions please do not hesitate to contact me as indicated below, or contact Mr. Wayne Hunt. Portions of this Plan are being implemented as it has been prepared.

Sincerely yours,

Frederick Martin, MS, REA-I 04775
Founder and Principal
Phone 707 895 2607
Fax    707 895 9361



EXHIBIT NO. 29
VERBATIM REPORTING
SERVICE

Phone: (650) 938-3012 / (800) 699-NEST (6378), Fax: (650) 968-6633

EXHIBIT 2

Ukiah Auto Dismantlers
500 D, :Pinoleville Drive
Ukiah, California 95490

Cleanup and Abatement Project

REF.:  North Coast Regional Water Quality Control Board
       Cleanup and Abatement Order No.: R1-2006-0036
       March 29, 2006 and subsequent communications

The Cleanup and Abatement Project (*CAP*) has been organized into three distinct activities. The first is a series of tasks related to improving the infrastructure of this facility. The second, addresses procedures used to process vehicles for dismantling and disposal. The third, describes the sampling and testing of samples of soil at strategic locations on the facility.

Most of the CAP activities take place on the Ukiah Auto Dismantlers' property but some of the activities encompass the adjacent property referred to as – R&M Backhoe Services.

The object of the CAP is to create a program that performs the important function of disposing of old and wrecked vehicles and concomitantly complies with the need to prevent petroleum products and other hazardous materials from contaminating soil and potentially ground water.

This presentation is organized in three sections describing the changes and improvements to the infrastructure, process, and testing. The document also contains several maps and drawings that describe the facility and are referred to during the description. Each section is built around a table that lists the specific tasks, issues addressed in the Order No.R1-2006-0036, a date for completion, and a cell for closure.

List of Maps and drawings:

1. County Assessor's Map, Pinoleville Rancheria and Yokayo Rancho
2. Site Map, Ukiah Auto Dismantlers
3. Entrance and Work Area Details, UAD
4. ½ Acre-Foot Catch Basin, UAD
5. Site Map, R&M Backhoe Service

For a description of these maps and drawings see below.

I. Infrastructure

This section is the most detailed and extensive. Water Board items addressed are identified on Page 6 of the Order dated March 29, 2006.

1

| Infrastructure Tasks | Map Ref. | Items Addressed | Proposed Completion | Completed |
|---|---|---|---|---|
| Remove all vehicles from R&M property | | B1a, B1d | August 1 | |
| Install crusher on cement pad "D" | Site, Entrance | A1a, A1b, A1e | | May 1 |
| Install temporary spill containment for crusher | ditto | A1e, A1a, A1b | | May 1 |
| Remove all batteries and vehical components containing oil from storage yard and place in secure location | | A1d | August 1 | |
| Create a temporary, secure location to process new vehicles on cement pad "D" | ditto | A1b, A1d | August 1 | |
| Collect scattered loose parts and include them in crushed vehicles | | A1d | August 1 | |
| Remove all tires, either put in crushed vehicle (5/per) or dispose to an appropriate facility | | A1a, A1b | August 1 | |
| Scoop up all dirt stains larger then one square foot, collect soil for disposal | | A1c | August 1 | |
| Construct ½ acre foot Catch Basin. See discussion below. | Site, Catch Basin | B1d, B1j | August 15 | |
| Pave with asphalt, 4 inches min., the entrance to cement pad "D". Pave above grade and slope northward to accumulate water at a convenient location. Place a 4 inch, drive-over, berm on the perimeter to contain spills. | Site, Entrance | B1a, B1b, | September 1 | |
| Construct new, high bay, building on cement pad "D" | Site, Entrance | B1a, B1b, B1c, B1h | September 1 | |
| Place a 4 inch, drive-over, berm at entrances to the new building | | Ditto | September 15 | |
| Install crusher in new building | | B1c, B1d | September 15 | |
| Install waste petroleum products storage in new building. Use double-walled tanks or secondary containment | | B1a, B1h | September 15 | |

**II. Procedural Tasks**

In this section we describe the features of the facility that relates to the treatment of vehicles that are brought into the facility for dismantling and disposal. Note, "hazardous materials" includes oils, grease, hydraulics, antifreeze, batteries, mercury switches.

| Procedural Tasks | Map | Items Addressed | Proposed Completion | Completed |
|---|---|---|---|---|
| Relocate dismantling of vehicles and removal of hazardous materials on the asphalt or in building "D" | Site, Entrance | B1a, B1i | September 1 | |
| Provide spill clean-up materials in the new building and in office/storage building | | B1i, A1c | September 15 | |
| Crusher under cover | Entrance | B1c | September 15 | |
| Remove all hazardous materials on paved containment area and store products in new building | Site, Entrance | B1a, B1i | September 15 | |
| Store all drive trains and engines for resale indoors | | B1h, B1i | September 15 | |
| Restore and implement a new SWPPP with employee training | | B1k | October 15 | |
| Place all stored vehicles on blocks | | B1a, B1i | October 15 | |

**III Monitoring Tasks**

| Monitoring Tasks | Map | Items Addressed | Proposed Completion | Completed |
|---|---|---|---|---|
| Collect soil samples, one foot below surface at locations A1-A9. | Site, Entrance | Ce | August 1 | |
| Based on results from samples A1-A9 take additional samples at B1-B7 if necessary | Ditto | Ce | TBD | |

The first group of samples A1-A9 will be tested for:

TPH as gasoline/BETX/MTBE
TPH as diesel
pH
Oil and Grease (HEM-SG)
Copper, Lead, and Zinc.

3

## Description of the Site Maps

The Assessor's Map shows the location of the subject property and some of the adjacent properties. This map forms the basis for the more detailed maps in this set.

The Site Map provides an overview of the entire site and the neighbor, R&M Backhoe. The UAD site comprises 8.16 acres of which only about 5 acres are useable because Ackerman Creek and its levy occupies a considerable portion of the acreage. This map shows all of the features of the facility and the new features proposed. The storm water drains to the north and east corner of the site where the proposed Catch Basin would be located.

The Entrance and Work Area drawing show the details of the proposed improvements to the infrastructure. This drawing is not scaled.

The "1/2 acre foot catch basin" is a scale drawing of the Catch Basin. It is a divided basin so as to provide optimum entrapment of sediments and debris. The outflow passes through oil absorbing material before discharging to the general drainage.

The final drawing is the Assessor's Map for the R&M Backhoe facility.

## Description of the Catch Basin

Referring to the Site Map and the Catch Basin Drawing, the Basin is located in the upper right corner of the facility. At four feet deep, it is sized to hold up to 0.1 foot of rain, in a single storm event, falling on the site. The Basin is close under the levy and all water is channeled into the west end of the basin. The Basin is divided into two equal sized units with a three foot wall between the west and east end of the Basin. They act as sand and debris traps. There is an overflow to a drain on the east end. The Water overflowing the Basin passes through a petroleum filter to clear the overflow of any residual petroleum products. The water enters a shallow drainage ditch which conducts it eastward. During the rainy season, petroleum absorbing material could be placed at the entrance to the Basin and also on the dividing partition, as extra precaution.

## Ancillary Items

Water wells: The County does not maintain a list of water wells. We have contacted the Pomo Indian group that owns the adjacent properties regarding wells but were unable to obtain any information..

Domestic Waste Disposal: General use is handled with portable facilities that are serviced regularly. The mobile house adjacent to the "office" building has a private septic system.

History: The owner does not believe that there was any prior use for this property. It has been an auto dismantling facility for many years.

Ukiah Auto Dismantlers
500 D, :Pinoleville Drive
Ukiah, California 95490

Cleanup and Abatement Project

REF.:  North Coast Regional Water Quality Control Board
Cleanup and Abatement Order No.: R1-2006-0036
March 29, 2006 and subsequent communications

The Cleanup and Abatement Project (*CAP*) has been organized into three distinct activities. The first is a series of tasks related to improving the infrastructure of this facility. The second, addresses procedures used to process vehicles for dismantling and disposal. The third, describes the sampling and testing of samples of soil at strategic locations on the facility.

Most of the CAP activities take place on the Ukiah Auto Dismantlers' property but some of the activities encompass the adjacent property referred to as – R&M Backhoe Services.

The object of the CAP is to create a program that performs the important function of disposing of old and wrecked vehicles and concomitantly complies with the need to prevent petroleum products and other hazardous materials from contaminating soil and potentially ground water.

This presentation is organized in three sections describing the changes and improvements to the infrastructure, process, and testing. The document also contains several maps and drawings that describe the facility and are referred to during the description. Each section is built around a table that lists the specific tasks, issues addressed in the Order No.R1-2006-0036, a date for completion, and a cell for closure.

List of Maps and drawings:

1.  County Assessor's Map, Pinoleville Rancheria and Yokayo Rancho
2.  Site Map, Ukiah Auto Dismantlers
3.  Entrance and Work Area Details, UAD
4.  ½ Acre-Foot Catch Basin, UAD
5.  Site Map, R&M Backhoe Service

For a description of these maps and drawings see below.

I. Infrastructure

This section is the most detailed and extensive. Water Board items addressed are identified on Page 6 of the Order dated March 29, 2006.


PHS
EXHIBIT NO. 29A
VERBATIM REPORTING
SERVICE

| Infrastructure Tasks | Map Ref. | Items Addressed | Proposed Completion | Completed |
|---|---|---|---|---|
| Remove all vehicles from R&M property | | B1a, B1d | August 1 | |
| Install crusher on cement pad "D" | Site, Entrance | A1a, A1b, A1e | | May 1 |
| Install temporary spill containment for crusher | ditto | A1e, A1a, A1b | | May 1 |
| Remove all batteries and vehical components containing oil from storage yard and place in secure location | | A1d | August 1 | |
| Create a temporary, secure location to process new vehicles on cement pad "D" | ditto | A1b, A1d | August 1 | |
| Collect scattered loose parts and include them in crushed vehicles | | A1d | August 1 | |
| Remove all tires, either put in crushed vehicle (5/per) or dispose to an appropriate facility | | A1a, A1b | August 1 | |
| Scoop up all dirt stains larger then one square foot, collect soil for disposal | | A1c | August 1 | |
| Construct ½ acre foot Catch Basin. See discussion below. | Site, Catch Basin | B1d, B1j | August 15 | |
| Pave with asphalt, 4 inches min., the entrance to cement pad "D". Pave above grade and slope northward to accumulate water at a convenient location. Place a 4 inch, drive-over, berm on the perimeter to contain spills. | Site, Entrance | B1a, B1b, | September 1 | |
| Construct new, high bay, building on cement pad "D" | Site, Entrance | B1a, B1b, B1c, B1h | September 1 | |
| Place a 4 inch, drive-over, berm at entrances to the new building | | Ditto | September 15 | |
| Install crusher in new building | | B1c, B1d | September 15 | |
| Install waste petroleum products storage in new building. Use double-walled tanks or secondary containment | | B1a, B1h | September 15 | |

2

II. Procedural Tasks

In this section we describe the features of the facility that relates to the treatment of vehicles that are brought into the facility for dismantling and disposal. Note, "hazardous materials" includes oils, grease, hydraulics, antifreeze, batteries, mercury switches.

| Procedural Tasks | Map | Items Addressed | Proposed Completion | Completed |
|---|---|---|---|---|
| Locate dismantling of vehicles and removal of hazardous materials on the asphalt or in building "D" | Site, Entrance | B1a, B1i | September 1 | |
| Provide spill clean-up materials in the new building and in office/storage building | | B1i, A1c | September 15 | |
| Crusher under cover | Entrance | B1c | September 15 | |
| Remove all hazardous materials on paved containment area and store products in new building | Site, Entrance | B1a, B1i | September 15 | |
| Store all drive trains and engines for resale indoors | | B1h, B1i | September 15 | |
| Prepare and implement a new SWPPP with employee training | | B1k | October 15 | |
| Place all stored vehicles on blocks | | B1a. B1i | October 15 | |

III Monitoring Tasks

| Monitoring Tasks | Map | Items Addressed | Proposed Completion | Completed |
|---|---|---|---|---|
| Collect soil samples, one foot below surface at locations A1-A9. | Site, Entrance | Ce | August 1 | |
| Based on results from samples A1-A9 take additional samples at B1-B7 if necessary | Ditto | Ce | TBD | |

The first group of samples A1-A9 will be tested for:

TPH as gasoline/BETX/MTBE
TPH as diesel
pH
Oil and Grease (HEM-SG)
Copper, Lead, and Zinc.

## Description of the Site Maps

The Assessor's Map shows the location of the subject property and some of the adjacent properties. This map forms the basis for the more detailed maps in this set.

The Site Map provides an overview of the entire site and the neighbor, R&M Backhoe. The UAD site comprises 8.16 acres of which only about 5 acres are useable because Ackerman Creek and its levy occupies a considerable portion of the acreage. This map shows all of the features of the facility and the new features proposed. The storm water drains to the north and east corner of the site where the proposed Catch Basin would be located.

The Entrance and Work Area drawing show the details of the proposed improvements to the infrastructure. This drawing is not scaled.

The "1/2 acre foot catch basin" is a scale drawing of the Catch Basin. It is a divided basin so as to provide optimum entrapment of sediments and debris. The outflow passes through oil absorbing material before discharging to the general drainage.

The final drawing is the Assessor's Map for the R&M Backhoe facility.

## Description of the Catch Basin

Referring to the Site Map and the Catch Basin Drawing, the Basin is located in the upper right corner of the facility. At four feet deep, it is sized to hold up to 0.1 foot of rain, in a single storm event, falling on the site. The Basin is close under the levy and all water is channeled into the west end of the basin. The Basin is divided into two equal sized units with a three foot wall between the west and east end of the Basin. They act as sand and debris traps. There is an overflow to a drain on the east end. The Water overflowing the Basin passes through a petroleum filter to clear the overflow of any residual petroleum products. The water enters a shallow drainage ditch which conducts it eastward. During the rainy season, petroleum absorbing material could be placed at the entrance to the Basin and also on the dividing partition, as extra precaution.

## Ancillary Items

City Water - RCA  7/28/06

Water wells: The County does not maintain a list of water wells. We have contacted the Pomo Indian group that owns the adjacent properties regarding wells but were unable to obtain any information..

Domestic Waste Disposal: General use is handled with portable facilities that are serviced regularly. The mobile house adjacent to the "office" building has a private septic system.

History: The owner does not believe that there was any prior use for this property. It has been an auto dismantling facility for many years.



Por. of Lots 141 & 142 of Yokayo Rancho
Por. of Pinoleville Rancheria (C2 D1 P74) D66 P88

154-020        169-19

N
1" = 200

18

10
Ukiah Auto Dismantlers

R&M Backhoe

Pcl.1
47
6.41 A±

Pcl.2
48
3.49 A±

Pcl.3
49
2.55 A±

Pcl.4
50
1.28 A±

21

#225

Pcl.4
41
1.08 A±

Pcl.2
35
1.39 A±

Pcl.5
42
1.15 A±

Pcl.1
34
1.01 A±

Pcl.4
29
4.5 A±

Pcl.6
43
1.12 A±

Por. Pcl.1
46
.5 A±

Por. Pcl.1
45
.51 A±

Pcl.7
44
1.06 A±

Pcl.1
37
1.02 A±

ROAD        #223

Bk
70
93

Assessor's Map
County of Mendocino, Calif.
March, 1969



$300
June 1, 2006

NOTE: This map was prepared for assessment purposes only. No liability is assumed for the data delineated hereon.



NOTES:

A - Current Waste Material Storage (to be removed)

B - Office and Storage (50x50)

C - Two Out Buildings

D - Concrete Slab (40x70) Site of proposed workshop

E - Area proposed for asphalt

F - ½ acre-foot catch basin ~ 100x55 x 4 feet Proposed



Former
Vehicle
Storage

R&M BACKHOE
SERVICE
6.4 Acres

N

→ 100′ ←
(= 1 inch)

A7

A1

B4

B2

NEST Environmental Services
Mountain View, California
Fred Martin, MS, REA
June 26, 2006

UKIAH AUTO DISMANTLERS
SITE MAP
Ukiah, Mendocino County, CA



(A₀) – Soil Sampler

Proposed 4" Asphalt with 4", drive-over berm. Slight grade North

Location for new building

(A₆)

40' x 70' Cement Pad

Install 4", drive-over berm at entrances

Crusher

Existing 50 x 50 Building: office & storage

Parking

Gate

Waste storage relocate to new building

Entrance to R & M

mobil home

small cabin

Ukiah Auto Dismantlers | NEST Environmental Services
Entrance and Work Area | Fred Martin, MS, REA
(not to scale) | June 26, 2006



CREEK LEVY

2 outflow chanels with hydrocarbon filters.

Drainage Ditch

Drainage

55'

A Drain

Grade Level

1 Foot berm

50'

1 Foot berm

4' deep

2' high Sand Trap

Line bottom with Betonite

50'

20' (= 1")

inlet

N

NEST Environmental Services    Ukiah Auto Dismantlers
Mountain View, CA    1 acre foot catch basin
Fred Martin, MS, REA    Ukiah
June 26, 2006    Mendocino County, CA

MAY-30-2006 11:16A FROM:RANDM         787-4621645         TO:16509686633         P.1/1



# *NEST Environmental Services*

1040 Grant Road, Suite 155, PMB 325, Mountain View, California 94040-3296

October 14, 2006

North Coast Regional Water Quality Control Board
5550 Skyline Boulevard, Suite A
Santa Rosa, CA 95403

**N C R W Q C B**

**OCT 1 6 2006**

Attn.:  Mr. Richard Azevedo
Re.:    Results of testing soil samples

| | | |
|---|---|---|
| ☐ EO_____ | ☐ WMgmt_____ | ☐ Admin_____ |
| ☐ AEO_____ | ☐ Timber_____ | ☐ Legal_____ |
| ☐ Reg/NPS_____ | ☐ Cleanups_____ | ☐_____ |
| | | Date_____ |

Dear Mr. Azevedo:

We have the results of soil sampling and testing done in September. They are summarized on the accompanying sheet.

I had some curiosity regarding the analysis for O&G so I ran a second set of three samples including a sample from my property. As a result, I learned that O&G is a rather imprecise measurement, with a PQL of 250 ppm (mg/Kg).

At that high level, samples A4 and A5, taken in Ackerman Creek show a non-detect which is consistent with the results from the second set, one of which was taken in the creek near A4. Also, the diesel measurements are given a note D-09 which signifies that they probably come from an overlap with O&G. The diesel results track quite well the O&G.

In discussing this with Alpha Laboratories, they suggest, as an alternative to O&G, that we should test for TPH as Oil which would provide a more reliable estimate on possible contamination. The soil samples will be kept to the end of November.

The sample numbers correspond to those shown on the site map. Please contact me at you earliest convenience with your comments and suggestions.

Sincerely yours,

Frederick Martin, MS, REA-I  04775
Founder and Principal
Phone 707 895 2607
Fax    707 895 9361

Encl. As noted
Cc: Wayne Hunt, UAD
    Rick Mayfield

EXHIBIT NO. 30
VERBATIM REPORTING SERVICE

EXHIBIT 3