1  Michael S. Biggs, Esq. SBN: 237640
   BIGGS LAW PC
2  Post Office Box 454
   Petaluma, CA 94953-0454
3
   (707) 763-8000 Telephone
4  (707) 763-8010 Facsimile
5  Attorney for Plaintiffs
   PINOLEVILLE POMO NATION et al
6

7

8                    UNITED STATES DISTRICT COURT

9             FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11 PINOLEVILLE POMO NATION,              Case No.: C 07 2648
   PINOLEVILLE POMO NATION
12 ENVIRONMENTAL ASSOCIATION AND
13 LEONA WILLIAMS,                        DECLARATION OF GEORGE O.
                                          PROVENCHER IN REBUTTAL TO
14     Plaintiffs,                        DECLARATION OF CHRISTOPHER
                                          NEARY IN OPPOSITION TO
15                                        PRELIMINARY INJUNCTION
              v.
16
17 UKIAH AUTO DISMANTLERS, WAYNE
   HUNT ISABEL LEWRIGHT, WARRIOR
18 INDUSTRIES, INC., RICHARD MAYFIELD,
   ROSS JUNIOR MAYFIELD, PAULA           Date:  06/25/08
19 MAYFIELD, KENNETH HUNT, U.S.          Time:  1:30 P.M.
   ALCHEMY CORPORATION AND DOES 1-       Dept:  Courtroom C, 15th Floor
20 50, INCLUSIVE,                        Judge: Susan Illston
21
   Defendants.
22

23
                                    /
24

25
        My name is George O. Provencher.  I have personal knowledge of the facts stated herein,
26
   unless expressly alleged on information and belief, and, if called as a witness, I could testify
27
   competently thereto.
28

1. Mr. Neary's declaration neither makes any affirmative statement as to the purpose of his

declaration, nor does it make any statement with any specificity other than the fact that a copy of

this report prepared by Vector Engineering in March 2003 has been furnished by Pinoleville

Pomo Nation as we are required to under discovery. I have read and reviewed this report, and I

have noted several issues concerning the results reported of the six bore drilling samples that

were analyzed. One of the bore sample drillings did not reach ground water, constituting a "dry

hole". On page 8, Section 5.2 "Nature and Extent of Contamination and Data Validity –

Groundwater" it states, "All five samples did contain some measurable quantity of the

inorganics tested, with the exception of cadmium that was found to be below the detection limits.

Levels of chromium, nickel, and zinc in the groundwater were found to exceed either the

Maximum Contaminant Level or the Secondary Drinking Water Standards, as defined in Articles

4 and 16 of Chapter 15, title 22, California Code of Regulations."

2. Section 5.2.2 – "Soils" of the report on page 10 stated, "As with groundwater samples, the

soils samples retrieved from each of the boring were analyzed for the same five metals,

specifically, cadmium, chromium, lead, nickel, and zinc. Comparing the concentrations of each

of these metals has shown higher concentrations than expected."

3. At the bottom of page 11 of the report, it states that, "The soil samples within the area of

investigation are composed of sediments that originated from mafic and ultra-mafic rock types

common in the northern California coastal ranges. These rocks typically contain high

concentrations of metals such as those analyzed in this study. Analytical data on groundwater

samples collected from aquifers within these rock and soil types commonly contain high

concentrations of the soluble metals characteristic of the host rock. As discussed previously, the

presence of high concentrations of chromium, lead, nickel and zinc within the water samples

DECLARATION OF GEORGE O. PROVENCHER
IN REBUTTAL TO DECLARATION OF CHRISTOPHER
NEARY IN OPPOSITION TO PRELIMINARY INJUNCTION

2

PPN v. UAD
C 07 2648

collected at the site are likely a result of soil particles within the sample also being quantified. The groundwater aquifer shows high metals concentrations because the metal ions in the soil go into solution when saturated. These metal ions have been detected in the groundwater sample." This basically means that although there are some unexpectedly high levels of heavy metals found in both water and soil samples, the results are not conclusive.

4.   I have discussed this five year-old report with Joaquin Wright, Senior Project Manager at Kennec Earth Engineering & Science, and I have learned that in order to draw any conclusions regarding the origins of the soil material and metals contained therein being naturally occurring, you would have to do a background investigation of soils and rock formations in the surrounding area. Although Vector Engineering's disclaimers are correct from a textbook and academic viewpoint, they did not conduct any such investigation or develop a scientific basis or foundation for their conclusions. The first paragraph of Section 5.2.2 on Soils seems to contradict the idea that the level of metals found in the sampling were typical background, as the report stated, "Comparing the concentrations of each of these metals by use of the mean and standard deviation, several wells and individual metals have shown higher concentrations than  expected". I would interpret this as "higher than normal".

5.   On page 5, Section 4.2 Geology and Groundwater – Soil Types Encountered, the report states, "The vast majority of soils encountered during the drilling program were sedimentary deposits consisting of silty sands and sandy silts that were places as alluvial deposits from depositional episodes of the nearby Ackerman Creek. No sediments larger than sand sized material were encountered during the drilling program, and no definitive stratum was observed that may act as a preferred conduit for lateral migrations of groundwater." So there is no "host rock" present in any of the boring samples or in the immediate surrounding area to characterize

DECLARATION OF GEORGE O. PROVENCHER
IN REBUTTAL TO DECLARATION OF CHRISTOPHER
NEARY IN OPPOSITION TO PRELIMINARY INJUNCTION

3

PPN v. UAD
C 07 2648

as to what the normal background levels would be for metals to form the basis for some of the conclusions in this report.

6.    Some of the conclusions in this report about the inconclusiveness of the data regarding high levels of metals, especially sample number B483, which contained some of the highest levels of metals, and was also the deepest sample taken at 12.96 feet at groundwater, are not well founded, and they do not explain the much higher levels of Lead found in more recent testing.  One thing that we do know for sure is that regardless of whether the levels of lead and other metals  they were finding were in the silt and sand, or in the water that carries the silt and sand, neither one is a very good thing to have. And if there are sufficient levels to put groundwater levels for metals above the MCL limit for drinking water, we should not be speculating as to why the results are so high, or making assumptions that this is normal, or typical for auto dismantling facilities. If the level is unacceptable, it is unacceptable.  However, due to some of the inconsistent statements and conclusions that require more background support.  In Section 4.1, General Findings, wherein the report states, "During the field investigation, no evidence of massive contamination was observed based on the cuttings retrieved from the drilling process, the soil sampling, or from the groundwater sampling", this is a rather misleading statement as there is no standard or definition for what is to be considered "massive contamination", and it diminishes the fact that there were results indicating serious contamination of groundwater above MCL limits that were not followed up or further investigated.  My view of this report is that it was incomplete and therefore cannot be completely relied upon, as it presents more questions than answers.

7.    One statement regarding the soil conditions of the site that struck me as being very important was in Section 5.5, Transport Mechanisms and Exposure Pathways, which is probably very

DECLARATION OF GEORGE O. PROVENCHER
IN REBUTTAL TO DECLARATION OF CHRISTOPHER
NEARY IN OPPOSITION TO PRELIMINARY INJUNCTION

4

PPN v. UAD
C 07 2648

important for future consideration of containing hazardous materials. It states, "In the event a major fuel or oil spill did occur in the future, the likely migration and transport mechanism would be migration of these liquids contaminants vertically downward through the pores of the vadose zone above the static water tale. Once the contaminants migrate into the aquifer, these organic compounds would likely be carried with the groundwater in the downgradient flow direction". This would seem to indicate that the soil conditions on the UAD site are not very ideal for entrapping or containing hydrocarbons or hazardous chemicals. Whatever is spilled or accumulated will tend to migrate straight down to groundwater.

**I DECLARE UNDER THE PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES THAT THE FOREGOING IS TRUE AND CORRECT.**

DATED 06/18/08

Ukiah California

                                    /S/ George O. Provencher
                                    George O. Provencher