1  Michael S. Biggs, Esq. SBN: 237640
   BIGGS LAW PC
2  Post Office Box 454
   Petaluma, CA 94953-0454
3
   (707) 763-8000 Telephone
4  (707) 763-8010 Facsimile
5  Attorney for Plaintiffs
6  PINOLEVILLE POMO NATION et al
7
8              UNITED STATES DISTRICT COURT
9         FOR THE NORTHERN DISTRICT OF CALIFORNIA
10
11 PINOLEVILLE POMO NATION,              Case No.: C 07 2648
   PINOLEVILLE POMO NATION
12 ENVIRONMENTAL ASSOCIATION AND
   LEONA WILLIAMS,
13                                       DECLARATION OF GEORGE O.
14 Plaintiffs,                           PROVENCHER IN REBUTTAL TO
                                         DECLARATION OF DONALD
                                         McEDWARDS IN OPPOSITION TO
15         v.                            PRELIMINARY INJUNCTION
16 UKIAH AUTO DISMANTLERS, WAYNE
17 HUNT ISABEL LEWRIGHT, WARRIOR
   INDUSTRIES, INC., RICHARD MAYFIELD,
18 ROSS JUNIOR MAYFIELD, PAULA           Date:  06/25/08
   MAYFIELD, KENNETH HUNT, U.S.          Time:  1:30 P.M.
19 ALCHEMY CORPORATION AND DOES 1-       Dept:  Courtroom C, 15th Floor
20 50, INCLUSIVE,                        Judge: Susan Illston
21 Defendants.
22
23 _____/
24
25     My name is George O. Provencher.  I have personal knowledge of the facts stated herein,
26 unless expressly alleged on information and belief, and, if called as a witness, I could testify
27 competently thereto.
28

1.    With respect to Dr. McEdwards' observation that the acronym "PQL" has been misstated and its correct representation is "Practical Quantitation Limit" is appreciated. My intent was to observe the measured values for contaminants and pollutants, especially heavy metals and volatile organic compounds and petroleum hydrocarbons, such as Lead, Copper, Zinc, Nickel, Chromium, Mercury, Ethylbenzene, Toluene, Xylene, Motor Oil, and total Petroleum Hydrocarbons, such as Diesel, respectively – all of which have been sampled, tested and found to exist in significant quantities on the Ukiah Auto dismantlers site, according to UAD's own records and reports to the Regional Water Quality control board, and according to their records and testimony taken in deposition of Mr. Richard Azevedo, who has been the principal agency representative and investigator.

2.    Mr. McEdwards' statement beginning at line 9, paragraph 8., on page 3, and ending at line 5 of paragraph 25 on page 6 describes what he believes in his professional opinion as a registered and licensed engineer, registered with the State of California Licensing Board, the true flow of surface water and storm water runoff that reaches Tribal Lands and which avoids Mr. Hunt's property altogether, flowing briefly onto Mr. Mayfield's property, and then again back onto Tribal Lands, as depicted also in Exhibit 3, would verify that there is no ground water flowing from Tribal Lands onto Mr. Hunt's property, as previously alleged by Mr. Hunt in his declaration response to the motion for injunctive relief.

3.    Mr. McEdwards' assertion that a single event is proof of the soundness of the technical design of the containment and percolation pond system installed on Mr. Hunt's property, combined with his statement that, "If Wayne Hunt's declaration that the containment basins did not overflow in January 2008, is accurate, then none of the storm water sampled by Plaintiff's experts in January 20-08 constitute storm water originating on the UAD Property," ignores

several pertinent facts concerning previous eye-witness accounts, sample analysis conducted by

UAD and the Regional Water Quality Control Board, records and testimony of the Regional

Water Quality Control Board's representative,  and the lack of technical foundation to provide

any assurance that future pollution and contaminated surface water flowing through the Mayfield

property from UAD can be effectively prevented, which is the purpose of the requirement for an

acceptable  Storm Water Pollution Prevention Plan and the required compliance with the original

Abatement Order issued by the Regional Water Quality Control Board over two years ago.

4.    Mr. Wayne Hunt stated in his declaration on page 2, paragraph 6, lines 14-20, "On New

Year's Day 2006, Ackerman Creek adjacent to my property overran its banks and flooded my

property and all of the adjoining property in the vicinity. The flood waters carried materials in

my yard across the adjoining Mayfield Property and even as far as some property owned by

plaintiff PINOLEVILLE POMO NATION."  To add further emphasis and support to Mr. Hunt's

own declaration, we also have Mr. Azevedo's testimony given in deposition on February 26,

2008, page 109, lines 19-25, wherein he states, "It appears that the natural drainage is along the

levy from west to east from the Hunt Property to the Mayfield property off onto the tribe. In fact,

that's how it's designed now as the current – this collection pond here is meant to discharge onto

the Mayfield property, which would then flow along the levy. And we've not changed the natural

drainage at all." Of great concern is the fact that until recently, Ukiah Auto Dismantlers has not

employed a geological engineer or civil engineer, licensed by the State of California Licensing

Board, as required by the Abatement Order, to oversee the design and construction of the

containment ponds. In Mr. Azevedo's testimony given in deposition on February 26, 2008, on

page 106, lines 6-17, he states, "They have submitted a written report that shows the location of

the retention basin and a cross-section in the manner in which – a cross-section of the pond and

the manner in which it's going to work. They didn't really size it in terms of engineering sizing.

When an engineer refers to sizing of a storm water treatment plant, they're usually looking at

how much runoff is occurring and how large a pond it should be and what type of storm it would

capture. So they have not submitted an actual sizing calculation, but they have shown the

location and cross-section and how it would operate." This statement is a clear indication of the

concern the Regional Water Quality Control Board has had for the lack of engineering and

design supervision over these containment ponds.

5.    Further to the above, the Regional Water Quality Control Board, via Mr. Azevedo's

testimony of February 26, 2008, has also expressed concerns about the design of these ponds

with respect to protection of ground water and the fact that hydrocarbons have been found in one

of the containment ponds. On page 103, lines 11-20, he stated, "And when you say it was in the

new retention pond, UAD created a pond in the back, and the idea there was originally to try to

minimize some runoff that was going onto the tribal property. So they came up with an idea that

we thought was reasonable that they could put in retention ponds on-site along the levy that

would capture a lot of runoff and hold runoff on-site where it would then percolate in rather than

being discharged, so that basically what that means is, in that new pond, they're finding

hydrocarbons in that pond." Mr. Azevedo further stated on page 104, lines 1-5, in the same

deposition, "Imagine, if you will, a pond that is in soil above a water table and it has pollutants in

it. As this material soaks into the ground, where do those pollutants go? They're going to adhere

to the soil. Potentially they're going to move into the ground water."

6.    To-date, soil sampling and analysis conducted on behalf of UAD, Regional Water Quality

Control Board, and Pinoleville Pomo Nation, in concert with written reports and verbal

testimony have confirmed that hydrocarbons and polluting heavy metals have been found in

various locations on the UAD site, on Tribal Lands where storm water is discharged, and in the

Ackerman Creek, close to the point of discharge, upstream along the Mayfield property, further

upstream along the Hunt Property, and downstream on federal trust land where the Ackerman

Creek flows through the Pinoleville Pomo Nation Tribal Lands. Through observation during

storm events and analysis of samples taken in dry and wet weather conditions, it has been

determined that there have been pollutants carried onto Tribal Lands by storm water flowing

from the Hunt Property, across the Mayfield property, along the levy or berm on Tribal Lands

and into the Ackerman Creek before, before a trench was dug, and before ponds were installed.

Exhibits 5, 6, and 7 in Dr. Mc Edwards' declaration are photographs of what we are truly

witnessing, holes dug into the ground without any foundation of engineering or science, without

consideration for protection of ground water and the surrounding environment - an inexpensive

solution to a serious problem, constructed in non-compliance with a two-year-old Abatement

Order.  As such, there is no way of assuring that these containment ponds are adequate to prevent

other storm events from carrying contaminated soil, hydrocarbons, Lead, other heavy metals, and

toxic substances onto Tribal Lands and into the Ackerman Creek.  Local people, Indian and non-

Indian, have known for some time that you can't eat the fish in the Ackerman Creek because

they are contaminated. Parents, Tribal Members, , and Community Members worry about the

dust that flies from the UAD property every time the wind blows and how much Lead it contains.

The Regional Water Quality Control  Board is concerned about samples that contained

significant levels of Lead and hydrocarbons that are under what is called the "Paved Area" and

whether it is a problem for local ground water. The Ackerman Creek , its surrounding

vegetation, and wildlife need to be restored.  Before this can be accomplished, The Ukiah Auto

1  Dismantlers property must be properly and professionally remediated to prevent future pollution

2  of Tribal Lands and the Ackerman Creek.

3

4  7.  I have the utmost respect for Dr. McEdwards' credentials. I am not, by admission, a

5  scientist, nor am I an engineer. In my career experience, which has included contracting,

6  program management, and project management, including technical construction, I have had to

7  depend on the expertise of engineers and people who have had extensive field experience. What I

8  have learned about science is that in order to learn the true nature of what you are observing, you

9  cannot rely on a single incident, nor does one data point produce a trend. You must step back and

10  look at every element of the model as it has been constructed, often through the observation,

11

12  experiences, and analyses of others.  Dr. Mc Edwards has examined a small part of the model,

13  which in and of itself, is actually helpful.  However, using one part of a model to construct and

14  support a larger theory is not good science. You must look at the whole picture, and not just the

15  part that supports your theory. Pinoleville Pomo Nation, the local Environment, and the

16

17  Community have, and continue to be victimized by bad science, poor regulation and poor

18  regulatory compliance, cheap solutions, and a culture among agencies of expedience, doing what

19  you can get away with, and postponing doing what is right. It would be highly constructive if Mr.

20  McEdwards had been able to give testimony as to how he has been able to bring about

21  engineered approaches to the real and known problems, the solutions for which remain

22

23  incomplete and unresolved, rather than contributing to the ongoing down-playing and denial of

24  their existence, thus using his training, skills, and experience for what they were intended.

25

26

27  **I DECLARE UNDER THE PENALTY OF PERJURY UNDER THE LAWS OF THE**

28  **UNITED STATES THAT THE FOREGOING IS TRUE AND CORRECT.**

1

2

DATED 06/18/08

3

4
Ukiah California

                                        /S/ George O. Provencher
5                                       George O. Provencher

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28