EXHIBIT 2

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE:   THE HONORABLE EUGENE F. LYNCH, JUDGE


GOVERNING COUNCIL OF PINOLEVILLE          )
INDIAN COMMUNITY,                         )
                                          )
              PLAINTIFF,                  )
                                          )
        -VS-                              )          NO. C 87-4320 EFL
                                          )
MENDOCINO COUNTY, BOARD OF                )
SUPERVISORS OF MENDOCINO COUNTY;          )
ROSS MAYFIELD, BRENT MAYFIELD,            )
                                          )
              DEFENDANTS.                 )
————————————————————————————————————————)
                                          SAN FRANCISCO, CALIFORNIA
                                          FRIDAY, NOVEMBER 20, 1987

APPEARANCES:
FOR PLAINTIFF:                   CALIFORNIA INDIAN
                                 LEGAL SERVICES
                                 200 W. HENRY STREET
                                 P.O. BOX 488
                                 UKIAH, CALIFORNIA  95482
                                 BY:  DAVID J. RAPPORT, ESQ.


FOR DEFENDANT                    H. PETER KLEIN, COUNTY COUNSEL
MENDOCINO COUNTY AND             COUNTY OF MENDOCINO
BOARD OF SUPERVISORS:            COURTHOUSE, ROOM 202
                                 UKIAH, CALIFORNIA  95482
                                 BY:  RICHARD M. FLORES,
                                        DEPUTY COUNTY COUNSEL


IN PRO PER:                      ROSS MAYFIELD, JR.
                                 BRENT MAYFIELD
                                 500 C PINOLEVILLE ROAD
                                 UKIAH, CALIFORNIA  95482


REPORTED BY:   SARA L. LARKIN, CSR, CP, CM
               OFFICIAL REPORTER, USDC

        COMPUTERIZED TRANSCRIPTION BY XSCRIBE

1    FRIDAY, NOVEMBER 20, 1987                    10:41 A.M.

2

3           THE COURT:  PINOLEVILLE INDIANS VERSUS MENDOCINO

4    COUNTY.

5           THE CLERK:  CIVIL CASE 87-4320.

6           MR. RAPPORT:  DAVID RAPPORT FOR THE PLAINTIFF.

7           THE COURT:  OKAY.

8           MR. FLORES:  GOOD MORNING, YOUR HONOR.  RICHARD

9    FLORES FOR THE COUNTY OF MENDOCINO.

10           MR. BRENT MAYFIELD:  BRENT AND ROSS MAYFIELD.  WE

11    ARE REPRESENTING OURSELVES.

12           THE COURT:  RIGHT, OKAY.  LET ME JUST GET SOME

13    NOTES TO READ HERE.  I HAVE TWO CASES ON THE CALENDAR THAT

14    ARE GOING TO BE BY PHONE, SO I'M TRYING TO FIT THEM ALL IN

15    HERE.

16                     (PAUSE IN PROCEEDINGS)

17           THE COURT:  ALL RIGHT.  THE INDIANS, ALL RIGHT.

18           OKAY.  WELL, IT SEEMS WE HAVE FEDERAL JURISDICTION.

19    IT'S A FEDERAL QUESTION UNDER 1331.  INTERESTING THOUGH, AND

20    I PLAN TO WRITE AN OPINION ABOUT THIS, BUT IT STRIKES ME

21    THAT INJUNCTION PROBABLY SHOULD BE GRANTED.

22           MR. FLORES:  THIS WOULD BE A PRELIMINARY

23    INJUNCTION, YOUR HONOR?

24           THE COURT:  WELL, IT WOULD BE A PRELIMINARY

25    INJUNCTION AND WOULD SET IT FOR TRIAL, YEAH.

SARA L. LARKIN, OFFICIAL REPORTER, USDC, 415-431-8095

1          MR. FLORES:  WHAT ABOUT BOND?

2          THE COURT:  WHAT TYPE OF BOND DO YOU THINK YOU'RE

3    GOING TO WANT THAT YOU CAN PAY?

4          MR. RAPPORT:  WELL, YOUR HONOR, WE COMMUNICATED IN

5    OUR PLEADINGS THEY FILED THIS CASE IN FORMA PAUPERIS.

6          THE COURT:  THAT DOESN'T MEAN YOU COULDN'T DRAW UP

7    SOME SORT OF A BOND IT SEEMS TO ME.

8          MR. RAPPORT:  AS INDICATED IN THE PETITION THEY

9    FILED, THEY REALLY HAVE NO DISCRETIONARY FUNDS THAT ARE

10   AVAILABLE THAT THEY CAN COMMIT TO THAT.

11         THE SOLE SOURCE OF FUNDS ARE FEDERAL GRANTS THAT

12   ARE DESIGNATED FOR SPECIFIC PURPOSES, AND THEY HAVE NO MONEY

13   AVAILABLE THAT THEY COULD USE TO POST BOND.  I THINK THAT

14   WAS THE BASIS FOR GRANTING THE IEP PETITION IN THE FIRST

15   PLACE.

16         THE COURT:  WHAT TYPE OF A BOND DO YOU THINK IT

17   SHOULD BE?

18         MR. RAPPORT:  EXCUSE ME, YOUR HONOR.

19         I ALSO WANTED TO POINT OUT THAT THE ONLY -- THAT

20   THE BOND WOULD SECURE ANY DAMAGES WHICH RESULTED UNTIL FINAL

21   JUDGMENT.  THAT'S WHAT THE BOND IS SUPPOSED TO SECURE.

22         AND THE ONLY DAMAGES THAT HAVE BEEN ALLEGED ARE THE

23   LOSS OF INCOME FROM OPERATING THIS CEMENT PLANT.  AND AS WE

24   POINTED OUT, THEY WENT INTO THAT BUSINESS AFTER THE

25   ORDINANCE WAS ADOPTED AND AFTER THE TRIBE HAD APPEALED THE

1    DECISION TO THE BOARD OF SUPERVISORS.

2         AND UNDER STATE LAW, IF THE TRIBE CAN FILE A

3    LAWSUIT WITHIN 30 DAYS -- AND THE STATE LAW SAYS IF THEY

4    PROCEED AT THAT POINT, THEY DO THEIR OWN RISK.

5         SO BASICALLY THEY UNDERTOOK ANY FINANCIAL LOSSES AT

6    THIS POINT AT THEIR OWN RISK, AND I DON'T THINK A BOND WOULD

7    BE JUSTIFIED, IN ANY EVENT.

8         THE COURT:  HOW DO THEY GET DAMAGES IF YOU'RE WRONG

9    OR I'M WRONG?  HOW WILL THEY GET THEIR DAMAGES?  HOW WOULD

10   THEY GET THEIR DAMAGES FOR THE LOST INCOME FOR RUNNING THIS

11   CEMENT PLANT?

12        MR. RAPPORT:  WELL, IF THEY CAN SUE THE TRIBE, THEY

13   WOULD HAVE TO SUE THE TRIBE.

14        THE COURT:  WHY COULDN'T THEY SUE THE TRIBE -- IF

15   I'M GOING TO GRANT A PRELIMINARY INJUNCTION HERE -- AND IT

16   TAKES SOME PERIOD OF TIME TO ACTUALLY GET A TRIAL ON IT, SIX

17   MONTHS OR SO -- IF THEY CAN'T OPERATE THE CEMENT PLANT

18   DURING THAT TIME AND WE FIND OUT WE SHOULDN'T HAVE GRANTED

19   THE PRELIMINARY INJUNCTION, AND THEY'RE SUCCESSFUL, HOW DO

20   THEY THEN GET THEIR COSTS BACK AGAINST THE INDIANS FROM THIS

21   LAWSUIT?

22        MR. RAPPORT:  FIRST OF ALL, I'M NOT SURE THEY WOULD

23   BE ENTITLED TO THAT COST AGAINST THE TRIBE UNDER THE

24   CIRCUMSTANCES, YOUR HONOR.

25        AS I POINTED OUT, UNDER STATE LAW, IF THE TRIBE HAD

1    BROUGHT THE STRAIGHT CEQA ACTION, DURING THE TIME THAT THE

2    ACTION WAS PENDING, THEY'D BE PROCEEDING AT THEIR OWN RISK.

3            SO IF IT WAS LATER DETERMINED THAT AN EIR WAS

4    REQUIRED, THEY WOULDN'T HAVE BEEN ENJOINED FROM OPERATING

5    DURING THAT TIME, BUT ANY COSTS THEY INCURRED WOULD BE AT

6    THEIR RISK.  THEY WOULDN'T HAVE ANY INVESTED RIGHT TO

7    CONTINUE OPERATIONS OR ANYTHING ELSE.

8            MR. FLORES:  YOUR HONOR, THE CEQA MATTER IS

9    PROCEDURES AS SUCH THAT THEY DO PROCEED AT THEIR OWN RISK,

10   BUT THEY CAN PROCEED RIGHT HERE.

11           WE HAVE AN INSTANCE WHERE PRELIMINARY INJUNCTION

12   HAS BEEN REQUESTED, AND THEY CAN'T, NOT EVEN AT THEIR OWN

13   RISK -- RISK OF CONTEMPT OF COURT.  SO I THINK A BOND SHOULD

14   BE REQUIRED.

15           AND THE MAYFIELDS WOULD BE ABLE TO ADDRESS IN TERMS

16   OF WHAT FORM OF THE BOND...

17                    (PAUSE IN PROCEEDINGS)

18           THE COURT:  WHAT EVIDENCE HAVE YOU FILED THAT THEY

19   HAD NOT GONE AHEAD AND DONE ANYTHING AND THEN PROCEEDED TO A

20   HEAD AFTER YOU FILED YOUR SUIT?

21           MR. RAPPORT:  I'M RELYING ON THE DECLARATIONS THAT

22   THEY SUBMITTED, YOUR HONOR.

23           THE DECLARATION -- APPARENTLY THE SITUATION IS

24   THEY'VE LEASED -- THEY'VE GOT A LEASE WITH A CEMENT COMPANY

25   TO OPERATE THE CEMENT PLANT.  ACCORDING TO THE DECLARATION

1   OF THE VICE-PRESIDENT OF THE CEMENT COMPANY, THEY WAITED

2   UNTIL AFTER THEY GOT THEIR DEVELOPMENT REVIEW PERMIT FROM

3   THE COUNT BEFORE THEY MOVED EQUIPMENT ON TO THE SITE AND

4   BEGAN OPERATIONS.

5          THE COURT:  THE BUILDING IS ALREADY THERE, RIGHT?

6          MR. FLORES:  YES.

7          MR. RAPPORT:  RIGHT, BUT IT WAS APPARENTLY MOVED

8   THERE AFTER THEY GOT THEIR DEVELOPMENT REVIEW PERMIT.

9          BY THAT TIME, OBVIOUSLY THE ORDINANCE WAS IN PLACE

10  AND THE TRIBE'S OPPOSITION TO THE PROJECT, AS WAS WELL

11  MANIFESTED THROUGH THE APPEAL PROCESS.  SO THEY KNEW GOING

12  IN THAT THE GOVERNING COUNSEL WAS OPPOSED TO THIS PROJECT,

13  AND THEY KNEW THAT THE GOVERNING COUNSEL WAS PURSUING ALL

14  THEIR REMEDIES.

15         SO IF THEY ARE NOW GOING TO INCUR COSTS FROM HAVING

16  GONE AHEAD WITH THE PROJECT KNOWING THAT, THE TRIBE'S

17  POSITION IS THAT THEY HAVE ASSUMED THE RISK OF THAT AT THIS

18  POINT.  IT'S NOT FAIR TO REQUIRE THE TRIBE TO POST A BOND TO

19  SECURE THEM AGAINST DAMAGES WHICH THEY UNDERTOOK KNOWING

20  THAT THEY WERE GOING TO BE IN THIS POSITION TO BEGIN WITH.

21         THE COURT:  DID THEY GO AHEAD ONLY AFTER THEY KNEW

22  THE TRIBE WAS SUING?

23         MR. FLORES:  WELL --

24         MR. BRENT MAYFIELD:  WE ENTERED INTO A CONTRACT

25  WITH --

1          THE COURT:  YOU REPRESENT YOURSELF?

2          MR. BRENT MAYFIELD:  YES.

3          THE COURT:  YOU'RE NOT A CORPORATION?

4          MR. ROSS MAYFIELD:  WE ARE A CORPORATION.

5          MR. BRENT MAYFIELD:  WE WERE SUED AS INDIVIDUALS.

6          THE COURT:  IS THAT RIGHT; THEY WERE ONLY SUED AS

7    INDIVIDUALS?

8          MR. RAPPORT:  THEY WERE SUED AS INDIVIDUALS, YOUR

9    HONOR.

10          MR. BRENT MAYFIELD:  THE CONCRETE PLANT -- WE

11   ENTERED INTO A CONTRACT WITH THEM ON APRIL 1ST, AND THE

12   ORDINANCE I BELIEVE DIDN'T COME INTO EFFECT UNTIL MAY 22ND.

13          THE CONCRETE PLANT -- ACTUALLY WE HAD TWO OF THEM

14   THERE, AND THE FIRST ONE WAS THERE PRIOR TO OUR CONTRACT

15   DATE, AND --

16          THE COURT:  CAN I JUST BACK UP?

17          YOU KNEW, HOWEVER, THAT YOU WERE ON -- YOU KNEW,

18   HOWEVER, THAT THE RANCHERIA BUSINESS WAS OVER WITH AND THAT

19   THE INDIANS THAT NOW WERE THE -- YOU WERE ESSENTIALLY ON

20   INDIAN LAND, RIGHT?

21          MR. BRENT MAYFIELD:  NO.

22          MR. ROSS MAYFIELD:  NO.

23          MR. BRENT MAYFIELD:  WE WEREN'T AWARE OF THE

24   JURISDICTION PROBLEM UNTIL WE WERE -- AT SOME POINT IN

25   THE --

1          THE COURT:  BUT A LOT OF TIME HAD PASSED.  YOU

2   SHOULD HAVE BEEN AWARE.

3          I MEAN I'M NOT SAYING WHETHER YOU ACTUALLY KNEW OR

4   NOT.  SOME COUPLE YEARS HAD PASSED, RIGHT?

5          MR. BRENT MAYFIELD:  IT NEVER SHOWED UP ON OUR

6   TITLE REPORTS.

7          WE HAD NO INCLINATION THAT THERE WAS ANY

8   JURISDICTION PROBLEM OR THAT THERE WAS A RESERVATION THAT

9   WAS STILL ACTIFIED (SIC) UNTIL WE WENT BEFORE THE

10  SUPERVISORS OR JUST LIKE A MONTH BEFORE THAT.

11         THE COURT:  WHAT DO YOU SAY THE ISSUES FOR TRIAL

12  WOULD BE THEN?

13         MR. FLORES:  WELL, THE ISSUES FOR TRIAL WOULD BE,

14  ONE, THE INTERPRETATION OF THE HARDWICK CASE AS TO WHETHER

15  OR NOT THE COUNTY OR THE TRIBAL COUNCIL HAS AUTHORITY TO

16  REGULATE THIRD PARTY PURCHASERS WITHIN THE RANCH --

17         THE COURT:  I THINK THEY HAVE A RIGHT TO DO IT --

18  IT'S A BALANCING TEST DEPENDING ON THE FACTS, RIGHT?

19         IS THAT RIGHT?

20         MR. FLORES:  I DON'T THINK WE GET TO THAT BECAUSE

21  OF THE HARDWICK CASE.

22         THE CASES THAT ARE DISCUSSED AT LENGTH IN THE

23  BRIEFS, NONE OF THEM HAVE A CASE WHERE THERE WAS ACTUALLY A

24  JUDGMENT INVOLVING TWO OF THE PARTIES, THE COUNTY OF

25  MENDOCINO AND THE PINOLEVILLE RANCHERIA.

1        AND THE HARDWICK CASE IS SPECIFIC REGARDING WHAT

2   THE INDIANS' RIGHTS ARE AND WHAT THE COUNTY'S RIGHTS ARE,

3   AND WHAT THE THIRD PARTY PURCHASERS' RIGHTS ARE.

4        AND THAT IS THAT ANY ACTIONS CAN BE TAKEN BY THE

5   COURT TO THE EXTENT THAT THEY CANNOT ADVERSELY --

6        THE COURT:  ONE OF THE FIRST ISSUES HERE UNDER THE

7   MONTANA CASE, THE SUPREME COURT CASE, IS THE ACTIONS OF

8   INDIANS ARE LIMITED OVER NON-INDIAN MEMBERS, RIGHT?

9        MR. RAPPORT:  THAT'S RIGHT, YOUR HONOR.

10       THE COURT:  AND IT'S A BALANCING TEST TO DETERMINE

11  THAT FACT ESSENTIALLY.

12       MR. RAPPORT:  THAT'S CORRECT, YOUR HONOR.

13       THE COURT:  I VISUALIZE A TRIAL ON THE BALANCING

14  TEST TO DETERMINE WHETHER A PERMANENT INJUNCTION SHOULD BE

15  GRANTED OR NOT.

16       WHAT DO YOU VISUALIZE AT TRIAL?

17       MR. FLORES:  WELL, I VISUALIZE THAT AS THE TEST IF

18  THE FIRST ISSUE IS ADDRESSED AND RESOLVED.

19       AND I BELIEVE AN ISSUE IS IN FACT THE

20  INTERPRETATION OF THE HARDWICK DECISION INVOLVING THE

21  RANCHERIA AND THE COUNTY OF MENDOCINO IN TERMS OF THE

22  JURISDICTION TO ZONE AND REGULATE.

23       IT'S NOT CLEAR BY THE JUDGMENT WHO HAS THE ABILITY

24  TO ZONE AND REGULATE.  IT INDICATES THAT AS TO THIRD PARTY

25  PURCHASERS, THEIR INTERESTS WILL NOT BE ADVERSELY AFFECTED.

1       THE COURT:  HOLD ON A SECOND.

2       ISN'T IT UNDER THE NINTH CIRCUIT LAW, THE <u>MONTANA</u>

3   LAW, THE INDIANS HAVE TO DEMONSTRATE WHEN THEY'RE TRYING TO

4   EXERCISE ZONING OVER NON-INDIAN MEMBERS, SUCH THING THAT

5   THEY'RE DOING IT BECAUSE OF POLITICAL INTEGRITY, ECONOMIC

6   SECURITY AND THE HEALTH AND WELFARE OF THE INDIANS?

7       I ASSUME WHAT THE PLAINTIFFS ARE ARGUING HERE IS

8   THEY HAVE A RIGHT TO ZONE THE CONDUCT OF NON- -- THEY HAVE A

9   RIGHT OVER THE TERRITORY WHICH INCLUDES AUTHORITY OVER

10  NON-INDIANS PRIMARILY BECAUSE OF THE HEALTH AND WELFARE OF

11  THE INDIANS.

12      AND THE NINTH CIRCUIT GOES TO THE ANALYSIS:  WHAT

13  IS THE INTEREST OF THE INDIAN IN ZONING THE PROPERTY?

14      MY UNDERSTANDING IS TO MAKE IT NON-INDUSTRIAL.

15  THEY WANT TO HAVE AN AGRICULTURALLY PURE HOMELAND FOR ITS

16  PEOPLE.  AND THEY CONTEND THAT A CEMENT FACTORY AFFECTS A

17  VARIETY OF THINGS ON THE HEALTH AND WELFARE OF THE INDIANS

18  ON THEIR ADJOINING -- ON THEIR LAND THERE, THAT THAT WOULD

19  INTERFERE WITH THEIR RIGHT TO HAVE AN AGRICULTURALLY PURE

20  HOMELAND FOR THEIR PEOPLE.

21      THERE'S STEELHEAD FISH ON THE RIVER.  THERE'S A

22  TREMENDOUS DUST FROM A CEMENT FACTORY; THERE'S NOISE AND

23  TRAFFIC AND HEAVY TRUCKS.  CEMENT FACTORIES BECOME BLIGHTED

24  AREAS AND BLIGHT AFFECTS THE LANDS AROUND BECAUSE OF THE

25  DUST AND THE NOISE, ET CETERA, ALL OF WHICH INTERFERES WITH

1   THE HEALTH AND WELFARE OF THE INDIANS, RELAYING THE FISHING

2   RIGHTS AND USING THE LAND AS AN AGRICULTURAL PURE AREA.

3           AND SO IT STRIKES ME THAT THESE ARE THE ISSUES FOR

4   THE TRIAL.

5           BUT ONCE THEY HAVE A RIGHT TO ZONE IT EVEN THOUGH

6   THE ZONING AFFECTS NON-INDIANS, THEN WHAT ISSUE IS LEFT?

7           MR. FLORES:  WELL, YOUR HONOR, I THINK THAT BEFORE

8   YOU GET TO THAT ISSUE -- BECAUSE WE DON'T HAVE A CASE WHERE

9   YOU SIMPLY HAVE A RANCHERIA OUT THERE THAT'S BEEN DETERMINED

10  RANCHERIA LAND AND THERE'S NO AGREEMENT BETWEEN THAT

11  RANCHERIA AND AN ENTITY, A PUBLIC ENTITY -- IN THIS CASE THE

12  COUNTY OF MENDOCINO, AND THE UNITED STATES GOVERNMENT, FOR

13  THAT MATTER -- REGARDING CERTAIN RIGHTS, ONE OF THEM BEING

14  THE RIGHT FOR THE COUNTY OF MENDOCINO TO TAX PROPERTY OUT

15  THERE, ANOTHER RIGHT BEING THAT AFTER JANUARY 1, 1988, THEY

16  COULD EVEN TAX INDIAN PROPERTY THAT HASN'T BEEN PUT INTO

17  TRUSTS, AND ALSO THERE'S A RIGHT REGARDING THIRD PARTY

18  PURCHASERS OF PROPERTY ON THE RANCHERIA PRIOR TO THE

19  JUDGMENT.

20          THE MAYFIELDS RECEIVE THEIR PROPERTY FROM A THIRD

21  PARTY PURCHASER WHO PURCHASED THE PROPERTY AT A TIME HE

22  BELIEVED THE RANCHERIA WAS TERMINATED --

23          THE COURT:  IT'S NOT WHAT THEY KNEW; IT'S WHETHER

24  THEY SHOULD HAVE KNOWN.  AT THE TIME THEY EXERCISED THE

25  OPTION -- THEY HAD AN OPTION; ISN'T THAT CORRECT?

1        MR. ROSS MAYFIELD:  THAT'S CORRECT.

2        THE COURT:  AT THE TIME THEY EXERCISED THEIR

3   OPTION, A SUBSTANTIAL PERIOD OF TIME HAD PASSED SINCE THE

4   PROPERTY HAD CEASED TO BE A RANCHERIA AREA; ISN'T THAT

5   RIGHT?  IT WAS A PERIOD OF MONTHS.

6        MR. RAPPORT:  IT WAS OVER A YEAR, YOUR HONOR.

7        THE COURT:  ISN'T THAT RIGHT?

8        MR. RAPPORT:  IN FACT, MORE THAN A YEAR IN ADVANCE,

9   NOTICE OF THE PROPOSED SETTLEMENT, WHICH INCLUDED THIS

10  JURISDICTIONAL -- NOTICE IN THE CHANGE OF JURISDICTION WAS

11  PUBLISHED THREE TIMES IN THE LOCAL NEWSPAPER.

12        THE COURT:  BUT IN ANY EVENT, THE INDIANS POSSESS

13  INHERENT SOVEREIGN POWER OVER THEIR TERRITORY, WHICH

14  INCLUDES AUTHORITY OVER NON-INDIANS.

15        AND THEN WE HAVE TO DETERMINE WHAT AUTHORITY THEY

16  HAVE TO GOVERNING THEIR LAND WHEN IT AFFECTS NON-INDIAN

17  MEMBERS.

18        MR. FLORES:  I AGREE, YOUR HONOR.

19        BUT THEN WE GET TO THE ISSUE -- THAT'S A CASE WHERE

20  THERE'S NO AGREEMENTS -- TO JUDGMENTS THAT WERE AGREED UPON

21  BETWEEN THE PARTIES REGARDING WHAT AUTHORITY.

22        I BELIEVE THE HARDWICK CASE INDICATES AND

23  DELINEATES WHAT THE AUTHORITY IS.  AND I BELIEVE THE

24  HARDWICK CASE, INTERPRETED PROPERLY, INDICATES THAT THEY DO

25  NOT HAVE AUTHORITY OVER NON-INDIAN --

```
 1              THE COURT:  LET ME TAKE ABOUT A TWO-MINUTE RECESS.
 2                   (RECESS TAKEN AT 10:55 A.M.)
 3                (PROCEEDINGS RESUMED AT 11:04 A.M.)
 4              THE COURT:  LET ME JUST GET BACK TO THE HEART OF
 5    THE CASE FOR A MINUTE.
 6              THE HARDWICK CASE SAID THE STATE WAS WRONG, AND IT
 7    RETURNED IT TO A RESERVATION, RIGHT?
 8              MR. RAPPORT:  RIGHT.
 9              MR. FLORES:  YES.
10              THE COURT:  SO AS A MATTER OF LAW, THAT MADE IT A
11    RESERVATION WHICH GAVE THE INDIAN SOVEREIGN RIGHTS OVER
12    THEIR TERRITORIES, CORRECT?
13              MR. FLORES:  WELL, THERE'S AN INTERPRETATION THAT
14    MUST BE MADE REGARDING ONE OF THE PARAGRAPHS --
15              THE COURT:  WHICH PARAGRAPH ARE YOU TALKING ABOUT?
16              BEFORE YOU STATE THE PARAGRAPH, DON'T YOU AGREE
17    THAT THE HARDWICK CASE ESSENTIALLY IS A JUDGMENT RESTORING
18    TO THE INDIANS ALL THEIR RESERVATION RIGHTS OVER THAT LAND?
19              MR. FLORES:  ESSENTIALLY, YES.
20              THE COURT:  OKAY.  WE AGREE ON THAT THEN, OKAY.
21              SO NOW WE HAVE A LAND THAT'S A RESERVATION IN WHICH
22    WE HAVE THE INDIANS HAVE SOVEREIGN RIGHTS OVER.  SO THE ONLY
23    ISSUE IS THAT THEY HAVE A RIGHT TO AFFECT NONMEMBERS.  AND
24    YOU GO THROUGH A BALANCING TEST.
25              AND MY ANSWER WOULD BE CLEARLY YES, YES, THEY HAVE
```

1    A RIGHT UNDER THE BALANCING TEST.

2              MR. FLORES:  YOUR HONOR, THE PARAGRAPH -- IT'S

3    EXHIBIT I, PAGE 22, TO THE VERIFIED COMPLAINT, AND --

4              MR. RAPPORT:  IT'S QUOTED IN THE BRIEFS ALSO, YOUR

5    HONOR.

6              MR. FLORES:  PAGE 2, YOUR HONOR, OF MY BRIEF,

7    POINTS AND AUTHORITIES IN OPPOSITION.  IF I MAY READ IT?

8              THE COURT:  GO AHEAD.

9              MR. FLORES:  "AS A CONSEQUENCE, THIS COURT HAS

10             AUTHORITY AS A COURT OF EQUITY TO REMEDY THE

11             EFFECTS OF THE PREMATURE AND UNLAWFUL

12             TERMINATION OF THE PINOLEVILLE AND REDWOOD VALLEY

13             RANCHERIAS AND THE PLAINTIFFS TO THE EXTENT THAT IT

14             CAN DO SO WITHOUT ADVERSELY AFFECTING THE INTEREST

15             OF THIRD PARTY PURCHASERS FOR VALUE OF RANCHERIA

16             PARCELS."

17             THE COURT:  SO YOU ARE SAYING THAT IS NOW

18   RESERVATION LAND, AND ONE OF THE THINGS THAT I HAVE TO

19   CONSIDER IN DETERMINING WHETHER THE INDIANS HAVE RIGHTS TO

20   AFFECT NON-MEMBERS OF THE INDIAN TRIBE, ONE OF THE THINGS I

21   HAVE TO LOOK AT IS HOW PREJUDICIAL IT WOULD BE TO THE RIGHTS

22   OF YOUR PARTIES, RIGHT?

23             MR. FLORES:  YES.

24             THE COURT:  OKAY.  THEN I HAVE TO DECIDE EXACTLY

25   WHAT -- IT ISN'T A QUESTION OF THEM KNOWING THEMSELVES.  OR

1    IT'S A QUESTION OF WHAT THEY SHOULD HAVE KNOWN; AND

2    THEREFORE I HAVE TO LOOK AT TWO THINGS.

3        WHAT PROPERTY RIGHTS DID THEY HAVE AT THE TIME THIS

4    JUDGMENT WAS SIGNED?  AND AS I UNDERSTAND, THEY HAD NOTHING

5    MORE THAN AN OPTION, RIGHT?

6        MR. FLORES:  YES, YOUR HONOR.

7        I BELIEVE THEY ARE SUCCESSORS IN INTEREST --

8        THE COURT:  ALL THEY HAVE IS AN OPTION TO PURCHASE

9    PROPERTY; ISN'T THAT RIGHT?

10        MR. FLORES:  THAT'S CORRECT, YOUR HONOR.

11        THE COURT:  AS OF NOVEMBER 18, 1985, CORRECT?

12        MR. FLORES:  PRIOR TO, YES.

13        THE COURT:  AND THEY EXERCISE THE OPTION AFTER THIS

14    JUDGMENT CAME OUT.

15        MR. FLORES:  THAT'S CORRECT.

16        THE COURT:  OKAY.  SO THEY HAD VERY LITTLE PROPERTY

17    RIGHTS.

18        HOW MUCH DID THEY PAY FOR THE OPTION, A THOUSAND

19    DOLLARS, 500?

20        MR. BRENT MAYFIELD:  THE OPTION WAS IN OUR ORIGINAL

21    LEASE.  THERE WAS NO VALUE ON IT.

22        THE COURT:  YOU HAD A LEASE WITH AN OPTION TO

23    PURCHASE.

24        MR. BRENT MAYFIELD:  YES.

25        THE COURT:  OKAY.  AND YOU DIDN'T HAVE TO EXERCISE

16

1    THE OPTION TO PURCHASE, RIGHT?

2           MR. BRENT MAYFIELD:  IT WAS OUR INTENTIONS ALL

3    ALONG TO EXERCISE --

4           THE COURT:  BUT HE DIDN'T HAVE MUCH PROPERTY RIGHTS

5    IN LOOKING AT THE -- IN LOOKING AT THE EQUITY, ALL THEY WERE

6    WERE LEASEHOLDERS WITH THE POWER TO EXERCISE AN OPTION TO

7    PURCHASE.

8           AND THEY EXERCISED THEIR OPTION TO PURCHASE IN THE

9    FACE OF THE FACT THAT THE LAND WAS NOW BACK TO BEING INDIAN

10   RESERVATION TERRITORY, AND IN FACT BACK TO BEING RESERVATION

11   TERRITORY FOR OVER A YEAR, AS I BELIEVE; IS THAT CORRECT?

12          MR. RAPPORT:  FROM NOVEMBER OF '85 UNTIL OCTOBER OF

13   '86.

14          THE COURT:  ALMOST A YEAR.

15          MR. RAPPORT:  YES.

16          MR. FLORES:  AND THERE WAS NEVER ANY QUESTION, UP

17   TO THE TIME OF THIS MORATORIUM ATTEMPT, THIS ORDINANCE, THIS

18   LAST YEAR REGARDING WHO HAD THE AUTHORITY TO REGULATE THE

19   PROPERTY OUT THERE IN TERMS OF ZONING.

20          AND THAT WAS EVEN PRIOR TO THE PART --

21          THE COURT:  YOU'RE MISSING THE POINT.

22          AFTER NOVEMBER 18TH, 1985, IT WAS RESERVATION LAND,

23   CORRECT?

24          MR. FLORES:  IT WAS RESERVATION LAND WITH THE

25   PROVISIONS OF THE JUDGMENT, THE HARDWICK JUDGMENT.

1    THE COURT:  IT WAS RESERVATION LAND.

2    YOU JUST TOLD ME THAT ONE OF THE THINGS I HAD TO

3    CONSIDER IS HOW IT WOULD AFFECT PEOPLE WHO HAD A PROPERTY

4    INTEREST IN THE LAND, CORRECT?

5    MR. FLORES:  YES.

6    THE COURT:  THEIR PROPERTY INTEREST WAS EXCEEDINGLY

7    MINIMAL.

8    THEY DIDN'T OWN THE LAND.  THEY HAD NOTHING MORE

9    THAN A LEASE AND AN OPTION TO PURCHASE, RIGHT?

10    MR. BRENT MAYFIELD:  YOUR HONOR, WHEN WE FIRST CAME

11    ON THE PROPERTY, IT HADN'T BEEN SUBDIVIDED, AND WE HELPED

12    DIVIDE AND DO THE IMPROVEMENTS THAT WERE NECESSARY TO

13    COMPLETE THE SUBDIVISION.  WE HAD A SUBSTANTIAL INTEREST IN

14    IT ALL ALONG.

15    OUR ORIGINAL LEASE WAS MODIFIED FROM 1982 INTO A

16    LATER DATE SOMETIME IN '85, WHICH I'M NOT FAMILIAR --

17    THE COURT:  BUT IN FACT YOU DIDN'T HAVE TO EXERCISE

18    YOUR RIGHT TO PURCHASE.  IF YOU DIDN'T PURCHASE, WHAT WOULD

19    YOU HAVE LOST?

20    MR. ROSS MAYFIELD:  WE WOULD HAVE LOST THE AMOUNT

21    OF MONEY THAT WE DID OUT OF ALL THE IMPROVEMENTS AND

22    EVERYTHING.

23    THE COURT:  HOW MUCH?

24    MR. ROSS MAYFIELD:  ABOUT $50,000.

25    THE COURT:  THEN THE ONLY THING I HAVE TO CONSIDER

1    HERE IS, AT BEST, AT BEST -- I CAN'T CONSIDER THEM AS OWNERS

2    OF THE PROPERTY.  I CONSIDER THEM, AT BEST, PEOPLE WHO PUT

3    IN IMPROVEMENTS OF LAND EXPECTING TO EXERCISE AN OPTION TO

4    PURCHASE.

5            AND I HAVE TO CONSIDER HOW WISE IT WAS FOR A

6    LEASEHOLDER, WHO HAS AN OPTION TO PURCHASE, TO PUT IN

7    IMPROVEMENTS OF LAND WITHOUT HAVING ALREADY EXERCISED HIS

8    OPTION.

9            SO HOW HIGH THEIR EQUITY FALLS ON THIS SCALE IS

10   NOT -- THAT MAY BE VERY HIGH.

11           AND THE OPTION RAN ONLY TO THE TWO OF THE SIX AND A

12   HALF ACRES, AND THE OTHER LAND WAS PURCHASED AFTERWARDS.

13           MR. BRENT MAYFIELD:  WE HAD A VERBAL COMMITMENT

14   BETWEEN US AND THE PEOPLE WE BOUGHT IT FROM, THE JOHNSONS.

15   WE COULDN'T PURCHASE THE PROPERTY UNTIL THE SPLIT HAD

16   ACTUALLY GONE THROUGH.

17           THE COURT:  I'M JUST SAYING IT STRIKES ME THAT

18   THEIR PROPERTY RIGHTS WERE MINIMAL.  BUT AT BEST THAT'S JUST

19   ONE THING I HAVE TO CONSIDER.

20           BUT I SUGGEST THAT THEY GIVE US SOME VERY -- I

21   DON'T HAVE ANY DETAILS ABOUT WHAT THEIR RIGHTS ARE,

22   AFFIDAVITS FROM THEM OR ANYTHING ELSE, YOU KNOW?  YOU'RE

23   REPRESENTING THE COUNTY, NOT REPRESENTING THEM.

24           MR. FLORES:  THAT'S CORRECT, YOUR HONOR.

25           THE COURT:  SO AS FAR AS THE COUNTY GOES, THE

1    COUNTY CERTAINLY KNEW IT WAS RESERVATION LAND.

2    MR. FLORES:  WITH THE PROVISIONS OF THE JUDGMENT,

3    INDICATING -- AND TO THE COUNTY'S WAY OF THINKING, THAT THEY

4    WERE ENTITLED TO REGULATE THE PROPERTY AND DID SO PRIOR TO

5    THE JUDGMENT AFTER THE JUDGMENT, AND DO TODAY.

6    THE COURT:  WHAT DOES THAT MEAN?

7    YOU DON'T HAVE ANY RIGHTS TO REGULATE ANYTHING

8    THAT'S ON THE LAND, RIGHT?

9    MR. FLORES:  WE BELIEVE THAT THE HARDWICK JUDGMENT

10   ALLOWS US TO REGULATE NON-INDIAN OWNED LAND IN RANCHERIA --

11   THE COURT:  WHERE DOES IT SAY THAT AFTER THE

12   HARDWICK JUDGMENT, THE COUNTY WOULD HAVE ANY RIGHTS ON THE

13   RESERVATION?

14   MR. FLORES:  I'M SORRY, YOUR HONOR?

15   THE COURT:  WHERE DOES IT SAY --

16   MR. FLORES:  SPECIFICALLY REGARDING ZONING?

17   THE COURT:  SPECIFICALLY REGARDING THE RIGHTS OF

18   THE COUNTY ON THE INDIANS' RESERVATION AFTER IT RETURNED TO

19   BEING A RESERVATION.

20   MR. FLORES:  WELL, WE HAVE THE SECTION ON TAXES,

21   AND THAT WAS SPECIFIC -- BECAUSE THAT WAS DISPUTED --

22   THE COURT:  WHAT ELSE OTHER THAN TAXES?

23   MR. FLORES:  AND ABLE TO REGULATE IT IN TERMS OF

24   THE THIRD PARTY PURCHASERS OR VALUE, YOUR HONOR.

25   THE COURT:  THEY WEREN'T THIRD PARTY PURCHASERS TO

1    VALUE --

2            MR. FLORES:  TO A PERSON THAT HAD ANY PROPERTY --

3            THE COURT:  NONSENSE.  THEY PURCHASED THE PROPERTY

4    AFTERWARDS.

5            BUT I SUGGEST WE HAVE SOME AFFIDAVITS AS TO WHAT

6    THEY DID, AND I NEED SOME LAW FROM YOU AS TO WHY YOU DON'T

7    HAVE TO POST A BOND.

8            MR. RAPPORT:  I PUT SOME LAW IN OUR POINTS AND

9    AUTHORITIES, YOUR HONOR.

10           THE COURT:  WOULD YOU DO THAT FOR ME?

11           FURTHERMORE, I VISUALIZE A TRIAL NOT AS -- THE

12   HARDWICK CASE IT SEEMS TO ME PUTS THIS CASE BACK TO BEING

13   RESERVATION LAND, AND YOU AGREE.

14           MR. FLORES:  WELL --

15           THE COURT:  AND AS A MATTER OF LAW, IT IS

16   RESERVATION LAND, AND THEREFORE ALL I HAVE TO CONSIDER

17   REALLY AT A TRIAL IS WHAT, UNDER THE BALANCING ACT, WHAT

18   RIGHTS DO THE INDIANS HAVE TO REGULATE NON-MEMBER LAND

19   WITHIN THE RESERVATION.

20           MR. FLORES:  NOW, SEE, YOUR HONOR, IF I MAY JUST

21   INDICATE SOMETHING, THE COUNTY -- THE COUNTY IS REGULATING

22   RIGHT NOW -- AND THE PRELIMINARY INJUNCTION COMES IN, WE

23   WON'T, OF COURSE, IN TERMS OF ANY USES OUT THERE -- BUT

24   THERE ARE A LOT OF INDIVIDUALS OUT THERE WHO PURCHASED

25   PROPERTY PRIOR TO THE INITIATION OF THE HARDWICK CASE.

1      THE COURT:  I CAN ONLY TAKE IT ONE INDIVIDUAL AT A

2  TIME.

3      MR. FLORES:  I'M JUST INDICATING THERE IS A BROAD

4  PICTURE HERE, YOUR HONOR.

5      THE COURT:  NOT TO ME THERE ISN'T.

6      THEY ARE ASKING A PRELIMINARY INJUNCTION AS TO TELL

7  THESE PEOPLE TO STOP USING THEIR CEMENT PROPERTY.  CORRECT?

8      MR. RAPPORT:  OUR PRELIMINARY INJUNCTION WE ASKED

9  FOR WAS SPECIFICALLY TO THE MAYFIELD PROPERTY.

10      THE COURT:  IT DOESN'T AFFECT ANYBODY ELSE'S

11  PROPERTY.

12      WOULD THEIR CASE BE DIFFERENT IF THEY HAD SPENT $2

13  MILLION ON PROPERTY AND BOUGHT IT BEFORE THE HARDWICK CASE?

14      MR. FLORES:  I THINK IF THEY HAD PURCHASED IT PRIOR

15  TO THE INCEPTION OF THE HARDWICK CASE, OBVIOUSLY.

16      THE COURT:  OF COURSE IT WOULD HAVE BEEN

17  SUBSTANTIALLY DIFFERENT.

18      ALL I HAVE IS THEIR CASE RIGHT NOW, AND IT STRIKES

19  ME THAT THERE'S A VERY GOOD CASE HERE FOR A PRELIMINARY

20  INJUNCTION BEING GRANTED, BUT I'LL HANDLE IT IN WRITING.

21      MR. ROSS MAYFIELD:  WE DIDN'T GET ANY NOTICE OR

22  NOTIFICATION UNTIL MAY THAT WE WERE ON INDIAN PROPERTY AND

23  THAT THEY WANTED TO REGULATE US UNTIL MAY.  OTHERWISE WE

24  WOULDN'T EVEN PURCHASED OR EVEN BEEN IN THAT AREA.

25      THE COURT:  I SUGGEST YOU HAVE AN ATTORNEY REALLY,

1       BECAUSE EVERYTHING YOU DO HAS TO BE PUT IN WRITING.

2               MR. ROSS MAYFIELD:  OKAY.

3               THE COURT:  I REALLY DO.  IT STRIKES ME THAT YOU

4       DIDN'T HAVE -- THAT YOU DIDN'T HAVE MUCH OF A PROPERTY RIGHT

5       BEFORE.  YOU HAD AT BEST A LEASEHOLD WITH AN OPTION TO BUY A

6       SMALL PORTION OF THE PROPERTY.  AND SUBSEQUENT TO THE LAND

7       BEING INDIAN RESERVATION LAND, YOU WENT AHEAD AND BOUGHT.

8               WE NEED FROM YOU SOME FURTHER AUTHORITIES AS TO WHY

9       YOU DON'T HAVE TO PUT UP A BOND.

10              MR. RAPPORT:  THAT WOULD BE FINE, YOUR HONOR.

11              THE COURT:  AND I'D LIKE SOME DETAIL AS TO THE

12      INDIANS' FINANCES, SOME DETAILS AS TO THEIR RIGHT TO BORROW,

13      COME UP WITH $10,000 BOND --

14              MR. RAPPORT:  WELL, I'LL GIVE YOU AN AFFIDAVIT ON

15      THEIR FINANCES THEN AND ALSO --

16              THE COURT:  -- AND WHAT THEY OWN AND WHAT RIGHT

17      THEY HAVE TO BORROW MONEY ON IT FOR PURPOSES OF THIS

18      LAWSUIT, THINGS OF THAT NATURE, YOU KNOW?

19              MR. RAPPORT:  YES, SIR.

20              MR. BRENT MAYFIELD:  CAN I ADJUST ONE SMALL THING

21      HERE?

22              IN MARIE POLLOCK'S DEPOSITION, THEY ADVERTISED THE

23      MORATORIUM TO LAST FOR A SIX-MONTH PERIOD, AND IN THE

24      MORATORIUM ITSELF, IT SAYS A ONE-YEAR PERIOD.

25              THE SIX MONTHS WOULD BE UP ON THE 22ND OF THIS

1    MONTH.

2              THE COURT:  I DON'T UNDERSTAND WHAT YOU'RE TALKING

3    ABOUT.

4              MR. BRENT MAYFIELD:  IN THE ADVERTISEMENT, IN THE

5    PAPER WHERE THEY ADVERTISED THE MORATORIUM ITSELF, THEY SAID

6    THAT THE MORATORIUM WOULD BE SIX MONTHS --

7              THE COURT:  THE MORATORIUM IS A DIFFERENT THING

8    ENTIRELY.  THE MORATORIUM --

9              MR. RAPPORT:  WELL, YOUR HONOR, THAT'S THE

10   ORDINANCE THAT THE TRIBE HAD ENACTED.  WHEN THEY INITIALLY

11   PUBLISHED, THEY WERE CONTEMPLATING SIX MONTHS.

12             AT THE HEARINGS WHICH WERE CONTINUED -- THEY HAD

13   TWO HEARINGS -- THEY HAD DETERMINED AND ISSUED A ONE-YEAR

14   MORATORIUM.

15             I DON'T SEE WHAT DIFFERENCE IT MAKES WHETHER THEY

16   INITIALLY ADVERTISED PRIOR TO HAVING THEIR HEARING ON

17   ADOPTING THE HEARINGS.  EVERYBODY APPEARED AT THE HEARINGS,

18   AND AFTER CONSIDERABLE DISCUSSION, A NUMBER OF CHANGES WERE

19   MADE IN THE ORDINANCE, WHICH IS THE PURPOSE OF THE HEARINGS.

20             AND THE END RESULT IS THEY ENACTED AN ORDINANCE,

21   WHICH IS THE ONE THAT'S BEFORE YOU TODAY.

22             THE COURT:  I DON'T THINK THAT HAS MUCH EFFECT ON

23   THE CASE AT ALL.  I THINK IT REALLY -- IT SEEMS TO ME IT'S

24   INDIAN RESERVATION LAND AFTER THE HARDWICK JUDGMENT.

25             THEY HAVE CERTAIN RIGHTS -- NOT MANY -- TO GOVERN

1    NON-INDIAN PEOPLE THAT ARE ON THE RESERVATION THAT OWN THE

2    LAND.  BUT THEY HAVE A BALANCING TEST.  IF YOU READ THE

3    UNITED STATES SUPREME COURT CASE OF MONTANA, THE NINTH

4    CIRCUIT CASE FOLLOWING, THE BALANCE IS RIGHT.  BUT IT SEEMS

5    TO ME THAT WITH WHAT I HAVE, THEY PREVAIL.

6            I APPRECIATE THERE SHOULD BE A TRIAL ON THAT ISSUE

7    AS TO WHAT EQUITY RIGHTS YOU HAVE.  I SUGGEST YOU GET A

8    LAWYER.

9            HE'S NOT YOUR LAWYER.  HE ONLY REPRESENTS THE

10   COUNTY.

11           MR. BRENT MAYFIELD:  OUR LAWYER WAS UNABLE TO BE

12   HERE TODAY, YOUR HONOR.  HE WAS IN ANOTHER COURT.    .

13           THE COURT:  OH.  WELL, BETTER SEND SOMEBODY ELSE

14   THEN.  HE HAS TO FILE SOME REAL DOCUMENTS AS TO WHAT HE

15   CLAIMS WHAT FACTORS OF YOURS I SHOULD BALANCE.  AND I DON'T

16   THINK I CAN BALANCE THE FACT THAT YOU DIDN'T KNOW.  OKAY?

17   EXACTLY WHAT PROPERTY RIGHTS YOU HAD BEFORE, WHAT IT WENT

18   TO, HOW MANY ACRES.

19           MY REMEMBRANCE OF THE FACTS ARE THAT YOU HAD A

20   LEASEHOLD TO BUY -- YOU HAD A LEASEHOLD.  YOU HAD AN OPTION

21   TO BUY TWO OF THE ACRES I THINK; ISN'T THAT RIGHT?

22           MR. BRENT MAYFIELD:  THAT WAS THE ORIGINAL, BUT IT

23   HAD BEEN MODIFIED.

24           THE COURT:  I UNDERSTAND THAT.

25           BUT HOW WAS IT AS OF THE DATE OF THE HARDWICK CASE?

1          MR. ROSS MAYFIELD:  IN '83 WE WENT TO THE SIX

2    ACRES.

3          THE COURT:  BUT I MEAN --

4          MR. ROSS MAYFIELD:  SIX POINT SOME ODD ACRES, YOUR

5    HONOR.

6          MR. RAPPORT:  I DON'T UNDERSTAND WHY THEY SUBMITTED

7    A LEASE THAT WAS ENTERED IN '82.  IT WAS THE ONLY LEASE THEY

8    SUBMITTED TO THE COURT WITH THEIR AFFIDAVITS --

9          THE COURT:  THE ONLY LEASE THAT YOU HAVE IS THE ONE

10   THAT I'VE SEEN, AND IT SEEMS TO GO WITH TWO ACRES.

11         I SUGGEST YOU FILE IT WITHIN ONE WEEK, AND I'LL

12   SUBMIT THE MATTER AND GIVE YOU AN OPINION ON IT.

13         I SUBMIT THAT THE TRIAL COULD BE ONLY ON THIS

14   ISSUE, ON THE BALANCING TEST.

15         MR. RAPPORT:  IN THAT CASE, YOUR HONOR, IT MAY BE

16   POSSIBLE TO DO IT BY SUMMARY JUDGMENT.

17         THE COURT:  PERHAPS IT MAY BE.

18         MR. RAPPORT:  YEAH.

19         THE COURT:  OKAY?

20         MR. RAPPORT:  WE ALSO HAVE A STATUS CONFERENCE I

21   THINK FOR THE 9TH -- FOR DECEMBER 15TH.

22         THE COURT:  I'LL TAKE THAT OFF.

23         MR. FLORES:  THANK YOU, YOUR HONOR.

24         THE COURT:  ALL RIGHT.  THANK YOU.  IT WILL BE OUT

25   WITHIN THE NEXT TWO OR THREE WEEKS.  OKAY?

1                      (PROCEEDINGS ADJOURNED AT 11:17 A.M.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF REPORTER

I, SARA L. LARKIN, OFFICIAL REPORTER FOR THE UNITED STATES DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA, 450 GOLDEN GATE AVENUE, SAN FRANCISCO, CALIFORNIA 94102, DO HEREBY CERTIFY THAT THE FOREGOING TRANSCRIPT, PAGES NUMBERED 1 THROUGH 26, INCLUSIVE, CONSTITUTES A TRUE, FULL AND CORRECT TRANSCRIPT OF MY SHORTHAND NOTES TAKEN AS SUCH OFFICIAL REPORTER OF THE PROCEEDINGS HEREINBEFORE ENTITLED, AND REDUCED TO TYPEWRITING TO THE BEST OF MY ABILITY.

*Sara L. Larkin*

SARA L. LARKIN, CSR, CP, CM