Michael S. Biggs, Esq. SBN: 237640
BIGGS LAW PC
Post Office Box 454
Petaluma, CA 94953-0454

(707) 763-8000 Telephone
(707) 763-8010 Facsimile

Attorney for Plaintiffs
PINOLEVILLE POMO NATION et al.

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PINOLEVILLE POMO NATION, PINOLEVILLE POMO NATION ENVIRONMENTAL ASSOCIATION AND LEONA WILLIAMS,<br><br>Plaintiffs,<br><br>v.<br><br>UKIAH AUTO DISMANTLERS, WAYNE HUNT ISABEL LEWRIGHT, WARRIOR INDUSTRIES, INC., RICHARD MAYFIELD, ROSS JUNIOR MAYFIELD, PAULA MAYFIELD, KENNETH HUNT, U.S. ALCHEMY CORPORATION AND DOES 1-50, INCLUSIVE,<br><br>Defendants. | Case No.: C 07 2648<br><br>DECLARATION OF GEORGE O. PROVENCHER IN SUPPORT OF PLANTIFFS REPLY TO HUNT OPPOSITION BRIEF<br><br>Date: 06/25/08<br>Time: 1:30 P.M.<br>Dept: Courtroom C, 15th Floor<br>Judge: Susan Illston |

_____/

My name is George O. Provencher. I have personal knowledge of the facts stated herein, unless expressly alleged on information and belief, and, if called as a witness, I could testify competently thereto.

1. Mr. Hunt's statement that he "retained the services of NEST Environmental Services, Inc., which is a firm which specializes in providing environmental services to the auto recycling industry," is an admission that he failed to hire a licensed geological engineer or civil engineer, licensed by the California State Licensing Board, as required by the Abatement Order issued by the Regional Water Quality Control Board.

2. Mr. Hunt's statement that "on June 29, 2006, the compliance with the short-Term abatement measures was truthfully reported the State Board," is false and misleading. The facts are that this correspondence, referred to in his declaration as "Exhibit 2", a letter from Fredrick Martin of NEST Environmental Services, documented the submittal of an abatement plan that actually was a revised version of an earlier submittal of a plan to bring Ukiah Auto Dismantlers into compliance, and that there was an earlier letter, dated June 16, 2006 from Fredrick Martin of NEST Environmental Services to Mr. Richard Azevedo of The Northern California Water Quality control Board (ref. Preliminary Disclosure Document #0046), wherein he acknowledged the Board's request for a revised plan. It is clear at this point that Ukiah Auto Dismantlers was neither meeting the requirements of the abatement order, nor were they in compliance.

3. Mr. Hunt's statement that, "A further truthful report as to the status of compliance was forwarded on October 14, 2006, a true and correct copy of which is attached hereto as "Exhibit 3 and incorporated herein by this reference," is also false and misleading in that the letter reports an attempt at sampling and testing for Oil and Gas and discusses a process recommended by the laboratory for testing for Total Petroleum Hydrocarbons (TPH). There is no report in this letter as to the status of UAD's compliance with the Abatement Order or any plan submitted to the Regional Water Quality Control Board mentioned in this letter. The exhibit omits the attachment, which is the "Sample Summary for UAD", dated September 11, 2006 (UAD Pre-Discovery

Document #0053). The written report only makes reference to oil and diesel and Total Petroleum Hydrocarbons, but does not mention that there were measurable quantities of Copper, Lead, and Zinc, which appear in the laboratory sample summary. In a later letter of December 6, 2006, regarding the same Sample Summary for UAD for September 11, 2006, revised November 22, 2006, from Fredrick Martin (UAD Pre-Discovery Document #0056, #0057, and #0058), the written report refers to samples 2,3,6 (shop area), and samples 4,5 (Ackerman Creek), and discusses "significant contamination" of motor oil and diesel oil in the shop area, and again omits any discussion of the fact that the revised Sample Summary of November 22, 2006 also indicated measurable levels of Lead, Copper, and Zinc.

4.  Mr. Hunt's statement that "NEST Environmental Services provided the Regional board with a number of soil tests, which in my understanding, produced lower than expected levels of contamination," is false and misleading based on the foregoing facts and the fact that on March 12, 2007, Alpha Analytical Laboratories, Inc. (UAD Pre-discovery Document #0005 and #0006) reported measurable levels of the following hazardous chemicals in micrograms per liter: Toluene, 1.0 ug/liter; Ethylbenzene, .64 ug/liter; and Xylene, 4.0 ug/liter. Further to this pattern of down-playing and understatement, NEST Environmental Services issued a report on October 11, 2007 (see attached exhibit 1.) to the North Coast Regional Water Quality control Board, attention Mr. Richard Azevedo, wherein nine (9) samples were taken. The written report discusses the lack of presence of BTEX and MTBE and mentions values of Total Petroleum Hydrocarbons (TPH). The last paragraph of the report states, "Considering that the levels of contamination in this soil are generally in line with our experience with other auto dismantlers and that the DI Wet analysis shows little or no potential for affecting the local ground water, I believe that paving this area would be entirely appropriate. We seek your approval for paving, if

you have any questions please call me." This written report omits the fact that in the SUMMARY OF TEST RESULTS ON SOIL SAMPLES TAKEN "UNDER" THE PAVED AREA, September 2007 (see Exhibit 1. Attached) nine (9) of the samples indicated significant levels of lead, while TPH levels ranged from 77 to 2400. Samples G1 through G9 for Lead in milligrams per kilogram were 99, 620, 140, 65, 130, 730, 47, 42, and 31, respectively. The California Department of Toxic Substance Control, DTSC, according to Mr. Azevedo of the Regional Water Quality Control Board, has recently considered lowering the MCL (Maximum Contamination Level to a range of 350-500 due to increasing knowledge about the health hazards of Lead. This is also noted in Richard Azevedo's hand-written notes on the report in Exhibit 1. This would hardly qualify as "little or no potential for affecting local ground water".

5.      Further to the above, the following is what Mr. Richard Azevedo stated in his testimony given in deposition on March 13, 2008, page 165, lines 20-25, and page 166, lines 1-9 with respect to Lead concentrations found in analytical results: "We probably - - I'm going to have to review the whole file, but we probably directed them to take lead samples because of the dismantling activities and the batteries on site. Lead's a known problem, and they did sample for Lead. We found varying concentrations across the site. Several samples were high enough to raise the concern whether that concentration should be left in surface soils with a potential of Lead attached to soil particulate moving into the storm water and being carried off-site on to residential property." Exhibit 1, attached, includes a table of values for the test results titled, "SUMMARY OF TEST RESULTS ON SOIL SAMPLES TAKEN "UNDER" THE PAVED AREA, September 2007" that also contains hand-written notes by Mr. Richard Azevedo of the Regional Water Quality Control Board, which included the following statements: "Elevated MO (motor oil) & Diesel may create local problem w/ground water;" Lead & MO attached to

particulate moving in SW will be primary issue; Receptor are residential next door". There were also two particular values for Lead that were circled on the table of values for Lead. They were "620" and "730" milligrams/kg. In Mr. Azevedo's testimony given in deposition on March 13, 2008, he further stated on page 182, lines 7-9, "There were several samples that were above what you would consider acceptable for residential screening".

6. In rebuttal to Mr. Hunt's statement that, "I permitted access to the facility by the Mendocino county Hazmat Inspector and showed him the two collection ponds which had been built at the Northeast corner of the auto dismantling facility," and "During that event I did show to the County of Mendocino Hazmat Inspector that there was storm water being diverted from the Pinoleville Pomo Nation Property to the immediate west of my property, onto my Property," is the following: Neither the Hazmat Inspector for Mendocino County, nor the person who designed and oversaw the construction of the collection ponds is a geological or civil engineer, licensed by the California State Licensing Board, as required by the Abatement Order issued by the Regional Water Quality Control Board. Further, there is no record in the Hazmat Inspector's report that we are aware of that states with specificity where, or if any, or in fact that, any storm water was being diverted from the Pinoleville Pomo Nation Property, or any other specific property or parcel.

7. Mr. Hunt's statement that, "In compliance with the requirement that pollutants be removed from storm water prior to discharge from the facility, NEST Environmental Services designed and I constructed two collection facilities at the Northeasterly corner of the processing facility (not the Northeastern corner of the Property)," is false and misleading. Mr. Fredrick Martin of NEST Environmental Services is not a licensed geological or civil engineer, licensed and registered by the State of California Licensing Board, and as such, his submittals to the Regional

Water Quality Control board, and his oversight of the design and construction of these containment ponds is not in compliance with the Abatement Order. Mr. Azevedo has also stated in testimony during deposition that he is not in agreement with the design or location of the settlement ponds and that UAD chose a location contrary to his recommendation. He stated in his deposition of February 26, 2008 (page 93, lines 1-9) that, "When we originally looked at the facility, they had this existing, call it tire pit, and it seemed possible that they could route runoff from the work area over to that without construction a lot of excess improvements. They've chosen to move in a different direction. They're going to route -- the current plan from UAD is to direct the runoff to the east instead of the west and then back towards the percolation pit rather than using the tire pit." Further, Mr. Azevedo believes the design to be technically unsound with respect to the lack of lining contained in the ponds and Mr. Martin's statements and theories regarding particle entrainment and whether the soil particles are sufficient to keep contaminants out of ground water. Mr. Azevedo also stated during testimony that he does not believe any of the contamination found on the UAD site is the result of groundwater flowing from the reservation onto the UAD site. In Mr. Azevedo's testimony in deposition dated March 13, 2008, page 266, lines 5-7,

Q: "Have you ever seen any oil from any properties running on to Hunt's property?"

A: "No."

8. Mr. Hunt's statement, "The ponds were capturing all of the storm water discharge from the auto dismantling facility and preventing the discharge of any storm water from the facility, even at the height of the storm. In essence, the collection ponds were operating at a higher level than that required by the CAO," is misleading because it omits the fact that hydrocarbons have been found in the collection ponds and present a hazard to groundwater. In Mr. Azevedo's testimony

given in deposition on February 26, 2008, page 103, lines 11-25, and page 104, lines 1-5, "And when you say it was in the new retention pond, UAD created a pond in the back, and the idea there was originally to try to minimize some runoff that was going on to the tribal property. So they came up with an idea that we thought was reasonable that they could put in retention ponds on-site along the levy that would capture a lot of runoff and hold runoff on-site where it would then percolate in rather than being discharged, so that basically what that means is, in that new pond, they're finding hydrocarbons in that pond. Q.: With regard to finding hydrocarbons in that pond, was that status violative of any applicable statute or regulation that you're (Mr. Azevedo) charged with? A.: Yes, it's something we would look at in terms of our basin plan and in terms of Puerto Colon (protocol) (phonetic). Imagine, if you will, a pond that is in soil above a water table and it has pollutants in it. As this material soaks into the ground, where do those pollutants go? They're going to move into the groundwater."

9.   Mr. Hunt's statement, "I have retained the McEdwards Group to work with NEST Environmental Services in amending the SWPP to the satisfaction of the Regional Board," is misleading in that we have received no records or information in discovery that McEdwards Group has ever performed work for Ukiah Auto Dismantlers or Mr. Hunt. If this is a very recent development, then the fact of the recent hiring of McEdwards Group is a further indication of Regional Water Quality Control Board's dissatisfaction with the quality of the Storm Water Pollution Prevention Plan (SWPP).

10.   In rebuttal to Mr. Hunt's statement that, "I am informed and believe that the upgradient Pinoleville Pomo Nation Property is a former industrial site having been operated as a sawmill for many years up until the early 1970s," fails to make any connection with a sawmill operation or establish any basis in fact with regard to the high concentrations of Lead, Copper, Zinc,

Declaration of George O. Provencher                      7                      PPN v. UAD C 07 2648
In Support of Plaintiffs Reply to Hunt Opposition

Mercury, Ethylbenzene, Toluene, Xylene, and TPH, as diesel and motor oil found on his property, and the heavy metals discovered flowing onto Tribal Lands, and into the Ackerman Creek. On the contrary, as Mr. Azevedo stated in his testimony, "We probably directed them to take lead samples because of the dismantling activities and the batteries on site. Lead's a known problem, and they did sample for lead."

**I DECLARE UNDER THE PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES THAT THE FOREGOING IS TRUE AND CORRECT.**

DATED: <u>JUNE 19 2008</u>

Ukiah California

/S/ George O. Provencher
George O. Provencher

# *NEST Environmental Services*

1040 Grant Road, Suite 155, PMB 325, Mountain View, California 94040-3296

October 11, 2007

North Coast Regional Water Quality Control Board
5550 Skyline Boulevard, Suite A
Santa Rosa, CA 95403

Attn.:  Mr. Richard Azevedo

Dear Mr. Azevedo:

    We have completed testing of nine samples of soil to be covered with pavement. The attached drawing shows the locations of the samples. In preparing the area for paving, the contractor moved and compacted about 30 to 35 cubic yards of soils from the low end of the grade (samples 5, 3, & 9) to the high end of the grade (samples 1 & 2). The soil comprises graded river stones varying in size from pebbles to four or five inches with sandy clay for fines. It proved to be a very hard surface for collecting soil samples.

    We were obliged to take two soil samples on those labeled G1&P through G2&P because the first sample had insufficient soil to complete all of the tests. G9 was an additional sample I took for completeness. I have also characterized the soil samples according to their approximate level with respect to the grade level, and the hardness of the soil at each location. Some sample points were quite difficult to scrape out enough soil to fill the sample jar and some were somewhat loose. The grade levels varied from about six inches above grade to 18 inches below grade. To clarify the notation, samples G1-G8 were analyzed for the metals and gasoline; samples G1P-G8P were analyzed for oil and diesel. G9 was analyzed for the complete set of potential contaminates.

    Calling your attention to the summary chart of the analysis done on each of the samples you can see that the results of the Wet DI analysis are Non-Detect for all samples except G2 which lists some zinc in the leachate. Especially, there was no evidence for the presence of BTEX & MTBE. The values of TPH for gasoline represent the heavier hydrocarbons and could be an overlap with motor oils.

    Regarding the motor oil and diesel results the higher values are on the surface, whereas the levels drop significantly as the grade level decreases. There was no visible staining or odor in the samples. Also, one notes a rather strong correlation between the diesel and motor oil suggesting that the diesel levels are overlapping the motor oil.

Considering that the levels of contamination in this soil are generally in line with our experience with other auto dismantlers and that the DI Wet analysis shows little to no potential for affecting the local ground water, I believe that paving this area would be entirely appropriate. We seek your approval for paving, if you have any questions please call me.

Sincerely yours,

*Fred Martin*

Frederick Martin, MS, REA-I 04775
Founder and Principal
Phone 707 895 2607

Encl.: Pavement Drawing
Summary Table
Cc: Wayne Hunt
Rick Mayfield
Christopher Neary, Attorney

## SUMMARY OF TEST RESULTS ON SOIL SAMPLES TAKEN "UNDER" THE PAVED AREA, September 2007

| EPA methods | all values in ppm or mg/l | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 9045B | 6010 | | 6010 | | 6010 | | 8260GRO | | 8260B | | 8260B | | 8260B | |
| | | Cu | | Pb | | Zn | | Gasoline | | BTEX/MTBE | | Motor Oil | | Diesel | |
| PQL | | 10 | 0.1 | 5 | 0.1 | 10 | 0.1 | 1 | 0.005 | 1 | 0.005 | | | | |
| | | | | | | | | | | | 15-25 | | | | |
| sample | grade condition pH | Total | DI | Total | DI | Total | DI | TPH | DI | TPH | DI | TPH | DI | TPH | DI |
| | inches | | | | | | | | | | | | | | |
| G1&P | 6 hard 7.6 | 81 | ND | 99 | ND | 160 | ND | 4.7 | ND | ND | ND | 760 | 0.17 | 140 | 0.053 |
| G2&P | 4 hard 7.4 | 74 | ND | 620 | ND | 230 | 0.2 | 1.6 | ND | ND | ND | 890 | 0.21 | 150 | ND |
| G3&P | 0 loose 7.7 | 63 | ND | 140 | ND | 190 | ND | 54 | ND | ND | ND | 2400 | 0.48 | 470 | 0.12 |
| G4&P | 0 medium 7.9 | 54 | ND | 65 | ND | 130 | ND | 3.2 | ND | ND | ND | 2400 | 0.56 | 310 | 0.11 |
| G5&P | -12 loose 7.8 | 86 | ND | 130 | ND | 250 | ND | 3 | ND | ND | ND | 840 | 0.12 | 270 | 0.085 |
| G6&P | 0 loose 8 | 740 | ND | 730 | ND | 280 | ND | 1.5 | ND | ND | ND | 2300 | 0.93 | 370 | 0.21 |
| G7&P | -8 medium 7.6 | 30 | ND | 47 | ND | 150 | ND | 82 | ND | ND | ND | 170 | ND | 23 | ND |
| G8&P | -4 very hard 8.2 | 33 | ND | 42 | ND | 43 | ND | 250 | ND | ND | ND | 330 | 0.1 | 35 | ND |
| G9P | -18 very loose 6.8 | 38 | ND | 31 | ND | 77 | ND | 1.6 | ND | ND | ND | 77 | 0.13 | 12 | ND |

Handwritten notes:

- GRADE REFERS TO DEPTH OF FILL ABOVE NATURAL GRADE or depth of cut below grade
- CALLED ON OCT 15 for MDL info. (Fred Martin) (He says more soil work may be too costly for Wayne Hunt)

- TTLC for Lead → 1000 mg/kg
- proposed new standard 350-500 mg/kg

- Copper/Zinc within limits

- Gas, BTX not an issue

- Elevated mo + Diesel may create local problem w/ groundwater lead & MO attached to particulate moving in SW will be primary issue

- Receptor on residential next door
  DJ

